EXHIBIT B



ORIGINAL



1  DAVID E. KLEINFELD (Bar No. 110734)
2  PAUL A. ROSE (Bar No. 198962)
   NAOMI SPECTOR (Bar No. 222573)
3  HELLER EHRMAN LLP
4  4350 La Jolla Village Drive, 7th Floor
   San Diego, CA 92122-1246
5  Telephone: +1.858.450.8400
6  Facsimile: +1.858.450.8499
   E-mail: David.Kleinfeld@hellerehrman.com
7
8  ALEXANDER L. BRAINERD (Bar No. 42722)
   HELLER EHRMAN LLP
9  333 Bush Street
10 San Francisco, CA 94104-2878
   Telephone: +1.415.772.6000
11 Facsimile: +1.415.772.6268
12
   Attorneys for Plaintiff
13 G. DAVID JANG, M.D.
14
15                UNITED STATES DISTRICT COURT
16               CENTRAL DISTRICT OF CALIFORNIA
17              EASTERN DIVISION - RIVERSIDE
18 G. DAVID JANG, M.D.,   ED   CV   05 - 00426   VAP /SGLx
19                              Plaintiff,
20                                        Case No.:
21        v.
                                          **COMPLAINT AND DEMAND**
22 BOSTON SCIENTIFIC CORPORATION, a        **FOR JURY TRIAL**
   Delaware corporation; SCIMED LIFE
23 SYSTEMS, INC., a Minnesota corporation,
24
25                              Defendants.
26
27        Plaintiff G. David Jang, M.D. ("Dr. Jang"), for his Complaint against
28 Defendants Scimed Life Systems, Inc. and Boston Scientific Corporation, alleges as



DOCKETED
MAY 20 2005
BY             044

follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to Title 28, United States Code, Section 1332(a), because (1) Dr. Jang is a citizen of California, (2) Scimed Life Systems is a corporation incorporated under the laws of the State of Minnesota having its principal place of business there, (3) Boston Scientific Corporation is a corporation incorporated under the laws of the State of Delaware having its principal place of business in the State of Massachusetts, and (4) the matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars.

2.     Venue lies in this judicial district pursuant to Title 28, United States Code, Section 1391, because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## THE PARTIES

3.     Dr. Jang is an individual residing in the County of San Bernardino, California. In 1965, Dr. Jang obtained his medical degree at the Korea University College of Medicine in Seoul, Korea. He was a radiology resident and clinical fellow in cardiovascular radiology at Harvard Medical School. He was also a resident in internal medicine at Loma Linda University Medical Center and a fellow of cardiology at Stanford University Medical Center. Dr. Jang is a member of the American College of Cardiology, the American Heart Association, the American Medical Association, the Society of Cardiac Angiography, and the San Bernardino County Medical Society. He was an instructor of radiology at Harvard Medical School and is now a full professor of radiology and medicine at Loma Linda University School of Medicine. He has been practicing Interventional Cardiology at the Loma Linda University Medical Center since 1979. In 1999, Dr. Jang established a California S-corporation, "INVENCA," to facilitate his research and development of medical devices. In addition, the United States Patent and Trademark Office has issued approximately 25 patents to Dr. Jang in the fields of coronary balloon

2

1  catheters and coronary stents.

2      4.    On information and belief, Defendant Boston Scientific Corporation

3  ("BSC") is a corporation organized and existing under the laws of the State of

4  Delaware and having its principal place of business in the State of Massachusetts.

5      5.    On information and belief, Defendant Scimed Life Systems, Inc.

6  ("Scimed") is a corporation organized and existing under the laws of the State of

7  Minnesota and having its principal place of business there.  Dr. Jang is further

8  informed and believes that Scimed is a wholly-owned subsidiary of BSC.

9      6.    On information and belief, defendants, and each of them, at all times

10 herein mentioned were the agents, representatives, servants, employees and alter egos

11 of each of the remaining defendants, and each of them, and as such were at all times

12 herein mentioned acting within the purpose, course and scope of said agency,

13 representation, employment, and alter ego with the consent, permission and

14 ratification of the remaining defendants.

15                     **GENERAL ALLEGATIONS**

16    **The Technology**

17     7.    When a patient suffers from a blocked coronary artery, doctors will

18 often perform a coronary balloon angioplasty.  In that procedure, doctors insert a

19 small catheter carrying a deflated balloon through an artery in the patient's groin or

20 arm.  Doctors navigate the catheter to the blocked artery in the patient's heart, briefly

21 inflate the balloon in order to dilate the blocked artery, then deflate and remove the

22 balloon, hoping that the blocked artery will remain dilated as a result of having been

23 enlarged by the temporarily inflated balloon.  Balloon angioplasty has been the most

24 prevalent non-invasive interventional treatment for a blocked coronary artery, the

25 alternative being an invasive bypass surgery.

26     8.    To reduce the likelihood that a dilated artery will become blocked again

27 (a condition known as restenosis), or if a blockage is so severe that balloon

28 angioplasty alone would not be sufficient, a coronary "stent" is commonly placed in

                                     3

1  the affected artery. A coronary stent is a flexible, mesh, metal tube that is inserted in
2  the artery in a compressed state. It is delivered to the blocked site by way of a
3  balloon catheter and is expanded in place by inflating the balloon. Once expanded,
4  the stent remains in the artery in an expanded state, even after the balloon is deflated
5  and removed, preventing restenosis in the vicinity of the stent. Further reducing the
6  chances of restenosis are drug-eluting stents—stents coated with a drug that
7  suppresses on a long-term basis the re-growth of cells that block coronary arteries.
8  On average, doctors use coronary stents in 80-90% of angioplasty procedures
9  performed today. Consequently, the coronary stent industry is a multi-billion dollar
10 per year endeavor.

11      9.      While the vast majority of coronary stents are deployed by way of
12 balloon catheters, balloon catheters are frequently used in angioplasty without stents.
13 Balloon catheters are also used to "pre-dilate" a blocked artery before the stent is
14 deployed, and to "post-dilate" the artery after the stent has been deployed.

