**5.2 Infringement.** (a) Each of Jang and Scimed shall promptly inform the other in writing of any infringement of Licensed Patents within the Licensed Field by a third party of which it has knowledge and shall provide the other with any readily available information relating to such infringement.

(b) Jang shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement solely within the Licensed Field; provided, that Jang first obtains Scimed's agreement to join as a party to such legal proceedings which agreement Scimed may withhold in Scimed's discretion. Scimed agrees to assist in the prosecution of such legal proceedings. Jang shall reimburse Scimed for all reasonable expenses incurred in providing such assistance to Jang. If Scimed agrees to join as a party to any suit initiated by Jang pursuant to this Section 5.2 Scimed may be, at its expense, represented by counsel of its choice. In the event Jang decides that he will not institute proceedings, to prevent or restrain such infringement of the Licensed Patents within the Licensed Field, Scimed shall have the right, but not the obligation to institute, prosecute and control legal proceedings to prevent or restrain such infringement utilizing counsel of its own choice. Jang agrees to assist in the prosecution of such legal proceedings. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance.

(c) In the event that any Person is infringing Licensed Patents within and outside the Licensed Field or any Person files a declaration of non-infringement or invalidity with respect to any Licensed Patents that would limit the use of any Licensed Patents within and outside the Licensed Field, Scimed shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement. Jang agrees to assist in the prosecution of such legal proceedings. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance to Scimed.

(d) Any recovery of damages by Scimed or Jang in a suit brought pursuant to the provisions of this Section 5.2 within the Licensed Field shall be applied first in satisfaction of any unreimbursed expenses and legal fees of the party that prosecutes such matter relating to the suit or settlement thereof; and next in satisfaction of any unreimbursed expenses and legal fees of the party that participates in the prosecution of such matter relating to the suit or settlement thereof. The balance, if any, remaining after the parties have been compensated for expenses shall be retained by the party that prosecutes such matter; provided, that (i) in the event and to the extent that the infringing party is infringing Licensed Patents both within and outside the Licensed Field, the balance shall be divided between the parties in accordance with the percentage of damages attributable to the infringing activities in the Licensed Field and infringing activities outside the Licensed Field; (ii) any recovery of ordinary damages based upon infringement of Licensed Patents outside the Licensed Field shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out (as defined in the Assignment Agreement from such recovery amount an amount calculated in accordance with Section 3.1(c) of the Assignment Agreement to reimburse Jang for payments due in respect of lost sales of Contingent Payment Products (as defined in the Assignment Agreement); (iii) any recovery of ordinary damages based upon infringement of Licensed Patents within the Licensed Field shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Jang shall pay

8

PAGE 42
EX. 2

Scimed from such recovery amount an amount calculated in accordance with Section 3.1 of this Agreement to reimburse Scimed for royalties due in respect of lost sales of Licensed Products; and (iv) the allocation described in Section 5.3(d)(ii)-(iii) shall not apply as to special or punitive damages. No settlement, or consent judgment or other voluntary final disposition of the suit that relates to the Licensed Field may be entered into without the consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Scimed, however, may at any time enter into any settlement, or consent judgment or other voluntary final disposition of any suit (including a suit that relates to the Licensed Field) without the consent of Jang; provided, that such settlement, or consent judgment or other voluntary final disposition relates only to matters outside the Licensed Field.

(e) Notwithstanding the provisions of Section 5.3(b), in the event that a declaratory judgment action alleging invalidity or non-infringement of any of the Licensed Patents is filed or in the event that any counterclaim or response by a Person in connection with an enforcement action undertaken by Jang pursuant to Section 5.3(b) is filed, Scimed, at its initial option, shall have the right, within thirty (30) days after notification of same, to assume defense of the action at Scimed's expense.

(f) In any infringement suit as either party may institute to enforce Licensed Patents, or in any declaratory judgment action alleging invalidity or non-infringement of any Licensed Patents brought against Jang or Scimed, the other party shall, at the request and expense of the party initiating or defending the suit or action, cooperate and assist in all reasonable respects, having its employees testify when requested and making available relevant records, papers, information, specimens and the like.

## 6. TERM; TERMINATION.

**6.1 Term.** Unless sooner terminated in accordance with this Section 6, this Agreement shall remain in effect until (a) the expiration of the term of the last to expire of the Licensed Patents or (b) ten (10) years following the First Commercial Sale of Licensed Products, whichever is later.

**6.2 Termination.** (a) Each party shall have the right to terminate this Agreement and the rights and license granted hereunder with sixty (60) days' notice to the other party in the event that the other party materially breaches any of its (or his) obligations under this Agreement unless the other party cures such breach prior to the expiration of said 60-day period, provided, however, that said sixty (60) day period shall be reduced to thirty (30) days for any breach involving a payment due under this Agreement.

(b) Jang shall have the right to terminate this Agreement and the license granted it hereunder for any reason with ninety (90) days' notice to Scimed at any time.    In the event of such termination, Jang will retain no rights in the Licensed Patents or Licensed Technology.

**6.3 Effect of Termination.** Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party of any obligation which matured prior to the effective date of such termination, and Jang may, after the effective date of such termination, complete

9

PAGE 43
EX. 2

Licensed Products in the process of manufacture at the time of such termination and sell the same together with Licensed Products in inventory for a period of six (6) months; provided that Jang pays to Scimed royalties as required by Section 3.1 and otherwise complies with the provisions of Section 3. The provisions of Sections 1, 2.2, 4, 6, 7 and 8 shall survive any termination of this Agreement. In the event the license granted to Jang under Section 2 terminates for any reason, each of Jang's sublicensees at such time shall continue to have the rights and license set forth in their sublicense agreements; provided that the terms of such sublicense agreement have been consented to by Scimed and such sublicensee agrees in writing that Scimed is entitled to enforce such provisions directly against such sublicensee.

## 7. RISK ALLOCATION

**7.1 Limitation of Liability.** EXCEPT FOR BREACH OF OBLIGATIONS UNDER SECTION 8.1 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 7.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY.

**7.2 Indemnification.** (a) Subject to the provisions of Section 7.3, Jang hereby indemnifies Scimed and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, *Losses*) incurred or suffered by Scimed or any of its Affiliates arising out of or related to any (a) use by Jang, or by any party acting on behalf of or under authorization from Jang, of Licensed Technology or Licensed Patents; and (b) use, sale or other disposition by Jang or by any party acting on behalf of or under authorization from Jang, of Licensed Products. The foregoing indemnification action shall not apply in the event and to the extent such Loss(es) arose as a result of any Scimed Indemnified Party's intentional misconduct, negligence or breach of this Agreement. Jang shall require each of its sublicensees to indemnify, defend and hold harmless Scimed and its Affiliates under the same terms as stated in this Section 7.2(a).

