# Exhibit D

## SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-Q

☒     QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934

For the quarterly period ended: September 30, 2005

Commission file number: 1-11083

# BOSTON SCIENTIFIC CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE | 04-2695240 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| One Boston Scientific Place, Natick, Massachusetts | 01760-1537 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (508) 650-8000

Former name, former address and former fiscal year, if changed since last report.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒         No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☒         No ☐

Indicate by check mark whether the registrant is shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐         No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the last practicable date.

Shares Outstanding

Class                                as of September 30, 2005
Common Stock, $.01 Par Value                          819,484,069

Page 1 of 51 Pages
Exhibit Index on Page 50

## TABLE OF CONTENTS

| | | PAGE NO. |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| **Item 1.** | Condensed Consolidated Financial Statements | 3 |
| | Condensed Consolidated Statements of Operations | 3 |
| | Condensed Consolidated Balance Sheets | 4 |
| | Condensed Consolidated Statements of Cash Flows | 5 |
| | Notes to the Condensed Consolidated Financial Statements | 6 |
| **Item 2.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| **Item 3.** | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| **Item 4.** | Controls and Procedures | 49 |
| | | |
| **PART II** | **OTHER INFORMATION** | 49 |
| **Item 1.** | Legal Proceedings | 49 |
| **Item 2.** | Unregistered Sales of Securities and Use of Proceeds | 49 |
| **Item 6.** | Exhibits | 50 |
| | | |
| **SIGNATURES** | | 51 |

ITEM 1.  CONDENSED CONSOLIDATED FINANCIAL STATEMENTS.

## BOSTON SCIENTIFIC CORPORATION AND SUBSIDIARIES
Condensed Consolidated Statements of Operations
(Unaudited)

| (in millions, except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2005 | 2004 | 2005 | 2004 |
| Net sales | $ 1,511 | $ 1,482 | $ 4,743 | $ 4,024 |
| Cost of products sold | 343 | 309 | 1,044 | 964 |
| Gross profit | 1,168 | 1,173 | 3,699 | 3,060 |
| Selling, general and administrative expenses | 444 | 504 | 1,346 | 1,227 |
| Research and development expenses | 181 | 145 | 506 | 411 |
| Royalty expense | 52 | 57 | 174 | 131 |
| Amortization expense | 47 | 34 | 114 | 82 |
| Purchased research and development |  |  | 276 | 64 |
| Litigation-related charges | 780 | 75 | 780 | 75 |
|  | 1,504 | 815 | 3,196 | 1,990 |
| Operating (loss)/income | (336) | 358 | 503 | 1,070 |
| Other income/(expense): |  |  |  |  |
| Interest expense | (21) | (19) | (58) | (44) |
| Other, net | 5 | 9 | 8 | 9 |
| (Loss)/income before income taxes | (352) | 348 | 453 | 1,035 |
| Income tax (benefit)/expense | (83) | 90 | 159 | 270 |
| Net (loss)/income | $ (269) | $ 258 | $ 294 | $ 765 |
| Net (loss)/income per common share - basic | $ (0.33) | $ 0.31 | $ 0.36 | $ 0.91 |
| Net (loss)/income per common share - assuming dilution | $ (0.33) | $ 0.30 | $ 0.35 | $ 0.89 |

See notes to the unaudited condensed consolidated financial statements.

3

Boston Scientific Corporation and Subsidiaries
Condensed Consolidated Balance Sheets
(Unaudited)

| (in millions, except share data) | September 30, 2005 | December 31, 2004 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 745 | $ 1,296 |
| Marketable securities | 172 | 344 |
| Trade accounts receivable, net | 951 | 900 |
| Inventories | 428 | 360 |
| Deferred income taxes | 330 | 241 |
| Other current assets | 135 | 148 |
| Total current assets | 2,761 | 3,289 |
| Property, plant and equipment, net | 986 | 870 |
| Intangible assets, net | 3,532 | 3,340 |
| Investments | 581 | 529 |
| Other assets | 216 | 142 |
| **Total Assets** | $ 8,076 | $ 8,170 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Borrowings due within one year | $ 84 | $ 1,228 |
| Accounts payable and accrued expenses | 981 | 1,010 |
| Other current liabilities | 77 | 367 |
| Total current liabilities | 1,142 | 2,605 |
| Long-term debt | 2,430 | 1,139 |
| Deferred income taxes | 354 | 259 |
| Other long-term liabilities | 249 | 142 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $ .01 par value - authorized 50,000,000 shares, none issued and outstanding | | |
| Common stock, $ .01 par value - authorized 1,200,000,000 shares, 844,565,292 shares issued at September 30, 2005 and December 31, 2004 | 8 | 8 |
| Treasury stock, at cost - 25,081,223 shares at September 30, 2005 and 9,221,468 shares at December 31, 2004 | (744) | (320) |
| Other stockholders' equity | 4,637 | 4,337 |
| Total stockholders' equity | 3,901 | 4,025 |
| **Total Liabilities and Stockholders' Equity** | $ 8,076 | $ 8,170 |

See notes to the unaudited condensed consolidated financial statements.

BOSTON SCIENTIFIC CORPORATION AND SUBSIDIARIES
Condensed Consolidated Statements of Cash Flows
(Unaudited)

| (in millions) | Nine Months Ended September 30, 2005 | | 2004 |
|---|---|---|---|
| Cash provided by operating activities | $ | 393 | $ 1,147 |
| Investing activities: | | | |
| Purchases of property, plant and equipment | | (267) | (201) |
| Proceeds from sale of property, plant and equipment | | 17 | |
| Net maturities/(purchases) of marketable securities | | 172 | (501) |
| Acquisitions of businesses, net of cash acquired | | (178) | (804) |
| Payments related to prior year acquisitions | | (25) | (85) |
| Net payments for investments in companies and acquisitions of certain technologies | | (178) | (88) |
| Cash used for investing activities | | **(459)** | **(1,679)** |
| Financing activities: | | | |
| Net increase/(decrease) in commercial paper borrowings | | 1,095 | (20) |
| Net (decrease)/increase in revolving borrowings | | (411) | 166 |
| Net (decrease)/increase in notes payable, capital leases and long-term borrowings, net | | | |
| of debt issuance costs | | (505) | 613 |
| Repurchases of common stock for treasury | | (734) | |
| Proceeds from issuances of shares of common stock | | 77 | 208 |
| Cash (used for)/provided by financing activities | | **(478)** | **967** |
| Effect of foreign exchange rates on cash | | (7) | (1) |
| Net (decrease)/increase in cash and cash equivalents | | (551) | 434 |
| Cash and cash equivalents at beginning of period | | 1,296 | 671 |
| Cash and cash equivalents at end of period | $ | 745 | $ 1,105 |

See notes to the unaudited condensed consolidated financial statements.

