# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 05-768-SLR |
| CONOR MEDSYSTEMS, INC., | ) ) |
| Defendant. | ) ) ) |

## EXPERT REPORT OF JACOB (KOBI) RICHTER, Ph.d.

# REDACTED

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION
and BOSTON SCIENTIFIC SCIMED, INC.

Plaintiffs

v.

CONOR MEDSYSTEMS, INC.

Defendant.

HIGHLY CONFIDENTIAL

C.A. No. 05-768-SLR

## OPENING EXPERT REPORT OF NIGEL BULLER, B.SC, M.B., F.R.C.P. REGARDING VALIDITY OF THE JANG PATENT

# REDACTED

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION )
and BOSTON SCIENTIFIC SCIMED, INC. )
)
Plaintiffs )
)                **HIGHLY CONFIDENTIAL**
v. )
)                C.A. No. 05-768-SLR
CONOR MEDSYSTEMS, INC. )
)
Defendant. )

## OPENING EXPERT REPORT OF RONALD J. SOLAR, Ph.D.
## REGARDING VALIDITY OF THE JANG PATENT

# REDACTED

# Exhibit D

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1534786 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**CALLAWAY GOLF COMPANY, Plaintiff/
Defendant-in-Counterclaim,
v.
DUNLOP SLAZENGER GROUP AMERICAS,
INC., d/b/a Maxfli, Defendant/Plaintiff-in-
Counterclaim.**

**No. Civ.A. 01-669-KAJ.**

May 21, 2004.

Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff/Counter Defendant.

David J. Ferry, Jr., Ferry, Joseph & Pearce, P.A., Wilmington, DE, for Defendant/Counter Claimant.

MEMORANDUM ORDER

JORDAN, J.

**I. Introduction**

*1 Presently before me is a motion by Callaway Golf Company ("Callaway") to exclude the testimony of Dr. Lewis M. Koppel ("Dr.Koppel") (Docket Item ["D.I."] 316), a motion by Callaway to exclude portions of Dr. John Jepson's ("Dr.Jepson") testimony (D.I.318), and a motion by Callaway to exclude the testimony of Dr. Daniel Klempner ("Dr.Klempner") (D.I.320), all expert witnesses of Dunlop Slazenger Group Americas, Inc. d/b/a Maxfli ("Dunlop"). Also before me is a motion by Callaway for partial summary judgment on grounds that Dunlop cannot prove damages on its trade secret, common law, or false advertising claims. (D.I.312.) I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. For the reasons set forth below, the motion to exclude Dr. Koppel's testimony will be granted in part and denied in part, the motion to exclude portions of Dr. Jepson's testimony will be granted, and the motion to exclude Dr. Klempner's testimony will be granted. The motion for partial summary judgment will be denied.

**II. Background**

Because the factual and procedural history of this case is set forth in three prior rulings, see Memorandum Opinion dated May 13, 2004 (D.I.359), Memorandum Opinion dated May 18, 2004 (D.I.362), and Memorandum Order dated May 18, 2004 (D.I.360), it will not be repeated herein. Rather, the facts pertinent to the motions currently before me are incorporated in the discussion below.

**III. Standard of Review**

The motions to exclude evidence are committed to the court's discretion. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749, 777-78 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard).

The summary judgment standard is well known. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn [s] on whether a proper jury question … [has been] presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. Id. at 255; Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the non-moving party must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

**IV. Discussion**

*2 Federal Rule of Evidence 702 obligates judges

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d                                                Page   4
(Cite as: 2004 WL 1534786, *2 (D.Del.))

to ensure that any scientific testimony or evidence admitted is relevant and reliable. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Rule provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2003). The party offering the expert testimony has the burden of proving admissibility. Daubert, 509 U.S. at 592 n. 10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. Id. at 589-590. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." Id. at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. Id. at 592-93. As part of that inquiry, the court must examine the expert's conclusions in order to determine whether they reliably follow from the facts known to the expert and the methodology used. See Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999).

A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir.1996). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir.1987); STX, Inc. v. Brine, Inc., 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), aff'd, 211 F.3d 588 (Fed.Cir.2000); SEC v. Lipson, 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

A. Dr. Koppel

Dunlop has retained Dr. Koppel, as an expert, to quantify Dunlop's economic damages resulting from Callaway's alleged misappropriation of trade secrets described in the documents that Henry Felipe ("Felipe") took with him to Callaway after he was laid off at Dunlop (the "Felipe binder"), [FN1] and from Callaway's alleged misappropriation of Dunlop's polyurethane technology through Pijush Dewanjee ("Dewanjee"). [FN2] (D.I. 327 at 24; D.I. 322 at Ex. A; D.I. 327 at 5-16.) First, Dr. Koppel estimated that Callaway was unjustly enriched in the amount of $10.4 million because of avoided research and development costs through Callaway's use of the Felipe binder. (D.I. 327 at 25.) Second, Dr. Koppel asserts that Dunlop lost profits in the amount of $8.1 million from decreased golf ball sales during the years 2000 through 2006 because of Callaway's use of the Felipe binder. (Id. at 25-26.) Third, Dr. Koppel claims that Dunlop is entitled to approximately $11.3 million in royalty damages for the research and development costs that Callaway avoided by having the information in the Felipe binder rather than creating it independently, and for the head start, or accelerated market entry, that Callaway received by using that information. (Id. at 26.) Finally, Dr. Koppel claims that Dunlop is entitled to about $11 .3 million in royalty damages for Callaway's misappropriation of Dunlop's polyurethane technology. [FN3]

> FN1. The Felipe binder includes Dunlop's "Golf Ball Specifications and Process Manual."

> FN2. In my May 13, 2004 Memorandum Opinion, I held as a matter of law that Callaway, through Dewanjee, had not misappropriated trade secrets. (D.I.359.)

> FN3. Specifically, Dunlop claims that "Dr. Koppel uses the connection between [Dunlop's] Polyurethane Trade Secrets and [Callaway's U.S. Patent No. 6,117,024 (the " '024 patent") ] to substantiate his use of analyses most commonly used in patent valuation." (D.I. 327 at 27.)

*3 Callaway argues that Dr. Koppel's testimony should be excluded under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because Dr. Koppel's methodology and conclusions "are speculative and unreliable, do not fit the facts and circumstances of this case, and are inconsistent with damage measures

required by law." (D.I. 317 at 2.) First, Callaway argues that Dr. Koppel's unjust enrichment analysis, which considers Callaway's avoided research and development costs, does not take into account the extent to which Callaway actually used or benefitted from the information contained in the Felipe binder. (Id.) Callaway states that Dr. Koppel "deliberately chose to assess [Callaway's] avoided [research and development] expenses by calculating the amount that [Callaway] would have had to spend to recreate all of the information contained in the Felipe [binder] without analyzing what information from the Felipe [binder] [Callaway] actually used." (Id. at 15.) Callaway also claims that Dr. Koppel did not consider whether Callaway's research and development spending would have been different if it did not have the Felipe binder, and, as a result, included the cost of an item in his avoided research and development costs even if Callaway incurred the cost. (Id.)

Second, Callaway argues that Dr. Koppel's $10.4 million damages figure makes numerous erroneous factual assumptions, including the assumption that the Felipe binder contains information on 82 different golf balls [FN4] (Id. at 16-17), the assumption that the Felipe binder describes 82 different paint systems [FN5] (Id. at 18-19), and the assumption that the Felipe binder contains information on patent searches and competitive golf ball analyses. [FN6] (Id. at 19-20.)

FN4. Callaway asserts that there are 82 separate specification sheets contained in the Felipe binder, but many of those describe identical golf balls.

FN5. Callaway claims that there are at most two paint systems described in the Felipe binder.

FN6. Competitive golf ball analyses provide information about other companies' balls, which is obtained by taking the balls apart and examining them. Callaway says that there is no information about patent searches or competitive golf ball analyses in the Felipe binder.

Third, Callaway argues that Dr. Koppel's measure of damages for the profits Dunlop lost as a result of Callaway's entrance into the golf ball market sooner than it would have if Callaway did not have the Felipe binder damages is not supported by evidence. Specifically, Callaway claims that Dr. Koppel's

opinion that it should have take Callaway five years to develop its first golf ball is flawed and that Dr. Koppel erroneously assumes that Callaway would have made no golf ball sales until 2007 without the Felipe binder. (Id. at 21-22.)

Fourth, Callaway argues that Dr. Koppel's calculation for royalties should be excluded because it is based on his avoided research and development costs and lost profits conclusions, which, according to Callaway, are inadmissible. (Id. at 23.)

Finally, Callaway argues that Dr. Koppel should be excluded from testifying on the damages allegedly resulting from Callaway's use of the '024 patent because, among other things, Callaway did not misappropriate Dunlop's trade secrets in the '024 patent. (Id. at 23-28.)

As to that fifth and final argument, because Callaway did not misappropriate trade secrets related to polyurethane technology, as I held in the May 13, 2004 Memorandum Opinion (D.I.359), Dr. Koppel's testimony on those points will be excluded. However, as to Dr. Koppel's testimony regarding the information contained in the Felipe binder, Callaway's arguments are matters for cross examination because Dr. Koppel's opinions, while arguably flawed and open to attack, are not so devoid of fit or reliability as to be inadmissible. Therefore, the motion to exclude Dr. Koppel's testimony will be granted in part and denied in part.

B. Dr. Jepson

*4 Dunlop has retained Dr. Jepson, who "has worked in the golf industry for some 30 years" (D.I. 328 at 12), to testify regarding "Callaway's accelerated entry into the golf ball market as a result of misappropriating Dunlop's alleged proprietary information. (Id. at 7.) Dunlop states that Dr. Jepson "is not a 'forensic economic expert' who will offer a formal valuation opinion," and that it "has no intent to offer any calculations by [Dr.] Jepson as a competing valuation to the economic analysis offered by Dr. Lewis Koppel." (Id. at 6-7.) Rather, Dunlop claims that "Dr. Jepson's opinions merely add 'real world' corroboration to [Dr.] Koppel['s] valuation" and "suggest[ ] that [Dr.] Koppel['s] valuations are conservative." (Id. at 1.) Callaway asserts that Dr. Jepson has opined that Callaway's alleged misappropriation of the Felipe binder and

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1534786, *4 (D.Del.))

Dunlop's polyurethane technology resulted in at least $74 million in unjust enrichment to Callaway. (D.I. 319 at 4; D.I. 323 at Ex. J, pp. 12-13.)

Callaway does not challenge Dr. Jepson's opinions that the trade secrets at issue are "valuable," and that Callaway allegedly acquired "valuable information" that "greatly accelerated Callaway's entry into the golf ball market." (D.I. 344 at 3) (quoting D.I. 328 at 2, 11, 17). Remarkably, Callaway also does not challenge Dr. Jepson's "generic" opinion that "Dr. Koppel's forensic damages number is conservative." (D.I. 344 at 3.) Rather Callaway argues that Dr. "Jepson's testimony should not extend to asserting dollar figures purporting to 'quantify' the value of the trade secret information" because Dr. Jepson's unjust enrichment values and dollar amounts fail to meet the reliability and relevance standards under Fed.R.Evid. 702 and Daubert. (D.I. 344 at 3-4.) I agree.

Dunlop's Answering Brief and Dr. Jepson's expert report both fail to explain how Dr. Jepson arrived at his claim that Callaway was unjustly enriched by $74 million from the misappropriation of Dunlop's trade secrets. (See D.I. 328; D.I. 323 at Ex. J.) Therefore, Dr. Jepson's unjust enrichment estimate appears to be based solely on his personal knowledge and experience rather than any methodology, analysis, or factual support. Under Daubert, such evidence is not reliable. See Primavera Familienstiftung v. Askin, 130 F.Supp.2d 450, 530 (S.D.N.Y.2001) (An expert "must do more than simply aver conclusorily that his experience led to his opinion"); LinkCo., Inc., v. Fujitsu Ltd., No. 00 Civ. 7242(SAS), 2002 WL 1585551 at *4 (S.D.N.Y. July 16, 2002) ("[A] court cannot permit experts to 'offer credentials rather than analysis' ') (citation omitted). In addition to proffering unreliable testimony, Dunlop concedes that Dr. Jepson is "not qualified to independently opine on trade secrets quantification." (D.I. 328 at 2.) Therefore, Callaway's motion to exclude Dr. Jepson from opining or testifying as to the dollar amounts set forth in his expert report will be granted.

C. Dr. Klempner

*5 Dunlop has retained Dr. Klempner, a polymer chemist, to testify that Callaway misappropriated

Dunlop's trade secrets through Dewanjee's systematic incorporation of each and every ingredient of Dunlop's proprietary polyurethane formula into the initial Callaway cover formula. This includes a polyurethane cove formulation using a diisocyanate with a PTMEG polyol to form a prepolymer, cured with a curing agent blend, such as is disclosed, or should have been disclosed, in the Dunlop February, 1997 Patent Application and/or Dewnajee's Dunlop laboratory notebook. This also includes the use of PPDI as the diisocyanate component of a polyurethane-based cover formulation, in general, and specifically as the diisocyanate component of Dunlop's polyurethane cover system. (D.I.329.) Dr. Klempner also opines that Callaway's development of its two polyurethane-based cover formulations was expedited by its use of Dunlop's trade secret technology.

As earlier stated, I have already ruled on summary judgment that Callaway did not misappropriate Dunlop's trade secrets in relation to Dewanjee's work. Therefore, the motion to exclude Dr. Klempner's testimony will be granted.