15 **The Negotiations**

16     10.      Beginning in late 2000, Dr. Jang and defendants began negotiating for
17 the acquisition by defendants of Dr. Jang's coronary stent technology and patents.
18 Many of the negotiations took place between Dr. Jang, on his own behalf, and Larry
19 Best (then, Chief Financial Officer and Senior Vice President of BSC and Scimed,
20 and now CFO and Executive Vice President) and Doug Godshall (then, Director of
21 New Business Development for BSC focusing on cardiology, and now Vice
22 President of New Product Development), on behalf of defendants. Best and Godshall
23 represented to Dr. Jang that they had the authority to negotiate such an agreement on
24 defendants' behalf.

25     11.      During the course of the negotiations, Dr. Jang specifically asked
26 Messrs. Best and Godshall whether defendants were interested in acquiring Dr.
27 Jang's balloon catheter technology and patents. They responded that defendants did
28 not wish to acquire them. Consistent with these discussions, on March 14, 2001, Dr.

1  Jang and BSC (acting through Best) signed a term sheet documenting the terms on
2  which Dr. Jang would sell to BSC his coronary stent technology and patents (the
3  "Term Sheet"). The business agreement reflected in the Term Sheet did not include
4  Dr. Jang's balloon catheter technology or patents, and defendants did not pay any
5  monies for Dr. Jang's balloon catheter technology and patents. A true and correct
6  copy of the Term Sheet is attached hereto as Exhibit 1 and is incorporated herein by
7  this reference.

8    **The Agreements**

9    12.   On or about May 4, 2001, Dr. Jang and BSC entered into an option
10  agreement (the "Option Agreement") that gave BSC a one-year period to evaluate,
11  and determine whether it wished to acquire, Dr. Jang's coronary stent technology and
12  patents. The Option Agreement contemplated that if BSC wished to acquire Dr.
13  Jang's coronary stent technology and patents, the parties would enter into an
14  assignment agreement and a part-time employment agreement, drafts of which were
15  attached to the Option Agreement.

16    13.   On or about May 1, 2002, BSC sent Dr. Jang a notice that it had, on
17  April 29, 2002, assigned to Scimed all of BSC's rights and obligations under the
18  Option Agreement. The notice also states that Scimed was electing to exercise the
19  option to acquire Dr. Jang's coronary stent technology and patents.

20    14.   On June 3, 2002, Dr. Jang entered into an assignment agreement with
21  Scimed (the "Assignment Agreement") and a part-time employment agreement with
22  BSC (the "Employment Agreement"), copies of which are attached hereto as Exhibits
23  2 and 3, respectively, and are incorporated herein by this reference.

24    15.   The Assignment Agreement provides that Dr. Jang shall assign to
25  Scimed his coronary stent technology and patents, which he did on or about June 3,
26  2002. The coronary stent patents and designs assigned by Dr. Jang to Scimed are set
27  forth on the schedules attached to the Assignment Agreement. Consistent with the
28  parties' intent and negotiations, the schedules of assigned technology and patents do

5

1  not include any coronary balloon catheters or balloon patents. Indeed, Exhibit C to

2  the Employment Agreement specifically notes that Dr. Jang's coronary balloon

3  catheters and patents are his prior inventions and that any improvements to those

4  patents and designs developed by Dr. Jang will belong to him.

5      16.  As consideration for the assignment of Dr. Jang's coronary stent

6  technology and patents, the Assignment Agreement requires Scimed to pay Dr. Jang

7  up to $160 million (the same amount provided for in the Term Sheet), based on

8  revenues generated by products developed by defendants that incorporate Dr. Jang's

9  coronary stent technology or patents (defined in the Assignment Agreement as

10  "Contingent Payment Products"). More specifically, the Assignment Agreement

11  provides for an up-front payment of $50 million, followed by 10% royalty payments

12  on Contingent Payment Products (capped at $60 million), plus an additional payment

13  of $50 million if worldwide sales of Contingent Payment Products reach or exceed

14  $2.5 billion within five years of the first commercial sale of such products in the

15  United States. The Assignment Agreement refers to payments based on sales of

16  Contingent Payment Products as the "Earn Out." Finally, the Assignment Agreement

17  provides for a $10 million payment (to be credited against the $60 million cap on

18  Earn Out payments) to be paid to Dr. Jang if defendants fail to obtain a European CE

19  Mark on a Contingent Payment Product within two years of entering into the

20  Assignment Agreement.

21      17.  Defendants' "Express," "TAXUS Express" (BSC's drug-coated version

22  of Express), "Liberté," and the drug-coated version of Liberté coronary stent products

23  constitute Contingent Payment Products. According to BSC's annual reports,

24  worldwide sales of Express and Liberté coronary stent products (including the drug-

25  coated versions) by defendants have exceeded $2.5 billion since the first commercial

26  sale in the U.S. Thus, sales of Contingent Payment Products by defendants have

27  generated sufficient revenue to trigger Scimed's 10% royalty obligation (easily

28  reaching the $60 million cap) and triggering the $50 million payment for achieving

worldwide sales of $2.5 billion. Nevertheless, to date, Scimed has made only the $50 million initial payment due under the Assignment Agreement, plus a $10 million payment on June 2, 2004. Scimed has not explained why it made the $10 million payment, but, presumably, Scimed contends it failed to obtain a European CE Mark on a Contingent Payment Product within two years of entering into the Assignment Agreement (even though it obtained such a mark for the Liberté stent within that timeframe). Because the Liberté stent is a Contingent Payment Product and because Scimed timely obtained a European CE Mark for it, Dr. Jang has credited the $10 million payment against Scimed's Earn Out obligation under the Assignment Agreement.

18.     Additionally, contrary to the parties' intent—as expressed in the Term Sheet, the negotiations, and the agreements—defendants are wrongfully asserting an ownership interest in Dr. Jang's coronary balloon catheter technology and patents.

## FIRST CLAIM FOR RELIEF

### (Breach of the Assignment Agreement Against Scimed)

19.     Dr. Jang specifically realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 18 hereof.

20.     The Assignment Agreement is a written agreement between Dr. Jang and Scimed.

21.     Dr. Jang has performed all covenants, conditions, and promises to be performed on his part under the Assignment Agreement, save for any obligations excused by Scimed's breach of the agreement.

22.     Scimed has breached the Assignment Agreement by failing to pay Dr. Jang the Earn Out, even though the Express and Liberté coronary stent products (including the drug-coated versions) constitute Contingent Payment Products and have generated sufficient revenue to trigger Scimed's Earn Out payment obligation.