(b) Subject to the provisions of Section 7.3, each party (each an *Indemnifying Party*) hereby indemnifies the other party and such party's Affiliates (each, an *Indemnified Party*) against and agrees to hold the Indemnified Party harmless from any and all Losses incurred or suffered by such Indemnified Party arising out of any misrepresentation or breach of warranty, covenant or agreement made or to be performed by the Indemnifying Party pursuant to this Agreement. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of the Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

**7.3 Procedures.** To receive the benefit of indemnification under Section 7.2, the Indemnified Party must promptly notify the Indemnifying Party in writing of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under Section 7.2 and provide reasonable cooperation (at the Indemnifying Party's expense) and tender to the Indemnifying Party (and its insurer) full authority to defend or settle the claim or

10

PAGE 44
Ex. 2

suit. Neither party has any obligation to indemnify the other party in connection with any settlement made without the Indemnifying Party's written consent. The Indemnified Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefor. The Indemnified Party shall cooperate with Indemnifying Party (and its insurer), as reasonably requested, at Indemnifying Party's sole cost and expense.

## 8. MISCELLANEOUS

**8.1  Protection of Confidential Information.**  (a)  For a period of three (3) years from the date of the termination or expiration of Jang's employment with BSC, Jang and Scimed (each, as a Receiving Party) shall limit access to Confidential Information received from the other party (each, a Disclosing Party) pursuant to this Agreement, to those of their employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect the Disclosing Party's rights in its Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of itself (except as anticipated by this Agreement) or any independent third party.

(b)  Each Receiving Party shall exercise at least the same reasonable care it uses to protect its own valuable, proprietary Confidential Information in order to prevent the disclosure of the Disclosing Party's Confidential Information to independent third parties. Each Receiving Party shall promptly notify the Disclosing Party of any actual or suspected unauthorized use or disclosure of the Disclosing Party's Confidential Information of which it has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure.  Each Receiving Party shall include the Disclosing Party's reasonable proprietary rights notices on any media embodying the Disclosing Party's Confidential Information, including partial copies thereof, which are circulated within that party.

**8.2  Publicity.**  Scimed and Jang shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public statement except as they may mutually agree, except as is necessary for governmental notification purposes or to comply with applicable laws and regulations.

**8.3  Independent Contractors.**  Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and between Jang and Scimed do not constitute a partnership, joint venture, franchise, agency or contract of employment. Scimed is not granted, and shall not exercise, the right or authority to assume or create any obligation or responsibility on behalf of or in the name of Jang or its Affiliates.

**8.4  Assignment.**  Except in the case of assignment by a party to its Affiliate or pursuant to a merger, consolidation or sale of substantially all of the assigning party's assets or stock, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld in the case of any assignment; *provided* that the proposed assignee under this Section 8.4 agrees in writing to assume all of the

11

PAGE 4
EX. 2

obligations of the assignor party under this Agreement. It is understood that Scimed may from time to time perform some or all of its obligations hereunder through one or more of its Affiliates; provided that Scimed shall remain responsible for the performance of such obligations.

**8.5 Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**8.6 Notices.** Unless otherwise provided herein, any notice, report, payment or document to be given by one party to the other shall be in writing and shall be deemed given when delivered personally or mailed by certified or registered mail, postage prepaid (such mailed notice to be effective on the date which is three (3) business days after the date of mailing), or sent by nationally recognized overnight courier (such notice sent by courier to be effective one business day after it is deposited with such courier), or sent by telefax (such notice sent by telefax to be effective when sent, if confirmed by certified or registered mail or overnight courier as aforesaid) as follows:

If to Jang, addressed to:
    G. David Jang, M.D.
    30725 Eastbern Lane
    Redlands, CA 92374
    Phone: 909.794.1803
    Fax: 909.794.1938

If to Scimed, addressed to:
    Boston Scientific Corporation
    One Boston Scientific Place
    Natick, MA 01760-1537
    Attention: Lawrence C. Best
    Phone: 508.650.8450
    Fax: 508.650.8960

With a copy to:
    Boston Scientific Corporation
    One Boston Scientific Place
    Natick, MA 01760-1537
    Attention: General Counsel
    Phone: 508.650.8567
    Fax: 508.650.8960

or to such other place as either party may designate as to itself by written notice to the other party.

**8.7 Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts, United States of America, to the exclusion of both

12

PAGE 4
Ex. 2

its rules on conflicts of laws and the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

**8.8 Amendment and Waiver.** No provision of or right under this Agreement shall be deemed to have been waived by any act or acquiescence on the part of either party, its agents or employees, but only by an instrument in writing signed by an authorized officer of each party. Scimed and Jang may, by written notice to the other party, (a) extend the time for the performance of any of the obligations or other actions of the others under this Agreement; (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions to their obligations contained in this Agreement; or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of Scimed or Jang, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement. The waiver by Scimed or Jang of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**8.9 Severability.** In the event any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

**8.10 Entire Agreement.** The terms and provisions contained in this Agreement (including the schedules), the Assignment Agreement and the Employment Agreement constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof. Except for the Assignment Agreement and the Employment Agreement, no representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement, the Assignment Agreement or the Employment Agreement or incorporated by reference in this Agreement, the Assignment Agreement or the Employment Agreement shall be of any force or effect. No agreement or understanding extending this Agreement or varying its terms (including any inconsistent terms in any purchase order, acknowledgment or similar form) shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by the duly authorized representative of the applicable party.

**8.11 Captions.** Captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement and shall not limit or affect the meaning or construction of the terms and conditions hereof.

13

PAGE 47
Ex. 2

**8.12 Word Meanings.** Words such as *herein, hereinafter, hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires. The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**8.13 Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against either party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**8.14 Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**8.15 Further Assurances.** At any time and from time to time, each party hereto, without further consideration, shall cooperate, take such further action and execute and deliver such further instruments and documents as may be reasonably requested by any other parties in order to carry out the provisions and purposes of this Agreement. The parties acknowledge and agree that the remedy at law for any breach of this Section 8.15 may be inadequate, and hereby agree that temporary and permanent injunctive and other relief may be sought without proof of actual damage or inadequacy of legal remedy, and without the need for posting any bond, in any proceedings which may be brought to enforce any of the provisions of this Section 8.15.

[rest of this page intentionally left blank]

14



Exhibit 4.2(f)

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Non-Exclusive License Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____
Name: Lawrence C. Best
Title:   Chief Financial Officer

_____
G. David Jang, M.D.

PAGE 49
EX. 2

Exhibit 4.2(f)

## Schedule 1
### Designs

(Listed Below Are US Patents Only. PCT-Counterparts Are Not Listed)

**Pending Provisional Patent Applications:** (Filed in the US Patent Office: Filing Dates)

- PSJ-10 Stent 60/234,614 (09/22/00)
- PSJ-9  Stent 60/235,164 (09/23/00)
- PSJ-11 Stent 60/235,167 (09/23/00)
- PSJ-14 Stent 60/235,115 (09/25/00)
- PSJ-15 Stent 60/235,180 (09/25/00)
- Drug-Coating Enhancement Measures 60/209,255 (06/05/00)

**US Patent To Be Filed on Following PSJ-Stent Platforms:**

- PSJ-7  Stent Platform
- PSJ-8  Stent Platform
- PSJ-15  Stent Platform
- PSJ-16  Stent Platform
- PSJ-17  Stent Platform
- PSJ-18  Stent Platform
- PSJ-19  Stent Platform
- PSJ-20  Stent Platform
- PSJ-22  Stent Platform
- PSJ-23  Stent Platform
- PSJ-24  Stent Platform
- PSJ-25  Stent Platform
- PSJ-25.1  Stent Platform
- PSJ-27  Stent Platform
- PSJ-28  Stent Platform