5

**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)
SEPTEMBER 30, 2005**

**Note A - Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of Boston Scientific Corporation (Boston Scientific or the Company) have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States for complete financial statements. In the opinion of management, all adjustments (consisting only of normal recurring adjustments) considered necessary for a fair presentation have been included. Operating results for the three and nine months ending September 30, 2005 are not necessarily indicative of the results that may be expected for the year ending December 31, 2005. For further information, refer to the condensed consolidated financial statements and footnotes thereto incorporated by reference in Boston Scientific's Annual Report on Form 10-K for the year ended December 31, 2004.

Certain prior year's amounts have been reclassified to conform to the current year presentation.

**Note B - Stock Compensation Arrangements**

During 2004, the FASB issued Statement No. 123(R), *Share-Based Payment*, which is a revision of Statement No. 123, *Accounting for Stock-Based Compensation*. Statement No. 123(R) supersedes APB Opinion No. 25, *Accounting for Stock Issued to Employees* and amends Statement No. 95, *Statement of Cash Flows*. In general, Statement No. 123(R) contains similar accounting concepts as those described in Statement No. 123. However, Statement No. 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. Alternative phase-in methods are allowed under Statement No. 123(R), which was to be effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. The SEC announced in the second quarter of 2005 that it would extend this phase-in period and, therefore, the Company's effective date for implementation of Statement No. 123(R) is January 1, 2006. The Company is considering adopting Statement No. 123(R) using the "modified-prospective method," which is a method in which compensation cost is recognized beginning with the effective date (a) based on the requirements of Statement No. 123(R) for all share-based payments granted after the effective date and (b) based on the requirements of Statement No. 123 for all awards granted to employees prior to the effective date of Statement No. 123(R) that remain unvested on the effective date. The Company expects to apply the Black-Scholes valuation model in determining the fair value of share-based payments to employees, which will then be amortized on a straight-line basis.

6

As permitted by Statement No. 123, the Company is currently accounting for share-based payments to employees using Opinion No. 25's intrinsic value method and, as such, generally recognizes no compensation cost for employee stock options. Accordingly, the adoption of Statement No. 123(R)'s fair value method will impact the Company's statements of operations. The impact of adoption of Statement No. 123(R) cannot be quantified at this time because it will depend on the level of share-based payments granted in the future, expected volatilities and expected useful lives, among other factors, present at the grant date. However, had Statement No. 123(R) been effective in prior periods, the impact of that standard would have approximated the impact of Statement No. 123 and net (loss)/income and net (loss)/income per share would have been reported as the following pro forma amounts:

| (in millions, except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Net (loss)/income, as reported | $ (269) | $ 258 | $ 294 | $ 765 |
| Add: Stock-based employee compensation expense included in net (loss)/income, net of related tax effects | 4 | | 9 | |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (19) | (17) | (53) | (48) |
| **Pro forma net (loss)/income** | **$ (284)** | **$ 241** | **$ 250** | **$ 717** |
| Net (loss)/income per common share - | | | | |
| Basic | | | | |
| Reported | $ (0.33) | $ 0.31 | $ 0.36 | $ 0.91 |
| Pro forma | $ (0.35) | $ 0.29 | $ 0.30 | $ 0.86 |
| Assuming dilution | | | | |
| Reported | $ (0.33) | $ 0.30 | $ 0.35 | $ 0.89 |
| Pro forma | $ (0.35) | $ 0.28 | $ 0.30 | $ 0.84 |

Under Opinion No. 25 and Statement No. 123, the Company recognizes compensation cost over the explicit vesting period, including awards subject to acceleration of vesting upon retirement. During the second quarter of 2005, the SEC Staff indicated for employees becoming eligible to retire during the explicit service period, such period is considered "nonsubstantive" for service performance. The SEC Staff accepts the practice of recognizing the compensation cost over the explicit service period in those cases, but only until such time as the Company adopts Statement No. 123(R). At that time, compensation cost will be recognized over the period through the date the employee first becomes eligible to retire. The impact on recognized compensation cost for the three and nine months ended September 30, 2005 and 2004 is not material had the Company applied the nonsubstantive vesting provisions of Statement No. 123(R).

**Note C - Comprehensive (Loss)/Income**

The following table provides a summary of the Company's comprehensive (loss)/income:

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| Net (loss)/income | $ (269) | $ 258 | $ 294 | $ 765 |
| Foreign currency translation adjustment | 3 | 6 | (36) | (5) |
| Net change in derivative financial instruments | 10 | 8 | 97 | 46 |
| Net change in equity investments | (30) | (25) | 16 | (47) |
| Comprehensive (loss)/income | $ (286) | $ 247 | $ 371 | $ 759 |

**Note D - Earnings per Share**

The following table sets forth the computations of basic and diluted earnings per share:

| (in millions, except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| **Basic** | | | | |
| Net (loss)/income | $ (269) | $ 258 | $ 294 | $ 765 |
| Weighted average shares outstanding | 819.9 | 843.8 | 827.8 | 838.1 |
| Net (loss)/income per common share | $ (0.33) | $ 0.31 | $ 0.36 | $ 0.91 |
| **Assuming dilution** | | | | |
| Net (loss)/income | $ (269) | $ 258 | $ 294 | $ 765 |
| Weighted average shares outstanding | 819.9 | 843.8 | 827.8 | 838.1 |
| Net effect of common stock equivalents | | 17.2 | 12.5 | 20.6 |
| Total | 819.9 | 861.0 | 840.3 | 858.7 |
| Net (loss)/income per common share | $ (0.33) | $ 0.30 | $ 0.35 | $ 0.89 |

Potential common shares of 11 million were excluded from the computation of earnings per share, assuming dilution, for the first nine months of 2005 because the exercise prices of these potential common shares were greater than the average market price of the Company's common shares during the quarter.

**Note E - Business Combinations**

**2005 Acquisitions**
In March 2005, the Company acquired 100 percent of the fully diluted equity of Advanced Stent Technologies, Inc. (AST) for approximately 3.6 million shares of its own common stock, which was valued at approximately $120 million on the date of acquisition. The Company may also make earn-out payments in the future that are contingent upon AST achieving certain regulatory and performance-related milestones. AST is a developer of stent delivery systems that are designed to address coronary artery disease in bifurcated vessels. The acquisition was intended to provide the Company with an expanded stent technology and intellectual property portfolio.

In April 2005, the Company acquired 100 percent of the fully diluted equity of TriVascular, Inc. (TriVascular) for approximately $65 million in addition to its previous investments and notes issued of approximately $45 million. The Company may also make earn-out payments in the future that are contingent upon TriVascular achieving certain regulatory and performance-related milestones. TriVascular is a developer of medical devices and procedures used for treating abdominal aortic aneurysms (AAA). The acquisition was intended to expand the Company's vascular technology portfolio.