D. Motion for Partial Summary Judgment

Callaway brings a motion for partial summary judgment on grounds that Callaway cannot prove damages on its trade secret, common law, or false advertising claims. (D.I.312.) Callaway argues that "[i]f this Court grants [Callaway's] motion to exclude Koppel's testimony and damage measures ... [Dunlop] can make no showing that it suffered any damages recoverable under the UTSA--even if [Dunlop] is entitled to summary judgment on [Dunlop's] trade secret claim," and is thus entitled to summary judgment on Dunlop's trade secret misappropriation claim. (D.I. 313 at 6.) Since Callaway's motion to exclude Dr. Koppel's testimony is denied as to the information in the Felipe binder, the summary judgment motion is likewise denied as to Dunlop's misappropriation and common law claims involving that information. [FN7]

FN7. As to damages related to Dunlop's claim that Callaway misappropriated polyurethane technology, the present motion is moot because summary judgment has already been granted against Dunlop on that claim. (See D.I. 359.)

V. Conclusion

Accordingly, and as explained herein, IT IS
HEREBY ORDERED that the motion to exclude
Dr. Koppel's testimony (D.I.316) is GRANTED in
part and DENIED in part, the motion to exclude the
challenged portions of Dr. Jepson's testimony
(D.I.318) is GRANTED, and the motion to exclude
Dr. Klempner's testimony (D.I.320) is GRANTED.
The motion for partial summary judgment on
grounds that Callaway cannot prove damages on its
trade secret, common law, or false advertising
claims (D.I.312) is DENIED.

2004 WL 1534786 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

# Exhibit E

Not Reported in F.Supp.2d                                   Page 9
(Cite as: 2005 WL 782809 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**ADVANCED MEDICAL OPTICS, INC., a
Delaware corporation, Plaintiff,
v.
ALCON INC., a Swiss corporation, and Alcon
Laboratories, Incorporated, a
Delaware corporation. Defendants.**

**No. Civ.A. 03-1095-KAJ.**

April 7, 2005.

Richard L. Horowitz, and David E. Moore, Potter Anderson & Corroon LLP, Wilmington, Delaware, for plaintiff.

A. James Isbester, and Gillian W. Thackray, Isbester & Associates, Berkeley, California, of counsel.

Josy W. Ingersoll, and Melanie K. Sharp, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for defendants.

Robert G. Krupka, and Erica S. Olson, Kirkland & Ellis, LLP, Los Angeles, California, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** This is a patent infringement case. Presently before me are two Daubert motions [FN1] filed by defendants Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd. (collectively, "Alcon") seeking to exclude the testimony of two experts, Dr. Randall Olson (see Docket Item ["D.I."] 156) and Mr. Harold Walbrink (see D.I. 160), offered by Advanced Medical Optics, Inc. ("AMO") pursuant to Federal Rule of Evidence 702. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338. For the reasons that follow, Alcon's motions will be granted in part and denied in part.

> FN1. The motions are based upon Federal Rule of Evidence 702 and the Supreme Court's direction in

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), and later cases that district court judges are to perform a "gatekeeping" function when considering the admissibility of expert testimony. (D.I. 156; 160.)

II. BACKGROUND

The background related to the patents in suit is set forth in the Opinion construing the disputed claim terms. (D.I. 238 at 1-5.)

III. STANDARD OF REVIEW

Motions to exclude evidence are committed to the court's discretion. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). [FN2] "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." Id. at 750.

> FN2. The Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony, and, therefore, the Third Circuit's holdings on the issue are binding precedent. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed.Cir.2003) ( "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we ... [apply] the law of the regional circuit...." ).

IV. DISCUSSION

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. See *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an

opinion or otherwise...." The party offering the expert testimony has the burden of proving admissibility. See Daubert, 509 U.S. at 592 n. 10 (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. Id. at 589-90. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." Id. at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. Id. at 592-93. As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999).

*2 Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field. See Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997) (metallurgist not qualified to testify about industry standards for safes); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir.1996) (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. See McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir.1987) (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); S.E.C. v. Lipson, 46 F.Supp.2d 758, 763 (N.D.Ill.1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

A. Dr. Olson

Pursuant to Federal Rule of Evidence 702, Alcon

seeks to preclude Dr. Olson from testifying in regard to four categories of issues (D.I.156), each of which will be discussed in turn.

1. General sales and market analysis

Alcon seeks to preclude Dr. Olson from testifying in regards to a general sales and market analysis of phacoemulsification devices. (D .I. 157 at 7-11.) Specifically, Alcon notes four opinions rendered by Dr. Olson on this topic:

(1) "In regards to companies selling phacoemulsification equipment, I believe there is a competitive disadvantage for any company that does not have Occlusion Mode in its equipment. (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.)

(2) "I think that [if] that information [on Occlusion Mode were] out there and appropriately marketed [it] would produce a huge competitive advantage for whoever had occlusion mode." (D.I. 158, Ex. 3 at A172, Dep. of Dr. Olson at 58:14-17, Oct. 11, 2004.)

(3) "Fluidics drives sales, because removing the air reduces the post-occlusion surge and therefore allows high aspiration levels to be used safely." (D.I. 158, Ex. 1 at A022, Dr. Olson's Revised Expert Disclosure at 21.)

(4) General comments on Alcon's financial size and market strength. For example, "[t]hey're the 800 pound gorilla," (D.I. 158, Ex. 3 at A134, Dep. of Dr. Olson at 8:25, Oct. 11, 2004), "they're the biggest. They're the strongest." (Id. at A138, 12:12.)

(D.I. 157 at 8.) Alcon asserts that "[t]hese opinions venture outside Dr. Olson's general area of cataract surgery because they require specific knowledge about how the phacoemulsification market has responded to Occlusion Mode and the '765 patent, and should be excluded for that reason." (Id.) In support of its position, Alcon argues that Dr. Olson admitted during his deposition that he lacks specialized training in analyzing sales or market trends for phacoemulsification machines:

*3 Q. You don't claim to have any special knowledge or training in the analysis of sales and market trends for phacoemulsification machines, right?

A. I'm not in sales and marketing, but I do see sales and marketing figures, ... I think I have an interest, but I don't claim any special expertise. (D.I. 158, Ex. 3 at A206-07, Dep. of Dr. Olson at

Not Reported in F.Supp.2d                                                                  Page  11
(Cite as: 2005 WL 782809, *3 (D.Del.))

173:21-174:4, Oct. 11, 2004 (emphasis added).)

In response, AMO argues that Dr. Olson, as an "expert consumer" of phacoemulsification products, should be permitted to address the jury in regards to the competitive advantage that a phacoemulsification machine having the invention of each of the two patents in suit would have in the market. (D.I. 185 at 6.) For support, AMO asserts that Dr. Olson is a sophisticated consumer of phacoemulsification machines because he is familiar with various phacoemulsification machines, has been performing cataract surgery for thirty years, and because he approves all purchases by his department at the Moran Eye Center. (Id.) Additionally, AMO asserts that Dr. Olson provided four reasons why he believes Occlusion Mode offers a competitive advantage:

> 1) Alcon would not have added it to its systems if Alcon did not believe it was important to do so, 2) his conversations and interactions with leading surgeons such as Bruce Wallace and Howard Fine led him to conclude that some surgeons would not purchase equipment that did not have occlusion mode, … 3) [his] review of the trade literature regarding occlusion mode suggests that occlusion mode is an important feature to a number of leading surgeons, and 4) [his] own study of the problem of thermal injury leads him to conclude that the use of occlusion mode can reduce thermal injury eight fold.

(Id. at 8-9.)

Because Dr. Olson lacks expertise in the analysis of sales and market trends for phacoemulsification machines, he will be precluded from testifying on this topic. He has admitted that he has no expertise in this particular area. Being an "expert consumer," as AMO puts it, does not remedy this deficiency. Further, the "main basis" for Dr. Olson's opinions are "[t]he fact that Alcon decided to put occlusion mode on its latest equipment." (D.I. 158, Ex. 3 at A169, Dep. of Dr. Olson at 55:12, 1-2, Oct. 11, 2004.) That reason, as AMO admits, is "more a matter of plain common sense than special expertise." (See D.I. 185 at 9.)

Additionally, Dr. Olson's opinion regarding the general preferences of other surgeons is speculative and not supported by reliable data. The basis for his opinion on this point is that two of his colleagues have preferences for devices with Occlusion Mode,

and even as to them, he testified that he could only be certain one of them would actually insist on buying a machine with Occlusion Mode. Dr. Olson testified during his deposition as follows:

Q. Is there any other basis for your statement?

A. I do feel there are people out there who use occlusion mode and feel its important, and I think that they--I mean, the Alcon people know. You could ask them, but I'm sure they have surveys. And I'm sure there are people who would not buy the equipment without it, so I think that that's got to be it as well.  But my main basis is the fact that Alcon put it in their equipment.

*4 Q.  You say that you're sure that there were people who would not buy the equipment without it having occlusion mode. Why are you sure that there are people who would not buy a phacoemulsification system if it didn't have occlusion mode?

A.  Because there are people talking about occlusion mode and how you should have it. There are many names listed there, Bruce Wallace most recently in the meeting I was just at, so I know one, Bruce Wallace. I mean, from what he said, I don't think Bruce Wallace would buy anything without an occlusion mode. He talked about the fact that occlusion-mode phaco was important. So there have to be others. If there were none, why would Alcon add it to their equipment in face of a patent? It makes no sense.

Q.  Other than Bruce Wallace, can you identify anyone else who you believe would not purchase a phacoemulsification system if it didn't have occlusion mode?

A.  Not without talking to them. There's others, who talk about it here, but I--the only one I'm aware who's talked to very recently is Bruce Wallace.  Whether Howard Fine still thinks it's important or not, he certainly in there will say he feels it's very important.

Q.  And when you're saying in there, you're referring to the articles that Ms.  Thackray sent to you, right?

A.  Yes, that you now have, yes.

(D.I. 158, Ex. 3 at A169-70, Dep. of Dr. Olson at 55:6-56:13, Oct. 11, 2004 (emphasis added).)

In that testimony, Dr. Olson admits that he has not talked to any other surgeons, besides Bruce Wallace, about whether they would only buy machines with Occlusion Mode. The articles to which he refers do not support his opinion in this

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

regard either, because as he admits, he cannot tell without talking to those surgeons whether they would only buy machines with the occlusion mode feature. His comments also reveal that he does not know whether other surgeons agree with Bruce Wallace's view, nor has he conducted a survey to find out. Thus, his testimony on the viewpoints of other surgeons is purely speculative.

Lastly, Dr. Olson testified that his opinion on the sales and marketing aspects of Occlusion Mode were based on extrapolations from a survey he conducted on wound burns. That survey, however, which was unpublished and not peer reviewed, did not ask its respondents whether Occlusion Mode was enabled during the surgery, and did not even mention the Occlusion Mode feature. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; see D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004 ("Q. Now, the survey didn't ask whether the occlusion mode feature was active, correct? A. [It d]id not. Q. So it could be that occlusion mode was enabled during some of the wound burns that the ... study found? A. It's possible.").) Thus, it is not a reliable basis from which an opinion on the general market and physician preferences could be based.

Therefore, because Dr. Olson does not have sufficient expertise in the sales and marketing of phacoemulsification devices, and his opinion on such matters is not supported by reliable bases, he will be precluded from testifying to any sales and market analysis of phacoemulsification devices, including testimony addressing the economic advantages of phacoemulsification devices incorporating Occlusion Mode and the '765 patent as they pertain to the market. Dr. Olson will be permitted, however, to testify about his own preferences for certain features in phacoemulsification machines and what he considers advantageous from his perspective, based on his many years of experience using such machines in the performance of cataract surgery, to the extent such opinions were disclosed in his expert report.

2. Infringement by Alcon of the '240 or '765 patent

*5 Alcon seeks to preclude Dr. Olson from offering testimony relating to whether Alcon infringes either the '240 patent or the '765 patent.

(D.I. 157 at 11-12.) According to Alcon, "Dr. Olson implied at numerous times throughout his deposition that Alcon's phacoemulsification systems infringed the '240 and '765 patents, and that Alcon's alleged infringement was knowing and deliberate." (Id. at 11.) Alcon argues that Dr. Olson "lacks the expertise that would enable him to perform a claim construction analysis of the patents to determine whether they are infringed by the Infiniti system ... [because he] admitted that he lacks specialized training in engineering and patents." (Id. (citing D.I. 158, Ex. 3 at A141, Dep. of Dr. Olson at 18:11-13, Oct. 11, 2004.))

AMO asserts that "Dr. Olson has not done an element-by-element analysis of the patents against the accused products and AMO has no intention of asking him to do so...." (D.I. 185 at 9.) Rather, AMO argues that Dr. Olson's view that Alcon's device is so similar to AMO's device that it appears to have been copied is both competent and pertinent. (Id. at 10.)

Dr. Olson will not be permitted to testify in regards to infringement of either patent. Federal Rule of Civil Procedure 26(a)(2)(B) states, in relevant part, that "[t]he [expert] report shall contain a complete statement of all opinions to be expressed...." Dr. Olson did not disclose an opinion on infringement of either patent in his expert report, and as such he may not offer one at trial. See Fed.R.Civ.P. 26(a)(2)(B). Additionally, in its Answering Brief in Opposition to Alcon's Motion, AMO lists six things upon which Dr. Olson has been asked to opine, not one of which concerns infringement or copying. [FN3] (See D.I. 185 at 3.) Thus, it is clear that Dr. Olson may not properly offer an opinion on infringement, and it is equally clear that AMO did not intend for him to do so. Therefore, Dr. Olson will not be permitted to offer testimony relating to whether Alcon infringes either patent in suit.