23.     As a direct and proximate result of Scimed's breach of the Assignment Agreement, Dr. Jang has been damaged in an amount to be determined at trial.

7

## SECOND CLAIM FOR RELIEF

### (Intentional Misrepresentation Against All Defendants)

24.    Dr. Jang specifically realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 23 hereof.

25.    BSC and Scimed, through their authorized agents Best and Godshall, affirmatively represented to Dr. Jang that they did not wish to acquire Dr. Jang's coronary balloon catheter technology or patents.

26.    On information and belief, at the time the statement was made, defendants knew it to be false, inasmuch as they intended later to claim an ownership interest in Dr. Jang's balloon catheter technology, patents, and improvements thereon without paying for it. Dr. Jang is further informed and believes that defendants intended for him, in deciding whether to assign his coronary stent technology and patents, to rely on their representation that they did not wish to acquire his coronary balloon technology or patents.

27.    Defendants' misrepresentation was material to Dr. Jang's decision of whether or not to assign his coronary stent technology and patents and Dr. Jang relied on the misrepresentation, in that he would not have entered into the Assignment Agreement but for the misrepresentation.

28.    As a direct and proximate result of defendants' misrepresentation, Dr. Jang has been damaged by being fraudulently induced into entering into a contract he would not have entered into but for the misrepresentation and by casting a cloud upon his outright ownership of his balloon catheter technology and patents, thereby hindering his ability to exploit the same.

29.    In doing the acts hereinabove alleged, defendants acted with oppression, fraud and/or malice, entitling Dr. Jang to recover punitive damages in an amount appropriate to punish defendants and to deter them from engaging in similar misconduct in the future.

8

## THIRD CLAIM FOR RELIEF

### (Rescission of the Assignment Agreement Against All Defendants)

30.    Dr. Jang specifically realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 29 hereof.

31.    Dr. Jang seeks to rescind the Assignment Agreement on the basis of a material failure of consideration inasmuch as Scimed has failed to pay to Dr. Jang approximately $100 million that is now due and owing under the Assignment Agreement.

32.    Dr. Jang further seeks to rescind the Assignment Agreement on the ground of mistake with respect to whether his balloon catheter technology and patents (and improvements thereon) are covered by the Assignment Agreement. Dr. Jang believes, through no fault or neglect of his own, that the Assignment Agreement relates only to coronary stents and not to coronary balloon catheters. This mistake is material to the Assignment Agreement, as Dr. Jang would not have entered into the Assignment Agreement as it is currently drafted had he believed that it governed balloon catheters and patents. Defendants, through their agents Best and Godshall, knew of or caused the mistake because they represented to Dr. Jang that defendants did not wish to acquire Dr. Jang's balloon catheter technology and patents and did not pay for it. Even if defendants were not aware of, or had not caused, the mistake, it would be unconscionable under the circumstances to enforce the Assignment Agreement as defendants contend it should be read.

33.    Additionally, Dr. Jang seeks to rescind the Assignment Agreement on the basis that his consent thereto was obtained by fraud on the part of defendants, as further alleged herein above.

34.    By way of service of this Complaint, Dr. Jang hereby provides notice of rescission and offers to restore to defendants all consideration provided by them to Dr. Jang pursuant to the Assignment Agreement. Dr. Jang seeks restitution of all

9

benefits conferred upon defendants as a result of the Assignment Agreement.

### FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment Against Scimed)

35.    Dr. Jang specifically realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 34 hereof.

36.    Dr. Jang contends that his coronary balloon catheter technology and patents and improvements thereon are not covered by the Assignment Agreement, while Scimed contends the contrary. Therefore, an actual controversy has arisen and now exists with respect to whether the Assignment Agreement requires Dr. Jang to assign to Scimed technology, patents, and improvements relating to coronary balloon catheters.

### PRAYER

WHEREFORE, Dr. Jang prays for the following relief:

1.    For damages for breach of contract in an amount to be determined at trial;

2.    For damages for fraud in an amount to be determined at trial;

3.    For punitive damages in an amount to punish and deter defendants;

4.    For an order rescinding the Assignment Agreement and compelling defendants to make restitution to Dr. Jang of all benefits conferred upon them as a result of the AssignmentAgreement;

5.    For a judicial declaration that coronary balloon catheters, patents, and improvements thereon are not covered by the Assignment Agreement; and

6.    Any other and further relief as the Court deems appropriate.

1
2

## DEMAND FOR JURY TRIAL

3

Dr. Jang demands a trial by jury of all issues so triable in this action.

4

5    May 19, 2005                          HELLER EHRMAN LLP

6
                                          By
7                                             DAVID E. KLEINFELD
8                                             ALEXANDER L. BRAINERD
                                              PAUL A. ROSE
9                                             NAOMI SPECTOR
10                                            Attorneys for Plaintiff G. DAVID JANG, M.D.

11

12

13

14

15

16

17    SD 724217 v7
      (39204.0001)

18

19

20

21

22

23

24

25

26

27

28

11

## Term Sheet for the Acquisition of all Intellectual Property related to Stents from Dr. G. David Jang by Boston Scientific Corporation (BSC)

| Issue | Proposal |
|---|---|
| **Scope:** | • Payment for the acquisition of stent-related Intellectual Property from G. David Jang, M.D. (Dr. Jang), in the form of an up front payment and earn outs.<br>• Technical development relationship as a part time employee in the area of vascular stents between Dr. Jang and BSC reporting to Lawrence C. Best.<br>• Non-exclusive license-back to Dr. Jang for use of certain identified intellectual property in the field of pacemaker leads. |
| **Payments:** | • BSC shall pay Dr. Jang $50 million upon signing of a definitive agreement assigning to BSC all issued, pending and disclosed intellectual property in the area of vascular stents existing as of the date hereof or conceived through four years from the date of the definitive agreement.<br>• BSC shall pay Dr. Jang an "Earn Out" (the "Initial Earn-Out") of 10% of Net Sales of stent systems incorporating any designs ("PSJ" stent systems) that are developed using the acquired intellectual property (i.e., infringe the valid claims of issued or pending patent applications in the country of sale or manufacture). Net Sales will be consistent with those reported in BSC's financial statements in accordance with GAAP. This obligation shall extend for the life of the patents that have issued or been filed as of the date of the signing of the agreement.<br>• BSC shall pay Dr. Jang $10 million if no "PSJ" stent system has received a CE mark as of July 31, 2004 (the "noncommercialization fee").<br>• BSC shall pay Dr. Jang $50 million (the "Second Earn-out") if worldwide net sales of "PSJ" stent systems achieve $2.5 Billion in the 5 years following the first commercial sale in the United States of the first "PSJ" stent system (the "Performance Period"). |
| **Intellectual Property** | • All intellectual property, issued, pending and disclosed, shall be assigned to BSC upon signing of a definitive agreement.<br>• Dr. Jang shall collaborate with BSC to respond to office actions and complete all related applications and continuations currently in process or initiated following acquisition. |