PAGE 50
EX. 2

Exhibit 4.2(f)

Schedule 2
Licensed Patents

| Patent/Application/Invention Disclosure Title | Serial Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| US – Intravascular Stent | 08/824,142 | 03/26/97 | Allowed | |
| US – Intravascular Stent | 08/824,866 | 03/26/97 | 5,954,743 | 09/21/99 |
| US – Intravascular Stent | 08/824,865 | 03/25/97 | 6,152,957 | 11/28/00 |
| PCT – Intravascular Stent | PCT/US97/06609 | 04/24/97 | | |
| PCT – Intravascular Stent | PCT/US97/06610 | 04/24/97 | | |
| US – Intravascular Stent | 08/845,657 | 04/25/97 | 5,922,021 | 7/13/99 |
| PCT – Intravascular Stent | PCT/US97/06907 | 04/25/97 | | |
| US – Intravascular Stent | 08/949,865 | 10/14/97 | 6,039,756 | 03/21/00 |
| US – Intravascular Stent With Non-Parallel Slots | 08/936,297 | 09/25/97 | 5,948,016 | 09/07/99 |
| PCT – Intravascular Stent | PCT/US98/05835 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/05856 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/08408 | 04/27/98 | | |
| PCT – Intravascular Stent | PCT/US98/08411 | 04/27/98 | | |
| PCT – Intravascular Stent With Non-Parallel Slots | PCT/US98/15531 | 07/22/98 | | |
| US (PRO) Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | 60/073,412 | 02/02/98 | | |
| JP – Intravascular Stent | 9-538979 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,593 | 04/24/97 | | |
| JP – Intravascular Stent | 9-538981 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,591 | 04/24/97 | | |
| EP – Intravascular Stent | 97922367.4 | 04/24/97 | | |
| EP – Intravascular Stent | 97918756.4 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,882 | 04/24/97 | | |

PAGE 51

| | | | | |
|---|---|---|---|---|
| JP – Intravascular Stent | 9-538980 | 04/24/97 | | |
| CA –Intravascular Stent | 2,252,596 | 04/25/97 | | |
| JP – Intravascular Stent | 9-539031 | 04/25/97 | | |
| EP – Intravascular Stent | 97918755.6 | 04/24/97 | | |
| EP – Intravascular Stent | 97926382.9 | 04/25/97 | | |
| US – Tubular Stent With Chevron Striped Expansion Struts | Open Disclosure | | | |
| US – Tubular Stent With Contralateral Attached Connecting Struts | Open Disclosure | | | |
| US – Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | 09/237,537 | 01/26/99 | Allowed | |
| PCT – Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/02050 | 01/28/99 | | |
| US – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached-Connectors | 09/241,320 | 02/01/99 | 6,113,627 | 09/05/00 |
| PCT – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | PCT/US99/02171 | 02/02/99 | | |
| US – Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | 09/243,911 | 02/03/99 | 6,200,334 | 03/13/01 |
| PCT – Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/02342 | 02/03/99 | | |
| PCT – Tubular Stent Consists of Chevron-Shape Expansion Struts and Ipsilaterally Attached M – Frame Connectors | PCT/US99/03428 | 02/17/99 | | |
| US – Tubular Stent Consists of Chevron-Shaped Expansion Struts And Ipsilaterally Attached M-Frame Connectors | 09/251,650 | 02/17/99 | 6,123,721 | 09/26/00 |
| JP – Intravascular Stent | 10-545944 | 03/25/98 | | |
| EP – Intravascular Stent | 98912026.6 | 03/25/98 | | |
| EP – Intravascular Stent | 98912031.6 | 03/25/98 | | |
| JP – Intravascular Stent | 10-545953 | 03/25/98 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally . | 99904533.9 | 02/02/99 | | |

18

BUSDOCS:994384.4

Page 52
Ex. 2

| | | | | |
|---|---|---|---|---|
| Attached Diagonal-Connectors | | | | |
| JP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 2000-529193 | 02/02/99 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 99903509.0 | 01/28/99 | | |
| US (PRO) Intravascular Stent Consists of Stairstep Expansion Strut Pairs and Double Stairstep Diagonal Connecting Struts Contralaterally Extended From Expansion Struts | 60/235,164 | 09/23/00 | | |
| US -- PSJ-10 Stent | 60/234,614 | 09/22/00 | | |
| US -- PSJ-11 Stent | 60/235,167 | 09/23/00 | | |
| US -- PSJ-14 Stent | 60/235,115 | 09/25/00 | | |
| US -- PSJ-15 Stent | 60/235,180 | 09/25/00 | | |
| US – Drug-Coating Enhancement Measures | 60/209,255 | 06/05/00 | | |

PAGE 53
Ex. 2

PAGE 54
EX. 2

## EXHIBIT 4.2(g)

**Employment Agreement**

See Tab 3 of this Binder.

PAGE 45
EX. 2

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), dated as of June 3, 2002 (the "Effective Date"), between Boston Scientific Corporation, a Delaware corporation (the "Company"), and G. David Jang, M.D. (the "Employee").

## W I T N E S S E T H:

WHEREAS, the Company's wholly-owned subsidiary, Scimed Life Systems, Inc., a Minnesota corporation ("Scimed") and the Employee have entered into an Assignment Agreement dated as of the date hereof (the "Assignment Agreement"), pursuant to which the Employee has assigned to Scimed certain patents, patent applications and other intellectual property rights in exchange for the consideration set forth in the Assignment Agreement (capitalized terms that are not defined herein shall have the meanings assigned to them in the Assignment Agreement);

WHEREAS, the Company desires to employ the Employee on and after the Effective Date on a part-time basis on the terms set forth herein, and the Employee is willing to accept such employment and perform services for the Company, on and after the Effective Date, on the terms and conditions set forth herein; and

WHEREAS, as an inducement for Scimed to enter into the Assignment Agreement and the License Agreement, the parties desire to enter into this Agreement, effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants, terms and conditions set forth herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed between the Employee and the Company as follows:

## 1. EMPLOYMENT AND DUTIES

1.1  General. The Company hereby agrees to employ the Employee, and the Employee hereby agrees to accept employment with the Company, upon the terms and conditions herein contained. The Employee shall perform such duties and services for the Company, and at such locations, as may be designated from time to time by the Senior Vice President and Chief Financial Officer of the Company (the "CFO") or his successor. The Employee agrees to serve the Company faithfully and to the best of his ability under the direction of the CFO or his successor.