In April 2005, the Company acquired 100 percent of the fully diluted equity of CryoVascular Systems, Inc. (CryoVascular) for approximately $50 million in addition to its previous investments of approximately $10 million. The Company may also make earn-out payments in the future that are contingent upon CryoVascular achieving certain performance related-milestones. CryoVascular is a developer and manufacturer of a proprietary angioplasty device to treat atherosclerotic disease of the legs and other peripheral arteries, which the Company previously distributed. The acquisition was intended to expand the Company's peripheral vascular technology portfolio.

In June 2005, the Company completed its acquisition of 100 percent of the fully diluted equity of Rubicon Medical Corporation (Rubicon) for approximately $70 million in addition to its previous investments of approximately $20 million. The Company may also make earn-out payments in the future that are contingent upon Rubicon achieving certain regulatory and performance related-milestones. Rubicon is a developer of embolic protection filters for use in interventional cardiovascular procedures. The acquisition was intended to strengthen the Company's leadership position in interventional cardiovascular procedures.

### Purchased Research and Development

The Company's 2005 purchased research and development consisted of $130 million relating to the acquisition of TriVascular; $73 million relating to the acquisition of AST; $45 million relating to the acquisition of Rubicon; and $3 million relating to the acquisition of CryoVascular. In addition, the Company's accounting policy is to record certain costs associated with its strategic alliances as purchased research and development. In accordance with this policy, the Company recorded $25 million of purchased research and development in conjunction with obtaining distribution rights for new brain monitoring technology that Aspect Medical Systems, one of the Company's strategic partners, is currently developing. This technology is designed to aid the diagnosis and treatment of depression, Alzheimer's disease and other neurological conditions.

For the in-process projects the Company acquired in connection with its 2005 acquisitions, it used risk-adjusted discount rates that ranged from 18 percent to 27 percent to discount its projected cash flows. The Company believes that the estimated purchased research and development amounts so determined represent the fair value at the date of acquisition and do not exceed the amount a third party would pay for the projects. The purchased research and development associated with the Company's 2005 acquisitions was valued and accounted for in accordance with the Company's policy that is detailed in the "Critical Accounting Policies" section of the Company's Form 10K.

9

The most significant in-process projects acquired in conjunction with the Company's 2005 acquisitions included TriVascular's AAA stent-graft and AST's Petal[TM] bifurcation stent, which collectively represented 73 percent of the 2005 acquired in-process projects. TriVascular's AAA stent-graft design reduces the size of the stent-graft by replacing much of the metal stent assembly with a polymer that is injected into channels within the stent-graft during the procedure. The cost to complete the AAA stent-graft is estimated to be approximately $100 million. As of the date the Company acquired TriVascular, it expected the AAA stent-graft to be commercially available on a worldwide basis in approximately 4 years.

AST's Petal bifurcation stent is designed to expand into the side vessel when a single vessel branches into two vessels, permitting blood to flow into both branches of the bifurcation and providing support at the junction. The cost to complete the Petal bifurcation stent is estimated to be between $100 million and $125 million. As of the date the Company acquired AST, it expected the Petal bifurcation stent to be commercially available on a worldwide basis within 6 years in a drug-eluting configuration.

The condensed consolidated financial statements include the operating results of these acquisitions from the date of acquisition. Pro forma information is not presented, as the results of operations of these entities prior to the date of acquisition individually or in the aggregate are not material to the Company. The aggregate purchase price for these acquisitions has been allocated to the assets acquired and liabilities assumed based on their fair values at the date of acquisition. The estimated excess of purchase price over the fair value of the net tangible assets acquired was allocated to identifiable intangible assets, including purchased research and development, based on detailed valuations that used information and assumptions provided by management. In conjunction with its 2005 acquisitions, the Company obtained approximately $250 million in technology-related intangible assets, with a weighted-average useful life of 18 years. Further, as of September 30, 2005, the Company has recorded a liability of $104 million to account for the excess of the fair value of the assets acquired over the initial purchase price for certain of the Company's acquisitions. This liability will be reduced in conjunction with the future settlement of contingent consideration arrangements.

### Contingent Consideration

Certain of the Company's business combinations involve the payment of contingent consideration. Certain earn-out payments are determined based on the acquired company's achievement of certain regulatory and/or performance-related milestones and, consequently, the Company cannot currently determine the total payments. However, the Company has developed an estimate of the maximum potential contingent consideration for each of its acquisitions with an outstanding earn-out obligation. At September 30, 2005, the estimated maximum potential amount of future contingent consideration (undiscounted) that it could be required to make associated with its business combinations is approximately $4.5 billion, some of which may be payable in the Company's common stock. The regulatory and performance-related milestones that must be reached before the contingent consideration is payable will occur or will not occur in certain future periods ranging from 2005 through 2014. The estimated cumulative specified revenue level associated with these maximum future contingent payments is approximately $10 billion.

**Note F - Other Balance Sheet Information**

Components of selected captions in the condensed consolidated interim balance sheets are as follows:

| (in millions) | September 30, 2005 | | December 31, 2004 | |
|---|---|---|---|---|
| **Trade Accounts Receivable** | | | | |
| Accounts receivable | $ | 1,021 | $ | 980 |
| Less: allowances | | 70 | | 80 |
| | $ | 951 | $ | 900 |
| | | | | |
| **Inventories** | | | | |
| Finished goods | $ | 281 | $ | 238 |
| Work-in-process | | 73 | | 65 |
| Raw materials | | 74 | | 57 |
| | $ | 428 | $ | 360 |
| | | | | |
| **Property, Plant and Equipment** | | | | |
| Property, plant and equipment | $ | 1,806 | $ | 1,645 |
| Less: accumulated depreciation | | 820 | | 775 |
| | $ | 986 | $ | 870 |
| | | | | |
| **Intangible Assets** | | | | |
| Intangible assets | $ | 4,164 | $ | 3,871 |
| Less: accumulated amortization | | 632 | | 531 |
| | $ | 3,532 | $ | 3,340 |

**Note G - Borrowings and Credit Arrangements**

During the first nine months of 2005, the Company received net borrowing proceeds of $179 million. These proceeds are primarily from approximately $1,095 million in net commercial paper issuances, offset by a repayment of its $500 million 6.625 percent senior notes that matured in March 2005 and its 45 billion Japanese yen (approximately $400 million) credit facility borrowings that matured in September 2005.