FN3. AMO asserts that it asked Dr. Olson to provide expert testimony in the following six areas: "(i) a tutorial into the physiology and treatment of cataracts; (ii) the importance, from the surgeon's point of view, of each of the patents in suit; (iii) the problem of thermal injury; (iv) the difficulty in manual detection of occlusion; (v) the increased safety of the automatic response to occlusion of the system described in the '240 patent; and (vi) the

Not Reported in F.Supp.2d                                                         Page 13
(Cite as: 2005 WL 782809, *5 (D.Del.))

inapplicability of the Shimizu reference to [the] invention of the '240 patent." (D.I. 185 at 3.)

### 3. Occlusion Mode and Safety of Phacoemulsification

Alcon seeks to preclude Dr. Olson from offering testimony "relating to his opinion that Occlusion Mode made phacoemulsification safer, and consequently a mainstream procedure in cataract surgery because it enabled surgeons to rely on the Occlusion Mode feature to prevent the occurrence of thermal injury to the eye." (D.I. 156 at 1.) More specifically, Alcon objects to five opinions on this topic offered in Dr. Olson's report: (i) that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level" (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17); (ii) that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment" (id . at A019); (iii) that "[t]he overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream (id. at A018); and, in the same vein, (iv) that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today" (id. at A019); and again (v) that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients" (id.).

**\*6** Alcon asserts that these opinions rendered by Dr. Olson are "inadmissible because they lack adequate foundation, and therefore fail to 'assist the trier of fact." ' (D.I. 157 at 13.) Specifically, Alcon asserts that they are based in large part on "(1) biased information supplied almost exclusively by AMO attorneys, (2) materials that Dr. Olson himself labels as 'scanty,' (3) a partial analysis of an unpublished survey, and (4) unsupported assumptions that are speculative at best." (Id.)

AMO argues in response that Dr. Olson reviewed whatever publications were available, not merely those provided by AMO, concerning the use of Occlusion Mode in phacoemulsification, and that

"Dr. Olson did not rely on peer-reviewed articles on occlusion mode because none existed." (D.I. 185 at 10, 12.) AMO asserts that reliance on peer-reviewed journals is not a prerequisite to admissibility and that the articles on which Dr. Olson relied were "written by respected and well-known practitioners in the field." (Id.) Further, AMO argues that "Dr. Olson is well qualified to survey fellow practitioners on the incidence of wound burn, and to opine on the value of occlusion mode in reducing it." (Id.)

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed.R.Evid. 702 advisory committee's note. The main issue raised by Alcon is the reliability of the opinions offered by Dr. Olson. Alcon does not challenge Dr. Olson's expertise to offer such opinions, but rather challenges the bases upon which he relies to render them. (See D.I. 207 at 5.) Each challenged opinion is discussed below.

a. That the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level"

Alcon challenges Dr. Olson's opinion that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level." (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson testified at his deposition that "occlusion mode could dramatically decrease wound burn...." (D.I. 158, Ex. 3 at A183, Dep. of Dr. Olson at 77:5-6, Oct. 11, 2004 (emphasis added).) In his report, Dr. Olson was more emphatic, stating that Occlusion Mode actually did have that effect. (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson indicated that his opinion in this regard is largely based upon his survey. (See D.I. 158, Ex. 3 at A182-83, Dep. of Dr. Olson at 76:21-77:6, Oct. 11, 2004.) As discussed earlier, however, see supra Part IV.A.1., Dr. Olson's survey did not inquire whether Occlusion Mode was enabled during the procedures being reported, nor did it mention Occlusion Mode at all. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; see D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004.) Thus, it is not a reliable basis of support for

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2005 WL 782809, *6 (D.Del.))

the type of definitive conclusion rendered in Dr. Olson's report. Dr. Olson will be permitted to testify as to whether he thinks Occlusion Mode "could" decrease wound burn, based on his years of experience [FN4] and the various articles he has reviewed, but he cannot testify that Occlusion Mode in fact decreases instances of wound burn because his survey does not provide a reliable basis for such a conclusion, and because, as he admits, "there's basically no studies on this subject or anything." (D.I. 158, Ex. 3 at A145, Dep. of Dr. Olson at 26:24-25, Oct. 11, 2004.)

> FN4. Dr. Olson's experience with Occlusion Mode is apparently limited, however, because, as he admits, he does not use Occlusion Mode himself. (D.I. 158, Ex. 3 at A173-74, Dep. of Dr. Olson at 59:25-60:2, Oct. 11, 2004.)

b. "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment."

*7 Alcon challenges Dr. Olson's opinion that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon asserts that Dr. Olson lacks a reliable basis to conclude what "many" feel about modern phacoemulsification equipment. (D.I. 157 at 18.) At his deposition, however, Dr. Olson testified that he based his opinion on the articles he reviewed in which various experts have stated preferences for Occlusion Mode. Although Dr. Olson has testified that he considers these articles to be "throw-away" articles, in that "you usually look at them, and [then] you throw them away" (D .I. 158, Ex. 3 at A146, Dep. of Dr. Olson at 27:11-12, Oct. 11, 2004), they do provide an adequate basis for this specific opinion. Alcon's citation to Tuman v. Genesis Associates, 935 F.Supp. 1375, 1385 (E.D.Pa.1996), is unavailing because, as that court held, the expert's opinion was not "fundamentally unsupported." Neither is Dr. Olson's in this instance, and, as such, Alcon's objections go to the weight of Dr. Olson's opinion, not its admissibility.

c. "The overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream."

Alcon's next challenge is to Dr. Olson's opinions that "[t]he overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon's main objection is that this particular conclusion is misleading "because he overstates his propositions." (D.I. 157 at 18.)

I agree with Alcon that, in light of his deposition testimony, Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today, Dr. Olson replied, "I think its one of the steps that has made the procedure safer. There's others, but in totality, all of those different steps are the reason why it's the predominant procedure today." (D.I. 158, Ex. 3 at A167, Dep. of Dr. Olson at 53:10-13, Oct. 11, 2004 (emphasis added).) Dr. Olson clarifies that it is the totality of "all of those different steps" that has led to phacoemulsification being the predominant procedure today, not just Occlusion Mode.

In light of that qualification, I do not believe that his testimony will mislead the jury. He will be subject to cross-examination by Alcon, whose efforts will no doubt highlight the limitations Dr. Olson admitted on this point in his deposition. Alcon has not demonstrated that this opinion is inadmissible under Federal Rule of Evidence 702 and, therefore, he will not be precluded from giving it at trial.

d. "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today."

*8 Alcon makes the same challenge to Dr. Olson's opinion that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Again, I agree with Alcon that Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode made phacoemulsification safer and

put the technology in the hands of surgeons who were previously afraid of using phacoemulsification, Dr. Olson replied that "... it is one of many features that have made phaco safer...." (D.I. 158, Ex. 3 at A165, Dep. of Dr. Olson at 51:11-12, Oct. 11, 2004 (emphasis added).) Dr. Olson's testimony indicates that there are other features which contributed to the safety of phacoemulsification as well. However, for the same reasons discussed, supra Part IV.A.3.c., Alcon has not demonstrated that this opinion is inadmissible under Federal Rule of Evidence 702 and, therefore, he will not be precluded from giving it at trial.

e. "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients."

Dr. Olson also opined that Occlusion Mode "put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) When asked whether he was aware of any surgeons who were previously afraid of using phacoemulsification before they could use occlusion mode, Dr. Olson relied: "I don't have any survey. There's no study or published [sic], so this was just my opinion. I don't have anything other specifically than my opinion for that statement ... if there was scientific literature, if we had studies, if we had--we don't. I mean, all we have is a few opinions, so therefore, when you have nothing else to depend upon, then you can only use your opinion." (D.I. 158, Ex. 3 at A166-67, Dep. of Dr. Olson at 52:12-53:3, Oct. 11, 2004.) Furthermore, Dr. Olson testified that he believes Occlusion Mode is not used by most surgeons (id. at A167, 53:20), but that, in fact, he doesn't "know how many use it and how many do not" (id. at A168, 54:17-18). Thus, Dr. Olson admits that he has no reliable basis for this opinion, and, he will be precluded from testifying to it at trial.

4. Maximizing Air Removal

Alcon seeks to preclude Dr. Olson from offering testimony "related to his opinion that [the '765 patent] disclosed a method and apparatus that maximized air removal from the fluidics system of

phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability." (D.I. 156 at 2.) Alcon asserts that Dr. Olson's opinions on the '765 patent are based on unsupported suppositions as opposed to facts (D.I. 157 at 19), and that he lacks the necessary experience to offer expert testimony on fluidics devices (D.I. 207 at 10-11).

*9 In response, AMO asserts that Dr. Olson's opinions are based on his knowledge and experience of using phacoemulsification devices in the field of opthalmological surgery. (D.I. 185 at 12-13.) Thus, AMO argues that Dr. Olson's testimony meets the threshold of admissibility. (Id. at 13.)

In Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 324 (3d Cir.2003), the Third Circuit noted that although a proffered expert has "extensive experience with jet skis," his testimony on the safety of an accelerating mechanism was properly excluded because the expert "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or the accelerating mechanisms." Similarly, Dr. Olson's qualifications as a renowned ophthalmologist are not questioned, but he is not qualified to render an opinion on fluidics systems or chamber stability. He is not an engineer and has not conducted any studies to analyze whether different systems can achieve an aspiration level of 500 mmHg while maintaining excellent chamber stability. (D.I. 158, Ex. 3 at A203, Dep. of Dr. Olson at 136:15, Oct. 11, 2004.) Thus, like the expert in Calhoun, Dr. Olson would be outside his area of expertise if permitted to testify in this regard. Accordingly, he will be precluded from so testifying. "While [his] ... background, education, and training may provide [him] with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." Calhoun, 350 F.3d at 322.

B. Mr. Walbrink

Alcon seeks to exclude three discrete areas of testimony by Mr. Walbrink. (D.I.160.)

Page  16

1. Infringement Opinions

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on infringement of the '240 and '765 patents by Alcon's phacoemulsification systems, the Legacy with Advantec and the Infiniti. (D.I. 160 at 1.) Alcon argues that Mr. Walbrink's testimony contravenes Rule 702 because his opinions on infringement "are pulled directly from litigation positions crafted by AMO's attorneys, as opposed to conclusions drawn from his own independent assessment of the claims at issue." (D.I. 161 at 6.)

In response, AMO asserts that Federal Rule of Civil Procedure 26(a)(2)(B) "does not preclude counsel from providing assistance to experts in preparing [the expert's] report." (D.I. 186 at 4 (quoting Fed.R.Civ.P. 26(a)(2)(B) advisory committee's note).) Furthermore, AMO argues that Mr. Walbrink did not merely adopt the opinions of AMO's counsel, but rather "engaged in extensive telephone conversations with AMO counsel regarding claim interpretation" (id. at 13) and "participated in the compilation, drafting, editing, and organization of his report" (id. at 15).

Alcon's position is untenable. It admits that Rule 26 does not preclude counsel from assisting an expert in preparing a report, but it argues that Mr. Walbrink's report merely represents the substantive conclusions of counsel. (D.I. 161 at 5-6.) Alcon's citations to cases in which expert reports were excluded are distinguishable from the facts of this case because Mr. Walbrink did contribute his expertise to the drafting of the report. See Crowley v. Chait, 322 F.Supp.2d 530, 543 (D.N.J.2004) (noting that counsel may not draft the entire report without prior "substantive input" from the expert); Stein v. Foamex Int'l, Inc ., No. CIV A. 00-2356, 2001 WL 936566, at *5 (E.D.Pa. Aug. 15, 2001) (the rules do not permit "blanket adoption of reports prepared by counsel") (internal citation omitted). Mr. Walbrink testified at his deposition as follows:

*10 Q. Would you describe for me the process that you went through to develop the report that we've marked as Exhibit 179.

A. First, we discussed the issues at hand.

Q. And when you say "we," you mean you and Ms. Thackray?

A. And Jamie Isbester, as well, collectively. I drafted some of it, worked on claim construction

with one of their other associates--I believe his name is Bob--then met with Gillian, Ms. Thackray, and Jamie Isbester at their facility in Berkeley, and worked for a day, I think, further drafting and pulling it together. And then over the course of several days after that, there were multiple drafts and revisions, and then we submitted it.

Q. Now, you said you drafted some of it. What parts did you draft?

A. That would be hard because, I mean, I was involved in most of it. The claim construction was primarily done by--I believe it was Bob. But as far as the content of the body of the report, it was a collaborative effort. It would be hard to single out what I did versus someone else.

(D.I. 162, Ex. 3 at A131-32, Dep. of Mr. Walbrink at 22:8-23:5, Oct. 19, 2004 (emphasis added).) The foregoing testimony supports AMO's contention that Mr. Walbrink collaborated with AMO's counsel and was involved in the creation of his expert report. Thus, Mr. Walbrink's testimony on intringement cannot be excluded as simply reflecting the opinions or work product of AMO's counsel.