Confidential
Jang Term sheet clean 3-13-01_

Page 1

03/14/01

PAGE 1
EX. 1

**License for Pacemaker Leads**

- BSC shall grant Dr. Jang a non-exclusive license to certain identified intellectual property within the acquired portfolio for use in the field of Pacemaker Leads.

**BSC Pacemaker Lead Participation**

- BSC shall have an Option to acquire the pacemaker lead technology from Dr. Jang. The option shall expire at the conclusion of the Performance Period
- If BSC does not execute its option, a 5% royalty of net sales of Pacemaker leads using the licensed intellectual property shall be due BSC for the life of the licensed patents.

| Issue | Proposal |
|---|---|
| Definitive Agreement Timing | • BSC and Dr. Jang shall make reasonable efforts to complete and execute a definitive agreement by April 30, 2001.<br>• If a definitive agreement is not executed by April 30, and the delay is as a result of a lack of effort on BSC's part, then Dr. Jang shall have an option to solicit other partners. Until such time, Dr. Jang agrees to discuss the assignment or license of all or part of the Intellectual Property only with BSC. |
| Cap | • The Initial Earn Out shall be capped when total earn out payments have reached $60M.<br>• If earn out payments are made following payment of the noncommercialization fee, this payment will count towards the cap. |
| Employment | • BSC shall pay Dr. Jang, $100,000 per year for a period of at least 4 years as a part-time employee working on all technical and clinical areas of vascular stents and stent design. Dr. Jang shall be subject to standard obligations of confidentiality and noncompetition in the area of vascular stents, including design and delivery.<br>• BSC shall recommend to the Compensation Committee of the Board the grant to Dr. Jang of a stock option to purchase 100,000 shares of BSC common stock to vest over a four (4) year period at 25% per year on substantially the same terms as those generally provided to other BSC employees. |
| Earnest Money | • Upon signing of this Term Sheet by both parties, BSC shall pay Dr. Jang $1M in earnest money.<br>• The earnest money shall be credited against the $50M initial payment.<br>• If no definitive agreement is signed, Dr. Jang shall return $750,000 to BSC and retain the balance in consideration of the exclusive discussion period set forth under Definitive Agreement Timing above. |
| Due Diligence | • BSC shall be provided with ample opportunity to review all pending patent applications, disclosures and notebooks prior to the acquisition. |
| Confidentiality | • This Term Sheet shall be considered confidential information between the two parties. Neither party may disclose the terms or existence of this Term Sheet without the prior written consent of the other party. We believe that extreme confidentiality is beneficial to both parties. |

Confidential
Jang Term sheet clean 3-13-01

Page 3

03/14/01

PAGE 3.

**Non-Binding Nature of this Term Sheet**

• This Term Sheet is non-binding with the exception of the sections headed Definitive Agreement Timing and Confidentiality, and is intended only to outline the general business terms of this proposed arrangement.

Boston Scientific Corporation

By: _____

Name: L. Best

Title: CEO

Date: 3/14/01

Dr. David Jang, M.D.

By: _____

Name: G. DAVID JANG

Title: _____

Date: 3/14/01

## ASSIGNMENT AGREEMENT

This Assignment Agreement (*Agreement*) is entered into as of June 3, 2002 (*Effective Date*) between G. David Jang, M.D., an individual residing at 30725 Eastbern Lane, Redlands, California (*Jang*) and Scimed Life Systems, Inc., a Minnesota corporation (*Scimed*).

### Background:

Jang has designed and developed certain stent technology. Scimed desires to acquire such technology. Scimed and Jang desire to have Scimed's sole shareholder, Boston Scientific Corporation (*BSC*), enter into a part time employment arrangement with Jang to facilitate the development and commercialization of the stent technology. Scimed also desires an option to obtain exclusive rights to pacemaker delivery technology of Jang. The parties contemplate entering into an Employment Agreement in substantially the form of **Exhibit 4.2(g)** to this Agreement (the *Employment Agreement*).

This Agreement sets forth the terms under which Jang assigns to Scimed such technology in exchange for payment at assignment of certain amounts and the obligation to make certain earn out payments as well as certain compensation obligations as specified in the Employment Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises and agreements hereinafter set forth, the parties hereto agree as follows:

### Agreement

1. **DEFINITIONS.**
1.1 **Defined Terms.** Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*Affiliate* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this Agreement, "*control*" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*Confidential Information* means all technical and commercial information and data which either party (the *Disclosing Party*) has or may disclose to the other party (the *Receiving Party*) pursuant to this Agreement useful in, the development or commercialization of Technology (as defined below) or Improvements (as defined below), excluding any portion thereof which: (a) is known to the Receiving Party before receipt thereof under this Agreement; (b) is disclosed to the Receiving Party by a third person who is under no obligation of confidentiality to the Disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of the Receiving Party; (d) is independently developed by the Receiving Party, as evidenced by the Receiving Party's written records, without use of such information; or (e) is approved for release by written

BUSDOCS:994381.7

Page 5
Ex. 2

authorization of the original Disclosing Party.

*Contingent Payment Products* means any stent, including any stent pre-mounted on a delivery system or any stent with coatings, coverings or other features, manufactured by or for Scimed or any of its Affiliates the development, manufacture, use, or sale of which is covered by one or more Valid Claims of the Patents in the jurisdiction in which such stent is manufactured or sold or which, but for the assignment made pursuant to this Agreement, would infringe one or more Valid Claims of the Patents. For the avoidance of doubt, for stents pre-mounted on delivery systems or stents with coatings, coverings or other features, the price of the stent together with such features constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. For example, in the case of a stent pre-mounted on a delivery system, the price of the stent and the delivery system together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. Similarly, in the case of a stent with a coating, the price of the stent and coating together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. Conversely, if a stent pre-mounted on a delivery system is sold together with a distal protection device, only the price of the stent and the delivery system is included in calculating Net Sales and not the price of the distal protection device.