1.2  Exclusive Services in Area. Except as may otherwise be approved in advance by the CFO, the Employee shall devote no less than 3.5 days per month (including travel time) throughout the Employment Term (as hereinafter defined) to the performance of his duties for the Company, provided, that in no event shall the Employee be required to devote more than 4 days per month to the performance of his duties for the Company without his consent. During


Page 50
Ex. 3

the Employment Term, the Employee shall render his services in the area of the design, development, delivery, manufacture and testing of stents for medical applications, including coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of stents (the "Field"), and such other areas within the Employee's competence as may be assigned by the CFO. The Employee shall use his best efforts, judgment and energy to improve and advance the business and interests of the Company in a manner consistent with the duties assigned by the CFO. During the term of his employment with the Company, the Employee shall provide his services in the Field exclusively to the Company to the extent required by Section 7.4 of the Assignment Agreement, and shall refrain from engaging in any business or enterprise which is competitive or conflicting with the Company to the extent prohibited by Section 7.4 of the Assignment Agreement.

        **1.3   Term of Employment.**   The Employee's employment under this Agreement shall commence as of the Effective Date and shall continue until the earlier of (a) the third anniversary of the Effective Date, or (b) the termination of the Employee's employment in accordance with Section 3 of this Agreement (the "Employment Term").

## 2.   COMPENSATION AND OTHER BENEFITS

        **2.1   Base Salary.**   The Company shall pay to the Employee an annual base salary (the "Salary") equal to $100,000. The Salary shall be payable in equal installments, no less frequently than monthly, pursuant to the Company's customary payroll practices in effect at the time of payment, less any required or authorized payroll deductions.

        **2.2   Stock Options.**   Contingent upon the execution of this Agreement and the Assignment Agreement, and subject to such terms and conditions as the Compensation Committee of the Board of Directors of the Company (the "Committee") may require, which terms and conditions shall be set forth in the form of the Non-Qualified Stock Option Agreement attached as Exhibit A hereto (the "Option Agreement") and the Company's 2000 Stock Incentive Plan (the "Stock Plan"), the Company has granted to the Employee a non-qualified option (the "Stock Option") to purchase 100,000 shares of common stock of the Company (the "Shares"). The Stock Option shall have an exercise price per share equal to the closing price of the Company's common stock on The New York Stock Exchange on the date hereof. The purpose of this Stock Option is to reward the Employee's continued loyalty and service to the Company. Except as provided herein, in the Stock Plan or the Option Agreement, the Employee shall have no claim to unvested stock or stock options.

        **2.3   Reimbursement of Expenses.**   The Company shall reimburse the Employee for reasonable and customary travel and other business expenses incurred by him in the fulfillment of his duties hereunder upon presentation by the Employee of an itemized account of such expenditures, in accordance with the applicable practices of the Company as may be in effect from time to time. The Employee must submit expense reports no less frequently than on a monthly basis. Any expense in excess of $1,000 must be pre-approved by the CFO or other authorized personnel of the Company. In accordance with Company policies in effect from time to time, the Employee may travel business class or first class when travelling on the account of his employment for substantial length.

-2-



PAGE 57
Ex. 3

**2.4    No Additional Compensation or Benefits.**  The Employee shall have no right under this Agreement or otherwise to receive any compensation or benefit other than his Salary, participation in the Stock Plan to the extent set forth in Section 2.2, and reimbursement of expenses as provided herein, *provided*, that nothing in this Section 2.4 shall be deemed to limit the Employee's right to receive the consideration provided under the Assignment Agreement.

3.    **TERMINATION OF EMPLOYMENT**

3.1    **Termination Without Cause**

3.1.1    **General.**  Subject to the provisions of Section 3.1.2, if, prior to the expiration of the Employment Term, the Company terminates the Employee's employment for any reason other than due to his Disability (defined herein as any physical or mental condition or impairment that renders the Employee incapable of performing the essential functions of his position, with or without reasonable accommodation), death or Cause (as hereinafter defined), the Company shall, subject to the Employee's execution of a general release of claims against the Company and any of its subsidiaries or affiliates in a form satisfactory to the Company, continue to pay the Employee his Salary (at the rate in effect on the date of such termination) for a period ending on the earlier of the six month anniversary of the termination date or the third anniversary of the Effective Date (such period hereinafter referred to as the "Severance Period"), with the Salary continuing to be paid at such time or times as his Salary would have been paid had the Employee remained in the active service of the Company. Except as specifically set forth in this Agreement and in the Option Agreement, the Employee shall have no further right, however arising, to receive any other compensation or benefits in respect of his employment or to participate in any other employee benefit plan, program or arrangement after termination of his employment.

3.1.2    **Death During Severance Period.**  In the event of the Employee's death during the Severance Period, payments of the Salary under Section 3.1.1 shall continue to be made during the remainder of the Severance Period.

3.1.3    **Date of Termination.**  The date of a termination of employment pursuant to Section 3.1 shall be the date specified in a written notice of termination to the Employee, which date may not be earlier than the date of delivery of such notice.

3.2    **Termination for Cause; Resignation**

3.2.1    **General.**  The Company may terminate the Employee's employment for Cause at any time in accordance with Section 3.2.3 below. In addition, the Employee may resign from the Company and terminate his employment at any time upon thirty (30) days prior written notice to the CFO or his successor. If, prior to the expiration of the Employment Term, the Company terminates the Employee's employment for Cause or if the Employee resigns from his employment hereunder for any reason, the Employee shall be entitled to payment of his unpaid Salary through and including the date of termination or resignation. Except as set forth in the Option Agreement, the Employee shall have no further right, however arising, to receive any

-3-


PAGE 58
EX. 3

other compensation or benefits in respect of his employment or to participate in any other employee benefit plan, program or arrangement after such termination or resignation of employment.

3.2.2  **Date of Termination.**  The date of a termination of the Employee's employment for Cause shall be the date specified in a written notice of termination to the Employee.  The date of resignation shall be thirty (30) days after receipt by the Company of written notice of resignation from the Employee, unless an earlier date is agreed upon by the Company and the Employee.

3.2.3  **Cause.**  Termination of the Employee's employment for "Cause" shall mean termination of the Employee's employment because of:

(a)  any act or omission by the Employee that constitutes a material breach by the Employee of any of his obligations under this Agreement, the Assignment Agreement or the License Agreement;

(b)  the failure or refusal of the Employee to reasonably perform the duties and obligations required of him as an employee of the Company;

(c)  gross negligence or dishonesty by the Employee in the scope of the Employee's services to the Company;

(d)  any material violation by the Employee of any law or regulation applicable to the business of the Company or any of its subsidiaries or affiliates, or the Employee's commission of, or a plea of <u>nolo contendere</u> to, a felony, or any willful perpetration by the Employee of a common law fraud; or

(e)  any other misconduct by the Employee that is injurious to the financial condition or business reputation of, or is otherwise injurious to, the Company or any of its subsidiaries, affiliates, or employees.

3.3  **Termination Due To Disability.**  The Company may terminate the Employee's employment in the event of his Disability (as defined in Section 3.1.1).  In that event, the Employee shall be entitled to payment of his Salary earned and unpaid through the date that the termination of his employment becomes effective, and the Stock Option shall vest in accordance with the Option Agreement.