During the first nine months of 2005, the Company refinanced its revolving credit facilities to extend the maturity of one credit facility and to reduce the total borrowing capacity by $165 million. At September 30, 2005, the Company's revolving credit facilities totaled approximately $2,020 million and consisted of a $1,500 million credit facility that terminates in May 2009; a $500 million credit facility that terminates in May 2010 and contains an option to increase the facility size by an additional $500 million in the future; and a $20 million uncommitted credit facility that terminates in May 2006. Use of these borrowings is unrestricted and the borrowings are unsecured. The revolving credit facilities provide borrowing capacity and support the commercial paper program. The Company had $1,375 million of commercial paper outstanding at September 30, 2005 at a weighted average interest rate of 3.73 percent and $280 million outstanding at December 31, 2004 at a weighted average interest rate of 2.44 percent.

11

In addition, the Company decreased its credit and security facility that is secured by its U.S. trade receivables from $400 million to $100 million, effective April 30, 2005. This credit and security facility terminates in August 2006. As of September 30, 2005 and December 31, 2004, there were no outstanding borrowings under this credit and security facility.

As of September 30, 2005, the Company had the ability and intent to refinance a portion of its short-term debt on a long-term basis through its revolving credit facilities and expected that a minimum of $1,300 million of its short-term obligations, consisting of commercial paper, would remain outstanding beyond a twelve-month period. Accordingly, at September 30, 2005, the Company classified $1,300 million of its short-term borrowings as long-term borrowings. No such reclassification was made at December 31, 2004.

Given favorable market conditions, the Company is considering the issuance of up to $750 million in long-term debt securities during the fourth quarter of 2005 under a public registration statement that was previously filed with the SEC. As of the end of the third quarter of 2005, the Company has $1,000 million available under this public registration statement to issue various debt and equity securities. In the event that the Company issues long-term debt securities, it anticipates filing a new public registration statement with the SEC to increase the amount of debt and equity securities it can issue from the $250 million remaining under the existing registration statement to a total of $1,500 million to maintain its ready access to the public capital markets.

**Note H - Commitments and Contingencies**

The Company is involved in various legal and regulatory proceedings, including intellectual property, breach of contract and product liability suits. In some cases, the claimants seek damages, as well as other relief, which, if granted, could require significant expenditures. The Company accrues costs of settlement, damages and, under certain conditions, costs of defense when such costs are probable and estimable. Otherwise, these costs are expensed as incurred. If the estimate of a probable loss is a range and no amount within the range is more likely, the Company accrues the minimum amount of the range. The accrual for regulatory and litigation-related costs that were probable and estimable was $23 million at September 30, 2005 and $99 million at December 31, 2004. The decrease in the accrual at September 30, 2005 reflects the $74 million settlement payment to the Department of Justice made during the second quarter of 2005.

In management's opinion, the Company is not currently involved in any legal proceeding other than those specifically identified in this Quarterly Report and the Company's Annual Report on Form 10-K for the year ended December 31, 2004, which, individually or in the aggregate, could have a material effect on the financial condition, operations and/or cash flows of the Company. Except as disclosed below there have been no material developments with regard to any matters of litigation disclosed in the Company's Form 10-K for the year ended December 31, 2004.

**Litigation with Johnson & Johnson**

On October 22, 1997, Cordis Corporation (Cordis), a subsidiary of Johnson & Johnson, filed a suit for patent infringement against the Company and SCIMED Life Systems, Inc. (SCIMED), a subsidiary of the Company, alleging that the importation and use of the NIR® stent infringes two patents owned by Cordis. On April 13, 1998, Cordis filed a suit for patent infringement against the Company and SCIMED alleging that the Company's NIR® stent infringes two additional patents owned by Cordis. The suits were filed in the U.S. District Court for the District of Delaware seeking monetary damages, injunctive relief and that the patents be adjudged valid, enforceable and infringed. A trial on both actions was held in late 2000. A jury found that the NIR® stent does not infringe three Cordis patents, but does infringe one claim of one Cordis patent and awarded damages of approximately $324 million to Cordis. On March 28, 2002, the Court set aside the damage award, but upheld the remainder of the verdict, and held that two of the four patents had been obtained through inequitable conduct in the U.S. Patent and Trademark Office. On May 16, 2002, the Court also set aside the verdict of infringement, requiring a new trial. On March 24, 2005, in a second trial, a jury found that a single claim of the Cordis patent was valid and infringed. The jury determined liability only; any monetary damages will be determined at a later trial. The Company, however, has requested the judge to enter judgment in its favor as a matter of law, and intends to appeal any adverse decision. Even though it is reasonably possible that the Company may incur a liability associated with this case, the Company does not believe that a loss is probable or estimable. Therefore, the Company has not accrued for any losses associated with this case.

On April 2, 1997, Ethicon and other Johnson & Johnson subsidiaries filed a cross-border proceeding in The Netherlands alleging that the NIR® stent infringes a European patent licensed to Ethicon. In this action, the Johnson & Johnson entities requested relief, including provisional relief (a preliminary injunction). In October 1997, Johnson & Johnson's request for provisional cross-border relief on the patent was denied by the Dutch Court, on the ground that it is "very likely" that the NIR® stent will be found not to infringe the patent. Johnson & Johnson's appeal of this decision was denied. In January 1999, Johnson & Johnson amended the claims of the patent and changed the action from a cross-border case to a Dutch national action. On June 23, 1999, the Dutch Court affirmed that there were no remaining infringement claims with respect to the patent and also asked the Dutch Patent Office for technical advice about the validity of the amended patent. In late 1999, Johnson & Johnson appealed this decision. On March 11, 2004, the Court of Appeals nullified the Dutch Court's June 23, 1999 decision and the proceedings have been returned to the Dutch Court. In accordance with its 1999 decision, the Dutch Court asked the Dutch Patent Office for technical advice on the validity of the amended patent. On August 31, 2005, the Dutch Patent Office issued its technical advice that the amended patent was valid but left certain legal issues for the Dutch Court to resolve. At this time, no further proceedings have occurred in the Dutch Court.

On March 30, 2000, the Company (through its subsidiary) filed suit for patent infringement against two subsidiaries of Cordis alleging that Cordis' Bx Velocity® stent delivery system infringes a published utility model owned by Medinol Ltd. (Medinol)

13

and exclusively licensed to the Company. The complaint was filed in the District Court of Dusseldorf, Germany seeking monetary and injunctive relief. A hearing was held on March 15, 2001, and on June 6, 2001, the Court issued a written decision that Cordis' Bx Velocity stent delivery system infringes the Medinol published utility model. Cordis appealed the decision of the German court. A hearing on the appeal originally scheduled for April 3, 2003 was suspended until decisions are rendered in two actions pending in the U.S. District Court of New York between Medinol and the Company. On October 19, 2004, Medinol filed an Intervention action requesting that the Court declare that the Company is not entitled to bring the infringement claim against Cordis and to declare that Cordis infringes the Medinol utility model. As a result of the Company's recent settlement with Medinol, the Company assigned all of its rights to bring the suit and rights to damages to Medinol.