2. Commercial success of AMO's systems

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on the commercial success of AMO's two phacoemulsification systems, the Diplomax and the Sovereign, because his opinion is based solely on what AMO's counsel has told him and is therefore unreliable. (D.I. 161 at 9.) Further, Alcon argues that Rule 26(a)(2)(B) requires that an expert's report "contain a complete statement of all opinions to be expressed and the basis and reasons thereof." (D.I. 208 at 9 (quoting Fed.R.Civ.P. 26(a)(2)(B)) (emphasis added).) Thus, Alcon asserts that the four new bases for his opinion identified in the declaration he submitted after his deposition and after the close of discovery should not be considered because those reasons were not presented in his Rebuttal Report. (Id. at 9.)

In response, AMO asserts that "counsel for Alcon failed to develop further testimony regarding the content of Mr. Walbrink's discussions with AMO's counsel and failed to acknowledge the further bases set forth in Mr. Walbrink's Rebuttal Report...." (D.I. 186 at 17.) AMO points to Mr. Walbrink's statement in his Rebuttal Report that "it would

appear to me, as discussed in my opening report on infringement, that the Advantec upgrade to Alcon's Legacy model and the Infinity model of phacoemulsification machines have adopted the exact same technology" (D.I. 162, Ex. 2 at A99-100, Rebuttal Report of Mr. Walbrink at 14-15) as a basis for his opinion on commercial success. (D.I. 186 at 17-18.) Additionally, AMO notes that Mr. Walbrink's declaration further discusses the bases for his opinion. (Id. at 18.)

*11 Under Rule 26(a)(2)(B), an expert's report must contain "the basis and reasons" for the expert's opinions. It is clear that none of Mr. Walbrink's Reports submitted during discovery contains the challenged reasons on which he now seeks to rely for his opinion on commercial success attributable to Occlusion Mode. Thus, based on Rule 26(a)(2)(B), Mr. Walbrink's Rebuttal Report is critically deficient in this regard. At his deposition, Mr. Walbrink testified as follows:

Q. Sure. It's at the bottom of page 14. You say, "[i]t is my understanding that the occlusion mode has been an important feature of two successful phacoemulsification machines sold by AMO, the Diplomax line and the Sovereign line." Did I read that correctly?
A. Yes.
Q. What is the basis for that statement?
A. Discussions with counsel. And I can't tell you what else may have been considered in that.
Q. So the only basis, as you sit here today, that you can identify is that AMO's counsel told you that, right?
A. That's all I can identify today, yes.

(D.I. 162, Ex. 3 at A163-64, Dep. of Mr. Walbrink at 197:19-198:7, Oct. 19, 2004 (emphasis added).) The foregoing shows that the only disclosed basis Mr. Walbrink had for this opinion was the "discussions [he had] with [AMO's] counsel." (See id.) Therefore, Mr. Walbrink's deposition cannot cure the deficiency of his Rebuttal Report. [FN5] If there were other bases for Mr. Walbrink's opinion, they were not disclosed as required. Simply claiming to have an understanding, without providing the bases for that understanding, fails to meet the disclosure requirements of the Federal Rules of Civil Procedure.

FN5. This is not meant to say that if Mr. Walbrink had testified to other bases, such testimony would necessarily have been sufficient under Rule

26(a)(2)(B) to remedy his deficient expert report.

Mr. Walbrink's last ditch declaration (D.I.189) does not remedy this deficiency, for at least two reasons. First, it was submitted long after the close of discovery, as an exhibit to AMO's Answering Brief on this motion. (D.I.186.) I agree with Alcon that acceptance of such a late submission would be unfairly prejudicial and would make "a mockery of the Rules' requirements for discovery and expert disclosure." (See D.I. 208 at 9.) Second, Mr. Walbrink has admitted that he is "not versed in the financial aspects of these products," yet he purports to offer four reasons for his opinion, each of which relate to the financial aspects of AMO's products. He cannot disclaim expertise in an area and then opinion on it. Thus, for these independent reasons, Mr. Walbrink will be precluded from testifying on the issue of commerical success.

3. The '765 patent and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability

Alcon asserts that Mr. Walbrink should be precluded from testifying that "[t]he Sovereign fluidics system, incorporating the invention of the '765 patent, was the first phacoemulsification system to achieve the 500 mg [sic] Hg aspiration level while maintaining excellent chamber stability" because his opinion is based solely on AMO's brochures and promotional materials and Dr. Olson's opinion. (D.I. 161 at 9-10.)

*12 In response, AMO asserts that Mr. Walbrink's opinion was based on his review of product brochures and promotional materials, the expert report of Dr. Olson, his background and experience, many hours of deliberation, and his examination of Alcon's Infiniti system. (D.I. 186 at 19.) AMO argues that these matters are the proper subject of cross-examination before the jury, not "the basis for a motion to exclude." (Id. at 21.) I disagree.

First, Alcon correctly notes that Mr. Walbrink's opinion is directed to AMO's Sovereign system, not Alcon's Infiniti system, and that Mr. Walbrink's examination of the Infiniti system does not provide a reliable basis for his conclusions regarding the Sovereign system. Second, Mr. Walbrink admitted in his deposition testimony that he "has not used the

Sovereign." (D.I. 162, Ex. 3 at A154, Dep. of Mr. Walbrink at 142:6, Oct. 19, 2004.) Third, he testified that he only has "incidental knowledge" of the Sovereign system, which he gained by reading Dr. Olson's expert report and "brochures or promotional materials" provided exclusively by AMO. (Id. at A154, 142:13, 19.) But as earlier discussed, supra Part IV.A.4., Dr. Olson will be precluded from testifying about the invention in the '765 patent achieving an aspiration level of 500 mmHg while maintaining chamber stability. Thus all that remains as Mr.  Walbrink's basis for his opinion are the brochures or promotional materials provided exclusively by AMO. As noted in Tuman, an expert's testimony may be unreliable if the expert "relied almost exclusively on information from one source who was clearly biased." Tuman, 935 F.Supp. at 1385 (internal citations omitted). This is such a case. The only remaining basis for this opinion from Mr. Walbrink is information that was provided exclusively by AMO, a party to the case. Thus, Mr. Walbrink will be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

V. CONCLUSION

Based on the foregoing reasons and authorities, Alcon's motion to exclude the testimony of Dr. Olson (D.I.156) will be granted in part and denied in part, and Alcon's motion to exclude the testimony of Mr. Walbrink (D.I.160) will be granted in part and denied in part. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that the Defendants' motion to exclude the testimony of Dr. Olson (D.I.156) is GRANTED IN PART, to the extent that Dr.  Olson will not be permitted to offer testimony on the analysis of sales and market trends for phacoemulsification machines, infringement by Defendants of the '240 or '765 patent, that Occlusion Mode in fact decreases instances of wound burn, that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients," and that the

'765 patent disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability, and DENIED IN PART, as to the remainder of Dr.  Olson's opinions which have been challenged by Defendants.

*13 Further, IT IS ORDERED THAT Defendants' motion to exclude the testimony of Mr. Walbrink (D.I.160) is GRANTED IN PART, to the extent that Mr. Walbrink will not be permitted to offer testimony on the issue of commercial success and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability, and DENIED IN PART, as to the remainder of Mr. Walbrink's opinions which have been challenged by Defendants.

2005 WL 782809 (D.Del.)

END OF DOCUMENT

# Exhibit F

Slip Copy                                                                    Page    20
(Cite as: 2007 WL 979854 (D.N.J.))

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,
D. New Jersey.

**M. EAGLES TOOL WAREHOUSE, INC., d/b/
a/ S & G Tool Aid Corp., Plaintiff,
v.
FISHER TOOLING COMPANY, INC., d/b/a
Astro Pneumatic Tool Company and Stephen
Fisher, Defendants.
Fisher Tooling Company, Inc., d/b/a Astro
Pneumatic Tool Company and Stephen
Fisher, Counterclaimant,
v.
M. Eagles Tool Warehouse, Inc., d/b/a S & G
Tool Aid Corp., Counterclaim
Defendants.**

**Civil Action No. 97-1568-(JAG).**

March 30, 2007.

Robert J. Kipnees, Lowenstein Sandler, Roseland,
NJ, for Plaintiff.

Joanne M. Maxwell, Littler Mendelson, PC,
Newark, NJ, for Defendants.

OPINION

GREENAWAY, JR., U.S.D.J.

**\*1** This matter comes before this Court on the
motion for partial summary judgment, pursuant to
Fed.R.Civ.P. 56(c), by Defendant /
Counterclaimant Fisher Tooling Company, Inc.,
doing business as Astro Pneumatic Tool Company
("Astro"). Astro has moved for summary judgment
on the all of the claims and affirmative defenses of
Plaintiff and Counterclaim Defendant M. Eagles
Tool Warehouse, Inc., doing business as S & G
Tool Aid Corp. ("S & G"), except for S & G's non-
infringement claim and non-infringement defense.
For the reasons set forth below, Astro's motion will
be granted in part and denied in part. Summary
judgment will be granted for Astro on S & G's
declaratory judgment claim for invalidity, and its
Lanham Act, state law unfair competition, New
Jersey Trade Act, and tortious interference claims.

I. FACTUAL AND PROCEDURAL
BACKGROUND

A. The Parties

S & G is a New Jersey corporation engaged in the
manufacture and wholesale distribution of tools and
associated products for the automobile repair
industry. Among the tools and parts that S & G sells
are abrasive and semi-abrasive discs. Consumers
mount these discs onto motor units that rotate these
discs so as to remove undesirable material from
structures.

The subject matter at issue in this action is a disc
known as an eraser wheel. The eraser wheel is
mounted to a hand held motor unit (also known as a
"driver") to remove pin-striping, molding adhesive,
decals, and other adhered items from autobody
panels without damaging the paint or body of the
vehicle. S & G markets its eraser wheel under the
name "Autobody Eraser Wheel." S & G does not
sell the hand held motor unit. S & G sells its eraser
wheel alone or in combination with an arbor. [FN1]
Without the arbor, S & G's eraser wheel is only
compatible with the motor unit manufactured by
Astro. When used with the arbor, S & G's eraser
wheel is compatible with many different motor
units.

FN1. An arbor is a device that can be attached to
the stem of any driver to make the Autobody Eraser
Wheel compatible with that driver.

Astro is a California corporation also engaged in
the business of selling tools and associated products
for the automobile repair industry. Defendant
Stephen Fisher is the President of Astro. For more
than twenty years, Astro has sold pneumatic drivers
[FN2] of several different types, which were used
with hard grinding and polishing discs. Astro did
not, however, have a driver that was used with a
soft eraser wheel. Around 1990, Astro developed a
driver that could be combined with a soft eraser
wheel to remove pinstripes, molding adhesive,
decals and other adhered items from the body of
cars. Astro markets its driver as the "Pinstripe
Removal Tool 533E." Astro also sells "Smart Eraser
Pads 400E" for use with its driver. Astro has
obtained a patent protecting the combination of its
driver with its eraser wheel.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Slip Copy                                                                                          Page   21
(Cite as: 2007 WL 979854, *1 (D.N.J.))

FN2. Pneumatic drivers are air driven, as opposed to electrically powered.

### B. The Patent and Astro's Efforts To Enforce It

United States Patent No. 5,259,914 (the "'914 Patent") is entitled "Portable Vehicle Adhesive Remover for Removing Pinstripes, Decals, Side Moldings and Other Adhered Items from a Vehicle," and was issued on November 9, 1993 to Irving Fisher as inventor, and to Fisher Tool Company as assignee. It protects "(a) a motor unit assembled inside a housing ...; (b) an extending shank ...; and (c) an eraser unit attached ..." See '914 Patent, Abstract.   [FN3] The device operates by using compressed air to rotate the eraser wheel. The rotating eraser wheel engages with an adhered decal on a vehicle, causing friction and generating heat, which in turn warms the adhesive and causes the decal to lose its adhesion.

FN3. The '914 Patent is attached to the Second Amended Complaint as Exhibit 4.

*2 The '914 Patent makes six claims, all of which relate to a portable vehicle adhesive remover consisting of an air-powered motor unit, a shank extending therefrom, and an eraser wheel attached to the shank. Claims 1 and 4 protect Astro's pneumatic driver combined with an eraser wheel. Claims 2, 3, 5, and 6 appear to relate to the eraser wheel component of the combination. Claims 2 and 5 require that the "eraser member is made of rubber material." Those claims, however, incorporate and are dependent on Claims 1 and 4, respectively. Claim 3, dependent on Claim 1, provides, "said erasing surface of said resilient eraser member is flat and round." Claim 6, dependent on Claim 4, provides the "resilient eraser member rotates at a speed between 3000 rpm and 4000 rpm."

Irving Fisher (now deceased), Astro's founder and then President, filed the ' 914 Patent application with a declaration stating that at the time of the filing, he was not aware of any relevant prior art, and he did not perform a novelty search for the purpose of discovering any such prior art. Six months after filing the patent application, Irving Fisher died, and his son, Stephen Fisher, took over as Astro's president, and directed the prosecution of the ' 914 Patent. [FN4] (Prior Cert. Harold James, [FN5] Exh. C at 36.)

FN4. Although this Court discusses the prosecution of the patent history as having been conducted by Irving Fisher and Stephen Fisher, it notes that Astro's patent attorney, Thomas Rozsa, actually corresponded with the Patent Office. This Court, however, is aware that Irving Fisher and Stephen Fisher provided the underlying information relevant to the prosecution and were integral participants in the prosecution of the ' 914 Patent.