*Contractual Obligation* means, with respect to any Person(s), any contract, agreement, purchase order, deed, mortgage, lease, license, indenture, other instrument, policy, commitment, undertaking, arrangement or understanding, written or oral, or other document, to which or by which any such Person is a party or otherwise subject or bound or to which or by which any property or right of any such Person is subject or bound.

*Design(s)* means any information used or useful in the design, development, delivery, manufacture or testing of stents for any medical application(s) (including Pacemaker Lead Technology but excluding Pacemaker Delivery Technology (subject to the limitations described in the definition therefor)) as well as any coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of such stents, including but not limited to those stent designs identified in Schedule I.

*First Commercial Sale* means the first sale of any Contingent Payment Product to a third party in the United States after such Contingent Payment Product has been granted all regulatory approvals required for importation, promotion, pricing, marketing and sale of such Contingent Payment Product in the United States.

*Legal Requirement* means any federal, state, local or foreign law, statute, standard, ordinance, code, order, rule, regulation, resolution, promulgation, or any order, judgment or decree of any court, arbitrator, tribunal or governmental authority, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force and effect of law as in effect on or prior to the Effective Date.

*Lien* means (a) any encumbrance, mortgage, pledge, lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon any property or assets of any character, or upon the income or profits therefrom; or (b) any arrangement or

2

PAGE 6
EV. 2

agreement which prohibits the creation of such encumbrances, mortgages, pledges, liens, liabilities, charges or other security interests of any kind or which restricts transfer of capital stock (other than restrictions on transfer imposed by applicable securities laws) or other property or assets, except any assets or property held under a Contractual Obligation.

*Net Sales* means the net sales of Contingent Payment Products in amounts reported on BSC's consolidated financial statements in accordance with United States generally accepted accounting principles (as specified by the American Institute of Certified Public Accountants), consistently applied, and generally defined as the aggregate invoiced gross revenue received by Scimed or any of its Affiliates from the sale of Contingent Payment Products to a non-affiliated third party <u>less</u> only the following *Deductions*: (i) amounts repaid or credited by reason of defects, returns, rejections, rebates, wholesale chargebacks, retroactive price reductions or allowances, (ii) sales, excise, value added, purchase, turnover, use, and other like taxes, and customs duties, paid, (iii) fees or commissions paid to "buyer-side" intermediaries, brokers or agents, (iv) shipping charges (including freight and insurance), and (v) cash, trade and quantity discounts actually allowed (and taken) to the extent customary in the trade.

With respect to products that are sold as part of a package that includes Contingent Payment Product(s) and products that are not Contingent Payment Products, Net Sales shall equal the product of (X) the gross sales of such combined products billed to customers by Scimed, its Affiliates or sublicensees, <u>less</u> Deductions, calculated in accordance with the procedure specified above, <u>multiplied</u> by (Y) a fraction the numerator of which shall be the per unit average selling price of the Contingent Payment Product sold separately, and the denominator of which shall be the per unit average selling price of package product sold in such combined form. If there is no established average selling price of the Contingent Payment Product sold separately, then Scimed's (or its Affilates') standard cost of manufacturing of the single active Contingent Payment Product and of the package product sold in such combined form, shall be used to determine (Y).

Net Sales are calculated on sales to independent third parties and shall not include revenue received by Scimed (or any of its Affiliates) from transactions with an Affiliate; <u>provided</u>, that Net Sales will be calculated on the sales by Affiliates to a non-Affiliate third party.

*Pacemaker Lead Field* means the use of stents that are a pre-attached component of pacemaker leads or the leads of similar devices and which are promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Pacemaker Delivery Technology* means systems that allow a physician to place and anchor a conductive electrode to the heart muscle, which electrode is attached to an insulated wire lead that carries a small electric impulse generated by a pacemaker to the electrode, including without limitation devices having one or more of the following components: (1) a coronary sinus selecting catheter; (2) a guiding receptacle; or (3) a pacemaker lead delivery system. The

3

PAGE 7
EX. 2

pacemaker lead delivery system in turn may include components such as: (a) a delivery (balloon) catheter; (b) a pacemaker lead wire; or (c) a detachable connecting junction. Pacemaker Delivery Technology may be used in conjunction with Pacemaker Lead Technology. Pacemaker Delivery Technology includes without limitation that certain patent application entitled "Method of Using a Stent-like Lead System in Pacemaker Devices" to be filed by Jang to the extent containing claims covering the use of stents generally as leads in pacemaker devices and not covering any particular stent design. Pacemaker Delivery Technology does not include Pacemaker Lead Technology.

*Pacemaker Lead Technology* means an implantable stent-like electrode; provided any such stent-like electrode is promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Person* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization.

*Technology* means individually and collectively the intellectual property rights embodied or disclosed in (a) all inventions, patents, patent applications and rights to file patent applications owned or controlled, directly or indirectly, by Jang relating to any Designs, including but not limited to (i) the invention disclosures, patent application(s) and patents listed in Schedule 2.1(a); (ii) any patent application filed in respect of an invention disclosure described in clause (a)(i); (iii) any patent application filed as a continuation, division, or continuation-in-part of the application(s) described in clauses (a)(i)-(ii), patents issuing therefrom and reissues, reexaminations and extensions of such patents; and (iv) any foreign counterpart to the application(s) described in clauses (a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent application), patents issuing therefrom and extensions thereof; and (b) all other disclosures, discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws) that are conceived, discovered, developed, created or reduced to practice or tangible medium of expression by Jang or any of his agents, consultants or employees at any time prior to the Effective Date or at any time in the course of Jang's employment, as further described in Section 3.2, or at any time during the Inclusion Period specified in Section 7.1 (regardless of whether or not within the course of Jang's employment). Technology includes Pacemaker Lead Technology but excludes Pacemaker Delivery Technology.