4.  **ARBITRATION**

4.1  **Procedure.**  Any future dispute, controversy or claim between the parties arising from or relating to the Agreement, its breach, or any matter addressed by the Agreement, will be resolved through binding confidential arbitration to be conducted by a panel of three arbitrators that is mutually agreeable to the Employee and the Company, all in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.  If the Employee and the Company cannot agree upon the panel of arbitrators, the arbitration shall be

-4-



settled before a panel of three arbitrators, one to be selected by the Company, one by the Employee and the third by the two persons so selected, all in accordance with the rules of the American Arbitration Association then in effect. The arbitration proceeding shall be held in such location as is mutually agreed upon by the parties. The arbitrators shall base their award on the terms of the Agreement, and the arbitrators shall strictly follow the law and judicial precedents that a United States District Judge sitting in the applicable District would apply in the event the dispute were litigated in such court. The arbitration shall be governed by the substantive laws of California applicable to contracts made and to be performed therein, without regard to conflicts of law rules, and by the arbitration law chosen by the arbitrators, and the arbitrator shall have no power or authority to order or grant any remedy or relief that a court could not order or grant under applicable law. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

    **4.2    Costs and Attorneys' Fees.** The Company shall bear the cost of the arbitrators. Costs and expenses associated with the arbitration that are not otherwise assignable to one of the parties shall be allocated between the parties by the arbitrators. In every other respect, the parties shall each be responsible for their own costs and expenses, including, without limitation, attorneys' fees and costs.

## 5.    PROTECTION OF COMPANY'S INTERESTS

### 5.1    Confidential Information

    **5.1.1    Acknowledgment.** "Confidential Information" means confidential and/or proprietary information relating to the business of, or belonging to, the Company or any of its subsidiaries or affiliates or third parties including, but not limited to, proprietary or confidential information, technical data, trade secrets, or know-how in respect of research, product plans, products, services, customer lists, customers, markets, computer software (including object code and source code), data and databases, outcomes research, confidential patient information, documentation, instructional material, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware, configuration information, models, manufacturing processes, sales information, cost information, business plans, business opportunities, marketing or finances, or other information of the Company marked as "confidential" or "proprietary," or which Employee reasonably should expect that Company considers confidential under the circumstances, that is disclosed to the Employee in any manner including by drawings or observations of parts or equipment, etc., all of which have substantial value to the Company. Confidential Information excludes that which: (a) is known to Employee before receipt thereof under this Agreement (other than information which is being conveyed to the Company pursuant to the Assignment Agreement); (b) is disclosed to Employee by a third person in a context that is not related to the Employee's employment with the Company who is under no obligation of confidentiality to Company with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of Employee; (d) is independently developed by Employee in a context that is not related to the Employee's employment with the Company, as evidenced by Employee's

-5-

PAGE 60
Ex. 3

written records, without use of such information; or (e) is approved for release by written authorization of Company.

**5.1.2  Use of Confidential Information.** During the Employment Term and for a period thereafter ending on the later of (i) the third anniversary of the termination of the Employment Term, or (ii) the third anniversary of the Effective Date, the Employee shall limit access to Confidential Information received pursuant to this Agreement, to those of his employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect Company's rights in Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of himself (except as anticipated by the Assignment Agreement or License Agreement) or any independent third party. Employee shall exercise at least the same reasonable care he uses to protect his own valuable, proprietary confidential information in order to prevent the disclosure of Confidential Information to independent third parties. Employee shall promptly notify Company of any actual or suspected unauthorized use or disclosure of Confidential Information of which he has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure. Employee shall include Company's reasonable proprietary rights notices on any media embodying Confidential Information, including partial copies thereof, which Employee circulates.

**5.1.3  Non-Disclosure Agreements.** During the Employment Term and for a period thereafter ending on the later of (i) the third anniversary of the termination of the Employment Term, or (ii) the third anniversary of the Effective Date, the Employee shall respect and adhere to any non-disclosure, confidentiality or similar agreements of which he is aware that the Company is, or during the period of the Employee's employment by the Company becomes, a party or subject.

**5.1.4  Company Property.** The Employee hereby confirms that all Confidential Information and "Company Materials" are and shall remain the exclusive property of the Company. Immediately upon the termination of the Employee's employment for any reason, or during the Employment Term upon the request of the Company, the Employee shall return all Company Materials, or any reproduction of such materials, apparatus, equipment and other physical property. For purposes of this Agreement, "Company Materials" are documents or other media or tangible item that contain or embody Confidential Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by the Employee or others.

**5.1.5  No Effect on License Agreement.** The obligations of the Employee under this Section 5.1 shall not be deemed to limit the Employee's ability to use Licensed Technology (as defined in the License Agreement) under the License Agreement in accordance with the terms thereof.

**5.1.6  Precedence of Assignment Agreement.** If there is any conflict between the terms of this Section 5 and the terms of Section 9.1 of the Assignment Agreement, the terms of Section 9.1 of the Assignment Agreement will control. Nothing in this Section 5.1 shall be deemed to limit or modify any of the obligations of the Employee under the Assignment

-6-

PAGE 61
EX. 3

Agreement. The obligations of the Employee under this Section 5.1 are in addition to, and not in lieu of, the Employee's obligations under the Assignment Agreement.

## 5.2    Work Product Assignment

**5.2.1    Generally.**    Without limiting the Employee's obligations under the Assignment Agreement, the Employee shall assign to the Company all of his right, title and interest in and to, and shall disclose promptly to the Company, any and all work product, developments, inventions, ideas and discoveries, including patentable and unpatentable inventions, copyrights, source code, object code, documentation, programs, software firmware, and works of authorship developed, discovered, improved, authored, derived, invented, conceived, created or acquired by the Employee (solely or jointly with others) either: (a) during the period of his Employment Term to the extent and as described in the Assignment Agreement; or (b) in the course of performing Employee's activities hereunder (collectively, "Work Product"); and whether or not reduced to tangible form or reduced to practice, and Employee agrees that such Work Product shall be and shall remain the exclusive property of the Company. The Employee shall do all acts and things (including the execution and delivery of patent and copyright applications and instruments of assignment) at any time deemed by the Company to be necessary or desirable in order to effect the full assignment of such Work Product to the Company, or to perfect, protect, or to otherwise exercise its ownership interest in and to such Work Product. The parties hereto understand that the term Work Product includes, but is not limited to, (to the extent included within the definition above) all work product developed, discovered, improved, authored, derived, invented, conceived or acquired by the Employee (solely or jointly with others) that:

(a)    incorporates or reflects any Confidential Information;

(b)    is to any extent developed utilizing any computer equipment or software of or licensed to the Company or any supplies, equipment or facilities of or provided by the Company;

(c)    relates to or arises out of research or any other activities conducted by, for, or under the direction of the Company, whether or not conducted at the Company's facilities, whether or not conducted during working hours or using Company assets;

(d)    relates directly or indirectly to the Company's actual or anticipated research and development with respect to Confidential Information or computer-related work product; or

(e)    results from any work performed by the Employee for the Company unless the Company and the Employee agree in writing that such work product does not constitute Work Product.