On March 26, 2002, the Company and Target Therapeutics, Inc. (Target), a wholly owned subsidiary of the Company, filed suit for patent infringement against Cordis alleging that certain detachable coil delivery systems and/or pushable coil vascular occlusion systems (coil delivery systems) infringe three U.S. patents, owned by or exclusively licensed to Target. The complaint was filed in the U.S. District Court for the Northern District of California seeking monetary and injunctive relief. A summary judgment hearing was held on April 19, 2004, and on June 25, 2004, the Court granted summary judgment in favor of the Company finding infringement of one of the patents. On February 3, 2005, the Court granted a stay in the proceedings pending reexamination of two of the patents by the U.S. Patent and Trademark Office. Summary judgment motions on the validity of the remaining patent are pending with one hearing held on September 26, 2005, and another scheduled for November 14, 2005.

On January 13, 2003, Cordis filed suit for patent infringement against the Company and SCIMED alleging the Company's Express$^{2TM}$ coronary stent infringes a U.S. patent owned by Cordis. The suit was filed in the U.S. District Court for the District of Delaware seeking monetary and injunctive relief. On February 14, 2003, Cordis filed a motion requesting a preliminary injunction. The Company answered the complaint, denying the allegations, and filed a counterclaim against Cordis, alleging that certain products sold by Cordis infringe a patent owned by the Company. A hearing on the preliminary injunction motion was held and on November 21, 2003, the Court denied the motion for a preliminary injunction. Cordis appealed the denial of its motion and a hearing was held on April 5, 2004. On May 28, 2004, the Court of Appeals affirmed the denial of the preliminary injunction. On August 4, 2004, the Court granted a Cordis motion to add the Company's Liberté™ coronary stent and two additional patents to the complaint. On June 21, 2005, a jury found that the Company's TAXUS® Express², Express², Express™ Biliary, and Liberté stents infringe a Johnson & Johnson patent and that the Liberté stent infringes a second Johnson & Johnson patent. On July 1, 2005, a jury found that Johnson & Johnson's Cypher®, Bx Velocity®, Bx Sonic™ and Genesis™ stents infringe the patent in the Company's counterclaim. The juries only determined liability; monetary damages will be determined at a later trial. The Company has requested the judge to enter judgment in its favor as a matter of law. The Company intends to appeal any adverse decision. Even though it is reasonably possible that the Company may incur a liability associated with this case, the Company does not believe that a loss is probable or

14

estimable. Therefore, the Company has not accrued for any losses associated with this case.

On March 13, 2003, the Company and Boston Scientific Scimed, Inc. filed suit for patent infringement against Johnson & Johnson and Cordis, alleging that its Cypher drug-eluting stent infringes a patent owned by the Company. The suit was filed in the District Court of Delaware seeking monetary and injunctive relief. On March 20, 2003, the Company filed a motion seeking a preliminary injunction with respect to the sale of the Cypher drug-eluting stent in the United States. Cordis answered the complaint, denying the allegations, and filed a counterclaim against the Company alleging that the patent is not valid and is unenforceable. The Company subsequently filed amended and new complaints in the District Court of Delaware alleging that the Cypher drug-eluting stent infringes four additional patents owned by the Company. A hearing on the preliminary injunction motion was held and on November 21, 2003, the Court denied the motion for a preliminary injunction. Following the announcement on February 23, 2004 by Guidant Corporation (Guidant) of an agreement with Johnson & Johnson and Cordis to sell the Cypher drug-eluting stent, the Company amended its complaint to include Guidant and certain of its subsidiaries as co-defendants as to certain patents in suit. In March 2005, the Company filed a stipulated dismissal as to three of the patents. On July 1, 2005, a jury found that Johnson & Johnson's Cypher drug-eluting stent infringes one of the Company's patents. The jury upheld the validity of the patent. The jury determined liability only; any monetary damages will be determined at a later trial. Johnson & Johnson has requested the judge to enter judgment in its favor as a matter of law. The trial on the second remaining patent against Johnson & Johnson, Cordis and Guidant originally scheduled for October 17, 2005 has been rescheduled until March, 2006.

On May 12, 2004, the Company (through its subsidiary Schneider Europe GmbH) filed suit against two of Johnson & Johnson's Dutch subsidiaries, alleging that Cordis' Bx Velocity stent, Bx Sonic stent, Cypher stent, Cypher Select stent, and Aqua T3 delivery systems for those stents, and U-Pass angioplasty balloon catheters infringe one of the Company's European patents. The suit was filed in the District Court of The Hague in The Netherlands seeking injunctive and monetary relief. On June 8, 2005, the Court found the Johnson & Johnson products infringe the Company's patent and granted injunctive relief. On June 23, 2005, the District Court in Assen, The Netherlands stayed enforcement of the injunction. On October 12, 2005, a Dutch Court of Appeals overturned the lower court's ruling and reinstated the injunction against the manufacture, use and sale of the Cordis products in the Netherlands. Damages for Cordis' infringing acts in the Netherlands will be determined at a later date. Cordis' appeal of the validity and infringement ruling by The Hague court remains pending.

On September 27, 2004, Boston Scientific Scimed, Inc. filed suit against a German subsidiary of Johnson & Johnson alleging the Cypher drug-eluting stent infringes a European patent owned by the Company. The suit was filed in Mannheim, Germany seeking monetary and injunctive relief. A hearing was held on April 1, 2005 and on July 15, 2005, the Court indicated that it would appoint a technical expert. A final hearing has not yet been scheduled.

15

On October 15, 2004, Boston Scientific Scimed, Inc. filed suit against a German subsidiary of Johnson & Johnson alleging the Cypher drug-eluting stent infringes a German utility model owned by the Company. The suit was filed in Mannheim, Germany seeking monetary and injunctive relief. A hearing was held on April 1, 2005 and on July 15, 2005, the Court indicated that it would appoint a technical expert. A final hearing has not yet been scheduled.

**Litigation with Medtronic, Inc.**
On August 13, 1998, Medtronic AVE, Inc. (Medtronic AVE), a subsidiary of Medtronic, Inc. (Medtronic), filed a suit for patent infringement against the Company and SCIMED alleging that the Company's NIR® stent infringes two patents owned by Medtronic AVE. The suit was filed in the U.S. District Court for the District of Delaware seeking injunctive and monetary relief. On May 25, 2000, Medtronic AVE amended the complaint to include a third patent. Cross-motions for summary judgment were filed and hearings were held on October 21 and 22, 2004. On January 5, 2005, the Court found the NIR® stent not to infringe the patents and on February 2, 2005, issued final judgment in favor of the Company. Medtronic appealed the judgment on March 16, 2005. A hearing on the appeal has not yet been scheduled.