FN5. "Prior Cert. Harold James" refers to the Certification of Harold James filed in support of S & G's prior motion for summary judgment, addressed by this Court in In M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 68 F.Supp.2d 494, 508 (D.N.J.1999) ("M. Eagles I") and M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 205 F.Supp.2d 306 (D.N.J.2002) ("M. Eagles II ").

The Patent Examiner, M. Osele, rejected all thirty claims under 35 U.S.C. § 102(b), as anticipated by an Astro advertisement. The Patent Examiner concluded that the claimed device had been "offered for sale more than one year prior to the application," and therefore was unpatentable. The Examiner also made reference to several devices existing in the prior art, but did not rely on any of those devices in rejecting the '914 Patent application.

In response, Stephen Fisher submitted a declaration to the Patent Office attesting that the advertisement could not have occurred until after or right around the time of the filing of the application. Based on that declaration and the accompanying sales receipt for the purchase of the advertisement, the Examiner withdrew his initial rejection and considered the claims of the application. The Examiner rejected Claims 1-3 and 7-30, but allowed Claims 4-6. These Claims were rejected as obvious in light of the prior art. The Examiner expressly noted that "Claims 4-6 are allowable because none of the art of record shows all of the detailed internal workings of the instant claims including the wave washer, the valve screw and 'O' rings, the valve stem and spring, the exhaust sleeve and 'O' ring, and the roll pins." (Prior Cert. Harold James, Exh. C at 42.)

Thereafter, Stephen Fisher voluntarily canceled Claims 10-15 and 25-30. He amended the various other claims to include those specific unique

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

characteristics pointed out by the Examiner. In response, the Examiner issued a notice of allowance for Claims 1-6, and rejected the remaining claims on the basis of obviousness. Stephen Fisher ultimately canceled all claims that had not been allowed, and the '914 Patent issued in its current form.

**\*3** After obtaining the '914 Patent, Astro marketed and sold its patented device both in combination, as a pneumatic driver with an eraser wheel, and as separate components. When the eraser wheel was sold individually, it was marked with a "patent pending" label, [FN6] and also with the '914 Patent number.

> FN6. Astro asserts that the "patent pending" label referred to the patent application that ultimately issued as United States Patent No. 5,624,990, which purportedly covers the wheel, and the process for making the wheel.

C. The Present Dispute and Procedural History

1. Pre-Litigation Conduct

In or about October 1996, Astro charged S & G, in writing, with infringing the '914 Patent. Astro stated that it believed that "S & G's sales of rubber eraser pads in the United States are contributing to or inducing others to infringe the '914 Patent, in violation of 35 U.S.C. § 271(b) and (c)." (Second Amended Compl., Ex. 5, October 8, 1996 Letter.) Astro further indicated that it would not "hesitate to initiate litigation to enforce its rights and recover all applicable damages and costs." (Id.) Correspondence between the parties ensued, and S & G expressed its belief that its eraser pads (1) did not directly infringe the '914 Patent; (2) did not induce infringement of the ' 914 Patent; (3) did not contributorily infringe the '914 Patent; and (4) were staple articles of commerce capable of non-infringing use. (See Second Amended Compl., Ex. 6.)

Astro initially chose not to sue S & G for infringement. Instead, Astro began to alert the industry that anyone selling S & G's eraser wheels could be subject to liability for infringement of the '914 Patent. Astro sent letters to S & G's customers stating that sales of S & G's eraser wheels infringe the ' 914 Patent. (See Second Amended Compl., Ex. 7.) Astro informed S & G's customers that use of S

& G's eraser wheel "in a tool that is not made by [Astro] infringe[s] the patent." (Id.)

The letters offered S & G's customers three options: (1) discontinue the sale of S & G erasers; (2) screen all customers and refuse to sell the S & G eraser wheel "to anyone that would use it with a tool not made by Astro;" or (3) continue infringing the '914 Patent. (Id.) If the last option were chosen, the letters stated that the customers could be subjected to a lawsuit; each letter indicated that it should be signed and returned to Astro within three weeks to "avoid becoming involved in a lawsuit to stop infringement of our patent." (Id.) After receiving the letters, all companies that previously sold S & G's wheels allegedly stopped their sales of the eraser wheels.

Astro maintains that the letters were dispatched based on its good faith belief in the validity and enforceability of the '914 Patent, and based on its good faith belief that those entities to whom the letters were dispatched were, and are, infringing the '914 Patent, either directly, contributorily, or through inducement of infringement (Def.'s Facts, ¶¶ 1-2; Doane Decl., Exh. 2 (Fisher Decl.), ¶ 6.) Astro further contends that S & G has no evidence demonstrating or supporting any allegation that Astro acted in bad faith in dispatching the letters. (Def.'s Facts, ¶ 3; Doane Decl., Exh. 1 (Gering Depo.) at 99:12-101:6.)

2. The Complaint And Counterclaim

**\*4** S & G commenced this lawsuit against Astro on March 27, 1997. S & G claims that Astro engaged in unfair competition, tortious interference with contractual relations, tortious interference with prospective economic advantage, false marketing, and violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1. S & G seeks (1) a declaratory judgment declaring that its sale of eraser pads does not infringe the '914 Patent; (2) an injunction ordering Astro to cease its communications with S & G's customers and requiring Astro to write to all S & G's customers retracting its charges of infringement; and (3) damages for Astro's allegedly tortious conduct.

Astro counterclaims that S & G commits contributory infringement and induces infringement

of the '914 Patent through the sale of its eraser wheel. Astro seeks an injunction enjoining S & G from further contributory infringement of, or inducement to infringe, the '914 Patent, as well as damages based on S & G's allegedly tortious conduct.

3. This Court's Prior Rulings

On November 18, 1998, S & G filed a motion for summary judgment based on invalidity and unenforcability of the '914 Patent, and in the alternative, noninfringement. In M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 68 F.Supp.2d 494, 508 (D.N.J.1999) ("M. Eagles I "), this Court denied S & G's motion for summary judgment of invalidity because S & G failed to satisfy its burden of establishing obviousness or lack of proper inventorship by clear and convincing evidence. This Court found, however, that based on the evidence before it, Fisher and Astro engaged in inequitable conduct before the Patent and Trademark Office ("PTO"), rendering the '914 Patent unenforceable. This Court stated that because Defendants had failed to inform the PTO of the existence of its Model 220 driver, it was reasonable to infer that Defendants acted intentionally to deceive the PTO. Id. at 503-04. This Court specifically observed that Defendants' failure to advise the PTO of the existence of the Model 220 driver constituted a failure to advise the PTO of relevant prior art. Id . at 502. This Court found that the '914 Patent was unenforceable, as a result, and dismissed as moot S & G's request for a declaratory judgment of noninfringement and Astro's counterclaims of contributory infringement and inducement to infringe. Id. at 504.

This Court also granted S & G's motion for summary judgment motion as to its § 43(a) Lanham Act claim. Id. at 505-07. In that claim, S & G alleges that by marking its eraser wheels as "patent pending" or covered under the '914 Patent, Astro deceived consumers in violation of the Lanham Act. Id. In granting judgment for S & G on its Lanham Act claim, this Court noted that Astro's motivation and intent did not affect the Court's analysis because "there is no requirement under the Lanham Act that a false representation be made willfully or with intent to deceive. A mistake is not a defense to an action under [the Lanham Act]." Id. at 506 (alteration in original) (citations omitted).

*5 This Court, however, denied S & G's motion for summary judgment as to its false marketing claim, pursuant to 35 U.S.C. § 292, concluding that S & G failed to demonstrate that there is no genuine issue as to a material fact concerning Astro's intent to deceive the consumer public. Id. at 505. This Court also denied S & G's motion for summary judgment on its claim for attorneys' fees, pursuant to 35 U.S.C. § 285, and its motion for sanctions, pursuant to Fed.R.Civ.P. 11. This Court found that S & G had submitted insufficient evidence to persuade that it was entitled to relief as a matter of law. Id. at 507-508.

On March 20, 2001, Astro filed a new motion for summary judgment on the unfair competition and tortious interference claims in light of the Federal Circuit's holding in Zenith Electronics Corp. v. Exzec Inc., 182 F.3d 1340 (Fed.Cir.1999). Zenith held that a showing of bad faith is required to establish a Lanham Act violation. S & G filed a cross-motion requesting that this Court grant summary judgment in its favor as to its Lanham Act, state unfair competition, and tortious interference claims, and award money damages, pursuant to 35 U.S.C. § 285.

On June 3, 2002, this Court issued an order and opinion reevaluating its prior holding in light of Zenith Electronics. See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 205 F.Supp.2d 306 (D.N.J.2002) ("M. Eagles II "). This Court cited its previous findings of inequitable conduct as evidence of bad faith in Astro's subsequent contacts with S & G and its customers, and found that the record presented clear and convincing evidence that Astro acted in bad faith such that S & G was entitled to summary judgment on its Lanham Act claim. Id. at 317. Pointing to the same evidence of inequitable conduct, this Court also granted summary judgment for S & G on its state law unfair competition claims. Id. at 322.

This Court also granted summary judgment for S & G on its tortious interference claim based on its finding of inequitable conduct. This Court found that Astro's conduct in sending out letters regarding an unenforcable patent to S & G's customers and suppliers, in lieu of filing a patent suit, fell outside "generally accepted standards of common morality," and therefore constituted tortious interference with prospective economic advantage. Id.  at 320-22.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Additionally, although this Court had previously denied S & G's motion for summary judgment on its attorneys' fees claim, it revisited its holding, and awarded fees in light of the Federal Circuit's holding in Brasseler, U.S.A. 1, L.P. v. Stryker Sales Corp., 267 F.3d 1370 (Fed.Cir.2001). This Court found that its finding of Astro's inequitable conduct before the PTO constituted proof of exceptional circumstances allowing the award of fees. M. Eagles II, F.Supp.2d at 323.

Having found Lanham Act, state law unfair competition, and tortious interference violations, this Court held a two-day hearing in 2004 to determine damages, which it awarded in an Order dated December 30, 2004. (Docket Entry No. 150.)

4. The Federal Circuit's Opinion

**\*6** Astro appealed this Court's findings, and on February 27, 2006, the Federal Circuit Court of Appeals reversed in part and vacated in part this Court's prior rulings, and remanded the action to this Court for further proceedings. See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 439 F.3d 1335 (Fed.Cir.2006) ("M. Eagles III "). The Federal Circuit found that this Court "erred in its determination of inequitable conduct because there was insufficient evidence on summary judgment to infer an intent to deceive the PTO." Id. at 1344. In reaching its ultimate conclusion, the Federal Circuit specifically held that "a failure to disclose a prior art device in the PTO, where the only evidence of intent is a lack of a good faith explanation for the nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable conduct." Id. at 1341. [FN7] Based on its finding that there was insufficient evidence to support a finding of inequitable conduct at the summary judgment phase of the proceedings, the Federal Circuit vacated this Court's holdings regarding S & G's declaratory judgment, Lanham Act, state law unfair competition, tortious interference, and attorneys' fees claims. [FN8]

> FN7. At the hearing before the Federal Circuit, when prodded by the presiding judges, S & G's counsel failed to articulate or identify any affirmative evidence of Astro's culpable intent. The following colloquy took place on the record: Circuit Judge: [B]ut what is your best evidence of intent?

... What is that, the best evidence you have? Mr. James: The fact that our, my adversary has not presented a single bit of evidence to show that the failure to disclose was inadvertent. Circuit Judge: Silence is evidence then? ... You're saying silence is evidence? Mr. James: I'm saying that, yes. Silence is evidence and that's the only evidence. (Transcript of Oral Argument at Federal Circuit, Dec. 6, 2005, Appeal Nos. 05-1224, 1228.)

> FN8. The Federal Circuit emphasized that its opinion did not address the issues of patent validity, infringement, and patent misuse. M. Eagles III, 439 F.3d at 1344.

5. The Instant Motion

On August 4, 2006, Defendant / Counterclaimant Astro moved this Court for summary judgment on all of S & G's claims, except for its non-infringement claim, and for summary judgment on all of its affirmative defenses, except for its non-infringement defense. Astro argues that S & G's affirmative claims for damages against Astro, i.e., those premised on S & G's contention that the ' 914 Patent is either unenforceable or invalid, must fail because there is no genuine issue of fact regarding bad faith, obviousness, or inventorship--the grounds for invalidity asserted by S & G. Astro next argues that S & G's Lanham Act claim for damages must fail because S & G has failed to establish a material issue of fact regarding (1) whether the alleged misleading statements were made in commercial advertisements; (2) whether S & G suffered actual damages, as opposed to a tendency to be damaged; or (3) whether S & G acted in bad faith in notifying potential infringers. Astro goes on to argue that all of S & G's state causes of action are (1) preempted by federal law; (2) barred by the litigation privilege; and (3) unsupported by evidence sufficient to create a genuine issue of material fact as to those claims.

Astro argues that S & G's affirmative defenses (except for its defense of non-infringement) fail as a matter of law because (1) the defense of "abuse of process" is barred by New Jersey's litigation privilege; and (2) S & G has adduced no evidence of patent misuse.

### III. DISCUSSION

A. Legal Standard Governing Motions For

Slip Copy                                                                Page 25
(Cite as: 2007 WL 979854, *6 (D.N.J.))

Summary Judgment

Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.2004) (quoting Anderson, 477 U.S. at 255).

*7 "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir.2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir.1995). "[U]nsupported allegations ... and pleadings are

insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir.1990); see also Fed.R.Civ.P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir.2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir.1992) (quoting Celotex, 477 U.S. at 322-23).