*Valid Claim* means (a) a claim of any issued patent which is contained within the Patents (defined below) and which has not expired, lapsed, or been held invalid, unpatentable or unenforceable by a final decision, which is unappealed or unappealable, of a court of competent jurisdiction or of an administrative agency having authority over patents; (b) a claim in any patent application which is contained within the Patents which patent application is less than

4

three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired; (c) a claim of any issued patent owned or controlled by Scimed that claims an invention included in Improvements (defined below); or (d) a claim in any patent application owned or controlled by Scimed that claims an invention included in Improvements and which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired.

**1.2 Other Defined Terms.** Each of the following terms have the meanings ascribed to it in the section set forth opposite such term:

| | |
|---|---|
| *Agreement* | Recitals |
| *Closing* | Section 4.1 |
| *Effective Date* | Recitals |
| *Employment Agreement* | Recitals |
| *Improvements* | Section 7.1 |
| *Inclusion Period* | Section 7.1 |
| *Indemnified Party* | Section 9.3 |
| *Indemnifying Party* | Section 9.3 |
| *Intellectual Property Rights* | Section 5.6 |
| *Jang* | Recitals |
| *Jang Assets* | Section 2.1 |
| *License Agreement* | Recitals |
| *Licensed Rights* | Section 2.2 |
| *Loss(es)* | Section 9.2 |
| *Omitted Item* | Section 7.4 |
| *Option Period* | Section 2.3 |
| *Patents* | Section 2.1 |
| *Performance Period* | Section 3.1 |
| *Prosecution* | Section 7.2 |
| *Purchase Price* | Section 3.1 |
| *Schneider Agreement* | Section 2.1(c) |
| *Scimed* | Recitals |
| *Technical Information* | Section 2.1(b) |

## 2. ASSIGNMENT.

**2.1 Assignment of Technology.** Upon the terms and subject to the conditions set forth in this Agreement, Jang shall sell, assign, transfer, convey and deliver to Scimed, and Scimed shall purchase from Jang, all and every right, title and interest of Jang in and to the following (collectively, the *Jang Assets*):

(a) All of Jang's worldwide rights and interests existing on the Effective Date in and to all Designs and all Technology, and all registrations, applications for registration and licenses for

5

*PAGE 9*

the Designs or the Technology, together with all ancillary rights thereto, including the right to sue for damages by reason of past infringement of any such rights, including: (i) the patent(s), patent application(s) and invention disclosure(s) listed in Schedule 2.1(a); (ii) any patent application(s) filed as a continuation, division, or continuation-in-part of the patent application(s) described in clause 2.1(a)(i), patents issuing therefrom and reissues, reexaminations and extensions of such patents; (iii) any patent application(s) filed in respect of the inventions that are the subject of the invention disclosures listed in Schedule 2.1(a); and (iv) any foreign counterpart to the patent(s) and patent application(s) described in clauses 2.1(a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent applications), patents issuing therefrom and extensions thereof (collectively, the *Patents*). For the avoidance of doubt, Jang has no obligation to assign to Scimed hereunder any Pacemaker Delivery Technology except as described in Section 2.3.

(b)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all information relating to the Designs or the Technology or otherwise required or useful for or incident to the performance of Jang's activities related to the Designs or the Technology, together with all ancillary rights thereto (collectively, the *Technical Information*), including all notebooks and other media listed in Schedule 2.1(b) embodying (i) the Technology or the Designs; (ii) all prior versions of the Technology or the Designs; and (iii) all other data, information and know-how, that has been developed by or for Jang and is necessary or useful to design, manufacture, use or test the Design(s) and develop enhanced or new Designs.

(c)  All of Jang's claims and rights under Section 3 of the certain Assignment and License Contract dated May 8, 1998 between Jang and Schneider (Europe) GmbH (the *Schneider Agreement*).

2.2  **Future License or Supply Arrangement.** In the event the parties do not enter into an exclusive license agreement within the 60-day period following Scimed's notice as described in Section 2.3(b), then upon Jang's request, Scimed shall either, as determined in Scimed's sole and absolute discretion, (i) enter into a license agreement in substantially the form attached as **Exhibit 4.2(f)** to this Agreement (the *License Agreement*) pursuant to which Scimed will grant to Jang a non-exclusive right and license to (a) use the Jang Assets (including Improvements) solely for purposes of developing products in the Pacemaker Lead Field; and (b) make, have made, use, import, export and sell products in the Pacemaker Lead Field that embody or use the Jang Assets (including Improvements) (collectively, the *Licensed Rights*) or (ii) enter into a supply agreement on commercially reasonable terms acceptable to Scimed in its sole discretion (the *Supply Agreement*) pursuant to which Scimed (or any of its affiliates as appropriate) shall sell to Jang stent products that incorporate the Technology to be used by Jang solely for the purpose of developing products in the Pacemaker Lead Field. Notwithstanding anything to the contrary herein, in the event that the parties are not able to agree on the terms of the Supply Agreement within thirty (30) days after Scimed's election to pursue a supply arrangement, Scimed and Jang shall enter into the License Agreement on the terms set forth therein. The parties acknowledge and agree that Scimed nor any of affiliate of Scimed is obligated, nor will it or any affiliate become obligated, (x) to supply any products to Jang in the absence of a fully

6

executed and delivered Supply Agreement or (y) to license to Jang any technology, intellectual property or product other than the Licensed Rights pursuant to a fully executed and delivered License Agreement.

2.3 Scimed Option. (a) During the period from the Effective Date until 11:59 PM California time on the fourth anniversary of the First Commercial Sale of any Contingent Payment Product (the *Option Period*), Scimed shall have an option to acquire from Jang an exclusive license to practice the Pacemaker Delivery Technology owned or controlled (whether directly or indirectly and whether by ownership, license or otherwise) by Jang within the Pacemaker Lead Field. Accordingly, during the Option Period, Jang shall not enter into any agreement with a third party relating to commercialization (including research, development, marketing or distribution) of products that embody or use all or any portion of the Pacemaker Delivery Technology or the Pacemaker Lead Technology (including the Improvements) for any applications, unless Jang shall first offer such opportunity to Scimed and provide Scimed and its Affiliates an opportunity to obtain an exclusive license for development and commercialization within such field. For purposes of offering Scimed and its Affiliates any such opportunity, Jang shall provide Scimed with notice, including sufficient technical detail to permit Scimed to evaluate its interest in the opportunity and shall meet with Scimed within thirty (30) days following such notice to discuss the technical features of the opportunity. Scimed shall treat all information relating to the Pacemaker Lead Field disclosed by Jang in connection with this Section 2.3 as Confidential Information of Jang.