**5.2.2    Previous Inventions.**    The Employee hereby understands that he may have rights under Section 2870 of the California Labor Code. The Employee hereby agrees that he has reviewed the Limited Exclusion Notification attached hereto as Exhibit B, and

-7-



PAGE 62
EX. 3

agrees that his signature on that <u>Exhibit B</u> acknowledges receipt of such notification. For greater certainty, certain inventions of Employee conceived and/or reduced to practice prior to the Employment Term are listed in <u>Exhibit C</u>. The parties acknowledge that such inventions will not be deemed Work Product, <u>provided</u>, that this Section 5.2.2. and <u>Exhibit C</u> shall not be deemed to limit the Employee's obligations under the Assignment Agreement and the License Agreement.

    **5.2.3   Conflict.** Nothing in this Section 5.2 is intended to amend or modify any of the rights and obligations of the Company and the Employee under Section 7.2 of the Assignment Agreement. In the event of a conflict between the provisions of this Section 5.2 and the provisions of Section 7.2 of the Assignment Agreement, the provisions of the Assignment Agreement shall control.

    **5.3   Disclosure of Previously Acquired Information to Company.** The Employee hereby agrees not to disclose to the Company, and not to induce the Company to utilize, any proprietary information or trade secrets of any other party that are in his possession, unless and to the extent that he has authority to do so.

    **5.4   Specific Performance.** The Employee hereby acknowledges and understands that the Company has expended considerable resources in developing the Confidential Information, it is novel, unique and valuable to the Company's business, it provides a competitive advantage to the Company, and it is not commonly known in the medical, information, financial, business or software fields. The Employee hereby understands and agrees that a breach or threatened breach by the Employee of this Agreement could cause irreparable harm to the Company and agrees that the Company shall be entitled to seek all remedies available at law or in equity with respect thereto, including but not limited to an injunction to prevent continued breaches of the provisions hereof. The Employee hereby understands that this Agreement shall be binding on both parties to this Agreement during the Employment Term and after the termination of the Employee's employment and upon the Employee's heirs, successors and personal representatives, and that this entire Agreement shall inure to the benefit of the Company and its successors and assigns.

    **5.5   Interference with the Company**

    **5.5.1   Non-Solicitation.** Both during the Employment Term and for a period of one year after the termination of the Employee's employment, the Employee shall not in any way, directly or indirectly, (a) induce or attempt to induce any employee, agent, or consultant of the Company to quit employment or engagement with the Company; (b) otherwise interfere with or disrupt the Company's relationship with its employees, agents, or consultants; (c) solicit, entice, engage, or hire any employee of the Company or former employee of the Company whose employment with the Company ceased less than six (6) months before the date of such hiring or engagement; or (d) influence or participate in the solicitation, enticement, engagement, or hiring of any employee of the Company or former employee of the Company whose employment with the Company ceased less than six (6) months before the date of such hiring or engagement. The parties acknowledge that the general solicitation of employees or consultants by an entity other

-8-



than Company that employs Employee, or of which Employee is a principal, will not be deemed a breach of this Section 5.5.1 unless the Employee directs or is personally involved in such solicitation.

5.5.2 **Customers/Business.** Both during the Employment Term and for a period of one year after the termination of the Employee's employment, the Employee shall not directly or indirectly: (a) solicit or contact any customer of the Company (or any other entity known to be a potential customer with respect to specific products or services of the Company and with which the Employee had contact during the period of its engagement by the Company) for any commercial pursuit that to the Employee's knowledge is in competition with the Company, or (b) take away or interfere or attempt to interfere with any custom, trade, business or patronage of the Company, or induce, or attempt to induce, any employee, agent or consultant of of to the Company to do anything from which the Employee is restricted by reason of this Agreement. The parties acknowledge that the general solicitation of business by an entity other than Company that employs Employee, or of which Employee is a principal, will not be deemed a breach of this Section 5.5.2 unless the Employee directs or is personally involved in such solicitation.

5.6 **Scope and Duration of Restrictions.** The parties hereto expressly agree that the scope and duration of the restrictions set forth in Section 5 are reasonable. In the event that any court of competent jurisdiction shall hold that the duration or scope of the restrictions set forth in Section 5 are unreasonable under circumstances now or hereafter existing, the maximum duration or scope of restriction reasonable under such circumstances shall be substituted, and each party hereto shall petition any such court to cause the maximum duration or scope of restriction reasonable under such circumstances to be so substituted for the duration or scope of restriction set forth herein.

6. **MISCELLANEOUS PROVISIONS**

6.1 **Communications.** All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered or on the fifth business day after mailed if delivered personally or mailed by registered or certified mail (postage prepaid, return receipt requested) to the party at the following addresses (or at such other address for a party as shall be specified by like notice, except that notices of changes of address shall be effective upon receipt):

(a)    if to the Company:

Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Facsimile No.: (508) 650-8960
Attention: Senior Vice President and Chief Financial Officer

with copies to:

-9-





Boston Scientific Corporation
One Boston Scientific Place
Natick, MA  01760-1537
Facsimile No.:  (508) 650-8960
Attention:  General Counsel

(b)     if to the Employee:

G. David Jang, M.D.
30725 Eastbern Lane
Redlands, CA  92374
Facsimile No.:  (909) 794-1938

6.2     **Waiver of Breach; Severability.**  The waiver by the Employee or the Company of a breach of any provision of this Agreement by the other party hereto shall not operate or be construed as a waiver or any subsequent breach by either party.  The parties hereto recognize that the laws and public policies of various jurisdictions may differ as to the validity and enforceability of covenants similar to those set forth herein.  It is the intention of the parties that the provisions hereof be enforced to the fullest extent permissible under the laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such laws or policies) of any provisions hereof shall not render unenforceable, or impair, the remainder of the provisions hereof.

6.3     **Assignment; Successors.**  No right, benefit or interest hereunder shall be assigned, encumbered, charged, pledged, hypothecated or be subject to any setoff or recoupment by the Employee, _provided_; however, that (i) the Employee may transfer the Stock Option in accordance with the terms of the Stock Plan and the Option Agreement, and (ii) the Employee may assign without consent, in whole or in part, any of the rights he has to receive monetary payments under the terms of this Agreement to one or more of the following: (1) any revocable trust of which the Employee is the sole trustee and the sole settlor; (2) any irrevocable trust established by the Employee as the sole settlor for members of his family, whether or not the Employee is the trustee of such trust; or (3) any charitable trust of which the Employee is both the sole trustee and the sole settlor.  Where the Employee is the trustee of a trust to which an interest is assigned pursuant to this Section 6.3 and the Employee later ceases to serve as trustee as a result of his death or incapacity, any such subsequent event shall not void or vitiate the assignment(s) made to the trust.  No assignment otherwise permitted under this Section 6.3 shall be valid unless and until the trustee of such trust acknowledges in writing in form satisfactory to the Company that the trustee, together with the trust, accept such assignment subject to all of the terms, conditions and provisions of this Agreement, including those set forth in Sections 4.1 and 4.2.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company.

6.4     **Entire Agreement.**  Except for the Assignment Agreement and the License Agreement, this Agreement represents the entire agreement of the parties and shall supersede any and all previous contracts, arrangements or understandings between the Company

-10-



and the Employee, including. This Agreement may be amended at any time only by mutual written agreement of the parties hereto.