On January 15, 2004, Medtronic Vascular, Inc. (Medtronic Vascular), a subsidiary of Medtronic, filed suit against the Company and SCIMED alleging the Company's Express coronary stent and Express[2] coronary stent infringe four U.S. patents owned by Medtronic Vascular. The suit was filed in the District Court of Delaware seeking monetary and injunctive relief. The Company has answered, denying the allegations of the complaint. Cross-motions for summary judgment were filed and hearings were held on October 21 and 22, 2004. On January 5, 2005, the Court found the Express coronary stent and Express[2] coronary stent not to infringe the patents and on February 2, 2005, issued final judgment in favor of the Company. Medtronic appealed the judgment on March 16, 2005. A hearing on the appeal has not yet been scheduled.

**Litigation Relating to Advanced Neuromodulation Systems, Inc.**
On April 21, 2004, Advanced Neuromodulation Systems, Inc. (ANSI) filed suit against Advanced Bionics, a subsidiary of the Company, alleging that its Precision® spinal cord stimulation system infringes a U.S. patent owned by ANSI. The suit also included allegations of misappropriation of trade secrets and tortious interference with a contract. The suit was filed in the U.S. District Court for the Eastern District of Texas seeking monetary and injunctive relief. On June 25, 2004, Advanced Bionics filed a motion to dismiss and a request for transfer of venue to California. On August 6, 2004, Advanced Bionics moved to send the trade secret claims and tortious interference proceedings to arbitration. On August 12, 2004, ANSI amended its complaint to include two additional patents. On January 25, 2005, Advanced Bionics' motion to dismiss and transfer was denied, but the Court granted, in part, the motion to move the misappropriation of trade secrets and tortious interference claims to arbitration. On March 11, 2005, Advanced Bionics answered the amended complaint, denying the allegations and filed a counterclaim against ANSI alleging that certain products sold by ANSI infringe two patents owned by Advanced Bionics. The counterclaim seeks monetary and injunctive relief. A patent claim interpretation hearing was held on April 15, 2005. On May 18, 2005, the Court granted ANSI's motion to sever the patents alleged in Advanced Bionics'

counterclaim. Trial on the ANSI patent claims is expected to begin in February 2006. Trial on the Advanced Bionics patent claims and arbitration in the trade secret claims have not yet been scheduled.

On October 20, 2004, ANSI filed a complaint against Advanced Bionics and a former employee of ANSI now working at Advanced Bionics. The suit includes allegations of breach of contract and misappropriation of trade secrets against the employee, tortious interference against Advanced Bionics, and conversion and civil conspiracy against both defendants. The suit was filed in the District Court of Collin County, Texas seeking monetary damages and temporary and permanent injunctive relief. On July 26, 2005, ANSI filed a notice of Dismissal and Nonsuit dismissing the complaint without prejudice.

**Litigation with Medinol Ltd.**
On September 21, 2005, the Company and Medinol Ltd. (Medinol) reached a settlement resolving all outstanding litigation between the parties. Under the terms of the settlement, the Company paid Medinol $750 million, and the parties agreed to a mutual release of most existing claims against each other, effectively dismissing all outstanding stent litigation, including all disputes with respect to the Express and TAXUS Express stents, the termination of all agreements between each other, including the supply agreement, the cancellation of our equity investment in Medinol, the establishment of an arbitration process to be the sole forum to hear any future disputes that may arise involving certain Medinol patents, in which Medinol has agreed to limit any relief it seeks to reasonable royalties, and a covenant by Medinol not to sue the Company under certain Medinol patents other than through the established arbitration process.

On April 5, 2001, Medinol filed a complaint against the Company and certain of its current and former employees alleging breaches of contract, fraud and other claims. The suit was filed in the U.S. District Court for the Southern District of New York seeking monetary and injunctive relief. On April 26, 2001, Medinol amended its complaint to add claims alleging misappropriation of trade secrets in relation to the Company's Express stent development program. Medinol seeks monetary and injunctive relief, as well as an end to the Company's right to distribute Medinol stents and to gain access to certain Company intellectual property. On April 30, 2001, the Company answered and countersued Medinol and its principals, seeking monetary and injunctive relief. During the last quarter of 2001, the Court dismissed several of the individuals from the case. Summary judgment hearings were held in November and December 2003. On December 2, 2004, the Court granted summary judgment in part and denied summary judgment in part, dismissing the remaining individuals and dismissing all of the jury claims. Trial began on June 27, 2005, and continued through September 2005. Pursuant to the Settlement Agreement between the Company and Medinol, this case has been dismissed with prejudice.

On June 11, 2001, the Company filed suit in the Jerusalem District Court in Israel against Medinol and its controlling shareholders, alleging among other things, loss of faith among Medinol's shareholders, breach of duty by Medinol management and misappropriation of corporate opportunities, including trade secrets and intellectual property. The suit seeks, among other things, monetary relief and costs. Preliminary

motions were heard on October 29, 2001. Medinol and its shareholders requested the Court to strike the claim on the grounds of lack of jurisdiction. The Court rejected the motion except for the nomination of a director to Medinol, which was referred to the District Court of New York. A preliminary hearing originally scheduled for June 9, 2003 was canceled and had not yet been rescheduled. Pursuant to the Settlement Agreement between the Company and Medinol, this case has been dismissed with prejudice.

On April 22, 2002, Medinol filed suit against Boston Scientific Medizintechnik GmbH, a German subsidiary of the Company, alleging that the Company's Express stent infringes four German patents and three utility models owned by Medinol. The suit was filed in Dusseldorf, Germany. On June 24, 2003, the German Court found that the Express stent infringes one German patent and one utility model asserted by Medinol and enjoined sales in Germany. Medinol appealed the finding of noninfringement on two of its patents and the Company appealed the finding of infringement of the utility model. In 2004, the Court of Appeals stayed the injunction of the Express stent pending the outcome of the appeal of the utility model. On March 31, 2004, the European Patent Office declared the infringed patent invalid. A hearing on the appeal was held in January 2005, and on February 24, 2005, the Court found the Company did not infringe two of the Medinol patents. The appeal as to the infringed utility model has been stayed pending the outcome of a related cancellation proceeding. The Court stayed its decision on the fourth patent pending the decision of an opposition hearing in the European Patent Office. On May 3, 2005, the European Patent Office declared the patent invalid. On December 6, 2004, Medinol filed an Extension of Complaint alleging infringement of another German patent, and a hearing on the merits had been scheduled for January 31, 2006. Pursuant to the Settlement Agreement between the Company and Medinol, this case has been dismissed with prejudice.