B. The '914 Patent's Validity

Astro argues that S & G's affirmative claims for damages against Astro, i.e., those premised on S & G's contention that the '914 Patent is either unenforcable or invalid, must fail because there is no genuine issue of fact regarding bad faith, obviousness, or inventorship--the grounds for invalidity asserted by S & G in its prior motion for summary judgment. S & G counters that the validity issue is alive and ripe for adjudication at trial. For the following reasons, this Court must grant Astro's motion for summary judgment of validity. [FN9]

FN9. In M. Eagles I, 68 F.Supp.2d at 508, this Court denied S & G's motion for summary judgment of invalidity because S & G failed to satisfy its burden of establishing obviousness or lack of proper inventorship by clear and convincing evidence. This Court's holding in M. Eagles I, however, addressed a different question than the one presented here. In M. Eagles I, this Court found that S & G was not entitled to summary judgment on its contention that the '914 Patent is invalid because the evidence it had proffered did not clearly and convincingly establish that the '914 Patent is invalid. Here, the issue is not whether S & G has established invalidity by clear and convincing evidence, but rather, whether S & G has adduced sufficient evidence to create a triable issue of fact as

to invalidity. As this Court will explain, no such evidence has been adduced by Plaintiffs.

### 1. Legal Standard Governing Determinations Of Patent Validity

**\*8** Initially, "[a] patent shall be presumed valid." 35 U.S.C. § 282. "The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." Id. The presumption of patent validity "may be rebutted only by clear and convincing evidence." Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1050 (Fed.Cir.), cert. denied, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (citations omitted). Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable.' " Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). [FN10]

> FN10. Corroboration of a witness' oral testimony is required to invalidate a patent under 35 U.S.C. § 102. See Finnigan Corp. v. International Trade Comm'n, 180 F.3d 1354, 1367 (Fed.Cir.1999). This requirement exists regardless of whether the witness is an interested party or an uninterested party. See id. at 1367-68. Corroboration has been required by the courts "because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." Id. at 1368.

### 2. Bad Faith / Inequitable Conduct

Astro first argues that the Federal Circuit's opinion in M. Eagles III, 439 F.3d 1335, which rejected this Court's findings of bad faith in granting S & G's motion for summary judgment, precludes S & G from now asserting bad faith as a ground for invalidating the '914 Patent.

#### a. Legal Standard Governing Inequitable Conduct

"Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a 'duty of candor and good faith' to the PTO." M. Eagles III, 439 F.3d at 1339 (citing 37 C.F.R. § 1.56(a) (2004); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995)).

"A breach of this duty may constitute inequitable conduct, which can arise from a failure to disclose information material to patentability, coupled with an intent to deceive the PTO." Id. at 1339-40 (citing Molins, 48 F.3d at 1178). Both intent and materiality must be established by clear and convincing evidence in order for a party to prevail on its challenge to the validity of a patent on such grounds. Id. at 1340 (citing J.P. Stephens & Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1554, 1559 (Fed.Cir.1984)).

"[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." Id. (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 552 (Fed.Cir.1990)). "Intent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." Id. (quoting Herbert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed.Cir.1996)).

"To satisfy the requirement of the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive.' " Id. at 1341 (quoting Paragon Podiatry Lab. v. KLM Lab., 984 F.2d 1182, 1189 (Fed.Cir.1993) (quoting Kingsdown Med. Consultants Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed.Cir.1988))). "Intent need not be proven by direct evidence." Id. (citing Merck & Co., Inc. v. Danbury Pharm. Inc., 873 F.2d 1418 (Fed.Cir.1989)). "Intent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure." Id. (citing Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1354 (Fed.Cir.2005)). "There still must be a factual basis, however, for a finding of intent." Id.; Hebert, 99 F.3d at 1116.

**\*9** The Federal Circuit has articulated that, while it is not impermissible to grant summary judgment on inequitable conduct grounds, it "urges caution" "in making an inequitable conduct determination at the summary judgment stage." Id. at 1340 (quoting Paragon Podiatry Lab, 984 F.2d at 1190).

#### b. Sufficiency Of Evidence Of Inequitable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Conduct

S & G first argues that the evidence it proffered with its prior motion for summary judgment creates a triable issue of fact regarding the intent to deceive element of inequitable conduct. This Court finds, however, that the evidence in the record before it and the Federal Circuit on S & G's motion for summary judgment, is not sufficient to lead a reasonable factfinder to conclude that S & G has established Astro's intent to deceive the PTO by clear and convincing evidence.

As the Federal Circuit found, "[i]n light of all the facts and circumstances surrounding the applicant's conduct, … Astro's acts do not demonstrate on summary judgment that Astro had a culpable intent during prosecution." M. Eagles III, 439 F.3d at 1343. The Federal Circuit, addressing S & G's prior motion for summary judgment of invalidity, labeled what S & G had proffered a "dearth of evidence as to the element of intent in light of the clear and convincing evidence standard." Id. Given the dearth, i.e., the paucity or shortage, of evidence S & G adduced concerning Astro's intent to deceive in its prior motion for summary judgment, and S & G's failure to present any additional evidence in opposition to Astro's pending motion, this Court cannot find that the evidence before it is sufficient to allow S & G's claim for invalidity to survive Astro's motion for summary judgment.

When prodded by the Federal Circuit during Astro's appeal of this Court's prior order on S & G's motion for summary judgment, the only "evidence" S & G could identify as probative of Astro's culpable intent was "silence," i.e., Astro's failure to come forth with a good faith explanation of its failure to disclose prior art to the PTO examiner. (See Transcript of Oral Argument at Federal Circuit, Dec. 6, 2005, Appeal Nos. 05-1224, 1228.) Similarly, when before this Court at the hearing on the instant motion brought by Astro seeking summary judgment on the issue of validity, S & G's counsel came forward with no evidence of Astro's culpable intent other than Astro's nondisclosure of prior art to the PTO. (Transcript of Proceedings, Jan. 30, 2007 at 12) (S & G's counsel stated, "it's still nondisclosure".) As the Federal Circuit clearly held, "[a] failure to disclose a prior art device in the PTO, where the only evidence of intent is a lack of a good faith explanation for the

nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable conduct." M. Eagles III, 439 F.3d at 1341. [FN11] Thus, by failing to submit evidence of mal intent beyond Astro's non-disclosure of prior art, S & G has failed to meet its burden on summary judgment concerning its invalidity claim. This Court therefore must grant Astro's motion for summary judgment based on validity.

> FN11. During oral argument, counsel for S & G argued that the Federal Circuit's holding was limited to a rejection of S & G's evidence of culpable intent in failing to disclose prior art related to the Model 220 product. This Court rejects such a narrow interpretation of the Federal Circuit's opinion. All of the evidence, which was before this Court in deciding S & G's prior motion, was similarly before the Federal Circuit. The Federal Circuit decided, based on "all of the facts and circumstances surrounding the applicant's conduct," that there was insufficient evidence in the record from which a reasonable factfinder could conclude, under the clear and convincing evidence standard, that Astro acted in bad faith. M. Eagles III, 439 F.3d at 1343. The Federal Circuit, while specifically rejecting this Court's finding of culpable intent in failing to disclose certain prior art references concerning the Model 220, also made its finding in light of the "dearth of evidence as to the element of intent," generally. Id. The clear language of the Federal Circuit's opinion indicates that its holding rejected the notion that "silence," i.e ., nondisclosure, is sufficient evidence of bad faith to justify a finding of inequitable conduct. This holding is not limited to "silence" regarding the Model 220, but also addresses the lack of any evidence in the record demonstrating culpable intent, while setting forth a generally applicable rule of law. Thus, S & G's argument that the Federal Circuit's opinion does not control this Court's decision must fail. The Federal Circuit not only controls this court in the area of patent law generally, but its decisions in this matter form the law of the case, and cannot be set aside or ignored by this Court, as this action moves forward towards trial and final adjudication.

**\*10** S & G also argues that, whatever the import of the Federal Circuit's holding, S & G is entitled to an opportunity to present a complete record at trial,

and conduct additional discovery to support its argument that Astro engaged in inequitable conduct in its relations with the PTO. (Pl.'s Opp. at 13-14.) S & G contends that discovery has been held in abeyance pending this Court's determination of the merits of Astro's pending motion, and that after this Court has ruled, S & G will take discovery in hopes of establishing: (1) "the dollar value of Astro's sales of the relevant prior art drivers"; (2) "the close relationship of Mr. Irving Fisher to the selection and construction of prior art Astro models"; and (3) "the fact that Astro's personnel, including Mr. Fisher, were at the relevant times thoroughly familiar with the driver parts, including the 'critical elements.' " (Id. at 13.) S & G claims these facts without evidentiary support, and argues that they are relevant to a determination of Astro's intent because such facts demonstrate that Astro was knowledgeable of the prior art models and their parts and failed to disclose them to the PTO.

This Court finds unavailing S & G's arguments regarding the evidence they will seek to introduce at trial concerning the '914 Patent's purported invalidity due to inequitable conduct. S & G is deplorably confused about its burden at this stage of the litigation, where discovery has been closed for a number of years. (See Docket No. 87 (ordering fact and expert discovery closed on August 31, 2000).) As this Court has explained, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co., 772 F.2d at 1109. The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, 54 F.3d at 1130-31. "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." Schoch, 912 F.2d at 657 (3d Cir.1990); see also Fed.R.Civ.P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Because S & G bears the burden of establishing

that the '914 Patent is invalid for inequitable conduct, M. Eagles III, 439 F.3d at 1340, once Astro points to an absence of evidence demonstrating inequitable conduct, as it has done here, S & G must come forth with actual evidence demonstrating a triable issue of fact regarding inequitable conduct. See Anderson, 477 U.S. at 248. By arguing that it will present such evidence at trial, S & G does not meet its burden. The opportunity to gather evidence is long gone.

**11** Because S & G has proffered insufficient evidence from which a reasonable factfinder could determine that S & G has established by clear and convincing evidence that Astro engaged in inequitable conduct before the PTO, thereby rendering the '914 Patent invalid, Astro's motion for summary judgment on S & G's claim for invalidity on inequitable conduct grounds is granted.

3. Obviousness

Astro next contends that S & G has failed to proffer sufficient evidence demonstrating that the '914 Patent fails for obviousness.

a. Legal Standard Governing Obviousness

A patent is invalid under 35 U.S.C. § 103(a) where: "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The question of obviousness, therefore, turns on four factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicators of non-obviousness, more commonly termed secondary considerations. See Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); B.F. Goodrich Co. v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1582 (Fed.Cir.1996); Uniroyal, 837 F.2d at 1050.

The existence of each limitation of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

references, and that would also suggest a reasonable likelihood of success." Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1356 (Fed.Cir.1999); see also Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc., 471 F.3d 1369, 2006 WL 3792689, at *7 (Fed.Cir. Dec.26, 2006). "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." Id. at 1356.

To rebut a prima facie case of obviousness based on prior art, objective evidence of nonobviousness may be used. Tec Air, Inc. v. Denso Mfg. Mich., Inc., 192 F.3d 1353, 1360 (Fed.Cir.1999). This objective evidence includes: (1) a long-felt and unmet need in the art for the invention; (2) failure of others to achieve the results of the invention; (3) commercial success of the invention; (4) copying of the invention by others in the field; (5) whether the invention was contrary to accepted wisdom of the prior art; (6) expression of disbelief or skepticism by those skilled in the art upon learning of the invention; (7) unexpected results; (8) praise for the invention by those in the field; and (9) independent invention by others. See Graham, 383 U.S. at 17-19. "The objective evidence of nonobviousness ... should when present always be considered as an integral part of the analysis." Demaco Corp. v. F. Von Langsdorff Licensing Ltd., 851 F.2d 1387, 1393 (Fed.Cir.1988) (quoting W.L. Gore & Assocs. Inc. v. Garlock, Inc., 721 F.2d 1540, 1555 (Fed.Cir.1983), cert. denied, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)).

*12 "Because patents are presumed to be valid[,] an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." Kao Corp. v. Unilever U.S., Inc. 441 F.3d 963, 968 (Fed.Cir.2006) (internal citation omitted) (citing Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1036 (Fed.Cir.2001)).

b. Whether There Is Sufficient Evidence Of Obviousness

In its prior motion for summary judgment, S & G argued that the '914 Patent is invalid for obviousness. This Court, in its opinion in M. Eagles I, denied S & G's motion for summary judgment of

invalidity on obviousness grounds, finding that genuine issues of material fact remained regarding obviousness. See M. Eagles I, 68 F.Supp.2d at 500. Astro now argues that subsequent developments have foreclosed S & G'ability to argue obviousness.

S & G's claim of invalidity for obviousness is based on its contention that the driver claimed in the '914 Patent is the same as the Astro Model 220, which was in existence for over twenty years before Astro applied for the ' 914 Patent. Astro argues that the Federal Circuit's recent decision prevents S & G from making this argument. The Federal Circuit rejected S & G's argument that the '914 Patent is the same as the Model 220. Comparing the claims of the '914 Patent to the features of the Model 220, the Federal Circuit found that "the Model 220 lacks all of the components in paragraphs (d), (f), (g) and (h) of claim 1 of the '914 Patent and many of the components in paragraph (e)." M Eagles III, 439 F.3d at 1342 n. 4.

In response, S & G does not specifically identify evidence supporting its obviousness contention. Rather, S & G spends the majority of its opposition brief drawing the court's attention to copious unorganized evidence, which references the prior art. S & G, however, fails to explain how this evidence supports its claim of obviousness, let alone creates a triable issue of fact such that a reasonable jury could conclude that S & G has established obviousness by clear and convincing evidence.