(b) Scimed shall notify Jang within sixty (60) days following receipt of Jang's notice of Scimed's (or its Affiliates') interest (or lack of interest) in pursuing such opportunity. If Scimed indicates that it or one of its Affiliates wishes to pursue such opportunity, then the parties shall within sixty (60) days following Scimed's notice engage in good faith negotiation of terms for a license and/or development agreement. If the parties cannot negotiate mutually acceptable terms for an agreement within such 60-day period, and the parties are not willing to extend the period for negotiation, then Scimed's option shall expire with respect to such opportunity and Jang may negotiate with a third party concerning such research and development opportunity; provided, however, that (i) Jang shall not provide any such third party with information or materials concerning such opportunity that are superior to the information and materials provided to Scimed; and (ii) any such agreement shall contain terms that are in the aggregate no more favorable to such third party than those offered to Scimed. If Jang wishes to offer such opportunity to a third party on terms that are in the aggregate more favorable than those offered to Scimed and/or any of its Affiliates, Jang shall first make an offer on such "improved" terms to Scimed in accordance with the procedure specified in this Section 2.3.

(c) Notwithstanding the provisions of Section 2.3(a), it is understood and agreed that Jang may contract with independent consultants to perform services with respect to Jang's efforts to develop products in the Pacemaker Lead Field; provided that Jang shall adopt and utilize written agreements with all such independent contractors and any employees Jang, directly or indirectly, retains to perform such services that include nondisclosure and invention assignment provisions that enable Jang to obtain and perfect proprietary rights in all work product undertaken on Jang's behalf in a manner consistent with the provisions of this Section 2.3. Jang shall not contract with

7

any consultants directly or indirectly affiliated with any Person that sells products that are competitive with the Designs or the Technology (or has publicly announced its intention to do so) prior to securing such written agreements with those consultants.

(d) Jang shall not, until after the expiration of the Option Period, directly or indirectly, sell, transfer, lease or license the Pacemaker Delivery Technology or encumber, mortgage, pledge, or place any other lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon the Pacemaker Delivery Technology, unless Jang shall have first complied with Sections 2.3(a) and (b).

3. **CONSIDERATION.** In consideration of the sale and transfer by Jang of the Jang Assets to Scimed and of the agreement by Jang to perform each of its other obligations hereunder, Scimed will pay to Jang, in the form of an up front payment and contingent "earn out" payments an amount determined as set forth in Section 3.1(a)-(e):

**3.1 Purchase Price.** The aggregate purchase price for the Assets (the *Purchase Price*) shall be not less than $50,000,000 nor more than $160,000,000, payable as follows:

(a) BSC has previously paid Jang $1,000,000 pursuant to the certain Term Sheet entered into as of March 14, 2001 by and between the BSC and Jang, and $10,000,000 pursuant to the certain Option Agreement entered into as of May 4, 2001 by and between BSC and Jang.

(b) At the Closing, Scimed shall pay to Jang by certified bank or cashier's check or wire transfer of immediately available funds, the sum of $39,651,574.00 as consideration for the assignment to Scimed of all Intellectual Property Rights existing as of the Effective Date as well as Jang's covenant to assign to Scimed all intellectual property in Improvements conceived during the Inclusion Period.

(c) During the period commencing on the Effective Date and ending on the expiration date of the last-to-expire of the Patents that have issued or are the subject of a filed patent application as of the Effective Date, Scimed shall pay to Jang on a quarterly basis in accordance with Section 3.5, as additional consideration for the purchase of the Assets, an additional purchase price amount equal to ten percent (10%) of Net Sales in respect of Contingent Payment Products. Notwithstanding any provision of this Agreement to the contrary, the maximum aggregate contingent payment due Jang under this Section 3.1(c) shall not exceed $60,000,000 (the amounts payable under this Section 3.1(c) are the *Earn Out*).

(d) In addition to the contingent payment due Jang pursuant to Section 3.1(c), Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $50,000,000 if the aggregate Net Sales of Contingent Payment Products on a worldwide basis during the period commencing on the date of the First Commercial Sale of Contingent Payment products in the United States and ending at 11:59 PM on the fifth anniversary of the date of the First Commercial Sale of Contingent Payment Products in the United States (the *Performance Period*) equals or exceeds $2,500,000,000.

8

PAGE 12
EX. 2

(e) Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $10,000,000 if Scimed has not received a CE mark for any Contingent Payment Product by 11:59 PM Boston time on July 31, 2004. Any payment pursuant to this Section 3.1(e) shall be credited against the Earn Out payments due under Section 3.1(c) for purposes of applying the cap on such payments.

3.2  **Employment Agreement.** BSC and Jang shall enter into the Employment Agreement as of the Effective Date, pursuant to which BSC shall pay Jang, $100,000 per year for a period of three (3) years as a part-time employee working on all technical and clinical areas of vascular stents and stent design.

3.3  **Stock Option Grant.** Pursuant to the Employment Agreement, BSC shall grant to Jang a stock option to purchase 100,000 shares of BSC Common Stock in accordance with the terms of the Stock Option Agreement attached as an exhibit to the Employment Agreement.

3.4  **Remittance; Foreign Exchange.** (a) Scimed shall make payments required under Section 3.1(b)-(e) by wire transfer of immediately available funds delivered to the U.S. bank account identified by Jang in accordance with Section 11.6. All payments shall be stated and paid in U.S. Dollars. For purposes of payments due under Section 3.1(c)-(d), Net Sales revenue received in currencies other than U.S. Dollars shall be converted into U.S. Dollars, in accordance with BSC's ordinary business practices, when calculating the amount of Net Sales.