6.5    **Other Severance Benefits.** The Employee hereby agrees that in consideration for the payments to be received under this Agreement, the Employee waives any and all rights to any payments or benefits under any severance plans, programs, contracts or arrangements of the Company or any of its respective subsidiaries or affiliates.

6.6    **Withholding.** The payment of any amount pursuant to this Agreement shall be subject to applicable withholding and payroll taxes, and such other deductions, if any, as may be required under the employee benefit plans of the Company or any of its respective subsidiaries or affiliates.

6.7    **Employee's Representation.** The Employee represents and warrants that his entering into this Agreement does not, and that his performance under this Agreement and consummation of the transactions contemplated hereby will not, violate the provision of any agreement or instrument to which the Employee is a party or any decree, judgment or order to which the Employee is subject, and that this Agreement constitutes a valid and binding obligation of the Employee in accordance with its terms. Breach of this representation will render all of the Company's obligations under this Agreement void *ab initio*.

6.8    **Governing Law.** This Agreement shall be governed by, and construed with, the law of the State of California without regard to conflicts of laws rules.

6.9    **Headings.** The headings in this Agreement are for convenience only and shall not be used to interpret or construe any of its provisions.

6.10    **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

[execution page follows]

-11-



IN WITNESS WHEREOF, the Company has caused this Employment Agreement to be duly executed and the Employee has hereunto set his hand, as of the day and year first above written.

BOSTON SCIENTIFIC CORPORATION

By:
Name:  Lawrence C. Best
Title:   Chief Financial Officer

G. David Jang, M.D.

BUSDOCS:994388.3

PACE
Ex. 3
67

IN WITNESS WHEREOF, the Company has caused this Employment Agreement to be duly executed and the Employee has hereunto set his hand, as of the day and year first above written.

BOSTON SCIENTIFIC CORPORATION

By:_____
Name:  Lawrence C. Best
Title:   Chief Financial Officer


_____
G. David Jang, M.D.

68
PAGE
EX. 3

**EMPLOYEE COPY**

*PLEASE KEEP FOR YOUR RECORDS*

This Agreement is entered into by and between Boston Scientific Corporation (the "Corporation") and the person whose name appears on the signature page hereof (the "Optionee") effective as of the 3rd day of June 2002. This Agreement is made pursuant to the Boston Scientific Corporation 2000 Long-Term Incentive Plan (the "Plan"), which is administered by the Committee.

Capitalized terms not defined in this Agreement have the same meanings specified in the Plan.

**I.    Grant of Option**

The Corporation hereby grants to the Optionee a Non-Qualified Stock Option (the "Option") to purchase that number of shares of common stock of the Corporation set forth on Schedule I hereof (the "Option Shares") at the price set forth on Schedule I hereof (the "Exercise Price").

**II.    Term and Vesting of Option**

Except as otherwise provided in Section IV, the Option shall have a term of ten (10) years from June 3, 2002 until June 3, 2012 and shall vest in accordance with the vesting schedule set forth on Schedule I hereof.

**III.    Exercise of Option**

While this Option remains exercisable, the Optionee may exercise a vested portion of the Option by delivering to the Corporation at its principal office, written notice addressed to the Plan Administrator stating the Optionee's intent to exercise a specified number of shares subject to the Option and payment of the full Exercise Price for the specified number of shares. The payment for the full Exercise Price for the shares exercised must be made in (i) cash, (ii) by certified check or bank draft payable in U.S. dollars ($US) to the order of the Corporation, (iii) in whole or in part in Common Stock of the Corporation owned by the Optionee, valued at Fair Market Value or (iv) by "cashless exercise", by the Optionee delivering to his/her securities broker instructions to sell a sufficient number of shares of Common Stock to cover the Exercise Price, applicable tax obligations and the brokerage fees and expenses associated therewith.

Shares of Common Stock of the Corporation used for payment, in whole or part, of the Exercise Price must have been owned by the Optionee, free and clear of all liens or encumbrances for a

BUSDOCS:994388.5

69
PAGE 69
EX. 3

period of at least six (6) months prior to the exercise date. In addition, the Committee may impose such other or different requirements as it may deem necessary to avoid charges to earnings of the Corporation.

The exercise date for the Optionee's exercise of all or a specified portion of the Option pursuant to this Section III will be deemed to be the date on which the Corporation receives the Optionee's payment in full for the Option Shares to be exercised accompanied by the written notice of exercise as set forth above. Written notice of exercise of all portions of the Option being exercised along with payment in full of the Exercise Price for such portion must be received by the Corporation on or prior to the last day of the Option term, as set forth in Section II above, except as provided in Section IV below.

Upon the Corporation's determination that there has been a valid exercise of the Option, the Corporation shall issue certificates in accordance with the terms of this Agreement, or cause the Corporation's transfer agent to make the necessary book entries, for the shares subject to the exercised portion of the Option. However, the Corporation shall not be liable to the Optionee, the Optionee's personal representative, or the Optionee's successor(s)-in-interest for damages relating to any delays in issuing the certificates or in making book entries, any loss of the certificates, or any mistakes or errors in the issuance of the certificates or in making book entries, or in the certificates themselves.

## IV.    Termination of Employment

Upon the Optionee's termination of employment for reasons of Retirement, death or Disability (as defined in Plan), all remaining unexercised portion(s) of the Option shall immediately vest and become exercisable by the Optionee or the Optionee's appointed representative, as the case may be, for the shorter of (i) three (3) years (one (1) year in the case of death) from the date of termination or (ii) the termination of the Option. For purposes of this Agreement, "Retirement" means cessation of employment and other association with the Company and any affiliates or subsidiaries of the Company at or after the normal retirement date specified in the Company's pension or other deferred compensation plan applicable generally to employees of the Company or, with the consent of the Committee, any early retirement date so specified.

Upon termination of the Optionee's employment for reasons other than for Cause (as defined in Plan) or those set forth above, the Optionee shall have the shorter of (i) ninety (90) days from the date of termination or (ii) the remaining term of the Option, to exercise all vested, unexercised portion(s) of the Option. Upon termination of the Optionee's employment for reasons other than for Cause or those set forth above, all non-vested unexercised portions of the Option shall lapse; provided that the Committee, in its sole discretion, may extend the exercise period and/or accelerate vesting of unvested portions of the Option provided that such exercise period does not extend beyond the original term of the Option and no portion of the Option shall become vested earlier than six (6) months from the date of grant.

At the time the Optionee is informed of termination of the Optionee's employment for Cause, all

BUSDOCS:994388.5


70
PAGE
EX. 3

unexercised portions of the Option shall lapse and be forfeited.

The Option, to the extent unexercised on the date following the end of the Option term set forth above in Section II, shall thereupon lapse and be forfeited.

Any permitted transferee (pursuant to Section VII below) of the Optionee shall receive the rights herein granted subject to the terms and conditions of this Agreement. No transfer of this Option shall be approved and effected by the Corporation unless (i) the Corporation shall have been timely furnished with written notice of such transfer and any copies of such notice as the Committee may deem, in its sole discretion acting reasonably, necessary to establish the validity of the transfer; (ii) the transferee or transferees shall have agreed in writing to be bound by the terms and conditions of this Agreement; and (iii) such transfer complies with applicable laws and regulations.