On January 21, 2003, Medinol filed suit against several of the Company's international subsidiaries in the District Court of The Hague, The Netherlands seeking cross-border, monetary and injunctive relief covering The Netherlands, Austria, Belgium, the United Kingdom, Ireland, Switzerland, Sweden, Spain, France, Portugal and Italy, alleging the Company's Express stent infringes four European patents owned by Medinol. A hearing was held on October 10, 2003, and a decision was rendered on December 17, 2003 finding the Company infringes one patent. The Court, however, granted no cross-border relief. The Company appealed the finding and filed nullity actions against one of the patents in Ireland, France, Italy, Spain, Sweden, Portugal and Switzerland. On March 31, 2004, the European Patent Office declared the injunction and damages order have been dismissed. Medinol appealed the Court's decision with respect to the remaining three patents seeking an expedited review of the claims by the Court. A hearing was held on March 14, 2005. On May 3, 2005, the European Patent Office declared one of these patents invalid. On June 9, 2004, Medinol filed a kort geding proceeding against the Company's same international subsidiaries alleging that the sale of the Express and TAXUS coronary stent systems infringe one of the patents on appeal from the 2003 suit. The suit was filed in the District Court of The Hague, The Netherlands seeking preliminary injunctive relief. On August 5, 2004, the Court denied Medinol's request for preliminary injunctive

18

relief. On September 1, 2004, Medinol filed an appeal. Pursuant to the Settlement Agreement between the Company and Medinol, this case has been dismissed with prejudice.

On April 30, 2004, Medinol filed suit against the Company alleging that the Company's Express and TAXUS stent systems infringe a utility model owned by Medinol. The suit was filed in Dusseldorf, Germany. A hearing originally schedule for April 21, 2005 was cancelled and proceedings were been stayed pending the outcome of a related invalidity action. Pursuant to the Settlement Agreement between the Company and Medinol, this case has been dismissed with prejudice.

On September 10, 2002, the Company filed suit against Medinol alleging Medinol's NIRFlex™ and NIRFlex™ Royal products infringe two patents owned by the Company. The suit was filed in Dusseldorf, Germany seeking monetary and injunctive relief. On October 28, 2003, the German Court found that Medinol infringed one of the two patents owned by the Company. On December 8, 2003, the Company filed an appeal relative to the other patent. Subsequently, Medinol filed an appeal relative to the one patent found to be infringed. A hearing was held on both appeals on April 14, 2005. The Court had requested an expert to provide more evidence. A hearing has not yet been scheduled.

On September 25, 2002, the Company filed suit against Medinol alleging Medinol's NIRFlex™ and NIRFlex™ Royal products infringe a patent owned by the Company. The suit was filed in the District Court of The Hague, The Netherlands seeking cross-border, monetary and injunctive relief. On September 10, 2003, the Dutch Court ruled that the patent was invalid. The Company appealed the Court's decision in December 2003. A hearing on the appeal has not yet been scheduled.

The September 10, 2002 and September 25, 2002 suits filed by the Company against Medinol were not dismissed as part of the Settlement Agreement.

**Other Patent Litigation**
On July 28, 2000, Dr. Tassilo Bonzel filed a complaint naming certain of the Company's Schneider Worldwide subsidiaries and Pfizer Inc. (Pfizer) and certain of its affiliates as defendants, alleging that Pfizer failed to pay Dr. Bonzel amounts owed under a license agreement involving Dr. Bonzel's patented Monorail® technology. The suit was filed in the U.S. District Court for the District of Minnesota seeking monetary relief. On September 26, 2001, Dr. Bonzel and the Company reached a contingent settlement involving all but one claim asserted in the complaint. The contingency has been satisfied and the settlement is now final. On December 17, 2001, the remaining claim was dismissed without prejudice with leave to refile the suit in Germany. Dr. Bonzel filed an appeal of the dismissal of the remaining claim. On July 29, 2003, the Appellate Court affirmed the lower court's dismissal, and on October 24, 2003, the Minnesota Supreme Court denied Dr. Bonzel's petition for further review. On March 26, 2004, Dr. Bonzel filed a similar complaint against the Company, certain of its subsidiaries and Pfizer in the Federal District Court for the District of Minnesota. The Company and its subsidiaries answered, denying the allegations of the complaint. The Company filed a

19

motion to dismiss the case and a hearing on the motion was held on August 27, 2004. On November 2, 2004, the Court granted the Company's motion and the case was dismissed with prejudice. On February 7, 2005, Dr. Bonzel appealed the Court's decision. A hearing on the appeal was held on October 25, 2005.

On March 29, 2005, the Company and Boston Scientific Scimed, Inc. filed suit against EV3, Inc. (EV3) for patent infringement, alleging that EV3's SpideRX™ embolic protection device infringes four U.S. patents owned by the Company. The complaint was filed in the U.S. District Court for the District of Minnesota seeking monetary and injunctive relief. Trial is expected to begin on February 1, 2007.

On February 1, 2005, the Company and Angiotech Pharmaceuticals, Inc. (Angiotech) filed suit against Conor Medical System, Inc. (Conor) in The Hague, The Netherlands seeking a declaration that Conor's drug-eluting stent products infringe patents owned by Angiotech and licensed to the Company. A hearing date has not yet been scheduled but is expected for Summer 2006.

On April 4, 2005, the Company and Angiotech filed suit against Sahajanand Medical Technologies Pvt. Ltd. (Sahajanand) in The Hague, Netherlands seeking a declaration that Sahajanand's drug-eluting stent products infringe patents owned by Angiotech and licensed to the Company. A hearing is scheduled for March 10, 2006.

On May 19, 2005, G. David Jang, M.D. filed suit against the Company alleging breach of contract relating to certain patent rights assigned to the Company covering stent technology. The suit was filed in the U.S. District Court, Central District of California seeking monetary damages and recision of the contract. On June 24, 2005, the Company answered denying the allegations and filed a counterclaim.

On September 7, 2005, Dr. Shaun L. W. Samuels filed suit against the Company alleging misappropriation of trade secrets, unfair competition and that one of the Company's development-stage products infringe a patent owned by Dr. Samuels. The suit was filed in the U.S. District Court, Eastern District of Texas seeking monetary damages and injunctive relief.

**Department of Justice Investigation**
In October 1998, the Company recalled its NIR ON® Ranger™ with Sox™ coronary stent delivery system following reports of balloon leaks. Since November 1998, the U.S. Department of Justice had been conducting an investigation primarily regarding: the shipment, sale and subsequent recall of the NIR ON® Ranger™ with Sox™ stent delivery system; aspects of its relationship with Medinol, the vendor of the stent; and related events. On June 24, 2005, the Company entered into a civil settlement with the U.S. Department of Justice. As part of the agreement, the Company agreed to pay $74 million. Also pursuant to the agreement, the Department of Justice filed a complaint in the U.S. District Court for the District of Massachusetts together with a Notice of Dismissal with prejudice. No charges were brought against the Company or any employee. The settlement involves no admission of any wrongdoing by the Company or any of its employees. The Company believes it acted legally, responsibly and appropriately at all times.