As the Federal Circuit has found, in challenging a patent as invalid for obviousness, "it is insufficient to merely identify each element in the prior art to establish unpatentability of the combined subject matter as a whole"; instead, "a party alleging invalidity due to obviousness must articulate the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious." Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1379 (Fed.Cir.2006) (quoting Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1336 (Fed.Cir.2006)). By neglecting to articulate clearly how the prior art renders that '914 Patent obvious, S & G has failed to meet its burden on summary judgment. This Court, therefore, must grant summary judgment for Astro on S & G's invalidity claim, to the extent it is rooted in S & G's contention of obviousness. [FN12]

FN12. This Court notes that in addition to oblique references to unorganized prior art evidence, S & G has also submitted various reports by its purported expert, Melvin Lindner. Mr. Lindner's report, dated July 2000, and his supplemental affidavit, dated January 2001, are not probative as to obviousness in any respect. (James Decl., Exh. 8.) Fed.R.Evid. 702 only permits the introduction and consideration of expert evidence that is helpful to the trier of fact, i.e., if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," it is admissible. Id. Without deciding whether Mr. Lindner is qualified as an expert, this Court finds that neither his 2000 report, nor his 2001 affidavit, render an "opinion" or present any evidence demonstrating that the '914 Patent was obvious. Mr. Lindner's 2000 and 2001 submissions merely reiterate the findings of the PTO examiner, explained in the facts section of this opinion. His 2000 and 2001 submissions, therefore, are not helpful to the trier of fact, and must be excluded from evidence. Fed.R.Evid. 702. In addition to the 2000 and 2001 submissions by Mr. Lindner, S & G has also (1) proffered a supplemental affidavit by Mr. Lindner, dated July 2006 (James Decl., Exh. 7); and (2) moved this court for leave to supplement Mr. Lindner's 2000 and 2001 submissions (Docket Entry No. 199). S & G's motion to supplement Mr. Lindner's report was filed after all briefing on Astro's motion for summary judgment had been completed, and after oral argument had been held. Astro has moved to strike the 2006 supplemental affidavit by Mr. Lindner, and has also opposed S & G's motion to supplement Mr. Lindner's earlier report and affidavit. Rule 26(a)(2)(A) requires that "a party ... disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed.R.Civ.P. 26(a)(2)(A). Rule 26(a)(2)(B) provides: Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years. Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). Rule 26(e) imposes a continuing duty on litigants to supplement their disclosures under Rule 26(a). Fed.R.Civ.P. 26(e)(1). Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1); see also Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir.1995) ("Rule 37 is written in mandatory terms, and is designed to provide a strong inducement for disclosure of Rule 26(a) material") (quotations and citation omitted); Yeti by Molly v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir.2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.... This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power.... The Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide [ ] a strong inducement for disclosure of material....' Courts have upheld the sanction even when a litigant's entire cause of action or defense has been precluded ...").    "Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless." Yeti by Molly, 259 F.3d at 1106; see also Brooks v. Price, 121 Fed. Appx. 961, 965 (3d Cir. Feb.14, 2005) ("Although Rule 37 'is designed to provide a strong inducement for disclosure of Rule 26(a) material,' it still leaves the trial court with discretion to determine if a party provides substantial justification for their delay or if the delay is harmless") (quoting Newman, 60 F.3d at 156). The burden of establishing substantial justification and harmlessness is on the party that failed to make the required disclosure. Yeti by Molly, 259 F.3d at 1107. Accord Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 310

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

F.3d 592, 596 (4th Cir.2003) (the burden is on the party facing sanction to prove harmlessness); Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 21 (1st Cir.2001) (same); Finely v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir.1996) (same). "The imposition of sanctions for abuse of discovery under Fed.R.Civ.P. 37 is a matter within the discretion of the trial court." Newman, 60 F.3d at 156 (quoting Orjias v. Stevenson, 31 F.3d 995, 1005 (10th Cir.1994)); see also Mid-America Table Wares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1361 (7th Cir.1996) ("The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court"). S & G's extremely belated presentation of a new submission by Mr. Lindner is unjustified and unduly harmful to Astro. S & G has not proffered any acceptable justification for submitting a new "expert report" close to five-and-a-half years after the close of expert discovery on August 31, 2000, or moving to supplement Mr. Lindner's earlier submissions after the close of all briefing and after oral argument on the instant motion. Moreover, there is every indication that S & G's untimely disclosure and attempt to supplement Mr. Lindner's prior submissions is unfairly prejudicial to Astro, which has had no opportunity to review the supplemental submissions, depose Mr. Lindner about the supplemental submissions, or prepare any rebuttal evidence of their own. For all these reasons, this Court grants Astro's motion to strike the 2006 supplemental affidavit by Mr. Lindner, and denies S & G's motion to supplement Mr. Lindner's earlier report and affidavit.

### 4. Inventorship

*13 Astro next claims that S & G's contention that the '914 Patent is invalid under 35 U.S.C. § 102(f), for not naming the true inventor, is not supported by sufficient evidence.

#### a. Legal Standard Governing Inventorship

"A person shall [not] be entitled to a patent [where] he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). Moreover, "[a] patent is invalid if more or fewer than the true inventors are named." Gemstar-TV Guide Intern., Inc. v. International Trade Com'n, 383 F.3d 1352, 1381 (Fed.Cir.2004). "Because a patent is presumed valid under 35 U.S.C. § 282, there follows a presumption that the named inventors on a patent are the true and only inventors." Id. (citing Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed.Cir.1997).

"Conception is the touchstone of inventorship." Borroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227 (Fed.Cir.1994). As a result, each joint inventor, to the extent that there is more than one inventor, "must generally contribute to the conception of the invention." Stern v. Trustees of Columbia University in City of New York, 434 F.3d 1375, 1378 (Fed.Cir.2006); Burroughs Wellcome, 40 F.3d at 1227-28 (Fed.Cir.1994). "Additionally, courts require corroborating evidence of conception." Stern, 434 F.3d at 1378 (citing Borroughs Wellcome, 40 F.3d at 1228). "However, contribution to one claim is sufficient to be a co-inventor." Stern, 434 F.3d at 1378 (citing Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed.Cir.1998)).

Conception has been defined by the Federal Circuit as "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986) (citation omitted). "Conception is complete when 'the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation .' " Stern, 434 F.3d at 1378 quoting Borroughs Wellcome, 40 F.3d at 1228).

The critical question on summary judgment is whether S & G can show by clear and convincing evidence, after all reasonable inferences are drawn in their favor, that the named inventor did in fact invent the '914 Patent. See Stern, 434 F.3d at 1377. [FN13] To meet this heightened threshold, S & G must present more than uncorroborated testimony. See Stern, 434 F.3d at 1378; Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1170 (Fed.Cir.2006) ( "the corroboration requirement provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony"). The sufficiency of corroborating evidence turns on evaluation of all pertinent evidence so that a sound

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

determination of the credibility of the plaintiff's story may be reached. See Trovan, Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1302 (Fed.Cir.2002). Corroborating evidence "preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention," but may also consist of circumstantial evidence about the inventive process or reliable testimony from someone other than the plaintiff. Id. at 1302-03; Checkpoint Systems, Inc. v. All-Tag Sec. S.A., 412 F.3d 1331, 1339 (Fed.Cir.2005) (corroborating evidence may include physical, documentary or circumstantial evidence, or reliable testimony from one other than an interested party). The sufficiency of corroborating evidence is evaluated on a "rule of reason" basis, and is a question of fact. Medichem, 437 F.3d at 1170-71.

> FN13. The rationale for this heightened standard is that, in the inventorship context, "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard." Hess v. Advanced Cardiovascular Systems, Inc., 106 F.3d 976, 980 (Fed.Cir.1997).

b. Whether There Is Sufficient Evidence To Challenge Inventorship

*14 Astro argues that the sole basis of S & G's claim of invalidity for failure to name the correct inventor is S & G's argument that a Japanese company, rather than Irving Fisher (the inventor named in the '914 Patent) was the true inventor. The only evidence S & G has offered in support of its inventorship argument is the deposition testimony of Stephen Fisher, who played no role in the conception and initial execution of the '914 Patent. Stephen Fisher testified as follows:

Q. Sir, from your knowledge of your father's experience and activities, what connection did he have in devising the internal--the detailed internal workings of the pneumatic driver, including the valve screw and O rings, the valve stem and spring, the exhaust sleeve and O ring, the wave washers and the various roll pins?
* * *
A. That's something that was in the hands of the Japanese or a Taiwanese company; correct?
(See James Decl., Exh. 11, Fisher Depo. at 111-112.)

Astro argues that this evidence is insufficient to create a triable issue of fact regarding inventorship, and this Court agrees. First, there is no evidence in the record indicating that Stephen Fisher had personal knowledge of his father's involvement in the creation of the patented product, such that his testimony is competent. Fed.R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Moreover, as this Court has explained, uncorroborated testimony, without more, is insufficient to create a triable issue of fact as to inventorship. Stern, 434 F.3d at 1378; Medichem, 437 F.3d at 1170.

At best, the colloquy transcribed above is equivocal. Stephen Fisher seems to be asking the examiner whether his response to the examiner's question is correct. He does not appear to be giving a definitive answer to the question posed. Stephen Fisher's statement, therefore, is far from definitive evidence of lack of inventorship. For these reasons, this Court must grant summary judgment for Astro on S & G's claim for invalidity, to the extent S & G's claim is made on inventorship grounds.

C. Lanham Act Claim

Astro also moves for summary judgment on S & G's Lanham Act claim on the ground that S & G cannot establish the commercial advertising, injury, or bad faith elements of its claim.

1. Legal Standard Governing Lanham Act Claims

The Lanham Act provides:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or
*15 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

To establish a violation of the Lanham Act, S & G must show that "(1) the defendant made false or misleading statements about the plaintiff's product [in commercial advertising or promotion]; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 171 (3d Cir.2001).

Generally, "there is no requirement that the falsification occur wilfully and with intent to deceive." U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922 (3d Cir.1990) (quoting Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648 (3d Cir.1958)). Where the Lanham Act (or a state law unfair competition claim) arises from a patentee's marketplace activity in support of its patent, the patentee's statements need to be made in bad faith for there to be a Lanham Act or state law unfair competition claim.  See Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1353 (Fed.Cir.1999) (stating that "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been in bad faith"); see also id. at 1355 (stating that bad faith is a requirement for state law tort claims or else the state law claim will be preempted by patent law). Therefore, S & G must show that Astro acted in bad faith to survive Astro's motion for summary judgment on its Lanham Act claim.

"Each of the above listed elements are essential to the claim and summary judgment is appropriate 'if there is no material issue of fact as to any one of the elements.' " Synygy, Inc. v. Scott-Levin, Inc., 51 F.Supp.2d 570, 575 (E.D.Pa.1999), aff'd, 229 F.3d 1139 (3d Cir.2000).

## 2. Commercial Advertisements

To prevail on its claim under § 1125(a), S & G must establish that Astro's challenged statements were made in the context of "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). "Notwithstanding that § 1125(a) applies to a broad range of misrepresentations, 'it does not have boundless application ... but is limited to false advertising as that term is generally understood.' " Guardian Life Ins. Co. of America v. American Guardian Life Assur. Co., No. CIV. A. 95-3997, 1995 WL 723186, at *3 (E.D.Pa. Nov.14, 1995) (quoting Gordon & Breach Science Publishers v. AIP, 859 F.Supp. 1521, 1532 (S.D.N.Y.1994) (quoting Alfred Dunhill Ltd. v. Interstate Cigar Co., 499 F.2d 232, 236 (2d Cir.1974))). See also Ditri v. Coldwell Banker, 954 F.2d 869, 872 (3d Cir.1992) (noting that the Lanham Act creates a remedy only for false descriptions or representations of products in advertising); U.S. Healthcare, 898 F.2d at 922 (noting that recovery under § 1125 requires a plaintiff to show that the falsification or misrepresentation "deceives a portion of the buying public").

*16 Courts have adopted the following four part test to determine whether a representation constitutes commercial advertising. The contested representation must be: " '(1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy defendants' goods or services'; and, (4) although representations less formal than those made as a part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." Fashion Boutique of Short Hills, Inc., v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir.2002); Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F.Supp.2d 695, 706 n. 4 (M.D.Pa.2006).

Astro argues that S & G fails to establish the "commercial advertising" element of its Lanham Act claim because the infringement notices of which it complains are not commercial advertising, i.e., they were not designed to influence customers to purchase Astro's goods instead of S & G's products. S & G does not argue that the notices constitute "commercial advertising." Rather, it argues that Astro's argument regarding the "commercial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

advertising" prong of the Lanham Act dissolves in light of the Federal Circuit's holding in Zenith, 183 F.2d 340. S & G contends that the Zenith court held that bad faith notices of infringement give rise to liability under the Lanham Act, as well as under state unfair competition law.