(b)  With respect to Net Sales of Contingent Payment Products that are covered by a patent application but not an issued patent, Scimed's payment obligations under Sections 3.1(c)-(d) shall be subject to adjustment in the following manner to account for Net Sales made during the period prior to the issuance of a patent or the rejection of a patent application that contains the claims upon which the Valid Claims determination is made at the time such Net Sales are recorded: (i) if Scimed ceases payment under Section 3.1(c) in respect of a Contingent Payment Product based upon the expiration of the 3-year period specified in the Valid Claims definition and a patent subsequently issues that includes such claim, then Scimed shall (1) commence making contingent payments in respect of such Contingent Payment Products and (2) pay Jang in respect of sales of such Contingent Payment Product during the period between the expiration of the 3-year period and the date a patent issues that includes such claim; and (ii) if a Contingent Payment Product with Valid Claims based solely upon a patent application that is subsequently the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired or which patent application does not issue as a patent that includes such claim, then Scimed shall be entitled to a credit as of the date of such determination equal to the amounts (if any) paid by Scimed in respect of Net Sales of such Contingent Payment Products during the period prior to the date of such determination. If a claim that is substantially similar to a Valid Claim described in Section 3.4(b)(ii) above issues subsequent to Scimed's application of any credit against payments made to Jang as described in Section 3.4(b)(ii) above, then Scimed shall promptly pay Jang all such amounts previously credited against contingent payments otherwise due Jang pursuant to Section 3.4(b)(ii). Any credits applied in favor of Scimed under Section 3.4(b)(ii) will be made with any corresponding reduction in the calculation

9

of aggregate Net Sales of Contingent Payment Products for the purposes of Section 3.1(d) unless and until such credit is subsequently reversed pursuant to the immediately preceding sentence of this Section 3.4(b); provided that if Net Sales of Contingent Payment Products on a worldwide basis equals or exceeds $2,500,000,000 as of 11:59 PM California time on the final day of the Performance Period, Scimed shall pay to Jang the amount set forth in Section 3.1(d), regardless of whether Net Sales are subsequently reduced by any such credits.

**3.5 Reports.** Scimed shall keep and maintain, during the term of this Agreement and, for a period of at least three (3) years following each calendar year in which the payment obligation accrued, records sufficient to determine the Net Sales and payments due under Section 3.1(c)-(d). Within sixty (60) days following each March 31, June 30, September 30 and December 31 in which payments are due under Section 3.1(c)-(d), Scimed shall provide Jang with a report including at least: (a) the Net Sales (in U.S. Dollars) of Contingent Payment Products that Scimed (including its Affiliates) sold during the preceding quarter; (b) identification of Contingent Payment Products consisting of systems that incorporate stents and Contingent Payment Products consisting of stand-alone stent products; (c) the calculation of contingent payments thereon; and (e) the total contingent payments so computed and due Jang. Such reports shall be submitted if sales of Contingent Payment Products have been made during a period. Upon delivery of the report due for the period ending December 31 of each year, Scimed shall also report to Jang the contingent payments due Jang for the entire preceding year.

**3.6 Audits.** Jang shall have the right, not more than once in any twelve (12) month period, to have Scimed's relevant books and records for the calendar year in which the audited payment obligations accrued and for up to three (3) calendar years following that year audited by an independent certified public accountant of Jang's choosing and reasonably acceptable to Scimed, to ascertain the accuracy of Scimed's reports under Section 3.5 in respect of Net Sales. Such audit shall be scheduled within thirty (30) days following delivery of notice by Jang requesting such audit to Scimed, and conducted during Scimed's normal business hours, in a manner that does not unreasonably interfere with Scimed's normal business activities. If any audit discloses underpayment of contingent payments under Section 3.1(c) or Section 3.1(d), Scimed shall promptly pay Jang the amount due. Jang shall be responsible for all expenses it incurs in connection with any audit; provided, that if any audit determines that the reported total contingent payments were less than ninety percent (90%) of the actual total amount due for the period in question, the actual out-of-pocket cost of such audit shall be borne by Scimed. Jang will hold in strict confidence, and will require any certified public accountant it retains to perform an audit to hold in strict confidence, all information learned in the course of any audit, except to the extent necessary for Jang to enforce his rights under this Agreement.

**3.7 Taxes.** In the event Scimed is required to withhold taxes or charges from the amounts paid to Jang hereunder and to pay the taxes or charges for the account of Jang, Scimed shall deliver to Jang true copies of the receipts or returns covering each such payment. The parties shall cooperate to minimize, to the extent legally permissible, the aggregate tax liabilities related to this Agreement. Notwithstanding the foregoing, such cooperation shall not cause any adverse tax consequences to be incurred by either party which would not have been incurred under the terms and conditions as described in this Agreement.

10

**4. THE CLOSING**

**4.1 Time and Place.** The closing of the transactions which are the subject of this Agreement (the *Closing*) shall take place at 10:00 A.M., local time, on the Effective Date, at the offices of Bingham Dana LLP, 150 Federal Street, Boston, Massachusetts 02110 or at such other time and place as Jang and Scimed may agree upon.

**4.2 Jang's Obligations at Closing.** At the Closing Jang shall: (a) execute and deliver to Scimed (i) one or more assignments of patents under the Patents in the United States and registrations therefor, in substantially the form of **Exhibit 4.2(a)(i)**; and (ii) a bill of sale, in substantially the form of **Exhibit 4.2(a)(ii)**;

(b) execute and deliver to Scimed such other good and sufficient instruments of conveyance, assignment and transfer in form and substance reasonably satisfactory to Scimed's counsel as shall be effective to vest in Scimed all rights and interests in, and subject to the Liens, good and marketable title to, the Jang Assets, including, without limitation, assignments of Patents and applications for registration thereof;

(c) deliver to Scimed all documents, certificates, consents, undertakings and assignments required to be delivered to Scimed under the provisions of this Agreement;

(d) commence delivering to Scimed physical possession of adequate copies of all media embodying the Designs and the Technology;

(e) deliver to Scimed physical possession of adequate copies of all media embodying prior versions of the Designs and the Technology and related documentation that are in Jang's possession or under the direct or indirect control of Jang;

(g) execute and deliver to BSC an Employment Agreement in substantially the form of **Exhibit 4.2(g)**; and

(h) deliver to Scimed original executed copies of instruments releasing all Liens other than those arising under the Schneider Agreement (if any).

**4.3 Scimed's Obligations and Closing.** At the Closing, Scimed shall: (a) deliver to Jang a check or wire transfer in the amount of $39,651,574.00 payable to Jang;

(b) cause BSC to execute and deliver to Jang an Employment Agreement in substantially the form of **Exhibit 4.2(g)**, including a Stock Option Agreement in the form attached to **Exhibit 4.2(g)**.

**5. REPRESENTATIONS AND WARRANTIES OF JANG.** In order to induce Scimed to

11

PAGE 1