### V.    No Rights to Continued Employment

The Option grant made under the Plan and this Agreement shall not confer on the Optionee any right to continue serving as an employee of the Corporation and this Agreement shall not be construed in any way to limit the Corporation's right to terminate or change the terms of the Optionee's employment.

### VI.    Change in Control

In the event of a Change in Control or Covered Transaction (as defined in the Plan), and to the extent not inconsistent with accounting for the Change in Control or Covered Transaction as a pooling, all unvested portions of the Option shall vest as of at least ten (10) days prior to the effective date of the Covered Transaction, and, at the discretion of the Committee, as provided in the Plan, the Option may be converted into an option to acquire securities of equivalent kind and value of the surviving entity as of the effective date of the Covered Transaction.

### VII.    Transferability

Except as required by law, the Option granted under this Agreement is not transferable and shall not be sold, transferred, assigned, pledged, gifted, hypothecated or otherwise disposed of by the Optionee other than by will or the laws of descent and distribution or without payment of consideration to Family Members of the Optionee or to trusts or other partnerships for the benefit of immediate family members of the Optionee.  During the Optionee's lifetime, the Option is exercisable only by the Optionee, except as provided in Section IV above.

BUSDOCS:994388.5

## VIII.  Satisfaction of Tax Obligations

The Optionee agrees to make appropriate arrangements with the Corporation for satisfaction of any applicable federal, state or local income tax, withholding requirements or like requirements, including the payment to the Corporation at the time of exercise of the Option of all such taxes and requirements.

## IX.    Securities Laws

Upon the acquisition of any shares pursuant to the exercise of the Option, Optionee will make or enter into such written representations, warranties and agreements as the Corporation may reasonably request in order to comply with applicable securities laws, or with the Plan.

## X.     Legal Notices

Any legal notice necessary under this Agreement shall be addressed to the Corporation in care of its Secretary at the principal executive office of the Corporation and to the Optionee at the address appearing in the personnel records of the Corporation for such Optionee or to either party at such other address as either party may designate in writing to the other.  Any such notice shall be deemed effective upon receipt thereof by the addressee.

## XI.    Choice of Law

The interpretation, performance and enforcement of this Agreement shall be governed by the laws of The Commonwealth of Massachusetts (without regard to the conflicts of laws principles) and applicable federal laws.

## XII.   Option Grant Subject to Plan

The Option granted by this Agreement is subject to the Plan.  The terms and provisions of the Plan as it may be amended from time to time are hereby incorporated herein by reference.  In the event of a conflict between any term or provision contained in this Agreement and a term or provision of the Plan, the applicable terms and provisions of the Plan will govern and prevail.  The Committee retains the right to alter or modify the Option granted under this Agreement as the Committee may determine as in the best interests of the Company; provided, however, if such alteration or modification affects the number of shares issuable upon exercise of the Option, the Exercise Price, or the term or vesting of the Option, in any case in a manner adverse to the Optionee, as determined in the reasonable discretion of the Committee, the Optionee's written consent to any such alteration or modification shall first be obtained.

PAGE 72
EX. 3

## XIII.   Headings

The headings contained in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

## IX.    Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[remainder of page left intentionally blank]

BUSDOCS:994388.5

PAGE 73
EX. 3

May.31. 2002  4:27PM   WILSON SONSINI                    No.1519  P. E

IN WITNESS WHEREOF, the Corporation, by its duly authorized officer, and the Optionee have executed and delivered to the Agreement effective as of the date and year first above written.

OPTIONEE

Signature: _____

Name: G. David Jang

BOSTON SCIENTIFIC CORPORATION

BY:_____

Name: James R. Tobin

Its:    President and Chief Executive Officer

BUSDOCS:994388.6

74

PAGE

EX. 3

May 31 02 04:50p

p. 5

IN WITNESS WHEREOF, the Corporation, by its duly authorized officer, and the Optionee have executed and delivered to the Agreement effective as of the date and year first above written.

OPTIONEE

Signature:_____
Name: G. David Jang

BOSTON SCIENTIFIC CORPORATION

James R. Tobin
President and Chief Executive Officer

PAGE 75
EX. 3

## EXHIBIT A

**Boston Scientific Corporation**

**2000 Long-Term Incentive Plan**

**Stock Option Agreement**

**June 3, 2002**

**PREPARED FOR:**

G. David Jang

BUSDOCS:994388.5

PAGE 76
EX. 3

**SCHEDULE I**
to
**Stock Option Agreement dated June 3, 2002**

Optionee:     G. David Jang

Option Shares:  100,000

Exercise Price: $27.85

Vesting Schedule:

| Percent of Option | Shares Vesting | Date Vested |
|---|---|---|
| 25% | 25,000 | June 3, 2003 |
| 25% | 25,000 | June 3, 2004 |
| 25% | 25,000 | June 3, 2005 |
| 25% | 25,000 | June 3, 2006 |



**EXHIBIT B**
**Limited Exclusion Notification**

**I hereby acknowledge notification** that in accordance with Section 2872 of the California Labor Code the foregoing Agreement between myself and the Company does not require me to assign or offer to assign to the Company any invention developed by me entirely on my own time without using the Company's equipment, supplies, facilities, trade secrets, Confidential Information or other proprietary information, except for those inventions that either:

1.    relate, at the time of conception or reduction to practice of the invention, to the Company's business, or actual or demonstrably anticipated research or development; or

2.    result from any work performed by me for the Company in accordance with the foregoing Agreement.

To the extent a provision in the foregoing Agreement purports to require me to assign an invention in contravention of Section 2870 of the California Labor Code, such provision is against the public policy of the State of California and is unenforceable.

**I acknowledge the receipt** of a copy of this notification.

By:_____

Name:_____

Date:___June 3, 2002___

**Witnessed by:**

Name:___Kathy S. Shawley___

BUSDOCS:994388.3

Page 78
Ex. 3

## EXHIBIT C
### Previous Inventions

--All Designs assigned to Company under the Assignment Agreement
--Inventions or technology not related to the Field and related to balloon catheter systems, including to the extent not related to the Field the list of technology below, which is not intended to be exhaustive.

### ISSUED PATENTS:

- US 4,744,366 (May 17, 1988)
- US 4,763,654 (August 16, 1988)
- US 5,263,932 (Nov. 23, 1993)
- US 5,304,193 (April 19, 1994)
- US 5,342,297 (Aug. 30, 1994)
- US 5,395,335 (May 7, 1995)
- US 5,462,530 (Oct. 31, 1995)
- US 5,554,118 (Sept. 10, 1996)

### PENDING PATENTS:

- US PAT. APPLICATION Serial # 07/705,295 (May 24, 1991)
- US PAT. APPLICATION Serial # 07/714,642 (June 13, 1991)
- US PAT. APPLICATION Serial # 07/756,295 (Sept. 6, 1991)

### WORK-IN-PROGRESS:

- Balloon Catheter Related to Pacemaker Lead Delivery System
- Continuation or Improvements of Above Delivery System

79
PAGE ●
EX. 3