**Other Proceedings**

On September 8, 2005, the Laborers Local 100 and 397 Pension Fund initiated a putative shareholder derivative lawsuit for and on behalf of the Company in the Commonwealth of Massachusetts Superior Court Department for Middlesex County against the Company's directors, certain of its current and former officers and the Company as nominal defendant. The complaint alleges, among other things, that with regard to certain matters of regulatory compliance, the defendants breached their fiduciary duties to the Company and its shareholders in the management and affairs of the Company and in the use and preservation of the Company's assets. The complaint also alleges that as a result of the alleged misconduct and the purported failure to publicly disclose material information certain directors and officers sold Company stock at inflated prices in violation of their fiduciary duties and were unjustly enriched. The suits seek a declaration of the directors' and officers' alleged breaches, unspecified damages sustained by the Company as a result of the alleged breaches and other unspecified equitable and injunctive relief. On September 15, 2005, Benjamin Roussey also initiated a putative shareholder derivative lawsuit in the same Court alleging similar misconduct and seeking similar relief. The Company believes the suits will be consolidated.

On September 23, 2005, Srinivasan Shankar, on behalf of himself and all others similarly situated, filed a purported securities class action suit in the U.S. District Court for the District of Massachusetts on behalf of those who purchased or otherwise acquired the Company's securities during the period March 31, 2003 through August 23, 2005, alleging that the Company and certain of its officers violated certain sections of the Securities Exchange Act of 1934. The complaint principally alleges that the Company did not adequately disclose its ability to satisfy FDA regulations governing medical device product quality, which resulted in the artificial inflation of the Company's stock price and enabled certain of the Company's officers to profit from the sale of Company stock at such inflated prices. The complaint seeks unspecified damages, equitable, and injunctive relief. On September 28, 2005, October 27, 2005, November 2, 2005 and November 3, 2005, Jack Yopp, Robert L. Garber, Betty C. Meyer and John Ryan, respectively on behalf of themselves and all others similarly situated, filed a purported securities class action suit in the same Court on behalf of the same purported class, alleging similar misconduct and seeking similar relief. The Company believes the suits will be consolidated.

On March 3, 2005, the African Assistance Program filed a charge of discrimination with the Minnesota Department of Human Rights and the Minnesota office of the U.S. Equal Employment Opportunity Commission, purportedly on behalf of certain of the Company's black employees of African national origin, alleging discriminatory and retaliatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended. At present, the EEOC is handling this matter on behalf of both agencies. On August 19, 2005, the Company responded, denying the allegations of the charge and moved to dismiss the matter.

**Note I - Tax Rate**

The following table provides a summary of the Company's reported tax rate:

|  | Three Months Ended September 30, | | Percentage Point (Decrease)/Increase |
|---|---|---|---|
|  | 2005 | 2004 |  |
| Reported tax rate | 24% | 26% | (2%) |
| Impact of certain charges* | 0% | (2%) | 2% |

|  | Nine Months Ended September 30, | | Percentage Point Increase/(Decrease) |
|---|---|---|---|
|  | 2005 | 2004 |  |
| Reported tax rate | 35% | 26% | 9% |
| Impact of certain charges* | (11%) | (2%) | (9%) |

*These charges are taxed at different rates than the Company's effective tax rate.

For the third quarter of 2005, the Company's reported tax rate decreased as compared to the same period in the prior year primarily due to the net impact of certain charges that are taxed at different rates than the Company's effective tax rate. These charges included: certain litigation-related charges; an enhancement to the Company's 401(k) Plan; and asset write-downs and employee-related costs that resulted from certain business optimization initiatives.

For the first nine months of 2005, the Company's reported tax rate increased as compared to the same period in the prior year primarily due to the net impact of certain charges that are taxed at different rates than the Company's effective tax rate. These charges included: certain litigation-related charges; purchased research and development; an enhancement to the Company's 401(k) Plan; costs related to certain retirement benefits; asset write-downs and employee-related costs that resulted from certain business optimization initiatives; and a benefit for a tax adjustment associated with a technical correction made to the American Jobs Creation Act.

**Note J - Segment Reporting**

The Company has four reportable operating segments based on geographic regions: the United States, Europe, Japan and Inter-Continental. Each of the Company's reportable segments generates revenue from the sale of minimally invasive medical devices. The reportable segments represent an aggregate of operating divisions.

Sales and operating results of reportable segments are based on internally derived standard foreign exchange rates, which may differ from year to year and do not include

inter-segment profits. The segment information presented for 2004 has been restated based on the Company's standard foreign exchange rates used for 2005. Because of the interdependence of the reportable segments, the operating profit as presented may not be representative of the geographic distribution that would occur if the segments were not interdependent.

| (in millions) | United States | Europe | Japan | Inter-Continental | Total |
|---|---|---|---|---|---|
| **Three months ended September 30, 2005** | | | | | |
| Net sales | $    926 | $    276 | $    142 | $    158 | $    1,502 |
| Operating income | 416 | 147 | 74 | 74 | 711 |
| **Three months ended September 30, 2004** | | | | | |
| Net sales | $    979 | $    236 | $    144 | $    122 | $    1,481 |
| Operating income | 515 | 125 | 80 | 51 | 771 |
| **Nine months ended September 30, 2005** | | | | | |
| Net sales | $    2,924 | $    846 | $    431 | $    473 | $    4,674 |
| Operating income | 1,408 | 445 | 230 | 215 | 2,298 |
| **Nine months ended September 30, 2004** | | | | | |
| Net sales | $    2,499 | $    707 | $    452 | $    357 | $    4,015 |
| Operating income | 1,236 | 366 | 262 | 158 | 2,022 |

A reconciliation of the totals reported for the reportable segments to the applicable line items in the condensed consolidated financial statements is as follows:

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| **Net Sales** | | | | |
| Total net sales allocated to reportable segments | $    1,502 | $    1,481 | $    4,674 | $    4,015 |
| Foreign exchange | 9 | 1 | 69 | 9 |
| | $    1,511 | $    1,482 | $    4,743 | $    4,024 |
| **Income before Income Taxes** | | | | |
| Total operating income allocated to reportable segments | $    711 | $    771 | $    2,298 | $    2,022 |
| Manufacturing operations | (111) | (96) | (327) | (274) |
| Corporate expenses and foreign exchange | (128) | (132) | (367) | (429) |
| Purchased research and development | | | (276) | (64) |
| Litigation-related charges | (780) | (75) | (780) | (75) |
| Cost of certain retirement benefits | | (110) | (17) | (110) |
| Cost of certain business optimization initiatives | (28) | | (28) | |
| | (336) | 358 | 503 | 1,070 |
| Other expense, net | (16) | (10) | (50) | (35) |
| | $    (352) | $    348 | $    453 | $    1,035 |