S & G has misread Zenith. The Zenith court did not find that bad faith notices of infringement necessarily give rise to liability under the Lanham Act. Instead, the court found that statements regarding non-infringement, "if made in bad faith, can be reached by § 43(a) (assuming the elements of such a claim are otherwise made out )." Zenith, 182 F.3d at 1354 (emphasis added). This holding was made in the context of finding that Lanham Act claims based on bad faith notices of infringement do not conflict with patent or antitrust laws. See Id. The Zenith court did not find that statements regarding non-infringement give rise to Lanham Act claims where those statements are not made in the context of commercial advertising and promotion. In fact, the Zenith court specifically noted that such statements would only give rise to liability if "the elements of such a claim are otherwise made out." Thus, contrary to S & G's argument, S & G is required to proffer evidence establishing that the challenged statements were made in the context of "commercial advertising or promotion" in order for its Lanham Act claim to survive Astro's motion for summary judgment.

As Astro correctly points out, the infringement notices/letters, upon which S & G's Lanham Act claim is based, do not constitute "commercial advertising." See ISI Intern., Inc. v. Borden Ladner Gervais LLP, 316 F.3d 731, 733 (7th Cir.2003) (finding that plaintiff's Lanham Act claim failed on the merits because letters sent to customers misleadingly asserting that the plaintiff lacks any right to license the subject invention and falsely asserting that defendant's client himself had a patent did not come within the scope of § 43(a)(1)(B), which is limited to false or misleading "commercial advertising or promotion," and does not cover all deceitful practices); Conditioned Ocular Enhancement, Inc. v. Bonaventura, 458 F.Supp.2d 704, 2006 WL 2982140 (N.D.Ill. Oct.17, 2006) (Cease and desist letters patent holder sent to alleged infringer's current and prospective customers were not "commercial advertising or promotion" within scope of Lanham Act's false or deceptive advertising

provision). Thus, even if all the facts are viewed in the light most favorable to S & G, its Lanham Act claim fails as a matter of law. Astro's motion for summary judgment on S & G's Lanham Act claim is granted. [FN14]

> FN14. Because this Court has found that S & G's Lanham Act claim fails as a matter of law for failure to satisfy "commercial advertising or promotion" requirement of the statute, this Court need not address Astro's arguments that S & G has failed to proffer sufficient evidence of actual damages or bad faith that might have resulted from proof of such a claim.

### D. State Law Claims

*17 Intermixed with its federal patent-related claims, S & G has also asserted three state causes of action: unfair competition; violation of the New Jersey Fair Trade Act; and tortious interference with prospective economic advantage. Astro contends that these state law claims must fail because (1) S & G lacks sufficient evidence to support these claims; (2) they are preempted by federal patent law; and (3) they are barred by the litigation privilege.

### 1. Sufficiency Of Evidence To Support Plaintiff's State Law Claims

Astro argues that S & G's state law claims fail as a matter of law because S & G cannot adduce sufficient evidence in support of the essential elements of its claims.

### a. Common Law & Statutory Unfair Competition Claims

S & G's common law unfair competition claim is essentially the same as its Lanham Act claim. [FN15] See SK & F Co. v. Premo Pharmaceutical Laboratories, Inc., 625 F.2d 1055, 1065 (3d Cir.1980) ("The federal law of unfair competition is not significantly different ... from that of New Jersey"); Birthright v. Birthright, Inc., 827 F.Supp. 1114, 1141 (D.N.J.1993) ("It is well established that the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal Lanham Act"). Similarly, the New Jersey Fair Trade Act mimics the Lanham Act. Eli Lilly and Company v. Roussel Corp., 23 F.Supp.2d 460, 495 (D.N.J.1998) ("N.J. STAT.

ANN. § 56:4-1 is the statutory equivalent of § 43(a) of the Lanham Act and the two can be treated alike for analytical purposes") (internal quotations omitted) (citing Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 854 (3d Cir.1984) and Warner Lambert Co. v. McCrory's Corp., 718 F.Supp. 389, 396 (D.N.J.1989)). For the same reasons that this Court grants Astro summary judgment on S & G's its Lanham Act claims, it also grants Astro summary judgment on S & G's state law unfair competition claims. Id. ("For the same reasons defendants violated Section 43(a)(1)(A) of the Lanham Act, defendants are also guilty of common law unfair competition."); see also SK & F, 625 F.2d at 1065 ("Since, except for the interstate commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same, we need not repeat the factual discussion as to likelihood of success on the merits of the federal cause of action.").

> FN15. The parties' briefs only minimally distinguish the elements of New Jersey's common law unfair competition claim, and those required by N.J. STAT. ANN.. § 56:4-1. This Court's review of the relevant case law shows a disagreement as to whether the two causes of action are identical. See Duffy v. Charles Schwab & Co., Inc., 97 F.Supp.2d 592, 600 n. 7 (D.N.J.2000). Although this Court disposes of the two claims similarly, it makes no determination as to whether and how they are distinguishable. Id.

**b. Tortious Interference With Economic Advantage Claim**

To establish a claim for tortious interference with economic advantage, S & G must prove that: (1) it had "some protectable right," or "reasonable expectation of economic advantage;" (2) "the interference was done intentionally ... without justification or excuse" (i.e., with malice); (3) "the interference caused the loss of the prospective gain;" and (4) "the injury caused the damage." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751, 563 A.2d 31 (1989).

*18 Astro argues that S & G cannot adduce sufficient evidence to establish the malice element of its intentional interference claim. As this Court has found, S & G has failed to proffer sufficient

evidence demonstrating that Astro had an intent to deceive the PTO in prosecuting the '914 Patent. No additional evidence has been proffered in support of S & G's tortious interference claim, separate and apart from the evidence adduced in support of S & G's claim for invalidity. It follows, therefore, that because there is insufficient evidence indicating that Astro knew about the alleged deficiencies in the '914 Patent when it sought to prosecute it, there is also insufficient evidence demonstrating that it knew the '914 Patent was unenforceable (at least according to S & G) when it sent out the infringement notices / letters. This Court, therefore, cannot find that S & G has proffered sufficient evidence from which a reasonable factfinder could conclude that S & G acted maliciously. Astro's motion for summary judgment on S & G's tortious interference claim is granted. [FN16]

> FN16. The ruling in Astro's favor on S & G's state tort claims precludes the necessity of addressing the additional grounds for summary judgment on those claims asserted by Astro-i.e., preemption and the New Jersey litigation privilege.

**E. Affirmative Defenses**

Astro also argues that it should be granted summary judgment on S & G's asserted defenses of abuse of process and patent misuse.

**1. "Abuse Of Process "**

In its fourth affirmative defense, S & G claims that Astro's counterclaims against S & G's customers "abused the legal process and has violated Fed.R.Civ.P. 11(b)." (Amended Reply to the Counterclaim at 8.) Astro argues that it must be granted summary judgment on S & G's abuse of process affirmative defense because (1) it is barred by New Jersey's litigation privilege; and (2) S & G cannot establish the "further acts" necessary to establish abuse of process under New Jersey Law. S & G responds briefly to Astro's motion for summary judgment on its abuse of process affirmative defense by arguing that the defense cannot be preempted in light of Zenith, and that the defense is predicated on Fed.R.Civ.P. 11, which, according to S & G, "cannot be trumped by any so-called state privilege and is based upon Astro's act of litigation misconduct specified in the Certification of Harold James of February 16, 2001, ¶¶ 14-17

and which has continued unabated since then." (Pl.'s Opp. at 23 n. 7.)

This Court finds that because S & G's abuse of process defense is predicated on Fed.R.Civ.P. 11, it cannot be overcome by New Jersey doctrines, which may or may not dispose of parallel state law affirmative defenses. Cf. Miller v. Fortis Benefits Ins. Co., 363 F.Supp.2d 700, 706 n. 6 (D.N.J.2005) ("question of when a federal cause of action accrues is determined by federal law even when the federal court borrows the state statute of limitation period"); Puricelli v. Houston, No. CIV. A. 99-2982, 2000 WL 760522, at *6 (E.D.Pa. June 12, 2000) ("Defendants have also asserted the good faith immunity defense set forth in the CPSL. See 23 Pa. Cons.Stat. Ann. § 6318. While this defense may immunize Children and Youth Services and its employees from state law causes of action, it is inapplicable to claims arising from alleged violations of federal law"). Because Astro's arguments are rooted entirely in state law, Astro's motion for summary judgment on S & G's federal law abuse of process affirmative defense is denied.

2. Patent Misuse

*19 In its fifth affirmative defense, S & G asserts patent misuse as a defense to Astro's counterclaim. (Amended Reply to the Counterclaim at 9.) Astro argues that it is entitled to summary judgment on S & G's claim of patent misuse because S & G cannot adduce sufficient evidence to support the prerequisites of this defense. Astro counters that the patent misuse issue is alive and well.

a. Legal Standard Governing Patent Misuse As An Affirmative Defense

"Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which 'requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect.' " Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 868 (Fed.Cir.1997) (quoting Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1001 (Fed.Cir.1986) (quoting Blonder-Tongue Lab., Inc. v. University of Ill. Found., 402 U.S. 313, 343, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)); see also Monsanto Co. v. Scruggs, 459 F.3d 1328, 1339 (Fed.Cir.2006).

The "policy of the patent misuse doctrine is to prevent a patentee from using the patent to obtain market benefit beyond that which inures in the statutory patent right." Scruggs, 459 F.3d at 1339 (quoting Monsanto Co. v. McFarling, 363 F.3d 1336, 1341 (Fed.Cir.2004) (internal quotations omitted)).

"The courts have identified certain specific practices as constituting per se patent misuse, including so-called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." Virginia Panel Corp., 133 F.3d at 869. Courts also have found per se patent misuse whenever the patentee conditions the licensee's right to use his patent "on the licensee's agreement to purchase, use or sell, or not to purchase use or sell, another article of commerce not within the scope of his patent monopoly." See Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 136, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). For example, the Supreme Court found per se patent misuse where the patentee permitted the licensee to use with the patented machines only salt tablets sold by the patentee. Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), abrogated on other grounds. The Third Circuit has similarly found per se patent misuse in a provision stipulating that the licensee would not manufacture any non-tangling spring washers except those covered by the licensor's patent. National Lockwasher Co. v. George K. Garrett Co., 137 F.2d 255 (3d Cir.1943).

"Congress, however, has established that other specific practices may not support a finding of patent misuse." Id. (citing 35 U.S.C. § 271(d) (1994); Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 202, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980) (construing earlier version of § 271(d)). "A 1988 amendment to § 271(d) provides that, inter alia, in the absence of market power, even a tying arrangement does not constitute patent misuse." Id. (citing 35 U.S.C. § 271(d)(5) (1994) (added by Pub.L. No. 100-703, § 201, 102 Stat. 4676 (1988))).

*20 "When a practice alleged to constitute patent misuse is neither per se patent misuse nor

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is 'reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims.' " Id. (quoting Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 708 (Fed.Cir.1992)). "If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse." Id. "If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the 'rule of reason.' " Id.

Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." Id. (quoting State Oil Co. v. Kahn, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (citing Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 343 & n. 13, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982))).

b. Whether Plaintiff Has Adduced Sufficient Evidence To Create A Triable Issue Of Fact Regarding Patent Misuse

Astro argues that S & G's patent misuse defense must fail as a matter of law because (1) Astro's mailing of notices of infringement to S & G's customers does not constitute per se patent misuse; and (2) S & G cannot establish that Astro's conduct imposed an unreasonable restraint on competition.

S & G counters that it is not relying on the notice of infringement letters to establish per se patent misuse. Rather, S & G argues that Astro's settlement agreements with counterclaim defendants Pro Tool, Inc. ("Pro Tool") and C.R.C. Line, Inc. ("CRC"), constitute per se patent misuse. Astro's stipulation of dismissal of the counterclaim defendants provides in pertinent part that the counterclaim defendants
and [their] agents, servants, employees, representatives, directors, officers, assigns and successors shall refrain from selling, distributing, marketing, using and/or manufacturing S & G Eraser Wheels. Furthermore, [they] shall return

all S & G Eraser Wheels that it may have in inventory to S & G.
(Doane Decl., Exh. 3, Docket Entry No. 186-4, CRC Stipulation of Dismissal, ¶ 8; Pro Tool Stipulation of Dismissal, ¶ 7.)

Neither party disputes that whether S & G's eraser wheels infringe the '914 Patent remains a question of fact to be decided in the trial on this matter. Assuming that S & G prevails on the infringement question, S & G's agreements with Pro Tool and CRC constitute per se patent misuse. Assuming S & G prevails, the agreements effectively restrain the licensees' (i.e., Pro Tool and CRC) ability to "purchase, use or sell, or not to purchase use or sell, another article of commerce not within the scope of [Astro's] patent monopoly." See Zenith Radio, 395 U.S. at 136. Because the question of patent misuse turns on whether S & G ultimately is found to be infringing the '914 Patent--a question of fact to be decided by the ultimate factfinder--a triable issue of fact remains regarding S & G's patent misuse affirmative defense. Therefore, Astro's motion for summary judgment on S & G's patent misuse affirmative defense is denied. [FN17]

FN17. S & G does not purport to propound evidence demonstrating that Astro's conduct imposes an unreasonable restraint on competition. Because S & G seeks to establish per se patent misuse, and because a triable fact remains regarding whether Astro engaged in per se patent misuse, S & G need not proffer such evidence to survive Astro's motion for summary judgment on its patent misuse affirmative defense.

IV. CONCLUSION

*21 For the reasons stated above, Astro's motion for partial summary judgment is granted in part and denied in part. Summary judgment will be granted for Astro on S & G's declaratory judgment claim for invalidity, and its Lanham Act, state law unfair competition, New Jersey Trade Act, and tortious interference claims. Astro's motion for summary judgment on S & G's affirmative defenses of abuse of process and patent misuse is denied.

2007 WL 979854 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo