# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION-RIVERSIDE


HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING


G. DAVID JANG, M.D.,                    )
                                        )
              Plaintiff,                )
                                        )
V.                                      )  DOCKET NO. EDCV 05-426 VAP
                                        )
BOSTON SCIENTIFIC CORPORATION,          )
et al.,                                 )
                                        )
              Defendants.               )
_____)


REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS
Riverside, California
Tuesday, May 30, 2006


PHYLLIS A. PRESTON, CSR
License No. 8701
Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501


COPY

1                          <u>APPEARANCES</u>

2

For the Plaintiff:        GIBSON, DUNN & CRUTCHER LLP
3                         By:  <u>WAYNE BARSKY</u>, <u>JULIAN POON</u>,
                               <u>JUNE TAI</u> & <u>BRENDA KLEIDOSTY</u>
4                         333 South Grand Avenue
                          Los Angeles, California 90071-3197
5                                       and
                          MUNDELL, ODLUM & HAWS
6                         By:  <u>THOMAS MUNDELL</u>
                          650 E. Hospitality Lane, Suite 470
7                         San Bernardino, California 92408

8

For the Defendants:       HOWREY LLP
9                         By:  <u>MATTHEW WOLF</u>, <u>EDWARD HAN</u> &
                               <u>JOHN NILSSON</u>
10                        1299 Pennsylvania Avenue, NW
                          Washington, DC 20004

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              TUESDAY, MAY 30, 2006, RIVERSIDE, CALIFORNIA
 2                            ---OOo---
 3          THE CLERK:  Calling Item No. 2, EDCV 05-426 VAP,
 4   G. David Jang versus Boston Scientific Corporation, et al.
 5          Counsel, please make your appearances.
 6          MR. BARSKY:  Good morning, Your Honor.  Wayne
 7   Barsky of Gibson, Dunn & Crutcher and with me this morning is
 8   Julian Poon, Brenda Kleidosty, K-L-E-I-D-O-S-T-Y, and June
 9   Tai, T-A-I.
10          THE COURT:  Good morning.
11          MR. MUNDELL:  Good morning, Your Honor.  Thomas
12   Mundell from Mundell, Odlum & Haws also on behalf of
13   Dr. Jang.
14          THE COURT:  Good morning.
15          MR. WOLF:  Good morning, Your Honor.  Matthew Wolf
16   from Howrey LLP on behalf of the Boston Scientific
17   defendants.  With me are my partner, Ed Han, my associate
18   John Nilsson and Dr. Wallace Woo.
19          THE COURT:  Good morning.
20          We're here this morning for the hearing on the
21   claim construction, although in a sense this is not, strictly
22   speaking, as the parties have pointed out, a patent
23   infringement matter, it's still necessary to have the Markman
24   hearing in order to resolve the claim construction issues for
25   the purpose of proceeding with the claims in this case.
```

1      I have reviewed the opening and response briefs

2   filed by both sides.  What I have not reviewed is the

3   declaration of Professor Squire that was submitted.  I have

4   reviewed the objection -- the evidentiary objections to it

5   that were submitted.  I would probably think we should

6   resolve that matter first.  I'm not inclined to actually

7   review the declaration because I do think it's the sort of

8   extrinsic evidence that is probably unnecessary for the Court

9   to review in order to resolve the issues that are presented.

10   So I am inclined to sustain the objections, but before I do

11   so, would you like to be heard?

12      MR. HAN:  Yes, Your Honor.  Ed Han, if I may be

13   heard.

14      Your Honor, we actually do agree that if the Court

15   is able to resolve these issues based on the intrinsic

16   evidence, and we believe that Boston Scientific's proposed

17   constructions are supported by the specifications of the

18   patents, then it may not be necessary.

19      We believe that Dr. Jang has potentially inserted

20   some ambiguities by their positions.  And to the extent that

21   the judge -- and that Your Honor does find there is some

22   ambiguity, we believe at that point it would be proper to

23   consider extrinsic evidence and we offer Dr. Squire's

24   declaration in that context.

25      If I may, of course, we received the objections

1    only late last week and have not had a chance to submit

2    papers and would welcome the opportunity, if Your Honor would

3    find that helpful, to briefly and quickly respond in writing,

4    but I'm prepared --

5              THE COURT:  I don't think it's necessary.

6              MR. HAN:  -- either in lieu of that or in addition

7    to that to speak to the issues raised by the objections now.

8              THE COURT:  Go ahead.

9              MR. HAN:  Dr. Squire's declaration does four

10   things.  The first is that it does provide several paragraphs

11   of background about the technology.  We don't believe

12   Dr. Jang's counsel have taken issue with that.

13             Secondly, it establishes Dr. Squire's

14   qualifications as one skilled in the art.  And again, we

15   don't believe, as I read the objections, that they are taking

16   issue with that either.

17             The other thing that Dr. Squire does is for certain

18   terms he does opine as to how a person skilled in the art

19   would understand those claims.

20             And finally, having stated those understanding, he

21   goes on to review the patents themselves to determine that

22   there is nothing in the patents that contradicts that

23   understanding that he's put forward.

24             We believe that all of those purposes are proper,

25   and actually we don't believe that the objections that

1  Dr. Jang has raised actually dispute that.  And, in fact,

2  they themselves quote a passage of the <u>Phillips</u> case in which

3  the Court finds that we have also held that extrinsic

4  evidence in the form of expert testimony can be useful to the

5  Court for a variety of purposes and list several things, the

6  last of which --

7          THE COURT:  But the case lists several conditions

8  that must exist before the Court --

9          MR. HAN:  That's true, Your Honor.

10         THE COURT:  -- would find helpful extrinsic

11 evidence.

12         MR. HAN:  Yes, Your Honor.  And so I've stated at

13 least one of those, and so we do agree that if Your Honor is

14 able to resolve this without reference but, again, there are

15 situations when it may be helpful.  So the question becomes

16 -- if the Court's analysis leads you to the point where you

17 may seek recourse to the extrinsic evidence, then the

18 question becomes, is Dr. Squire's declaration in proper form

19 for you to do so.

20         We believe that the objections proceed from three

21 faulty premises.  First of all, you know, all of them relate

22 basically to the idea that the declaration is too conclusory.

23         First of all, we believe that the objections

24 themselves have omitted to reference certain paragraphs of

25 the declaration which do actually explain the reasoning and

1    the reasons why someone skilled in the art, in particular, an

2    issue that you are going to hear about as the hearing

3    proceeds, a crucial issue of the distinction to practitioners

4    of the art between the connecting elements and the expansion

5    elements of the stents.  And I would refer the Court

6    particularly to paragraphs 22, 23 and 24 of Dr. Squire's

7    declaration, which are not specifically pulled out from in

8    the objections.

9            And we would submit, Your Honor, that if one

10    focuses entirely on the declarant's conclusions that it is

11    inevitable that it would seem conclusory, and we think that

12    in certain instances there are explanations and reasoning

13    that would support the conclusions that they have simply

14    ignored.

15            Second, the objections basically require Dr. Jang

16    in several instances to prove a negative which is very

17    difficult.  The point as I described was that having given

18    his opinion of how someone skilled in the art would view a

19    particular claim term that the next step in the analysis,

20    properly, we believe, is that Dr. Squire would then review

21    the specification to see that there's nothing in there that

22    contradicts that view, that shows that the inventor had

23    intended some other purpose with that otherwise commonly

24    understood term.

25            And what he says in several of those cases -- and I

1    would highlight paragraph 16, 25 and 27 -- is that I reviewed
2    the patent and I find no suggestion of some contradictory
3    understanding of the terms.  And so the effect of that is
4    there really is nothing more to be said in that analysis.  It
5    is in the nature of either he goes through every line of the
6    patents and shows that they do not suggest a contrary
7    understanding, or he can simply over all make the overall
8    statement that there's nothing there.

9          So when the objections say -- that criticize him
10   for failing to identify any specific passages or languages in
11   the Jang patents to support his conclusions, well, what he's
12   really saying is there are no such passages or languages that
13   I can cite that would contradict those conclusions.  So it
14   really is -- that's the nature of the analysis.

15         Counsel cites the Southwall case which seems to be
16   the case on which they principally rely.  And the point I
17   just made is kind of the critical distinction that we would
18   ask the Court to find between these facts, Dr. Squire's
19   declaration and the declarations at issue in Southwall.

20         In particular, what the federal circuit finds in
21   Southwall, neither of the experts testified as to how one
22   skilled in the art would interpret the term in question when
23   viewed in light of the claim specification and prosecution
24   history.  The Court goes on to find that, in fact, those
25   experts were trying to alter a meaning that was clear from

1  the specification.  And as I've tried to make clear, Your

2  Honor, a fair reading of Dr. Squire's declaration we believe

3  would be consistent with a reading of these claim terms that

4  is not contradicted by --

5          THE COURT:  Then why is it needed?

6          MR. HAN:  Your Honor, it's needed if the positions

7  that Dr. Jang has put forward create an ambiguity.  I would

8  say in the first instance our position is -- and you see this

9  kind of situation in contract disputes, too, where one party

10  argues that a document is unambiguous, but if the Court finds

11  an ambiguity, please refer to this extrinsic evidence.  And I

12  think we offer Dr. Squire's declaration in that spirit.

13          THE COURT:  All right.

14          MR. HAN:  The last point, and I'll be quick about

15  this, is we believe that the Daubert references -- citations

16  are inapposite, again, because of the nature of Dr. Squire's

17  analysis, basically what he knows and understands as a

18  practitioner in the art.

19          Rule 702 as amended in response to Daubert and its

20  progeny reflects a great deal of flexibility as to the

21  factors and tests, the idea that Daubert suggests, you know,

22  that the methodology be tested in a certain way, that peer

23  review is a relevant factor and so on.  Rule 702, the

24  advisory committee notes to Rule 702 says that not all of the

25  specific Daubert factors can apply to every type of expert

1    testimony.  And we would suggest in this case, Your Honor,

2    given the nature of it, it's really not the type of thing

3    that a lot of the Daubert factors, the Kumho factors would

4    really apply to.

5              So that actually is our response.  Again, if

6    there's a question, we would be happy to brief it within days

7    if that's helpful.

8              THE COURT:  It won't be necessary but thank you.

9              Mr. Barsky, do you wish to respond?

10             MR. BARSKY:  Your Honor, may I ask Mr. Poon to

11    address this issue?

12             THE COURT:  Mr. Poon.

13             MR. POON:  Thank you, Your Honor.  I'll be brief.

14    Not only is the Squire declaration not necessary, but under

15    the Phillips case and the Supreme Court precedence, such as

16    Daubert, it is unhelpful and it should be excluded because it

17    consists of conclusory unsupported assertions as to claim

18    terms that have no backup to it, that have no explanation of

19    how Dr. Squire reasons from an observation to a conclusion.

20    We can walk through just two or three examples, perhaps given

21    the examples that Mr. Han gave.  First he gives the example

22    of paragraphs 22, 23 and 24 of the declaration as not being

23    too conclusory.

24             Let's take a look at paragraph 22.  Dr. Squire

25    states that the fact that connecting --

1          THE COURT:  Excuse me one moment.

2          MR. POON:  Certainly, Your Honor.

3          MR. WOLF:  Your Honor, if I may approach?

4          THE COURT:  All right.  Go ahead.

5          MR. POON:  Your Honor, I have a copy if you would

6    like.

7          Your Honor, in these three paragraphs Dr. Squire

8    basically tells us that the connection struts not being

9    attached to each other is necessary to impart additional

10   longitudinal flexibility to the unexpanded stent.  And then

11   he goes on to say that's desirable, but he never explains how

12   it is that the unattached nature of the connecting struts in

13   the connecting column imparts additional longitudinal

14   flexibility to the unexpanded stent.

15         To take some other examples that Mr. Han referred

16   to, paragraphs 16, 20, 26 and 27 of the declaration which

17   I'll paraphrase for Your Honor, basically here Dr. Squire is

18   telling us that an expansion column can only consist solely

19   of expansion struts and a connecting strut column can only

20   consist solely of connecting struts, yet never tells us how

21   he arrives at that conclusion.  There are no paragraphs that

22   Mr. Han or any of his colleagues can cite where he provides

23   any backup for it.  He simply declares:  I'm a person of

24   skill in the art, I have the following degrees, I graduated

25   from the following universities, I've done some research in

1  this area, and then he declares it as such.

2          And the kind of classic ipse dixit that the Supreme

3  Court condemns as inconsistent with Daubert and

4  General Electric v. Joiner.  All he has is a declaration of

5  that effect and then he makes a blanket reference to having

6  looked at all of, quote, the Jang patents and their

7  prosecution histories, end quote.  That is the pattern that

8  he follows consistently when, as Mr. Han refers to, he says,

9  well, Dr. Squire is being asked to prove a negative.  And in

10  each of those paragraphs all he's saying is, well, I've

11  looked at the Jang patents and their prosecution histories

12  and I can't find anything to cause me to disagree with the

13  litigation position that the BSC is taking in its brief.

14          It really adds no value to this case and is really

15  quite consistent with what the federal circuit condemned not

16  only in Phillips but also in Southwall when it enjoined

17  courts to ensure that experts tendering extrinsic evidence

18  make some demonstration that the conclusions that they offer

19  to the Court have some grounding in the claims, the

20  specification, or the prosecution history of the patents in

21  question.  Simply saying I've looked at the patents and

22  prosecution history, with all due respect, Your Honor, I

23  don't think that cuts it.  That doesn't satisfy the standard

24  set forth by the federal circuit or the Supreme Court.

25          Let's take another example, paragraph 17 of the

1    Squire declaration, where Dr. Squire tells this Court that

2    the expansion column needs to be tubular.  Well, he never

3    explains what exactly he means by tubular, let alone offering

4    an explanation of why it is that the expansion columns, which

5    ring around the stents circumferentially, he agrees, needs to

6    be tubular.  There's no explanation, Your Honor, of how this

7    so-called tubular structure is necessary to ensure that the

8    expansion column performs its, quote, basic function.  He

9    simply declares it from the heavens as such, offers his

10   degrees up as proof of that, and says you need know no

11   further, Your Honor, than that.  I have these impressive

12   degrees and I'm a person of ordinary skill in the art and

13   just take my word for it.

14          Paragraph 30 is yet another example.  This is

15   actually quite an ironic example where it's a two sentence

16   paragraph.  It is the only support in the declaration for the

17   proposition that a certain compound term needs to be

18   construed in a certain way.  In this case -- it's a mouthful,

19   Your Honor, but basically he recites -- he quotes the claim

20   term from claim 1 of the '743 and '021 patent which states,

21   quote, the first expansion strut of the first expansion strut

22   pair and the first expansion column have a longitudinal axis

23   offset from the longitudinal axis of the first expansion

24   strut of the second expansion strut pair and the second

25   expansion column, end quote.  And then, voila, he just, in my

1   opinion, declares what this limitation is supposed to mean

2   with no reference and no explanation to the claims or the

3   specification or the prosecution history.  This is a textbook

4   illustration of what is meant by conclusory.

5          Perhaps the last example is paragraphs 15 and 21 of

6   the Squire declaration in which Dr. Squire makes reference to

7   prior art stents, yet he never tells us which prior art

8   stents he's referring to or where to look in these prior art

9   stents.  All he offers is a one-page exhibit full of what

10  looks like over a dozen patents, and it's anyone's guess

11  which of these prior art stents he's referring to and where

12  in the prior art stents we should look to to try and find

13  some support for the conclusions that he pronounces and

14  declares in paragraphs 15 and 21 of the declaration.

15         In sum, Your Honor, I think particularly because

16  BSC has not tendered Dr. Squire for cross-examination

17  purposes today, it's particularly incumbent on this Court in

18  keeping with the teachings of the federal circuit in Phillips

19  and in Southwall and in Storage Technologies, not to mention

20  the Supreme Court's decisions in Daubert, in

21  General Electric v. Joiner and in Kumho Tire to exclude this

22  evidence as inadmissible as conclusory unsupported assertions

23  by experts as to the definition of a claim term which are

24  not useful to this Court.

25         THE COURT:  Thank you.  I'm going to make a few

1    observations, but I think that your last point is maybe the

2    most critical; and that is, that unless the witness is here

3    to testify and is subject to cross-examination, that may be

4    the tipping point in whether I accept his declaration.

5         Just to step back and think about this declaration

6    the way I would think about any declaration that I review in

7    say a motion for summary judgment or any other matter that is

8    before the Court, the ideal declaration that's a part of

9    papers that are being reviewed by the Court has factual

10   matters. And, in fact, one of the things I dislike is

11   reading a motion accompanied by declarations that is

12   repetitive; that is, I read the motion and then I read the

13   declaration and they are sentence by sentence repetitive.

14   And it is not just that I find it tedious to read the same

15   sentences in both, but a declaration should not have the same

16   sentence because a declaration should contain facts.

17        Now, the declaration from an expert witness can

18   contain opinions, and that's fine, but the points and

19   authorities should contain legal argument. So when I'm

20   reading the same kinds of sentences in a declaration as I'm

21   reading in a set of points and authorities, I find that

22   troubling, not as I just said because it's tedious -- and by

23   the way, both sides papers here were far from tedious. Goes

24   without saying. Maybe it doesn't go without saying but they

25   are just very, very well written and you did a splendid job

1   of educating -- you did your best to educate me.  And I
2   really appreciate the effort that went into them.  They were
3   everything that they should be.
4           So none of this is directed at you.  But my point
5   is that what's set forth in a declaration is supposed to be
6   facts and, in the case of an expert, some legal opinions.
7   And when it's repetitive word for word sometimes of what's in
8   the legal argument, A, the lawyers perhaps have not done a
9   very good job, but it also makes me suspicious that what's
10  going on is not so much a set of facts from which the lawyers
11  have made some independent arguments, but that it's very hard
12  to sort out what are the facts and what are the arguments.
13          And to a certain extent that's what troubles me
14  about this declaration; that is, I think that the declaration
15  is, for the most part, unnecessary, because I think the
16  arguments -- and just to pick out a couple of them, the one
17  that you just argued or you just pointed out, Mr. Poon --
18  that is, that expansion struts are in expansion columns and
19  so forth -- those are arguments that are well developed in
20  the briefs submitted by Boston Scientific.
21          And they're, in my view, I'm not trying to -- I
22  haven't reached a decision.  I know that's why we're here for
23  today.  I want to hear the argument and so forth that the
24  parties are here to present, but those arguments are based on
25  all of the things that the authorities, the federal circuit

1    authorities and the Supreme Court authorities and all of the

2    case law in this area said that they can be based on, the

3    patent prosecution, the patents themselves, et cetera.  So

4    you don't need an expert to opine on those.

5        And so what we have is, we have an expert's

6    declaration saying the same things but those are things that

7    in the legal argument that they're all contained within the

8    points and authorities and the legal arguments, and as best I

9    can tell at this point, there is a basis for them, a

10   permissible basis for them, or I should say bases for them,

11   for all of those arguments.  So I think they are unnecessary.

12   I think the declaration is probably unnecessary and I find it

13   troubling, as I said, because I think it's duplicative of --

14   and not just duplicative, but it steps over the line I think

15   of argument.

16       And maybe I haven't explained it or articulated it

17   very well, but at this point I am inclined to sustain the

18   objection, but I'm going to take it under submission.  I

19   don't think I need any further briefing on it, but if I

20   change my mind on that, I'll certainly give you an

21   opportunity.

22       MR. POON:  Thank you, Your Honor.

23       MR. HAN:  Thank you, Your Honor.

24       THE COURT:  Let me start with plaintiff's counsel.

25   What's your estimate for your presentation?

1          MR. BARSKY:  Thank you, Your Honor.  We have an

2    initial presentation, Your Honor, that I think we can get

3    through in less than an hour.  I'm assuming it's going to be

4    right around 45 to 50 minutes, and I'd like to just reserve a

5    little bit of time at the end to address any issues that come

6    up during Boston Scientific's presentation.  And I was going

7    to inquire actually about the Court's schedule in terms of

8    recesses and so on and whether the Court would want me to

9    go --

10          THE COURT:  Completely flexible, whatever the

11    parties -- within reason.  We can certainly go -- we're not

12    tied to having a lunch hour at noon, but I will give you

13    within reason as much time as you need.  As I said, I've read

14    the papers and some of the case law that you've cited I am

15    familiar with.  Some of it I had to read for the first time.

16    Some of it I re-reviewed.  And I have some questions I've

17    written in the margins occasionally on your papers, so as you

18    go along I may ask some questions, but you may preempt my

19    questions as you explain.

20          What's the defense's estimate of time?

21          MR. WOLF:  Your Honor, we have a prepared roughly

22    45-minute presentation, but obviously, I'm going to do my

23    best to be responsive to Mr. Barsky, so if I can tone that

24    down, we'll skip through slides as appropriate.

25          THE COURT:  I have a whole day set aside for you.

```
 1    That doesn't mean you need to use it all, but I just want to
 2    assure you I know how important this matter is to both sides,
 3    so that's fine.  So we will go through lunch and then if
 4    necessary we'll take a lunch break.  If there's more to
 5    cover, then we'll resume after lunch.
 6              MR. WOLF:  Very good, Your Honor.
 7              THE COURT:  Mr. Barsky, you may resume.
 8              MR. BARSKY:  Thank you very much, Your Honor.
 9              First, Your Honor, I would like to just note for
10    the record the presence of the plaintiff, Dr. Jang, who is in
11    the courtroom today.  And I do want to say, and I speak not
12    only on behalf of our team but I'm sure for Boston
13    Scientific's as well, that we understand the amount of work
14    that the Court and its staff has to put in to a matter like
15    this and we appreciate very much the time and the attention
16    that the Court has given us in this case and we appreciate
17    that.
18              What I'd like to do, if I could give just a brief
19    overview of where we're going to be going this morning or
20    where I'm going to be going this morning in the plaintiff's
21    presentation.  I just have some preliminary comments that I
22    want to start with.  It should take about five or
23    six minutes.  I'm then going to speak briefly about the
24    preferred embodiment of Dr. Jang's inventions, the
25    specification or written description portion of the patents.
```

```
 1    That should be about another five or six minutes.  And then I
 2    would like to devote the balance of my time to discussing
 3    what I believe we all agree are the three principal claim
 4    elements that are at issue in this proceeding.  Five issues,
 5    as I count them, but only three specific issues.
 6              And one of the things I wanted to point out, Your
 7    Honor, is that I'm here obviously to address the Court's
 8    questions, the Court's issues, and so although I have a
 9    packaged or structured presentation, I'm prepared to depart
10    from that at any time in whatever is going to be the most
11    helpful way of proceeding for the Court.
12              THE COURT:  I appreciate that.
13              MR. BARSKY:  One of the things I would point out,
14    Your Honor, is that although I'm going to be focusing on what
15    we believe to be the five principal claim construction issues
16    in the course of this proceeding, there are a number of other
17    claim terms that we have proposed to be construed, some of
18    which Boston Scientific has not proposed any constructions
19    for, others for which Boston Scientific has proposed
20    competing constructions, but as to which there is perhaps a
21    difference in the words we might choose to describe those
22    constructions but nothing truly fundamental as is true of the
23    five principal issues.
24              THE COURT:  Now, you're talking about in the chart
25    that you provided the terms that are in the Roman numeral
```

1   Section III?

2          MR. BARSKY:  That's exactly right, Your Honor.

3   Attached as Appendix A for the Court's convenience to our

4   supplemental claim construction brief is the joint statement.

5   I think it may be a very helpful document.

6          THE COURT:  It was incredibly helpful.  I

7   appreciate it very much.  Of those terms the only one that

8   or the only two that I thought were perhaps important were

9   the terms "proximal" and "distal."

10         MR. BARSKY:  Yes.

11         THE COURT:  And although I at first was inclined to

12  think that your proposed construction was the appropriate

13  one --

14         MR. BARSKY:  Yes.

15         THE COURT:  -- I eventually was persuaded that the

16  defense's was more appropriate because, as they point out,

17  their proposed construction is that the terms "proximal" and

18  "distal" relate to the operator.  And the reason I think that

19  their proposed construction is the appropriate one is, as

20  they point out in their brief, we're talking about a

21  three-dimension -- I'm sorry, a two-dimensional stent.  And

22  so if the Court were to adopt your construction, and it's not

23  in relation to the operator, then if the stent is flipped,

24  then the terms "proximal" and "distal" lose their meaning.

25         MR. BARSKY:  Yes.  And I understood that argument

1   by Boston Scientific.  And, once again, this is a great

2   example of something where we don't have a fundamental

3   disagreement but it is just a question of the choice of

4   words.  And when we get to that section -- when I get to that

5   section of the presentation, one of the things I'll point

6   out, Your Honor, is that it can be flipped whether or not

7   it's left and right as we propose or whether it is closer to

8   the operator or further from the operator as Boston

9   Scientific proposes.

10          And the reason for that is that the stents are

11   symmetrical.  And so whether one mounts the stent on the

12   balloon, the delivery balloon, with say end A, let's just

13   call is it end A, closer to the operator, or end B, that's

14   going to determine, according to Boston Scientific, what will

15   be proximal or distal, much in the same way as whether it's

16   left and right using our proposals.

17          And I have a couple of slides that maybe I can use

18   to illustrate that, but it's helpful to hear the Court's

19   comments on that.

20          THE COURT:  But of all of those terms I think that

21   may be the only two that I thought were --

22          MR. BARSKY:  Very well, Your Honor.

23          THE COURT:  I'm sorry.

24          MR. BARSKY:  If during the course of today's

25   presentations there are any other terms that the Court would

1    like us to focus on, we will, of course, do that.  And

2    perhaps towards the end I'll make some additional comments

3    about these particular claim terms in Section 3.

4              THE COURT:  All right.

5              MR. BARSKY:  Thank you very much.

6              So then, Your Honor, I'll start with just some very

7    brief preliminary remarks.

8              We're here today, Your Honor, obviously, because

9    the Court is going to be considering what the proper

10   interpretation is of the claims in Dr. Jang's patents that

11   are at issue in this proceeding.  One of the things the

12   federal circuit has been quite clear about, Your Honor, is

13   that that process begins and ends with the language of the

14   claims themselves.  The reason for that, Your Honor, is

15   because, as a matter of law, it is the claims that define the

16   scope of the invention.

17             Now, one of the things that we tried very hard to

18   do in proposing constructions on behalf of Dr. Jang is to

19   make sure that the constructions that we were proposing were

20   driven by and consistent with the claim language, read, of

21   course, in light of the specification which the Court is

22   instructed by the federal circuit to do, but nonetheless,

23   consistent with the language of the claims.  And that's

24   particularly important here, Your Honor, because there are a

25   number of claim terms at issue in this proceeding -- just by

24

1   way of example, expansion column and connecting strut

2   column -- that are actually defined in the claim language.

3   So we have proposed claims that we believe arise directly out

4   of and are driven by the language of the claims themselves.

5           Boston Scientific we believe has taken a very

6   different approach.  They have avoided the language of the

7   claims.  They discussed it very infrequently in either of the

8   briefs that they submitted to this Court, and I will predict

9   that they will discuss the actual claim language just as

10  infrequently today during the course of this proceeding,

11  because what they are focusing on is the language of the

12  specification of the patent.  And what that has led to, Your

13  Honor, is Boston Scientific tendering claim constructions

14  that seek to limit the scope of the claims by the specific

15  embodiments or examples that Dr. Jang presents in his

16  patents.

17          That's something that the federal circuit again has

18  been quite clear about.  And it is not proper because among

19  the many things that the federal circuit has said -- and I'll

20  be the first to admit that when it comes to articulating

21  principles of claim construction, the federal circuit has not

22  always been that clear or uniform, but on this subject they

23  are a model of clarity, Your Honor.  The federal circuit has

24  clearly said that the specification, the examples in the

25  specification, do not limit the claims.

1          Now, the other thing that Boston Scientific has

2    said, Your Honor, and has pointed the Court to is that they

3    claim that under Dr. Jang's proposed claim constructions the

4    differences between, for example, a connecting strut and an

5    expansion strut are confused, that the proposed constructions

6    fail to distinguish between those different structures.  We

7    don't think that's the case, and when we talk about the

8    definitions that we're proposing we will, in fact, make it

9    clear that we're articulating very different definitions of

10   what an expansion strut is, what a connecting strut is and

11   their respective columns.

12          The other thing that Boston Scientific has argued

13   about is the prior art.  Again, it's not about the claim

14   language, it's about the specification, and in this case it

15   is also about the prior art.  Boston Scientific has argued at

16   length that if the Court were to adopt Dr. Jang's proposed

17   claim constructions, that would result in the claims reading

18   on or covering the prior art, rendering those claims invalid

19   and, Boston Scientific says, the Court can't construe the

20   claims that way.

21          Well, let's put aside the fact that that's not the

22   standard actually that the Court must apply when construing

23   the claims and focus instead on the assertion itself; namely,

24   that under Dr. Jang's constructions they would cover the

25   prior art.  Boston Scientific points to, for example, the

1    Fischell, Orth, Pinchasik and Palmaz prior art.  And they

2    provided some drawings to the Court in which they illustrate

3    with a lot of blue color how they believe that --

4              Yes, Your Honor.

5              THE COURT:  What about the Lau?

6              MR. BARSKY:  And they propose Lau and I was going

7    to get to that in a minute.  The point I was going to make,

8    Your Honor, about those four prior art patents is that Boston

9    Scientific is going to have a very hard time advancing that

10   argument for at least a couple of reasons.  Your Honor, each

11   of those four patents that I just mentioned -- not Lau, but

12   each of the four patents that I just mentioned were before

13   the patent office at the time that the examiner examined

14   Dr. Jang's patent applications and were before the patent

15   office when the patent office made a decision to allow those

16   claims as they are written and as they now appear in the '021

17   and '743 patents.

18             Part of the presumption of validity of an issued

19   patent, Your Honor, is a presumption that the examiner did

20   his or her job correctly and that the examiner knew what he

21   or she was doing at the time.  And here, one of the things

22   that's clear is that the examiner knew, for example, when he

23   permitted these claims to issue without imposing a

24   requirement that the connecting struts be unattached to each

25   other or that the connecting strut columns not have any

1    elements other than connecting struts or that the expansion

2    columns need not be adjacent to each other, at least the ones

3    that are connected by a connecting strut.

4           The patent examiner at the time that he allowed

5    these claims as written and then the patent office permitted

6    this patent to issue was aware of all this prior art.  So

7    it's a very difficult argument for Boston Scientific to make

8    because what they're asking this Court to do is, in effect,

9    what they're challenging is not so much the proposed

10   constructions that Dr. Jang is offering, what they are really

11   doing is saying that these claims as they are written now

12   should never have issued.  If the patent examiner was doing

13   his job, the patent examiner would have looked at these

14   claims and seen that there was no requirement, for example,

15   that the connecting struts be unattached and would have

16   required Dr. Jang before allowing this patent to issue to

17   specify that the connecting struts were unattached.

18          And so we think for that reason, Your Honor, that

19   what is really -- the position that Boston Scientific is

20   truly taking here is one where they are seeking to ask this

21   Court to redraft Dr. Jang's claims so that they read the way

22   that Boston Scientific thinks they should have read when they

23   first issued from the patent office.  And we'll have a lot

24   more to say about that later.

25          As to Lau, the Court is correct that they also

1    argue that the patent claims as construed by Dr. Jang would

2    read on the Lau patent, and they lump Lau in with Pinchasik,

3    Orth, Fischell and treat it the same way and say, look, if

4    you're going to read the patent claims this way, then it

5    reads on Lau, Pinchasik, Orth and Fischell.  There's no

6    distinction that Boston Scientific has pointed out between

7    Lau and any of those other items of prior art that the patent

8    office knew about.

9         Boston Scientific is not in here today telling this

10   Court and they never have told this Court that Lau presents

11   something new and different.  On the contrary, they have said

12   that these claims would read on Lau just like they would read

13   on these other prior art patents of which the patent office

14   was aware.

15        So that is the reason, Your Honor, why we believe

16   that they are, in effect, making a very difficult argument

17   here.  Validity must be proved obviously by clear and

18   convincing evidence, and we realize this isn't a motion for

19   summary judgment of invalidity, but nonetheless, if they are

20   asking this Court to alter the way it would normally

21   interpret these claims because of the prior art, then they

22   must prove that the claims as construed by the plaintiff and

23   as, frankly, issued by the patent office would read on that

24   prior art.

25        That concludes the overview I wanted to provide,

1    Your Honor, and unless the Court has any questions I will

2    move on now to talking briefly about the preferred

3    embodiments.

4            THE COURT:  Go ahead.

5            MR. BARSKY:  Let me start, Your Honor, by pointing

6    something out.  There are two -- there are obviously two

7    patents that are at issue in this proceeding.  The '021 and

8    the '743 patent.  The specifications of these two patents

9    largely overlap.  It's not complete but they largely

10   overlap.  The claims are obviously all different, but the

11   specifications largely overlap.  And because of that and in

12   order to expedite this proceeding and to make the

13   consideration of these issues a little less cumbersome, we're

14   going to proceed by focusing on the '021 patent and talk

15   about a lot of these issues in the context of the '021

16   patent.  But if at any point there are any -- and that's

17   because I don't think there are any unique issues with

18   respect to the '743 patent.  So I'm going to use that as a

19   shorthand for talking about the preferred embodiment and, in

20   fact, for talking about the patent claims.

21           But the other thing I would point out is that

22   although the claims of the two patents are distinct, the

23   claim terms that are at issue in the two patents overlap

24   completely.  In other words, they're not used the same way

25   but they appear in claim one of both the '021 and the '743

1   patent.  And we and Boston Scientific have agreed, and I
2   believe we have so advised the Court, that if a claim term,
3   for example, "expansion column" appears in claim one of the
4   '021 patent, it should be given the same construction as
5   whatever the Court adopts for the '743 patent.  They're not
6   being used differently in the two patents.
7          So then I will start then by just talking a little
8   bit about Dr. Jang's invention.  This is a three-dimensional
9   rendering, Your Honor.  It happens to be figure 8E from the
10  '021 patent.  It's a three-dimensional rendering of a stent
11  that is built in accordance with Dr. Jang's invention.  It is
12  an embodiment.  And I want to bring the Court's attention to
13  one specific repeating element that appears.  And I don't
14  know if the Court is able to see the highlighting, but --
15          THE COURT:  Yes.
16          MR. BARSKY:  -- that what I've highlighted is a
17  connecting strut connecting to expansion strut pairs.  There
18  is a closer look at it, Your Honor.  And this is, in effect,
19  a building block of this particular embodiment of Dr. Jang's
20  stent, because it is this repeating element that forms the
21  stent and drives its functional characteristics.
22          And there's one other thing and we're going to take
23  a closer look at that with a two-dimensional figure in just a
24  moment, Your Honor.  But one other thing I would point out on
25  this diagram to the Court is the longitudinal axis of the

1   stent.  That is the element that is numbered 16.  And

2   immediately above that line, Your Honor, there are two

3   numbers.  At the far left end of the longitudinal axis

4   there's the No. 12, and on the far right end it is hidden

5   under the superimposed magnified picture is 14 but it is just

6   peeking out under the shadows of that.  There's a better view

7   of that right here, Your Honor.

8        The specification -- and this goes to the Court's

9   question earlier about proximal and distal.  But the

10  specification is quite clear about what this is.  It

11  specifically says that this particular stent has a proximal

12  end 12 and a distal end 14 and that those two ends define

13  the longitudinal length of the stent.  The longitudinal axis

14  would be a line that runs through the barrel of the stent.

15        THE COURT:  A line that's the length of 16?

16        MR. BARSKY:  A line that would be parallel to and

17  the length of 16 -- actually, because it's a line I suppose

18  it would be infinite, but it would be an imaginary line

19  running through the center of the stent.  I'll correct

20  myself.  Element 16 is what the patent calls a longitudinal

21  length, not a longitudinal axis, but I think we understand

22  that the axis would be parallel to that running through the

23  center of the stent.

24        And this is important because it is here, among

25  other places, that Dr. Jang distinguishes between proximal

1   and distal.  In this particular two-dimensional drawing of a

2   three-dimensional object, it's obvious that proximal is to

3   the left and distal is to the right.  And that is important,

4   Your Honor, because one of the things that is clear

5   throughout this patent is that those markers, those proximal

6   and distal markers or sign posts, if you will, are used in

7   describing a number of different elements.  For example, they

8   are used in describing the connecting struts which have

9   proximal sections and distal sections, and they are used in

10  describing the expansion strut pairs which similarly have

11  proximal ends and distal ends.  And we'll look at that now.

12          Here is a two-dimensional rendering.  It is figure

13  8G of a slightly different building block, if you will, of

14  Dr. Jang's preferred embodiment.  And there are at least

15  three separate sections of this that I would point out to the

16  Court.

17          The first are the expansion struts.  These are the

18  elements that are labeled 28.  And as the Court can see,

19  there are four of them.  The thing I would point out about

20  this particular configuration, Your Honor, is that the

21  expansion struts have a closed end.  That's the end in which

22  the Court can see the joining struts.  The joining struts

23  couple adjacent expansion struts to each other.

24          So there is a closed end formed by that joining

25  strut and then there is an open end.  And I've taken to

1    calling, for example, the expansion strut pair on the left,

2    Your Honor, a left-handed expansion strut pair because it is

3    open to the left.  In the way I think at least it points to

4    the left whereas the expansion pair to the right points to

5    the right so I think of it as being right-handed, but

6    whatever convention the Court finds to be most helpful it's

7    clear that these expansion strut pairs have a closed end and

8    an open end, again, the closed end being defined by these

9    joining struts.

10           The third element I would point out in this, Your

11   Honor, is the connecting strut.  This particular connecting

12   strut, and there are a number of different ones that are

13   described in Dr. Jang's patent and the briefs cover this, so

14   I won't repeat this now, but certainly if the Court has any

15   questions about it I can go into it more deeply, but we

16   pointed out in our opening brief, for example, that there are

17   many different configurations of these connecting struts that

18   are possible, just as there are many different geometries

19   that someone building Dr. Jang's invention could employ with

20   respect to the expansion strut pairs and the particular shape

21   or cell that is formed when the stent is built.

22           But this particular connecting strut here has four

23   different sections.  The element 162 is the proximal section

24   of the connecting strut.  Why?  It's the furthest to the

25   left.  And this, by the way, is all defined in the

1   specification itself, and I can point that out to the Court

2   if need be, but these are actually mapped out in our opening

3   claim construction brief.  Element 168 is the distal section

4   of the connecting strut.  Again, it's the one furthest to the

5   right.  And then there are two intermediate connecting strut

6   sections, 164 and 166.  So this happens to be a four-part

7   connecting strut.

8           This is, as I said earlier, really the building

9   block of the preferred embodiment or a preferred embodiment

10  of Dr. Jang's patent and contains within it really most of

11  the issues that we're going to be talking about today.

12          Now, at the end of the specification, at the end of

13  the written description, just before Dr. Jang sets out the

14  numbered claims that define the scope of his invention

15  there's a passage, and it's an important passage, Your Honor,

16  for at least two reasons, for two principles that are

17  articulated in this paragraph.

18          The first is articulated in the second sentence of

19  that magnified section, and that is the notion that because

20  Dr. Jang has laid out specific examples, he is not intending

21  this to be exhausted or to in any way limit the scope of the

22  claims that he is now going to lay out for the reader.

23          The second point is in the third sentence, and that

24  is simply reciting the fact that people of skill in this art,

25  however it's defined and we're prepared to live with, for

1    example, Dr. -- Professor Squire's definition.  But, in any

2    event, persons of ordinary skill in the art will understand

3    that there are multiple ways of building a stent in

4    accordance with the invention made by Dr. Jang.

5            Now, that's not just language that appears in the

6    specification of Dr. Jang's patent.  It happens also to

7    accord completely with established federal circuit law, law

8    that was articulated as recently as the federal circuit

9    sitting en banc in the Phillips case.  The notion that the

10   specification does not limit the claims and the notion that

11   people of ordinary skill in the art would rarely -- and that

12   is, I believe, the exact word that the federal circuit used

13   in Phillips.  A person of ordinary skill in the art would

14   rarely look at the preferred embodiment of a patent and

15   believe that that was the only way of building the claimed

16   invention.

17           Your Honor, that more or less concludes a brief

18   discussion of the specification and the preferred embodiments

19   of Dr. Jang's patents.  And I'll move on now to talk about

20   what I believe is the heart of our presentation, and that is

21   to walk through each of the three principal claim terms that

22   the Court will no doubt be focusing on.

23           Excuse me one second.

24           We're going to approach this, as I said earlier,

25   Your Honor, in accordance with what the federal circuit has

1   clearly said should be the approach in construing claims, and

2   that is that the discussion begins and ends with the language

3   of the claims themselves.  And we're going to use that as a

4   paradigm for articulating our view in terms of what the

5   proper claim constructions should be.

6          So here are the three claim terms that are being

7   construed, Your Honor.  There are five, as we count them,

8   principal issues upon which we disagree.  And this is laid

9   out, by the way, in the introduction to our supplemental

10  brief as well.  I'll go through them very quickly.

11         With respect to an expansion column, Boston

12  Scientific -- let me stop for a minute and take a step back.

13         One of the things that I think is going to become

14  apparent, Your Honor, during the course of this proceeding is

15  that even as to these three -- even as to these three claim

16  terms on which the parties disagree and have some level of

17  fundamental disagreement, it is not the case that Boston

18  Scientific looks at our proposed constructions and says that

19  we are fundamentally wrong, that we are proposing some

20  construction that is fundamentally wrong.

21         In virtually each instance with perhaps one

22  exception that I'll turn to in a minute, but in virtually

23  each instance what Boston Scientific says is, fine, you say

24  that a connecting strut column must consist of two or more

25  connecting struts, well, they don't disagree with that.  What

1    they say is that's not enough.  You don't have enough

2    restrictions in your definition; and so therefore, they add

3    as we suggest in the middle of this slide that we say -- we,

4    Boston Scientific, say that they have to consist solely of

5    connecting struts.  There's no other elements that can appear

6    in a connecting strut column.  And they say, in addition,

7    each of those connecting struts must be unattached to each

8    other.

9            So that is a pattern that I think finds -- that

10   weaves its way through this proceeding.  Each one of these

11   five issues arises because Boston Scientific is taking the

12   position that certain limitations must appear in whatever

13   claim construction that the Court decides on and that in each

14   case those are claim limitations that are extraneous to the

15   claim; that is, whether or not they are required, they are

16   certainly not words or concepts that are found in the claim

17   language itself.

18           THE COURT:  Well, no.  I guess I mean yes, I agree

19   that those words aren't used.  And as you point out in the

20   response brief, the words "solely" or "only" is not to be

21   found in the specification.

22           MR. BARSKY:  Yes.

23           THE COURT:  But their response to that argument is

24   that only expansion struts are mentioned, right?

25           MR. BARSKY:  Well, I would leave it to Boston

```
 1   Scientific to articulate their position better than I could,
 2   but I thought --
 3           THE COURT:  You could probably do it much better
 4   than I could.  You might be better answering my arguments
 5   because theirs will be better.
 6           MR. BARSKY:  If that's their argument, yes.  Then
 7   I'll just say yes, that is --
 8           THE COURT:  As I understand it, really what they're
 9   saying is, if all that's mentioned is expansion struts in the
10   columns, then in the embodiments and in the specifications,
11   then how do you make the argument that the word "solely"
12   shouldn't be in the construction?
13           MR. BARSKY:  That the word "solely" shouldn't be in
14   the construction?
15           THE COURT:  Because that's all that's in the
16   patent.
17           MR. BARSKY:  Well, Your Honor, I'll turn to that
18   right now, in fact.  In their presentation what they have
19   said, as I understand it, is that the only embodiment that is
20   depicted anywhere in these patents is an embodiment whereby
21   there is an expansion column that consists of expansion strut
22   pairs and no other elements.
23           First point is, Your Honor, that whole argument has
24   been explicitly rejected by the federal circuit.  The federal
25   circuit has very clearly said -- and they did this as
```

1    recently as the Phillips en banc decision -- that they have

2    rejected the notion that because the patent only discloses

3    even a single embodiment that that is a basis for limiting

4    the claims if the claims do not specify that particular

5    embodiment and only that embodiment.  So that argument which

6    is one that weaves its way through the Boston Scientific

7    presentation, in fact, because it applies to some of the

8    other issues as well has been squarely rejected by the

9    federal circuit.  And we've discussed, for example, in our

10   papers the Liebel-Flarsheim case and its progeny.  But once

11   again, it was endorsed again by the federal circuit as recent

12   as the Phillips decision.  So that's the first thing is that

13   -- that's the first point, Your Honor.

14           The second point, and it's an important one, and

15   maybe I can just point to this now.  One of the things about

16   this claim is that it is a comprising claim --

17           THE COURT:  Right.  In the response brief Boston

18   Scientific I think, unless they conceded, but they stated, I

19   guess, that they agreed I think essentially with your

20   position about what it means to be a comprising claim.

21           MR. BARSKY:  Yes, they did.  In fact, the law is

22   pretty settled on what a comprising claim is.  And I'll

23   actually come back to that issue in just a minute, Your

24   Honor.

25           But I think that the point that we would want to

1  make is that comprising is what's called an open-ended

2  transition, and it means that the claim is open.  So, for

3  example, if a claim recites an invention comprising elements

4  A, B and C, it does not defeat that claim to add D to A, B

5  and C as long as A, B and C are there.  Among the things, for

6  example, that the claims in this case require clearly are

7  expansion struts, expansion strut pairs, expansion columns,

8  connecting struts and columns, and a particular configuration

9  of those expansion strut pairs to each other.

10         But there's nothing in this claim language that

11  suggests that you could start, for example, with Dr. Jang's

12  invention and add something to it and then deprive that

13  structure of being included within the scope of this claim

14  language.  It's not just the fact that it is a comprising

15  claim, it is the fact that before a court can limit a claim,

16  one has to find something in the claim that suggests that

17  limitation or in the specification.  And one of the things

18  that the Court has -- the federal circuit has clearly said is

19  that absent some special meaning created by the

20  specification, for example, an idiosyncratic definition of a

21  claim term by the inventor, or absent a disclaimer in the

22  prosecution history as to particular scope or criticism of

23  structure and prior art that would otherwise limit the scope

24  of the claim, absent those kinds of features in the claim

25  specification or prosecution history, it's the ordinary and

1    plain meaning that controls.

2              So let's take a look at what that meaning is here,

3    Your Honor.  The claim talks about a first expansion strut

4    pair.  And we believe it goes on to define what an expansion

5    column is.  And, again, this is the element we're talking

6    about now is the proper construction of an expansion column.

7    What it says is a plurality of the first expansion strut pair

8    forming a first expansion column.  We think that defines an

9    expansion column.  It is made up of -- an expansion column is

10   formed of a plurality of first expansion strut pairs, meaning

11   two or more expansion strut pairs.  That same exact structure

12   appears in the second paragraph of this claim with respect to

13   the second expansion strut pair and the second expansion

14   column.

15             So let's start then with what we think a column

16   means.  And this is one of those definitions, Your Honor,

17   where we made a proposal.  Boston Scientific did not make any

18   proposal with respect to it.  But, basically, a column -- and

19   the reason, by the way, Your Honor, I think it would be

20   helpful to have a definition of column, because although we

21   may be familiar and a jury may be familiar with what a column

22   is, for example, in say a financial table or some other type

23   of two-dimensional table, it's less of a familiar term

24   perhaps with a three-dimensional object.

25             So in this particular case it's pretty clear that

1   what Dr. Jang meant by column and what the '021 and '743

2   patents talk about is this extension of space around the

3   circumference of the stent.  So starting there with that

4   definition of column -- and here, by the way, are two

5   expansion columns that we've highlighted.  It's element 24

6   and the specification defines element 24 as the expansion

7   columns.

8           Our proposed definition of an expansion column then

9   is drawn directly from the language of the claim, Your Honor.

10  It is a column, as we've previously just defined it, that's

11  formed by two or more expansion strut pairs.  Now, clearly as

12  the Court has pointed out, Boston Scientific is taking the

13  position that it can be formed solely by expansion strut

14  pairs.  And so using the approach that the federal circuit

15  has suggested, we just go back to the claim language or to

16  the specification and ask whether or not that is supported by

17  the claim language.

18          And the point that I would make, Your Honor, is

19  that the language of the claims does not say a plurality of

20  the first expansion strut pair and no other elements forming

21  a first expansion column or solely expansion strut pairs

22  forming a first expansion column.  It simply recites that

23  this is what the column is formed of.

24          Now, the fact that it only mentions that the

25  expansion column is formed with expansion strut pairs I do

1    not believe leads to the conclusion that therefore it must be

2    only expansion strut pairs.  Just as, for example, this

3    courthouse, Your Honor, is formed of mortar and marble and

4    wood and steel and all sorts of other structure doesn't mean

5    that there are not other things that form this courthouse as

6    well, whether it be materials such as plastic or what have

7    you.  And so there's nothing about the language of something

8    being formed that would suggest it must be formed solely from

9    that element.

10            And Boston Scientific has not argued to the

11    contrary.  Instead what they've argued is that this claim, as

12    it was issued by the patent office, wasn't careful enough.

13    What the patent office should have required Dr. Jang to do is

14    specify that those expansion strut -- excuse me -- that those

15    expansion columns are formed of expansion strut pairs and no

16    other elements.  And that's something that we know from a lot

17    of federal circuit case law, Your Honor, and even Supreme

18    Court case law that we cited in our supplemental brief is not

19    the role of this Court.  It is not to redraft the claims or

20    to rewrite them or to second-guess what the patent office

21    decided years ago after a two-and-a-half-year examination of

22    these patents.  It is rather to construe the claims and to

23    construe the language as it was issued by the patent office.

24            The other issue that comes up -- and, by the way,

25    Your Honor, I'm going to move on to the tubular issue, but

```
 1   before I do that, let me just stop for a minute and see if
 2   the Court has any questions.
 3            THE COURT:  No, I have a question about tubular.
 4            MR. BARSKY:  Oh, okay.
 5            THE COURT:  If I remember correctly, the other
 6   patents that you talked about -- I know one begins with a "P"
 7   and I can't remember the names of the others, the Orth one
 8   and so forth as well as the stent at issue in this case,
 9   they're all designed to be -- they are all coronary stents,
10   correct?
11            MR. BARSKY:  They are used as coronary stents.
12            THE COURT:  And as I understand it from the
13   descriptions that the parties have presented about how
14   they're used, they are inserted through veins or arteries.
15            MR. BARSKY:  Yes.
16            THE COURT:  Which I didn't pay attention to in
17   biology class.
18            MR. BARSKY:  Yes, the Court is exactly right.
19            THE COURT:  In the shape of a vein, tubular, a vein
20   or an artery.
21            MR. BARSKY:  Sure.
22            THE COURT:  You've paid even less attention than
23   me.  So I guess isn't -- I guess my question is kind of
24   obvious.
25            MR. BARSKY:  Whether or not that means that the
```

 1    stent must be tubular?

 2            THE COURT:  If a stent is being used as the stent

 3    is --

 4            MR. BARSKY:  Yes.

 5            THE COURT:  -- does it have to be tubular?

 6            MR. BARSKY:  I will absolutely agree with that.

 7    The stent is tubular in shape.  It is an elongated hollow

 8    cylinder.  No question that that's tubular.  That's not the

 9    argument that Boston Scientific is making however.  They're

10    arguing that the expansion column is a tubular structure.

11    And that is where the friction is between our respective

12    claim construction positions.

13            We would readily concede -- in fact, I believe the

14    '021 patent specifically describes the stent as being

15    tubular, and so we would not quibble with that in the

16    slightest.  The issue, though, is whether the expansion

17    column should be construed as being -- the column itself, and

18    we'll take a quick look at that right now, should be

19    construed as being tubular.

20            Here's the important point.

21            THE COURT:  Just a moment.

22            MR. BARSKY:  Here's an important point, Your Honor,

23    with respect to this issue; that is, that Dr. Jang in coming

24    up with his patent criticized the tubular members or tubular

25    expansion members of the prior art.  And this is something --

1    this is a point we made in our supplemental brief.  He found

2    that those tubular members were too rigid.  Why?  Because --

3    and here's an example of, for example, the Palmaz tubular

4    member.  And if the Court will recall, the Palmaz stent is

5    made up of a series of these types of tubular members.

6            But one thing the Court will notice immediately

7    about the Palmaz geometry is that it is closed on both ends.

8    It has a closed cell structure that surrounds that interior

9    expansion cell, if you will.

10            And it is exactly that that Dr. Jang was trying to

11   improve over with his patent.  He believed that the stents

12   when they are made with those closed cells became

13   longitudinally inflexible.  And when the stent was being

14   threaded through the femoral artery and the thigh up about

15   six feet of vasculature to the coronary arteries, it has to

16   navigate these rather torturous bends in the body's anatomy,

17   and that those closed cells, those tubular members in the

18   prior art, rendered the stent so inflexible that it made it

19   very difficult for an interventional cardiologist to actually

20   get the stent where it needed to be.  So that was something

21   that he criticized in the prior art.

22            By contrast, if we take a look, for example, at yet

23   another figure, this is 9F from the '021 patent, and we look

24   at the expansion --

25            THE COURT:  What sort of a cross-section is that?

1          MR. BARSKY:  This one right here?

2          THE COURT:  Yes.

3          MR. BARSKY:  This is the stent cut open along one

4    of its -- along its length and flattened.  So that's looking

5    at the stent.  If one were to -- and, again, at the bottom of

6    that, of this figure, Your Honor, you can see the

7    longitudinal length 16, so that tells the Court that we are

8    looking at it lengthwise at this point.

9          THE COURT:  Thank you.

10         MR. BARSKY:  So let's take a close look then at the

11   expansion column, because that's the issue for the issue of

12   whether or not it's tubular.  It's that element 24.  The

13   expansion column specification very clearly teaches -- and we

14   don't have any disagreement on this I don't think.  The

15   expansion column is composed solely of expansion in the

16   preferred embodiment depicted here.  You can see that it

17   consists of expansion strut pairs which are expansion struts

18   joined together by the joining struts and linked together as

19   it is shown here.

20         If we take a closer look at that particular

21   structure we can see immediately that, unlike the Palmaz

22   tubular member, it is open on one end and closed on the

23   other.  As we talked about earlier with the expansion strut

24   pairs having distal ends and proximal ends, well, these

25   expansion strut pairs have a closed end formed by the joining

1    strut and an open end.  And so that was the improvement that

2    Dr. Jang was trying to make over prior art tubular members or

3    expansion members such as Pinchasik and Palmaz.

4            Now, the other important thing that I want to point

5    out, Your Honor, is that this is not the first proceeding in

6    which Boston Scientific has addressed claim construction for

7    the '021 patent.  As we pointed out in our supplemental

8    brief, there's litigation pending before Judge Robinson in

9    the District of Delaware where Boston Scientific is asserting

10   the '021 patent or at least one claim of the '021 patent.

11   And during the course of that proceeding one of the things

12   that they pointed out with respect to this whole issue of

13   tubular is that stents with closed cells, such as Pinchasik,

14   teach a fundamentally different stent structure.  Why?

15   Because it has these tubular members.

16           Now in this court, though, Boston Scientific is

17   taking a different position and they're saying that the very

18   structure that they distinguished in the District of Delaware

19   is a necessary structure for a stent built in accordance with

20   Dr. Jang's invention.

21           So that goes to the question of whether or not they

22   are taking consistent positions.

23           THE COURT:  Could you go back to that prior slide?

24           MR. BARSKY:  Absolutely.  Similarly, Boston

25   Scientific acknowledged in that proceeding in Delaware that

1    Dr. Jang was seeking to overcome the drawbacks of these

2    closed cell prior art tubular members, and yet now what they

3    say -- and this was something that was in the Squire

4    declaration in exactly the same language as it appeared in

5    Boston Scientific's legal brief -- now they say that the

6    expansion columns must form a tubular structure; otherwise,

7    they can't even do their job.

8            So they've taken inconsistent positions on this.

9    And we're not exactly sure why this is such an issue of such

10   importance in this proceeding, but we do know that it is not

11   the case that the expansion columns of Dr. Jang's patents are

12   tubular structures.

13           Anything more on expansion columns, Your Honor, or

14   may I move on?

15           THE COURT:  Go ahead.

16           MR. BARSKY:  Thank you.  So now we're going to deal

17   with the two issues that arise in interpreting the phrase

18   "connecting strut column."  There's one issue that is

19   repeated from the expansion column, and that is that Boston

20   Scientific says that a connecting strut column must have only

21   connecting struts and nothing else.  They also say that a

22   connecting strut column must have connecting struts that are

23   unattached to each other.  And that, again, frames the

24   dispute between the parties on these proposed extraneous

25   limitations.

1        So once again, Your Honor, we start where the

2    federal circuit tells us to start, and that's with the

3    language of the claim itself.  The claim talks about a first

4    connecting strut, and it talks about how a plurality of the

5    first connecting strut form a connecting strut column.

6    That's pretty clear.  We believe that that is a definition

7    within the claim itself of a connecting strut column.  It

8    doesn't say, as Boston Scientific would have it, that they're

9    unattached to each other and it doesn't say there's nothing

10   else, no other elements besides connecting struts.

11       What are we talking about?  Again, this is the

12   connecting strut itself.  These are the four sections that

13   the Court viewed earlier as well as the column that is formed

14   in at least one embodiment of Dr. Jang's patent.  It is

15   figure 5.

16       Your Honor, is your monitor cutting off at the

17   bottom?  I'm just looking over here and I see --

18       THE COURT:  It is cutting off at the bottom.

19       MR. BARSKY:  I don't know if the screen over here

20   is easier for the Court to see.

21       THE COURT:  I can read that.

22       MR. BARSKY:  Would the Court like me to move it

23   closer to the --

24       THE COURT:  No, I can actually read the numbers.

25       MR. BARSKY:  Very well.  So here, Your Honor, is

1    element 26 which the specification defines as being a
2    connecting strut column in one of Dr. Jang's embodiments.
3    This is why we have proposed the following definition:  That
4    it is a column as we defined it earlier that is formed by two
5    or more connecting struts.  Again, Boston Scientific is
6    seeking to have two additional limitations added to that
7    essential formula.  One is that it is formed solely of a
8    plurality of connecting struts and the other is that those
9    connecting struts must be unattached to each other.
10           So we think that what the Court should do is test
11   that proposition by, again, going back to the language.
12   We've looked at it already.  It is clear there is nothing
13   about unattached, nothing about solely, about having
14   connecting struts and no other elements in the language of
15   the claim itself, nor is there anything in the specification
16   that would suggest anything along those lines.
17           Again, this is not the first time that Boston
18   Scientific has had occasion to construe a first connecting
19   strut column.  They did so in the District of Delaware, again
20   in front of Judge Robinson.  And there they made a proposal
21   for this claim language to be construed.  And what do they
22   say?  They say it should be construed.  And what did they
23   say?  They said it should be construed simply.  That's Boston
24   Scientific's word to mean that the first connecting strut
25   column is formed with multiple connecting struts.  That's our

1    position almost word for word in this case.

2        Now, I do want to point out that is a slightly

3    different -- that language comes from a different claim.  So

4    what they were proposing was a slightly different -- or,

5    rather, the phraseology that they were construing was

6    slightly different, but it completely encompassed this notion

7    of a connecting strut column.  And that was the position that

8    they took in litigation that remains pending in the District

9    of Delaware.  Now, of course, they have a very different

10   position as we've already discussed.

11       So Boston Scientific looks at our claim language as

12   issued by the patent office and effectively says that the

13   patent office should have required Dr. Jang to make two

14   additions to this language.  First, just like with the

15   expansion column, the patent office should have made sure

16   that the claim language is clear that you can't have any

17   elements other than connecting struts in a connecting strut

18   column.  The second thing they say, of course, is that each

19   of those connecting struts have to be unattached to each

20   other.

21       Now, when we think about what Boston Scientific's

22   arguments are on this point, they're not really all that

23   different in kind from the arguments that were made earlier;

24   and that is, that they are arguing very clearly that because

25   this is the only embodiment that is disclosed anywhere in

1    Dr. Jang's patents, and they are very clear about this

2    position in their supplemental brief, that because it is the

3    only embodiment it must therefore be the sole embodiment that

4    is claimed.  And that, again, Your Honor, is a proposition

5    that has been squarely rejected by the federal circuit in the

6    cases that we have cited.

7            One of the other principles that the federal

8    circuit has articulated, Your Honor -- and this goes most

9    clearly to this issue of unattached.  One of the other

10   principles is that --

11           THE COURT:  Excuse me for interrupting you.  Let's

12   go back a moment.

13           MR. BARSKY:  Sure.

14           THE COURT:  I think your last argument was that --

15   your last point was that the defense argued in their

16   supplemental brief that because --

17           MR. BARSKY:  It was the only embodiment.

18           THE COURT:  -- it was the only embodiment that was

19   described in the patent, that it must be -- that the Court

20   should place significance on that, but the parties have I

21   think blurred the line a bit because earlier you made that

22   argument with respect to the specifications.  And there is a

23   slight difference -- there is a difference between

24   embodiments and specifications, correct?

25           MR. BARSKY:  Not really, Your Honor.

1          THE COURT:  You're using that term interchangeably?

2          MR. BARSKY:  Yes, I am, Your Honor.

3          THE COURT:  Well, my understanding is that there's

4     a difference between the two.  And your understanding is

5     those two terms can be used interchangeably?

6          MR. BARSKY:  Yes, Your Honor.  If I may elaborate?

7          THE COURT:  If that's the way you're using the

8     term, I will consider your argument in that light, but go

9     ahead.

10          MR. BARSKY:  Well, I want to stop on this because

11     I'm just concerned that I've not made our position clear

12     enough, so let me see if I can backtrack a little.  And

13     forgive me, Your Honor, if I'm telling the Court information

14     that the Court is already well aware of.

15          THE COURT:  Go ahead.  I think I know what you're

16     about to say but go ahead.

17          MR. BARSKY:  As I parse the patent, there's --

18     obviously, you have the cover page.  Then you have a series

19     of drawings and those drawings depict various embodiments.

20          THE COURT:  Yes.  Go ahead.

21          MR. BARSKY:  Various embodiments of the invention,

22     the ones that the inventor has chosen to hold out and say

23     here's an example of a great way of building a stent.  It is

24     one example, two examples, whatever it may be.  This is the

25     best way.  In fact, there's a requirement.

1          THE COURT:  Preferred embodiment.

2          MR. BARSKY:  The best way I know of making a stent

3    in accordance with my invention.  And then after those

4    drawings, which are an integral part of the specification or

5    written description of the patent, there are series of

6    sections, such as background of the invention and a summary

7    of the invention.  And then we get to in the '021 patent I'm

8    looking at column 5 on about line 35, we get to something

9    called detailed description.  And this is the engineering

10   level description.  Here's how you make --

11         THE COURT:  That's what I think of as the

12   specification.  I think of the drawings as the embodiments

13   and that as the specifications.  The text is the

14   specifications.  And if I'm incorrect, I'm happy to have that

15   pointed out to me now.

16         MR. BARSKY:  I can only say this, Your Honor, which

17   is that I have always considered those to be part and parcel

18   of the specification.  In other words --

19         THE COURT:  The drawings?

20         MR. BARSKY:  The drawings, yes, absolutely.

21         THE COURT:  I always think of the drawings as the

22   embodiments and the text as the specifications, but I guess

23   you all do not.  That's fine.  I just want to make sure that

24   I am understanding your terms.

25         MR. BARSKY:  Maybe we can clarify this.  I don't

1   know if Mr. Wolf wants to address this or not, but --

2          MR. WOLF:  Your Honor, I think there might be two

3   ships passing in the night because a specification is

4   everything from the first words of the patent until you get

5   to the claims.  Embodiments are a subset of the

6   specification.

7          THE COURT:  That may be a better way of expressing

8   my understanding.

9          MR. WOLF:  That's what I understand.  And to the

10  extent that the text is just describing the figures, then

11  they are part and parcel of the embodiments, but there's more

12  to a specification than just the embodiments.

13         THE COURT:  Thank you.  That clarifies my

14  understanding.  That was my understanding.

15         MR. BARSKY:  Yes.

16         THE COURT:  Thank you very much.  In substance I

17  don't think that changes your argument.

18         MR. BARSKY:  No, it doesn't, Your Honor, but it

19  certainly makes me aware of a need for me to be a little bit

20  more precise when I talk about these particular issues.

21         So I believe where I left off, Your Honor, was that

22  this is the second change that Boston Scientific would like

23  to make to the language that the patent office has issued.

24  And I believe where I was going was talking about the fact

25  that really their only argument on this unattached point is

1    that in all of the specific embodiments, depicted for example

2    in the drawings, or discussed for example in the

3    specification, in all of those embodiments the connecting

4    struts are, in fact, unattached to each other, and that

5    therefore your claims are limited to those particular

6    embodiments.   That's the proposition that has been squarely

7    and repeatedly rejected by the federal circuit that I just

8    wanted to reiterate for the Court.

9             Absent any questions --

10            THE COURT:  Go ahead.

11            MR. BARSKY:  I appreciate the Court's time.  I know

12   I've gone over.  I'll go quickly through this last part.

13            The last issue, Your Honor, is whether it goes to

14   the definition of a connecting strut.  Boston Scientific --

15   and there's an issue here because Boston Scientific said that

16   a connecting strut must couple only adjacent expansion

17   columns.  Now, we have -- let me start off with a small

18   distinction that I would make; and that is, that the

19   connecting struts, in our view, are clearly articulated in

20   the specification as connecting expansion strut pairs, not

21   expansion columns, and that it is only a series of connecting

22   struts arranged in a column that connect expansion columns to

23   each other.

24            But putting that aside, that's not really the core

25   of the dispute.  The core is whether or not a connecting

1    strut must connect only adjacent expansion columns.

2         So, once again, we start with the claim language.

3    It talks about a first connecting strut.  The claim language

4    then goes on to tell us a little bit about the sections of

5    that connecting strut and how they couple certain expansion

6    strut pairs.  In particular, it talks about it coupling the

7    distal -- being coupled to the distal end of a first

8    expansion strut pair in one column and the proximal end of a

9    second expansion strut pair in another column, another

10   expansion column.  That's, again, the function of this

11   particular connecting strut.  It connects pairs, not columns.

12        We think, again, that this provides all the

13   information the Court needs in order to construe the language

14   at issue.  And that's why we're suggesting that a connecting

15   strut be construed as a strut that couples an expansion strut

16   pair in one column with an expansion strut pair in another.

17        Boston Scientific, of course, is arguing that those

18   expansion columns must be adjacent.  So I want to go back to

19   the claim language and test that hypothesis with one

20   particular principle in mind, Your Honor; and that is, that

21   as the federal circuit has told us in the Phillips case, that

22   the context in which a term is used in the asserted claims

23   can be highly instructive.  So the federal circuit is saying

24   that not only is the claim term at issue to be examined but

25   look at the way that it is used in context.  So let's take a

1    look at how it's used in context, Your Honor, and see what

2    the language of the claim says about this issue of adjacency.

3            And it turns out, Your Honor, that, in fact, the

4    word "adjacent" does appear in claim one.  In fact, it

5    appears twice.  It appears to describe the relationship of

6    the expansion struts to each other, a first expansion strut

7    and a second expansion strut to each other.  What's that

8    referring to?  It is referring to those expansion struts that

9    are coupled by the joining strut in separate columns.

10           When the language of the claim is directed to

11   describing the expansion columns, there is no such

12   requirement of adjacency.  It simply says you have a first

13   expansion column and you have a second expansion column.

14           THE COURT:  How could they not be adjacent?

15           MR. BARSKY:  Well, one way they could not be

16   adjacent, Your Honor, is that the connecting strut can skip

17   or -- can skip elements.  That's one way it could do it.

18   There's no limit, I suppose, to the imagination of people

19   trying to build Dr. Jang's invention.  Dr. Jang's invention

20   goes to a specific geometry and to the way in which you link

21   expansion strut pairs, for example, in an offset manner.  And

22   so that is one way in which they could not be adjacent.

23           But the important point here, Your Honor, I think

24   is that when Dr. Jang and when the patent office wanted to

25   make sure that there was a requirement of adjacency between

1  expansion columns, the claim language said it.  It didn't do

2  so with respect to the expansion columns themselves.  We

3  think that is a big difference.  And, again, the expansion

4  columns as opposed to the struts are depicted in this element

5  No. 24 in this figure.  And so when we look at that claim

6  language we think it is pretty clear from the context, as the

7  federal circuit has advised the Court to consider in the

8  context, that there is no requirement of adjacency.

9        What does Boston Scientific rely on?  They rely on

10  a description that appears in the specification of a specific

11  embodiment of Dr. Jang's invention.  In particular, they rely

12  on language that refers specifically to figure 1A which we

13  looked at earlier.  And they quoted to the Court, as we

14  anticipated in our opening brief and as we discussed at

15  length in our supplemental brief, they rely on language that

16  quite clearly is talking about a specific embodiment of

17  Dr. Jang's invention, because it talks about those connecting

18  struts connecting adjacent expansion columns.

19        Now, one of the things that we did in our

20  supplemental brief, and I can talk about it now or not as the

21  Court would like, is we explain why that language cannot be a

22  definition of a connecting strut, because it would result in

23  there being inconsistent usages of that term in the

24  specification.  That's discussed in our supplemental filing,

25  Your Honor.  But the language obviously goes on to continue

1    to describe a specific embodiment of Dr. Jang's invention.

2         Now, one of the other points I want to make and

3    this goes back -- I'm sorry, Your Honor, but this goes --

4    well, it's not going to work.  I'll go forward and I'll come

5    back to this issue.

6         Here's an example of what the federal circuit has

7    said very recently on this very issue, because, again, Boston

8    Scientific's position is, look, the only connecting struts

9    you have are connecting struts that connect adjacent

10   expansion columns so how could it not be a limitation that's

11   in this claim?  And the federal circuit in _Phillips_ obviously

12   directed its attention to this particular issue and made

13   clear that the fact that there is a specific embodiment --

14        THE COURT:  But the comeback to that is, as the

15   other side points out in their supplemental papers I think,

16   at least I think that's where it is, is that in leaving aside

17   the pre-_Phillips_ cases that you distinguish, leaving aside

18   those cases and looking at it primarily because the _Phillips_

19   case is so recent, it was in September I think of last year,

20   there has been very few cases since then, if any, other than

21   some scattered district court cases.

22        Even so, you have to look at -- as the defense

23   points out, you have to look at the language in the

24   particular patent as to whether -- for example, if there's

25   only one embodiment that's shown in the patent, the courts

1    have instructed -- I think it's even in Phillips -- that you

2    look at the language in the particular patent as to whether

3    or not there really are -- the inventor is really describing

4    that embodiment in such a way that there is -- let me put it

5    another way.

6         That the Court in construing the disputed terms

7    is obliged to treat that embodiment as something that

8    probably -- well, as something that is more likely to be

9    the -- not just the preferred but perhaps the only embodiment

10   of the invention.  In other words, there are patents in which

11   there is only one preferred embodiment, and that's not a

12   coincidence, put it that way.  And there are cases that say

13   you have to look at what the preferred embodiment or

14   embodiments are and you have to put some weight on that.  So

15   it's not something that the Court pays no attention to.

16        MR. BARSKY:  Absolutely true.  That's absolutely

17   true, Your Honor.  You know, district courts are put in this

18   position in every claim construction hearing.

19        THE COURT:  That's why you make the big money.

20        MR. BARSKY:  And the reason for it is is that you

21   have -- you know, stepping back for a second, you have these

22   two canons of claim construction that compete with each

23   other.  The first is that the claims must be read in light of

24   the specification.  The second is that you can read the

25   claims -- you have to read the claims in light of the

1  specification, but don't import limitations from the
2  specification into the claim.
3            THE COURT:  Right.  And that's the tightrope.
4            MR. BARSKY:  And that's exactly the tightrope.  And
5  that's the line and it's often difficult to draw.  And
6  Phillips recognizes this as well as a number of other cases,
7  such as the Renishaw case which we cited in our brief,
8  recognize this and they talk about how you deal with those
9  situations, how district courts are supposed to, on the one
10  hand, avoid reading in limitations, but on the other hand,
11  make sure the Court is reading the claims in light of the
12  specifications.
13            And one of the things that the federal circuit has
14  pointed to is the fact that absent some specific departure
15  from the ordinary and plain meaning of the language of the
16  claims, the ordinary and plain meaning of the language --
17  ordinary and plain meaning of the claims should control.  And
18  Phillips, Renishaw and a number of other cases give very
19  specific examples where, for example, the patentee
20  distinguishes the prior art.  That kind of conduct or that
21  kind of statement in the prosecution history or in the
22  specification distinguishing another structure as inferior
23  could be used to limit the scope of otherwise broad claim
24  language.  That's a departure that's offered from the
25  ordinary and plain meaning that's authorized by the federal

1    circuit.  Great example is in this case where Dr. Jang

2    distinguished the tubular members or tubular structures

3    Pinchasik and Palmaz.

4         Another instance in which or another tool that the

5    federal circuit has given the district courts for navigating

6    this course is that sometimes inventors use terms in

7    accordance with meanings or definitions that they make up.

8    And in those cases where the patentee is called his or her

9    lexicographer, in those cases it is the patentee's own

10   definition that controls.  So if the patentee has applied a

11   very narrow definition to an otherwise broad claim term, it's

12   the narrow definition that controls.

13        But absent a situation like that, and we don't have

14   that situation here, either of those situations here in this

15   case, it's the ordinary and plain meaning that controls.  And

16   so that is how I would or that is how I do, in fact, think

17   about how to balance those competing canons of claim

18   construction.

19        In this case I think that neither of those

20   situations, an expressed disclaimer or an idiosyncratic

21   definition of an otherwise broad claim term are present.  And

22   so it is for that reason that I don't think that the

23   preferred embodiments or the specification of Dr. Jang's

24   patents can be used to limit language in the claims that is

25   not so limited.

1        Your Honor, I'm just moving forward then and

2    wrapping up this one section.  I do want to talk about, once

3    again, how what Boston Scientific is seeking to do is define

4    connecting strut in a way that the patentee did not in his

5    patent and nor did the patent office require.  Actually,

6    before I get to that, I want to make one other point; and

7    that is, that I talked very briefly about how the federal

8    circuit has said the context of the claim language is

9    important and how here the context of the claim language on

10   this issue, the issue of adjacency, screams out for there

11   being no requirement of adjacency as to expansion columns.

12   And that is because that when the patentee and the patent

13   office wanted to require adjacency, that word was used in the

14   claim.

15        We addressed that issue in our opening brief, Your

16   Honor.  Boston Scientific had three weeks to prepare its

17   supplemental brief and never addressed that issue once.  So

18   we don't have Boston Scientific's response on that, but I

19   would submit it's because there is no response to it because

20   it cannot be more clear that here the context of that claim

21   language itself answers the question that has been raised by

22   Boston Scientific's proposed construction.  So, Your Honor,

23   once again, Boston Scientific is asking this Court to insert

24   a limitation into the claim language that neither the patent

25   office nor the patentee in this case saw fit to include.

1    We've now covered or I've now covered each of the

2 three claim terms and the five issues that are at principal

3 issue here in this proceeding, Your Honor.

4    This, in effect, is what the final redraft from

5 Boston Scientific looks like. It is, in effect, a request

6 that -- it is an observation that the patent office didn't do

7 its job. It should have required that these additional

8 limitations be added. We think that is a clear departure

9 from the mandate of the federal circuit.

10    I don't know if the Court needs a summary of our

11 claim construction positions on these three issues or not,

12 but I do want to point out that in each and every case our

13 claim constructions arise directly out of the language of the

14 claims and the specification. And in each case on each of

15 these five issues Boston Scientific is proposing instructions

16 that are untethered to the language of the claims itself but

17 in each case arise out of the specification or in some cases

18 the prior art.

19    And that concludes my presentation, Your Honor, but

20 I'm willing to answer any questions if the Court has any.

21    THE COURT:  Not at this time.  Thank you very much.

22    MR. BARSKY:  Thank you very much for your time.

23 Appreciate it, Your Honor.

24    THE COURT:  Mr. Han.

25    MR. HAN:  Mr. Wolf.

1    MR. WOLF:  What's the Court's pleasure, Your Honor?

2    THE COURT:  You think about 45 minutes?

3    MR. WOLF:  Probably going to be a little longer in

4  light of the length of Mr. Barsky's presentation, but I would

5  say an hour on the outer limits.

6    THE COURT:  Let me consult.

7    MR. WOLF:  Sure.

8    THE COURT:  Let's take a 10-minute break and then

9  we'll continue through.

10                          (Recess)

11    MR. WOLF:  Good morning, Your Honor.  One

12  technical glitch, we were using the same set-up and there

13  seems to be a bit of incompatibility between the computer and

14  the little monitors.  You see there is a little bit of a

15  jittering going on.  I would recommend, if it please the

16  Court, that you turn that monitor off and just focus on the

17  big monitor, but whatever the Court's pleasure is.

18    THE COURT:  I will leave it on in case there's

19  something too small for me to read.

20    MR. WOLF:  Thank you, Your Honor.  Matthew Wolf for

21  the Boston Scientific defendants.  With me are

22  Peter Gaffner and Todd Masall from the client, both with

23  Boston Scientific.

24    Your Honor, the Court is well aware that a hung

25  jury is not 12 people sent to the gallows, and while a brick

1    house is a house made of brick, a dog house is not a house

2    made of dogs.  How do you know this?  Because you're steeped

3    in this.  Why do we know what a hung jury is?  Because we're

4    all lawyers here.  We know what the term means.

5          Connecting strut means something to those skilled

6    in the art like Dr. Jang.  Expansion strut means something to

7    those that work in the field.  And those that work in the

8    field know that expansion struts and connecting struts are

9    not the same thing.

10          The fundamental goal that we had when attempting to

11    arrive at our claim construction was explaining what a

12    connecting strut is and what an expansion strut is and

13    showing how they're not the same.  And the language we have

14    chosen to propose to this Court is to reflect that basic

15    reality.

16          The language chosen by Dr. Jang's counsel in this

17    case attempts to blur the distinction.  In fact, if adopted,

18    would succeed in blurring the distinction between expansion

19    struts and connecting struts and expansion strut columns and

20    connecting strut columns and would blur it despite the fact

21    that everyone that practices in this field knows what those

22    terms mean.

23          We will go into great detail as to what the terms

24    mean and how we know what the terms mean, but let's start

25    with a couple background notions.  The first, the context of

1   this discussion.  Just two weeks ago Boston Scientific had a

2   judgment affirmed against Johnson & Johnson on one claim of

3   the Jang patents that covered $3 billion in sales.  That's

4   one case, one defendant, $3 billion in sales.  Boston

5   Scientific has every interest in this case in maintaining the

6   broadest possible construction of the Jang patents consistent

7   with their validity.

8            Dr. Jang is not so encumbered.  His damages if he

9   wins are capped, are capped already at BSC sales.  He has no

10  interest like BSC does in maintaining the validity of his

11  patents.  So we're at an unusual posture as a defendant in

12  the case.  We want the Court to adopt a broad construction,

13  but it must be a construction consistent with the validity.

14           The second point -- and you'll be hearing about

15  this much more in a few months; that is, that the way

16  Dr. Jang's contract with BSC was constructed, he received

17  $50 million up front.  And the deal was one of two things

18  happened.  If we used his technology within a certain period

19  of time, he got a royalty on that technology.  If we didn't

20  use the technology, we owed him $10 million more,

21  essentially, a pay or play contract.  We wrote him the check

22  for $10 million because we didn't use his technology.  He

23  cashed the check for $10 million.

24           Now, he comes to this Court asserting a claim

25  construction that he couldn't have believed when he cashed

1  the check for $10 million.  He couldn't have actually thought

2  his patent meant what it said at the time or else he wouldn't

3  have cashed the check, but he did.  So we hope to prove in

4  discovery as this case goes forward that we will never have

5  to get to the infringement issues, that there will be

6  significant estoppel, waiver, accord and satisfaction,

7  whatever label you choose to put on it.  But that's a

8  backdrop to this discussion of what the parties' motivations

9  and true views of the patent construction are.

10         I'm going to talk about four major areas, first a

11  brief discussion of stent technology and the prior art.  I'm

12  going to move to the background of the Jang patents trying

13  not to be redundant with Mr. Barsky's presentation, and then

14  I'm going to talk about principles of claim construction.

15  And, Your Honor, I trust you recognize by your questions how

16  important this is because the landscape has shifted in the

17  last year.  What was uncertainty is now certainty.  What was

18  once duelling camps in the federal circuit --

19         THE COURT:  You're talking about the <u>Phillips</u> case.

20         MR. WOLF:  Exactly, Your Honor.

21         THE COURT:  The <u>Phillips</u> case came out the day

22  before I had a Markman hearing in September, plus I'm partial

23  to it because of the name.

24         MR. WOLF:  We understand.

25         THE COURT:  It's a very helpful case as far as I

1  think all trial courts are concerned.  It gives a lot of

2  guidance.

3  　　　　　MR. WOLF:  Absolutely, Your Honor.  And we'll be

4  talking about how Phillips plays into this case and what

5  Phillips' effect has been on these duelling camps that

6  existed before.  And then finally, but at the greatest

7  length, we'll talk about the claim terms in dispute.

8  　　　　　So let's begin by stent technology and the prior

9  art.  I just put together a brief animation to show how

10 stents work.  There's a blood vessel.  You can see it's

11 clogged with plaque.  In goes a stent mounted on a balloon.

12 That balloon is going to be expanded and push the plaque

13 back.  The balloon is then deflated and withdrawn.  And if

14 all goes well, that artery will now be clear and the patient

15 will live a long, happy, healthy life.

16 　　　　　That's the technology we're talking about here.

17 And the first significant balloon-mounted expandable stent

18 was the Palmaz stent.

19 　　　　　Your Honor, is your picture clear?

20 　　　　　THE COURT:  My picture is fine.

21 　　　　　MR. WOLF:  I apologize for the glitch.  As you can

22 see, Your Honor, this first balloon-mounted expandable stent

23 involved diamond shaped expansion segments attached to each

24 other.  There are no connectors.  And as Dr. Jang recognized

25 in his patent, as many had recognized before, there were

1    problems with that.  It wasn't very flexible.  So what

2    happened?  Let's go to the next slide.

3         Dr. Palmaz came out with a new patent.  Now, I

4    believe Mr. Barsky misspoke when he said that it was Dr. Jang

5    that thought of connectors, because, in fact, there were

6    connectors throughout the prior art long before Dr. Jang's

7    patents were filed.  And one of them is shown here.  We can

8    see in red the expansion segments and then in blue the

9    connecting segments, the connecting struts.

10        These then were taken forward in various

11   permutations.  In the upper left we see the Pinchasik, in the

12   bottom we see Orth, in the upper right we see Fischell.

13   These are all prior art stents.  Lots of different shapes but

14   they were all made of the same basic components.  At least

15   certainly with Fischell and Orth you had expansion struts and

16   connecter struts.  These were the building blocks of stents.

17        Against this crowded prior art backdrop Dr. Jang

18   brought forward his invention.  And let's talk about his

19   invention.  First, we have expansion struts.  They are

20   attached circumferentially by joining struts which are called

21   expansion strut pairs when the two struts are put together

22   with a joining strut.  There are then connecting struts.  And

23   these connecting struts -- here is the invention of

24   Dr. Jang's patent.  The connecting struts allow the expansion

25   strut pairs to be circumferentially offset.  If you look at

1    the prior art patents, you have the strut pairs that were on

2    the same plane.

3            What Dr. Jang did, and that was clever and that

4    allowed us to win the judgment we did against J&J and allows

5    us to move forward, is to offset them.  That's the invention.

6            THE COURT:  When you say "offset," you mean that

7    what you have shown here in red, it is not exactly parallel?

8            MR. WOLF:  Exactly, Your Honor.  If you look at the

9    upper left-hand picture you see that that strut pair, that

10   horseshoe, is a little lower than the one above it.  And

11   there are advantages as well as disadvantages.  I mean, it

12   depends on the physician, but there are advantages to that

13   particular structure and Dr. Jang thought of that.  And that

14   was the reason we paid him to date $60 million because it was

15   a clever idea.  It's just not a clever idea as embodied in

16   the Jang patents that we practiced.

17           So let's move on.  These expansion struts and

18   connecting struts then end up in columns.  And you can see in

19   the red the expansion strut columns and in the blue the

20   connecting strut columns.  This is the fundamental

21   architecture for all the Jang patents for the entire

22   specification for every embodiment.  This is the basic

23   building blocks of the Jang patent.

24           Now, let's talk about how the Jang building blocks

25   work.  Why don't we just run the animation.  You can see the

1    red and the blue are the expansion struts and the connecting

2    struts.  And as the balloon blows them up, you see that the

3    expansion struts expand circumferentially to make the larger

4    two and the connecting struts hold things together.

5         You can see and I have now put right onto the

6    picture from the patent what Dr. Jang says.  A stent is an

7    expandable mesh-like tube made of metal.  I want to talk

8    about tubular here, slightly out of order, but there is a

9    fundamental disconnect apparently between the parties on

10   tubular.

11        If we can go to the next slide actually and show

12   this animation.  This is the stent at work.  You can see the

13   red and the blue, the expansion in red and the connecting in

14   blue.  Now it gets expanded.  And there's the tubular stent.

15   Now we're going to remove the connecting struts.

16        What we have there are the expansion struts in

17   expanded form with the connecting struts removed.  So when we

18   say that the expansion struts are tubular, you can see that

19   each of the individual expansion strut columns forms a tube,

20   a series of tubes that are then connected by the connecting

21   struts.  That's the basic architecture of the Jang patent.

22        I don't think this fight over tubular that the

23   parties seem to have has any meaning to the infringement

24   analysis.  We just think it's the right definition.

25        THE COURT:  Excuse me.  What did you say was

1    removed?

2            MR. WOLF:  The connecting strut columns.

3            THE COURT:  Oh, the columns.

4            MR. WOLF:  Why don't we rerun the animation just so

5    we can talk through it again.

6            So there's the Jang stent in the unexpanded state.

7    It has now been blown up.  And now we have removed what are

8    the connecting stents for visual purposes.  They are

9    obviously there when the operation is done but just so the

10   structure can be understood.  And we can see now what

11   expansion struts do.  Expansion struts are what do the work

12   of the stent.  They are what hold open the artery in the

13   tubular form.

14           Now, Mr. Barsky -- obviously, we weren't clear in

15   our brief.  What Mr. Barsky seemed to be talking about in

16   referencing the disconnect with the J&J case where he put the

17   juxtaposition of the two terms is whether the cells -- and

18   the cells are the term we use either for the horseshoe shaped

19   thing or in the older Palmaz, the diamond shape, whether

20   those cells are tubular or not, because some patents have

21   tubular shaped cells.

22           That's not what we're talking about here.  When we

23   say "tubular," we mean when the expansion strut is expanded

24   it forms the same shape as the artery.  It has got to do its

25   work.  It has to hold open the artery.  And just as the

1    artery is a tube, so, too, must the stent be and the

2    individual component expansion column.  So I think this might

3    be a pillow fight, not something that really needs to be

4    resolved in this particular way because it seems to be based

5    on miscommunication.

6              So, anyway, Dr. Squire we had talked about the

7    stent geometry, but in light of the Court's previous

8    discussion we'll move past it.

9              Let's talk about the principles of claim

10   construction that are going to guide us.

11             First is that the specification is the best guide

12   to the meaning of disputed terms.  Second -- and we'll talk

13   about these in great detail -- the use of comprising language

14   does not expand the scope of claims.  Claim terms should not

15   be construed so as to render distinctions between them

16   meaningless.

17             THE COURT:  Can I ask you to speak a little more

18   slowly.

19             MR. WOLF:  Absolutely, Your Honor.  The lunch hour

20   was obviously invading my thoughts.

21             Claim terms should not be interpreted in a way that

22   would render them invalid.  And we talked about extrinsic

23   evidence already, and obviously, I won't belabor that point.

24             What Phillips taught us is that the specification

25   is the most important tool in deciding what claim terms

1    meant.  One passage, "Ultimately, the interpretation to be

2    given a term can only be determined and confirmed with the

3    full understanding of what the inventors actually invented

4    and intended to envelop with the claim.  The construction

5    that stays true to the claim language and most naturally

6    aligns with the patent's description of the invention, the

7    specification, will be in the end the correct construction."

8              Now, why is this important?  Your Honor, almost

9    every case cited by Dr. Jang for the proposition that we go

10   to the claims, the claims, the claims, come prior to

11   Phillips.  We've put together this time line here showing the

12   cases that were cited by Dr. Jang.  Mr. Barsky suggested that

13   absent idiosyncratic definitions you go by the plain

14   meaning.  That is exactly the proposition that was rejected

15   by Phillips.  That was exactly the proposition as cited most

16   recently before Phillips in the Texas Digital line of cases

17   which I'll, for example, cite the CCS case in which Dr. Jang

18   so heavily relied.  It was exactly that line of cases that

19   were expressly repudiated by Phillips.

20             Phillips specifically talks about Texas Digital and

21   said, no, plain meaning is not the way to go.  You look at

22   the specification.  You find out what the inventor meant by

23   the terms.  It's not a situation where you just go to the

24   dictionary, unless a specification says I didn't really mean

25   that.  You find out in the first instance what they really

1   mean by reading the specification.  Couldn't be more clear.

2          This is again from _Phillips_.  "Assigning such a

3   limited role to the specification" -- and there they're

4   referring to precisely what Mr. Barsky said in his

5   presentation, looking for the idiosyncratic, the change in

6   the definition.  "Assigning such a limited role to the

7   specification, and in particular, requiring that any

8   definition of claim language in the specification be

9   expressed is inconsistent with our rulings that the

10  specification is the single best guide to the meaning of a

11  disputed term."  The single best guide, not the only one we

12  acknowledge, not the only one this Court should recognize,

13  but it's the place you start.  It's the best place to go to

14  find out what a term means.

15         One aside, Your Honor, Mr. Barsky put up the last

16  paragraph of the specification right before the claims,

17  that's boiler plate language.  If you go to any patent

18  prosecutor, they just pull that up for every patent.  There

19  are specific federal circuit cases that say that that boiler

20  plate language has no legal effect.  That wasn't in their

21  briefs, but I'd be happy, if it's relevant to the Court, to

22  supplement briefly after the hearing explaining that that

23  boiler plate paragraph is of no legal moment.

24         Now, let's talk about comprising.  And Mr. Barsky

25  talked about this at some length as well.  We cited cases

1    talking about the role of comprising.  And Your Honor's right

2    that we basically agree with what Dr. Jang is suggesting,

3    but there's a difference.

4         Let's assume for the moment that I had a claim for

5    a new gear system on a tricycle.  So I said a means of

6    personal movement comprising a tricycle with a new gear

7    system, that's my patent.  Well, I could add a bell to that

8    and it would still infringe.  I could add new wheels to that

9    and it would still infringe.  But if I add a fourth wheel to

10   that, I don't infringe, because a tricycle is a tricycle.

11   Four wheels is not a tricycle.  That's exactly what the

12   cases talk about when they say it's not a weasel word to

13   abrogate meanings that exist.

14        So you can't take connecting strut or expansion

15   strut, words with definitions with specific functionality,

16   and change them and say, well, because it's comprising it's

17   okay.  If you change the meaning of a term, you're not within

18   what Phillips tells you you can do.

19        Now, let's talk about the disputed terms of the

20   Jang patents.  As I suggested, the central problem for this

21   Court, the central issue to be resolved, is how do we define

22   connecting strut and expansion strut or connecting strut

23   column and expansion strut column such that they have

24   distinct meanings, such that the jury will understand what

25   the terms mean and why they are different.  That's the

1    central task for us today.  We need to arrive at a

2    construction that recognizes the different roles for

3    connecting struts and expansion struts.

4         Now, for a connecting strut and connecting strut

5    columns they have specific purposes.  A connecting strut

6    column connects adjacent expansion columns.  It doesn't

7    itself act as an expansion column.  If it acted as an

8    expansion column, it wouldn't be a connecting strut, it would

9    be an expansion strut.

10        If they are attached, if connecting struts are

11   attached to each other, they cease being connecting struts.

12   They then become expansion struts.  It's a matter of simple

13   physics because then they are radially compressive rather

14   than allowing longitudinal stretching.

15        Then the question is on columns whether an

16   expansion strut column can contain a connecting strut column

17   and vice versa.  And we'll talk about that at some length.

18        Connecting strut, that term was well-known, is

19   well-known in the art.  What Dr. Jang tells you is a

20   connecting strut is a strut that connects.  That is not the

21   definition of connecting strut.  That is not sufficient to

22   define what those who make and use stents understand a

23   connecting strut to be.  And those in the prior art and in

24   the patent office know what a connecting strut and a

25   connecting strut meant.

1    If you look, Your Honor, on the right-hand side of

2    your screen, that doodling of that key is the patent examiner

3    during the prosecution of the Jang patents.  And you notice

4    that the patent examiner wrote "key, expansion strut, joining

5    strut, connecting strut," et cetera, and applied it to the

6    Pinchasik prior art reference.  The patent office understood

7    what those terms meant, what they required, and properly

8    applied them when reviewing the Jang application in light of

9    the prior art.

10    Now, here must be the most fundamental failure in

11    our briefing, because I don't think Dr. Jang understands what

12    our point is at all with regard to this prior art.

13    Mr. Barsky said that we are to presume that the patent

14    examiner knew what he or she was doing.  And that is exactly

15    right.  And our position is that the patent examiner did know

16    exactly what he or she was doing, that they knew what a

17    connecting strut was, they knew what an expansion strut was;

18    and therefore, in light of what those terms meant, what we

19    propose them to mean, then Jang could be patented over the

20    prior art.

21    It is Mr. Barsky that requires an ignorant patent

22    examiner, because only an ignorant patent examiner not

23    knowing what connecting strut is would have allowed that

24    definition, would have allowed those claims with Dr. Jang's

25    proposed construction to be allowed over the prior art.

1    In other words, what we say is the only way that
2  this prosecution history makes sense, the only way you could
3  understand why a smart, sane patent examiner would allow Jang
4  over the prior art would be if the examiner knew the terms
5  meant what we say, and for that matter what Dr. Jang in the
6  specification says the terms mean.  If they mean what
7  Mr. Barsky suggests they meant, then only a malfeasant patent
8  examiner would have allowed these claims, for reasons we
9  explain in the brief, and I'll go over here.

10    We talked about Dr. Squire.  He also knows what
11  connecting strut and connecting meant.  So let's move on to
12  the specification.  So we know that the prior art and the
13  patent office and Dr. Squire all know what the terms mean.
14  So, too, does Dr. Jang.  And that's reflected in his
15  specification.

16    The specification shows that connecting struts
17  connect adjacent columns.  The specification shows that
18  connecting struts and connecting strut columns are not
19  attached to each other.  And the specification shows that the
20  connecting strut column does not contain expansion struts.
21  Not one embodiment, not some embodiments, not even just all
22  embodiments, the specification in its entirety.  There is no
23  suggestion that there is any divergence from these
24  principles, none, not a single hint, not a whisper, not a
25  shadow, that the terms mean anything different than what

1  Boston Scientific suggests they mean, what the examiner
2  understood them to mean, and what was meant in the art.
3        So what are the assertions today?  Connecting
4  struts need not attach adjacent expansion columns.  What is
5  the support for that?  There is none.  There is no citation
6  to anything in the patent that suggests that that's okay.
7  There is no extrinsic evidence that suggests that's okay.
8  There is no testimony of any kind.
9        Next, connecting struts may be attached to each
10  other.  Where is the evidence that it's okay for connecting
11  struts to be attached to each other?  Again, there is none.
12  And this is a little verbal sleight of hand that was pulled
13  off this morning.  The definition of connecting strut, it was
14  flashed on the screen.  But one would have thought after
15  Dr. Jang filed a motion to exclude our expert as being too
16  conclusory, that if they were going to put up a definition,
17  they'd at least have a basis for it.
18        What was the support for their definition of
19  connecting strut?  Where was the citation to the
20  specification or, for that matter, where was the claim
21  language that says a connecting strut is?  It's entirely
22  conclusory.  In fact, if you read their opening brief, what
23  they say is a connecting strut is a strut that connects.
24  Well, that's not enough if you're one of skill in the art.
25  That's not enough.  That is an insufficient and, in fact,

1    inaccurate definition if you're one that is practiced in

2    designing and manufacturing stents.

3            In short, Mr. Barsky says we need to rely on the

4    plain meaning of connecting strut.  The problem is there is

5    no plain meaning of connecting strut.  There is only a

6    meaning to those in the industry, to those in the art, and

7    that's reflected in every patent we've talked about including

8    the Jang patents.

9            Finally, they say connecting strut columns may

10   contain expansion struts.  The support for that, again, there

11   is none.

12           This is the basic geometry.  The only way

13   connecting strut columns appear, straightforward, let's go

14   put the two quotes.  Interesting that the descriptions of

15   this specifically say that the connecting struts tie adjacent

16   expansion columns.  And Mr. Barsky corrected us and said

17   that, well, it's not that they connect expansion strut

18   columns, it's that they connect expansion strut pairs.  I

19   agree with Mr. Barsky, it's not terribly important for any

20   infringement analysis but, in fact, Dr. Jang himself said, if

21   you look on the right-hand side, connecting struts 38 connect

22   adjacent expansion columns.  That is exactly our construction

23   of connecting struts.

24           Now, this is pretty important.  Can we put up the

25   patent claim one of the '021 patent?  Pardon the

1    highlighting, Your Honor.  It was for a different purpose.

2        Mr. Barsky made the argument that the patentee knew

3    how to say adjacent when he meant adjacent and he didn't put

4    adjacent when talking about connecting struts.  Actually, he

5    didn't put adjacent.  He was much more clear.  If you look at

6    the third limitation beginning, "A first connecting strut..."

7    It says, "A first connecting strut including the first

8    connecting strut proximal section, first connecting strut

9    distal section and the first connecting strut intermediate

10   section, the first connecting strut proximal section" -- this

11   is important -- "being coupled to the distal end of the first

12   expansion strut pair and the first expansion column and the

13   first connecting strut distal section being coupled to the

14   proximal end of the second expansion strut pair of the second

15   expansion column."  That's a long way of saying that the

16   connecting strut connects column one and column two.

17   Exactly.  They're adjacent.  It doesn't say column one and

18   column three or column one and column five.  So we've

19   summarized that by using the term "adjacent" which happens to

20   also be consistent with the definition of connecting strut in

21   the art.

22        As I was suggesting, if we can go to the next

23   slide, there are no situations, no embodiments, no discussion

24   in the Jang patent --

25        THE COURT:  Could you go back to that last line?

1          MR. WOLF:  Sure.

2          THE COURT:  If it's too difficult, that's fine.

3    I'm sorry, the one before that.

4          MR. NILSSON:  You mean the claim one?

5          MR. WOLF:  Which one would you like, Your Honor?

6          THE COURT:  It was the one before this.

7          MR. WOLF:  That one?

8          THE COURT:  It was this one, I'm sorry.

9          MR. WOLF:  So here you have, Your Honor, the two

10   different references to the adjacency of the expansion

11   columns that are connected just as there is a reference in

12   the claim itself to connecting a first and a second, the

13   first and the second expansion columns.

14          Your Honor, here we have every embodiment in the

15   Jang patents.  And you see in every one the connecting struts

16   connect adjacent expansion columns.  There are no

17   alternatives.

18          Now, we've talked about case law and what effect

19   Phillips has and the Nystrom v. Trex case is probably the

20   best case study.  Prior to Phillips there were competing

21   doctrines.  On the one hand you had a series of federal

22   circuit judges or a collection of them that believe very

23   strongly in the dictionary plain meaning based approach.  And

24   then you had another set of federal circuit judges that said,

25   no, you've got to turn to the specification, you've got to

1  read clearly and understand what the patentee meant in light

2  of the specification.

3      The first Nystrom v. Trex case was resolved by a

4  panel, two of whom belonged to that first camp.  So the

5  question was -- and Trex is the decking that looks like wood

6  but it isn't really wood.  It's kind of made of chewed up

7  tires.  And the question was, when a claim said board, would

8  it include boards made of something other than wood.  And the

9  defendant in that case said, no, when you said board in your

10  claim, you meant board as in wood.  And I suppose there's a

11  fair argument both ways just looking in the abstract, because

12  board usually means wood, but I've certainly used board to

13  mean something other than made of wood.

14      And what the federal circuit said in

15  Nystrom v. Trex one was, yeah, we're not going to hold you

16  to what the specification says.  The specification only

17  discusses boards made of wood but board could mean boards

18  made of something else, so we're going to give you the

19  broader definition.

20      Along comes Phillips and Nystrom v. Trex is reheard

21  in light of Phillips.  And what the federal circuit said is,

22  Nystrom in light of Phillips, because you only talked about

23  boards in the specification being made of wood, we're going

24  to limit you because that was your invention.

25      Here we have an even more extreme case, because

1    whereas in <u>Nystrom</u> you had in the real world boards made of

2    wood and non-wood and the Court said, well, the specification

3    makes clear you were only referring to wood.  In our case

4    there's only one kind of connecting strut.  And if you ask

5    any inventor, any participant in the industry, there's only

6    one kind of connecting strut.

7              What Dr. Jang wants you to do is close your eyes to

8    the fact that connecting strut means something and break it

9    apart, just make it a strut that connects, and that's not

10   what it would mean, any more than to a baseball player the

11   term "home run" means you go to your house.  We know what the

12   term means.  If we didn't know or if there were any ambiguity

13   as to what connecting strut, connecting strut column,

14   expansion strut, expansion strut column meant, we have other

15   claim construction doctrines to fall back on.  And two I want

16   to talk about specifically.

17             The first is, if you've an ambiguity, if you're

18   uncertain how you want to go, you want to make sure you don't

19   read claims together, a claim such that one word and another

20   word mean the same thing or the line between the terms is

21   unclear.  You want to make sure that an expansion strut

22   column and a connecting strut column are not one in the same

23   or are not overlapping.

24             Well, Dr. Jang's claim construction would render

25   the claim term differences meaningless.  If you look on the

1    screen right now, Your Honor, this is the understanding of
2    the Jang patent we all have, both defendant and plaintiff,
3    that in red you have expansion strut columns and in blue you
4    have connecting columns.  There's no dispute on either side
5    that that's at least one way to read this patent.
6         The problem is, under Dr. Jang's reading you could
7    just as easily look at it this way.  Now you have what was
8    indisputably a minute ago an expansion column, at least part
9    of an expansion column, as you can see right under the number
10   24.  Now you have it part of a connecting strut and part of a
11   connecting strut column.  There's nothing in Dr. Jang's
12   proposed construction that precludes this reading of his own
13   invention.  We don't agree with that reading, but if you do
14   adopt that, then we see that as to column 24 there's no way
15   to distinguish under the definition what is a connecting
16   strut or an expansion strut.  There's just no end to this
17   mischief.
18        In fact, there's nothing in Dr. Jang's patent that
19   precludes this.  There's nothing that precludes having one
20   expansion strut on the far left side, to use their
21   terminology, connecting by a very long connecting strut to
22   the far right.  That's perfectly consistent with the
23   construction.
24        THE COURT:  And is that just because of the lack of
25   the term "adjacent"?

1          MR. WOLF:  That's correct, Your Honor.  That's

2    correct.  And also -- well, it's interlocking of adjacent and

3    also solely.  I mean because those are related terms,

4    obviously.  If it's adjacent then we know that it has to

5    connect the next line over which on this graph is under 24.

6          This problem is compounded not just on the strut

7    level but on the column level as well.  Let's suppose for a

8    moment that under Dr. Jang's construction you have a column

9    that has four expansion struts and two connecting struts.

10   But what is that?  Is that an expansion column or a

11   connecting column or neither or both?  Who knows?  There's no

12   way to distinguish if you don't use the word "solely" what is

13   a connecting strut column from an expansion strut column.

14         And as we've shown, the patent only discloses

15   throughout its entire specification in every embodiment, only

16   has connecting strut columns made up entirely of connecting

17   struts and expansion strut columns made up entirely of

18   connecting struts.

19         Now, Dr. Jang asked you in his opening brief to

20   look at the Express stent.  It is our view that is not

21   appropriate at this phase of the proceedings, but

22   nonetheless, it is instructive to accept the invitation.

23         Here is the Express stent as any unbiased observer

24   would see it.  In red you have the expansion strut and in

25   blue you have the connecting strut.  Dr. Jang has created a

1  new definition.  You see what he's done is he has taken metal

2  out of what was an expansion strut.  He's erased it,

3  literally taken White-Out and put over what was indisputably

4  an expansion strut and now made it part of a connecting

5  strut.  This is the mischief that happens.

6       And it gets worse, because you see that exactly the

7  same shape performing exactly the same function, expansion

8  strut pairs, are under Dr. Jang's reading as laid out quite

9  clearly in his opening brief, on the one hand, the

10  intermediate sinusoidal section of a connecting strut, and on

11  the other, two joined expansion strut pairs.  How can that

12  be?  How can a claim construction be acceptable if the result

13  is that two identical structures performing identical

14  functions have entirely different definitions?

15       In fact, we could flip it and you can see there's

16  nothing wrong under Dr. Jang's definition by having what is,

17  again, undisputably by Dr. Jang, an expansion strut now

18  performing as a connecting strut.

19       This is the architecture of the Express stent

20  without the connecting struts.  You have a major and a minor

21  expansion strut that gives the strut more flexibility.  These

22  expansion struts that alternate major, minor, major, minor,

23  are expansion struts.  There is no doubt.  You then take

24  these expansion struts, add connecting columns, and you've

25  got the Express stent.

1        Now, what's interesting is that Dr. Jang himself

2   contemplated the notion of using different size expansion

3   strut pairs, different size expansion strut columns.  Let's

4   go to figure 6A from his patent.  If you look, Your Honor,

5   figure 6A, which you see on your screen, is one of the

6   embodiments in Jang's patent.  On the left-hand side you can

7   see that those struts, those expansion struts under the

8   No. 86, are much thicker than those under 24.  That was

9   intentional.

10        THE COURT:  Is that just a function of where it's

11   cut off?

12        MR. WOLF:  No, Your Honor.  In fact, I can read to

13   you from the specification, but I'll just --

14        THE COURT:  When you say "thicker," what do you

15   mean by "thicker"?  You mean the -- what I would say meaning

16   it's wider?

17        MR. WOLF:  Yeah.  It's a different gauge of metal,

18   so one is -- so if you look at the top of -- you see the

19   expansion strut column 86?

20        THE COURT:  Right.

21        MR. WOLF:  And just look at the top expansion

22   strut.  It has a certain thickness.

23        THE COURT:  Oh, I see.

24        MR. WOLF:  And then you go over to 24 and that's

25   about half the size, half the thickness.

1          THE COURT:  All right.

2          MR. WOLF:  And Dr. Jang identified this as having

3   potential advantages alternating.  And I believe that it went

4   A, B, B, B, A, B, B, B in repeating patterns as the way he

5   disclosed it.  What's critical about this -- and this is all

6   at column 10, lines 46 through column 11, line 17 -- is that

7   he referred to both column 86 and column 24 as expansion

8   strut columns.

9          So the fact that we have different size expansion

10  strut columns -- ours go A, B, A, B rather than A, B, B, B,

11  A, et cetera.  The fact that they are of different size is of

12  no moment to Dr. Jang.  In his specification he makes it

13  quite clear.  If it serves the role of an expansion strut,

14  it's an expansion strut.

15         Now, I said there were two reasons why if there was

16  any ambiguity Dr. Jang's claim construction should be

17  rejected.  The first is that it blurs the distinction between

18  expansion struts and connecting struts.

19         The second is that if accepted it would threaten

20  the claim validity.  Why do we say that?  Well, let's show

21  this.  We have here Boston Scientific's Express stent.  You

22  can see the alternating large and small expansion columns

23  joined by straight connecters.  We are now going to blow it

24  up and show that this is substantially the same geometry as

25  the Lau stent.  In fact, our stent is based on the Lau

1  geometry.  You can see they are very, very similar

2  geometries.

3       If it is the case that the Express stent practices

4  the Jang patent and their construction is correct -- in other

5  words, we accept what they say about the definitions of

6  connecting strut column and expansion struts -- then the Lau

7  stent threatens to be invalidating prior art because it's the

8  same basic geometry.  Our response is, there is no validity

9  problem here because the patent office understood what the

10 terms meant, understood that our understanding of the terms

11 was accurate, Dr. Jang's proposed are not.

12      But, again, the point is, if you accept Dr. Jang's

13 proposal it risks invalidating the patent.  And, of course,

14 this can't be done.  We don't need to belabor it in our

15 brief.  We cite cases that only make sense.  If I sell you a

16 business, Your Honor, the next day I can't turn around and

17 trash the business to the community.  If I sell you a piece

18 of land, I can't the next day burn down all the trees on that

19 land.  Similarly, I can't sell you a patent and then the next

20 day argue for a construction that would invalidate what I

21 sold you for $60 million.  But that's exactly what Dr. Jang

22 is doing in this case.

23      Why don't we move forward to this one.  Another

24 point of confusion, when we showed the various prior art

25 stents Dr. Jang said that BSC has wrongly called these

1    expansion pairs part of a connecting strut -- on the

2    right-hand side you see the Lau stent -- and it says we

3    ignore this interconnecting element.  Missing the point.

4    We're saying that if you accept Dr. Jang's construction,

5    there's nothing that precludes that which is on the right.

6         But we don't accept Dr. Jang's construction.  In

7    fact, we think he is absolutely right that the

8    interconnecting element that he says we ignore is the

9    connecting strut just as on left-hand side you see the

10   corollary, albeit it's a little longer, the straight blue

11   line, not the sinusoidal shape that he has drawn.

12        THE COURT:  So all you're saying really is that

13   you're not ignoring it, you just consider it part of the

14   connecting strut?

15        MR. WOLF:  What we're saying -- let's go back to

16   our patent, the Express.  Your Honor, what we're saying is

17   that the expansion columns are clear.  It is the wavy line.

18   And what is straight is the connecting strut, part of the

19   connecting strut column.  And he says we're ignoring it.

20   We're not.  We're saying that that's right.  That is the

21   connecting strut.  But when you start getting that sinusoidal

22   shape, you're torturing the claims, you're torturing the

23   language.  That's precisely what we don't want to do.  We're

24   just taking their argument to its logical conclusion.  And we

25   can see, if we go to Pinchasik and Orth, we can see exactly

1    the same thing.  If you buy their construction, then it could

2    read just as easily on any of the other prior art patents.

3              THE COURT:  Could you go back?

4              MR. WOLF:  Sure.  Dr. Jang says the patent office

5    was fully aware of all but one of the prior art references

6    discussed by BSC at the time it examined and allowed

7    Dr. Jang's patent claim to issue.  As I've already suggested,

8    that's precisely right.  The patent office was fully aware,

9    understood what the terms mean, and by applying those terms

10   found that Dr. Jang's patent was patentable.  It would not

11   have done so had it understood Dr. Jang's claims to mean what

12   he claims it means.

13             THE COURT:  I'm sorry, but could you go again back

14   one?

15             MR. WOLF:  Sure.

16             THE COURT:  See, on this one --

17             MR. WOLF:  This is the way they actually should be

18   constructed, Your Honor.  So you see in red what we believe

19   are appropriately called expansion strut columns and in blue

20   what is appropriately called the connecting strut and the

21   connecting strut columns.  So this slide is showing the way

22   you should properly read Pinchasik, Orth and Fischell as

23   opposed to the previous slide which is the way they would be

24   read if Dr. Jang or could be read if Dr. Jang's construction

25   were accepted.

1          THE COURT:  So, for example, the figure on the far

2     right --

3          MR. WOLF:  Yes.

4          THE COURT:  And as it was shown on the previous

5     slide --

6          MR. WOLF:  Let's go back.  Yes, under Dr. Jang's

7     construction --

8          THE COURT:  And your point is as to this figure,

9     again, I would say you're trying to illustrate the need for

10    the term "adjacent."

11         MR. WOLF:  Exactly right, Your Honor.  The mischief

12    that is done if "adjacent" isn't understood as part of the

13    notion of connecting strut, that you're just allowed to wind

14    around the stent until you find another expansion column that

15    would otherwise satisfy.

16         THE COURT:  All right.

17         MR. WOLF:  Let me leave with this question, Your

18    Honor.  This is the same picture we were just looking at.

19    And I would ask Mr. Barsky to tell us in his rebuttal why it

20    is under his construction that this wouldn't constitute

21    invalidating prior art.  Under our construction you wouldn't

22    get here because you would have to use -- you see we have on

23    the left the first thing in red is the first expansion strut

24    pair.  And what we would understand is --

25         THE COURT:  I'm sorry, I don't understand the

1    question you're asking.

2         MR. WOLF:  Sure.  Let me take a step backward for a

3    moment.  Remember what I said earlier that what was

4    innovative about Jang primarily was the offset expansion

5    strut pairs.  By any fair reading and what the patent office

6    did was looked at this prior art and said, well, these

7    expansion strut pairs aren't offset.

8         THE COURT:  What prior art are we looking at?

9         MR. WOLF:  This is Orth -- Fischell, I'm sorry.

10        THE COURT:  All right.

11        MR. WOLF:  So the patent examiner with the

12   appropriate reading of -- consistent with our construction

13   looks at Fischell and says, well, I see expansion columns.  I

14   see the non-parallel connecting column.  And then I look at

15   the adjacent expansion strut column and although they're

16   connected, they're not offset.  So this doesn't invalidate

17   the Jang patent.  By making it offset Jang is different.

18        But if you accept Jang's construction which

19   eliminates the need for the expansion strut columns to be

20   adjacent and allows you that circuitous connecting strut

21   column as opposed to what is traditionally a connecting

22   strut, well, suddenly, he can draw a picture or, rather, the

23   patent office could have drawn a picture on the Fischell

24   stent and said, look, on the left-hand side in what is red

25   you have an expansion strut pair, on the right-hand side in

1    what's red you have an offset expansion strut pair, and

2    suddenly what you claim to be novel isn't novel.

3            If you don't have to ask the question are the

4    adjacent expansion strut pairs offset, if you can drop the

5    word "adjacent" from the notion of connecting strut from the

6    notion of this patent, well, then you read on every piece of

7    prior art that came.  You have to read the term.  And just

8    like he did in his description, we showed you the word

9    "adjacent" up here.  We showed you the language in the patent

10   where it said that the connecting strut connects expansion

11   column one to expansion column two.  In this case it's

12   showing expansion column one and expansion column three, I

13   guess would be the way to read it.  And once you do that,

14   you've threatened the validity of the patent.

15           So, Your Honor, we ask you to follow the claim

16   construction provision set out in <u>Phillips</u>.  We ask you to

17   rely on the specification and the claim language.  We ask you

18   to look at what the prior art taught us and what it didn't

19   teach us, and to accept the notion that expansion strut

20   columns must be connected to adjacent expansion strut columns

21   and that expansion strut columns must contain only expansion

22   struts and connection strut columns should only contain

23   connection struts.  Thank you.

24           THE COURT:  Do you wish to make an argument in

25   response?

1     MR. BARSKY:  Yes.  I wonder, though, what the
2  Court's preference is.  I just have a couple of things I want
3  to get together because there was a lot of new information
4  that I'm going to want to respond to very directly.
5     THE COURT:  That's fine.  Why don't you do that
6  because that will give me time to go through the notes that I
7  made as I read the briefs and see if there is anything
8  that --
9     MR. BARSKY:  Great.  What time would you like to
10 see us back, Your Honor?
11     THE COURT:  How long will it take you because I was
12 just going to sit here and do it?
13     MR. BARSKY:  Oh, okay.
14     THE COURT:  Five minutes enough?
15     MR. BARSKY:  I can try to do it in five minutes,
16 sure.  Thank you.
17                    (Brief recess)
18     THE COURT:  I'm ready when you are.  I have just
19 have one question.  I think you've addressed everything else.
20 I think I understand why this was cited, but in the
21 plaintiff's opening brief you had a short bit of argument
22 about the Wilson Sporting Goods and Lava Trading cases and
23 the case law that says that the claims of a patent are to be
24 construed independently of the accused product, that
25 principle doesn't really apply here, in my view, because as I

1  stated at the outset, this isn't, at least strictly speaking,

2  an infringement case.  And both sides have discussed and

3  spent the whole morning really discussing the Express stent.

4  Although you cited that out of an abundance of caution, I

5  suppose, I don't think anybody --

6          MR. BARSKY:  Exactly.

7          THE COURT:  Nobody has any concerns on that issue?

8          MR. WOLF:  Correct, Your Honor.

9          MR. BARSKY:  Just to clarify, Your Honor, I don't

10 think I discussed the Express stent at all in my

11 presentation, but certainly we pointed it out in our papers,

12 and the reason for it is, Your Honor, this is yet another

13 example of potentially conflicting signals from the federal

14 circuit.  On the one hand, we have this line of cases, the

15 SRI International line of cases, that say you don't ever

16 construe a claim in accordance with or based upon some view

17 of the accused device.

18         On the other hand, you have these recent federal

19 circuit cases in which the federal circuit has reversed

20 district courts on their claim construction and refused to

21 even enter -- in other words, the federal circuit refused to

22 even pronounce a claim construction saying we don't have

23 enough evidence about the accused device.  So it's completely

24 mixed signals.  And so just as a matter of caution, we

25 thought it would be best so that the record at least include

1    what we understand to be the architecture of the Express

2    stent.  And that's the only relevance, in my view.

3            THE COURT:  All right.  But really what the parties

4    are asking is not for the Court to make -- well, what the

5    parties are asking the Court to do is to construe these

6    claims for a purpose that's different -- somewhat different

7    than -- not for a purpose, but in a context that's somewhat

8    different than I would usually hold a Markman hearing.

9            MR. WOLF:  That's correct, Your Honor.

10           THE COURT:  I don't know that -- I mean, the Court

11   follows the same principles regardless of the context.

12           MR. BARSKY:  Yes.

13           THE COURT:  I just don't think this is as much of a

14   concern because we don't have an allegedly infringing device

15   here.

16           MR. BARSKY:  That's correct, Your Honor.

17           THE COURT:  That's why I was a little puzzled even

18   by the citation because we don't have an allegedly infringing

19   device.

20           MR. BARSKY:  Correct.  Although it's not clear the

21   federal circuit would say that in a case like this where the

22   issue is coverage under a license agreement or an acquisition

23   and sale agreement in this case that they would treat that

24   any differently than a standard infringement case.

25           THE COURT:  That's true.

1          MR. BARSKY:  We thought it would be best to err on

2     the side of caution in that regard.

3          THE COURT:  Thank you.  You may proceed.

4          MR. BARSKY:  Thank you very much, Your Honor.

5          Let me address right off the bat the question of

6     the motivation of the parties.  That was I believe one of the

7     very early issues that Mr. Wolf addressed and it's one that

8     I'm hoping we can dispose of pretty rapidly.

9          What Mr. Wolf said was that just last month the

10    district court had affirmed a jury award of infringement

11    against $3 billion worth of stents sold by Johnson & Johnson

12    in favor of Boston Scientific.  What Mr. Wolf suggested to

13    this Court was that they would be the last people on earth

14    who would ever do anything to threaten the validity of these

15    patents.  And, in fact, they want to preserve the validity of

16    these patents and interpret them as broadly as can fairly be

17    interpreted because that's what's in their interest.

18         Well, Your Honor, I submit that that is not correct

19    and it's not sincere.  And the reason is because at issue in

20    the Johnson & Johnson litigation -- and, Mr. Wolf, correct me

21    if I'm wrong -- are none of the claims that are at issue in

22    this case.  The only issue, as I understand it, in the J&J

23    litigation in front of Judge Robinson is what I understand to

24    be -- I think it's claim 37 of the '021 patent and that's it,

25    not claim one, not any of the claims that depend from claim

1    one.

2         THE COURT:  I think if I remember correctly, and

3    I'm sure someone will point out to me if I've got this wrong,

4    I think that the defense brief admitted that none of the same

5    claims are involved.

6         MR. BARSKY:  I was responding to the --

7         THE COURT:  I think the defense admitted in their

8    briefs that none of the same claims are involved in the case

9    before Judge Robinson.

10        MR. BARSKY:  That may be true, Your Honor.  I was

11   referring solely to the suggestion that somehow Boston

12   Scientific approaches this whole process reluctantly because,

13   by golly, they want as broad a claim construction as could

14   possibly be legitimate without effecting the validity of

15   their claims.  What I'm suggesting is that to hook in the

16   Cortis litigation, the J&J litigation, and suggest that that

17   somehow is constraining them is wrong.  And it is wrong

18   because none of those claims are at issue.

19        And in this case Boston Scientific would like

20   nothing more than to invalidate claim one.  They have 100

21   million reasons or more that would motivate them to do so.

22   And if they don't get the claim construction that they want

23   in this case and get these extraneous limitations read into

24   these claims, they will be in here urging that these are

25   invalid claims and that they only owe money, if at all, on

1  valid claims.  And so hopefully we can just -- put this to

2  the side.  I'm sorry, Your Honor, go ahead.

3          THE COURT:  Excuse me.  Under the terms of the

4  contract they don't owe anything under the contract so long

5  as nothing is manufactured that's within the terms of the

6  patent, right?

7          MR. BARSKY:  That's true.  But there's another

8  provision in that contract, Your Honor, and that talks about

9  royalties being payable on valid claims.

10          THE COURT:  Correct.

11          MR. BARSKY:  And so what Boston Scientific is

12  positioning themselves for here is to argue down the road

13  that these claims are invalid, that they've been construed --

14          THE COURT:  Has that been raised as an affirmative

15  defense?

16          MR. BARSKY:  Has it been raised as --

17          THE COURT:  Has it been raised as an affirmative

18  defense?

19          MR. BARSKY:  I don't believe they have ever

20  articulated that as an affirmative defense, but neither am I

21  sure that they would have had to in light of the fact that

22  there is not an infringement claim, per se, that is being

23  made in the case; in other words, that there are claims that

24  are being made of coverage, so they have never articulated

25  that.

1       But they did do the following, Your Honor:  We
2   asked them in a request for admission to admit that claim one
3   of the '021 patent and the '743 patent are valid.  And they
4   came back and they said, as we understand -- and I'm going to
5   paraphrase.  As we understand the construction of claim one
6   it is valid.  They did not or were unwilling to give an
7   unequivocal endorsement of a validity of claim one, and
8   that's because they're holding that as their trump card later
9   on so that they can argue if they don't get the construction
10  that they want, I guarantee, Your Honor, they will be in here
11  arguing that claim one is invalid.

12      So I raise that only because I think it would be
13  helpful to this proceeding to put aside this artifice that
14  somehow Boston Scientific is in here altruistically advancing
15  claim constructions, potentially even inconsistent with their
16  multi-billion-dollar verdict in the J&J case.  It's just not
17  true.  And it also demeans Dr. Jang's position in this
18  litigation.

19      Dr. Jang is seeking the rescission of these
20  patents, among other remedies.  He has offered, he has
21  tendered --

22          THE COURT:  You mean the assignment of the patents?

23          MR. BARSKY:  Correct.

24          THE COURT:  He is not seeking -- you said the

25  rescission of the patents.

1          MR. BARSKY:  I'm sorry.  If I said that, I

2     misspoke, Your Honor.

3          THE COURT:  You mean the assignment?

4          MR. BARSKY:  Yes.  I most definitely misspoke if I

5     said that.

6          He is seeking to rescind his assignment of the

7     patents, among other remedies.  He has offered to Boston

8     Scientific, tendered under California law, the consideration

9     that he received from Boston Scientific for these patents.

10    So the last thing Dr. Jang would want is to see any of these

11    patents invalidated.

12         So maybe with that quick comment on the respect of

13    motivations of the parties, I can turn to some of the other

14    things that were sounded by Boston Scientific's counsel in

15    their presentation.

16         One of the things I heard over and over and over

17    again during Mr. Wolf's presentation is about what everybody

18    knew, what people of ordinary skill in the art knew, what the

19    patent office knew, what the patent examiner knew, what

20    Dr. Jang knew.  Never did Boston Scientific point this Court

21    to anything in any of these patents -- and I'm referring now

22    to the prior art patents -- and talk about how those prior

23    art patents make it clear that persons of skill in the art

24    understood that a connecting strut was this and an expansion

25    strut was that and a column was this and other elements were

1    that.  It didn't do that.

2         What Mr. Wolf did was he stood up here and without

3    any evidence whatsoever and without pointing to anything in

4    the prior art, he just simply pronounced, like Dr. Squire

5    pronounced, only this time it's not in the form of a

6    declaration from an expert, it's just from Boston

7    Scientific's lawyer.  He just pronounced the patent office

8    knew what a connecting strut was.  The patent office knew

9    what an expansion strut was.  They knew that the expansion

10   columns had to be adjacent.  That's the only reason why the

11   claim doesn't say that, Your Honor.  That's the position that

12   they're advancing.

13        And then they actually seek to turn to our side of

14   the table and say, where is Barsky's proof that these

15   expansion columns don't have to be adjacent?  Where is

16   Barsky's proof that these aren't legitimate limitations on

17   these claims?

18        Well, we were scrupulous, Your Honor, in parsing

19   the language of these claims starting with that language and

20   finding what the restrictions and what the limitations are in

21   the claims.  It is not our burden to come to this Court and

22   prove that some extraneous limitation is not a part of the

23   claim.  It's Boston Scientific's burden because they are the

24   party that is coming in here saying this Court should say

25   that the connecting struts only connect adjacent expansion

1  columns, and this Court should say connecting struts should

2  be unattached to each other.  It is their burden to prove

3  that that is an appropriate limitation to find somewhere in

4  this claim language.  That they have not done and it is

5  inappropriate to turn to us and suggest that somehow we

6  should have to disprove that that limitation shouldn't be

7  included or shouldn't be read into the claim language.  So

8  that was a common theme that we heard, Your Honor.

9         And let me just give an example of why this whole

10  issue on adjacency is an unfortunate one.  And it's because

11  we understand from Dr. Squire, to the extent the Court wants

12  to look at his declaration, but we understand from

13  Dr. Squire, for example, well, everybody knew that the

14  expansion columns would have to be adjacent to each other.

15  Presumably had he taken the stand here today, and I'm sorry

16  that he didn't, but had he taken the stand here today, he

17  would have said it would have been obvious.  It would have

18  been obvious that they had to be adjacent.  Presumably that

19  is Boston Scientific's position.  It would have been

20  superfluous to put that kind of language, the requirement of

21  adjacency, in the claim.

22         Well, we went back and looked, for example, at some

23  of the prior art that Boston Scientific is relying on that

24  they say makes it so clear that adjacency is required in the

25  patents of Dr. Jang.  And I see that the smaller monitors are

1    on the blink, Your Honor.  One of the things that we found,

2    Your Honor -- sorry, Your Honor.  Excuse me one second,

3    please.

4            Thank you, Your Honor.  One of the things that we

5    found, Your Honor, is we went back to Lau, Pinchasik and

6    Palmaz and we found that every single claim in all three of

7    those patents specifically recite adjacency of the expansion

8    members in the claim.  Every single claim.  And I'm going to

9    run through just the independent claims now, Your Honor, and

10   I'll provide these sites to the Court after today's hearing.

11   In fact, I can provide a spiral book of all of the slides.

12   That may be helpful --

13           THE COURT:  That would be.

14           MR. BARSKY:  -- to the Court.

15           But all of the independent claims of Lau -- and, by

16   the way, if the Court wants to consult any of these, these

17   are attached to the Nilsson declaration.  The Lau patent is

18   attached as Exhibit H.  And every single one of the

19   independent claims in the Lau patent recite this requirement

20   of adjacency.  Same thing with Pinchasik, if the Court looks

21   at Exhibit E to Mr. Nilsson's declaration they --

22           THE COURT:  So really -- are you really arguing

23   that -- and maybe this is taking it further than you intend

24   to, which is why I'm asking.  But are you really arguing that

25   the omission of "adjacent" is what's necessary to avoid

1  reading of the prior art?

2          MR. BARSKY:  Am I arguing that the omission of

3  "adjacent" --

4          THE COURT:  In other words, you're arguing that the

5  omission of the term "adjacent" --

6          MR. BARSKY:  In the Jang patents.

7          THE COURT:  -- is deliberate?

8          MR. BARSKY:  Yes, that it distinguishes it from the

9  prior art.

10          THE COURT:  That was my question.

11          MR. BARSKY:  That was why I was hoping that

12  Dr. Squire would take the stand and explain why it is.  If

13  everybody understands that these expansion members have to be

14  adjacent to each other, why is it that in every one of these

15  claims, in Pinchasik and Palmaz, there's a specific reference

16  to the connecting struts or whatever the connecting members

17  may be or the tubular members being adjacent to each other?

18  In every single one of those independent claims it explicitly

19  requires adjacency.

20          THE COURT:  Are you saying that is not required in

21  Dr. Jang's?

22          MR. BARSKY:  Absolutely.  Except where the patent

23  claim says that something has to be adjacent, which are the

24  expansion struts.  I'm sorry, Your Honor, I didn't mean --

25          THE COURT:  No, go ahead.

1      MR. BARSKY:  And so there's that anomaly in the

2  position that Boston Scientific is advancing; namely, that

3  they keep telling this Court what everybody knew, but there's

4  no evidence of it.  They don't point to anything in the prior

5  art.  And, in fact, in the prior art it makes it clear that

6  it was far from superfluous.  So to the extent that the Court

7  needs to refer to the prior art, and I personally don't think

8  it does in order to construe these claims, but Boston

9  Scientific is pushing the Court's reliance upon what was in

10 the prior art as guiding its interpretation of these claims.

11 And if that invitation is accepted, then among the things the

12 Court should consider is that it's Dr. Jang's patent that

13 does not require or does not explicitly recite this

14 requirement of adjacency.

15      THE COURT:  Then how do you deal with the

16 problem -- I shouldn't say problem.  How do you deal with the

17 issue that the other side brought up in the form of the slide

18 that shows the extreme --

19      MR. BARSKY:  I'm glad you asked that question, Your

20 Honor.

21      THE COURT:  You know which slide I'm talking about?

22      MR. BARSKY:  Absolutely.  It's the absurdest

23 interpretation of our claim.

24      THE COURT:  You say "absurd," I say "extreme," but

25 you know which one I'm talking about.

1    MR. BARSKY:  I think we're speaking the same

2  language, Your Honor.  I know exactly what the Court is

3  referring to.  It's that meandering blue line across the

4  length of the stent.  Why isn't that within the scope of our

5  claims?  And this is actually the second point I wanted to

6  move to, which is that the lack of a requirement of adjacency

7  of the expansion columns does not mean that anything can be a

8  connecting strut.  It still has to be a connecting strut.  It

9  has to meet the definition that's provided by the claim

10  language.  Mr. Wolf said, when did Barsky ever tell the Court

11  where a connecting strut is defined in the claims -- excuse

12  me -- where it's defined in the patent?

13    I would suggest, Your Honor, we pointed to the

14  exact language that describes a connecting strut in

15  Dr. Jang's patent.  And it talks about it being coupled to

16  the distal end, the distal end of an expansion strut pair in

17  one column and the proximal end of an expansion strut pair in

18  another column.  That's what gave rise to the exact

19  definition that we've offered to this Court.  It is a strut

20  that connects expansion pairs.

21    Now, the question from the Court and suggested by

22  Boston Scientific is, well, why couldn't that meandering line

23  in the Fischell patent or in the Lau patent or even on the

24  Dr. Jang stent itself, why can't that meet the claim

25  limitations?  And the answer is because something that Boston

1    Scientific has harped on from the very beginning, and rightly

2    so, which is that patents must be construed not only in light

3    of this federal -- the claims must be construed not only in

4    light of the specification but from the vantage point of

5    someone of skill in the art at the time the invention was

6    made.

7            So if Boston Scientific is going to suggest to this

8    Court that that meandering blue line in Fischell or Orth or

9    Lau can constitute a connecting strut, what they're really

10   saying is that a person of ordinary skill in the art looking

11   at this structure would say, yes, that could fairly be a

12   connecting strut.

13           Now, Mr. Wolf says we don't think it is.  We don't

14   think it's a connecting strut.  We don't think that's the

15   proper interpretation, but under the plaintiff's proposed

16   interpretation that would be permissible.  Well, it wouldn't

17   be, Your Honor, because the question still has to be, is it

18   or is it not a connecting strut within the meaning of the

19   Jang patents.  They haven't tendered any evidence to the

20   Court.  Dr. Squire, the otherwise agreeable Dr. Squire,

21   didn't even put in his conclusory declaration a conclusory

22   statement about how a person of ordinary skill in the art

23   reading the Jang patents and having the Court's claim

24   construction, which adopts the plaintiff's point of view on

25   what a connecting strut is, would look at that meandering

1    blue line and, yes, that would be considered a connecting

2    strut.

3          The reason I said it was absurdest, Your Honor, was

4    not to be pointed in my comments from Boston Scientific's

5    counsel.  That was not my intention.  It's just an absurdest

6    proposition, however, that a person of skill in the art would

7    ever look at it that way.

8          Now, Mr. Wolf will say, well, if you can do that

9    with the Express stent, why can't you do that with Lau and

10   Pinchasik and Orth and Fischell and so on?  And the answer

11   is, Your Honor, that's an infringement issue.  That's a

12   separate issue.  And just as the Court said earlier, we don't

13   have that issue in this case.  And the Court's caveat in the

14   SRI International line of cases about not construing claims

15   in light of the accused device, that's an infringement

16   issue.

17         And we'll prove at the time of trial, Your Honor,

18   that the Express stent does not rely upon the Lau geometry.

19   In fact, nothing can be further from the truth.  In fact, it

20   relies very much so in all of its functional characteristics

21   and in its geometry on the innovation of Dr. Jang's patents.

22   Presumably that's a good reason for spending the kind of

23   money Boston Scientific spent in order to acquire that

24   technology.

25         So that is an issue for trial, it's an issue of

1    infringement, and presumably at some future point if Boston

2    Scientific doesn't get the claim construction that they think

3    is required, it will be an issue for their invalidity motion

4    as well.  Because much of what we've been talking about

5    today, Your Honor, is a proxy for their non-infringement

6    position or a proxy for the invalidity arguments we're going

7    to hear later in this case.

8             THE COURT:  All right.  Thank you.

9             MR. BARSKY:  Just a couple other points, Your

10   Honor, if I can impose on the Court.

11            The last point I would just make is a simple one.

12   It's the comprising issue.  We understand, Your Honor, that

13   once you add a fourth wheel to a tricycle, it's no longer a

14   tricycle.  And if the tricycle is required by the claim you

15   can't get out of it by saying, well, it's a comprising claim;

16   therefore, three wheels, four wheels, what's the difference.

17   Well, the difference is once you add that fourth wheel it is

18   no longer a tricycle.

19            What you didn't hear from Boston Scientific was any

20   response to any of the arguments that we made in our

21   supplemental brief, Your Honor, with respect to the notion of

22   adding something to an expansion column or a connecting strut

23   column.  All Mr. Wolf said and all Boston Scientific said in

24   its briefs was that -- was as Dr. Squire I presume would have

25   said had he testified, that, you know, once you add anything

1    to a connecting strut column, it's not a connecting strut

2    column anymore.  Now it's an expansion column.  Or once you

3    add something to an expansion column, it's not an expansion

4    column anymore.  Where is that?  Where does it say that in

5    the patents, in the prior art, even in any extrinsic evidence

6    that this Court can look to?  Where is it that the Court can

7    look other than a legal brief signed by Boston Scientific's

8    counsel to support that proposition?

9              THE COURT:  Their response would be, where would

10   the Court have to look to know that something with four

11   wheels is no longer a tricycle?

12             MR. BARSKY:  Well, one answer would be, I suppose,

13   that a tricycle by definition has three wheels and that if

14   it's got four wheels it's a quadracycle.

15             I guess the point that I'm trying to make, Your

16   Honor, is that their position is that they could take

17   Dr. Jang's invention, and by that I mean one of the preferred

18   embodiments, right out of this patent and they could add

19   something to it, for example, a radiopaque marker.  This is

20   something we raised in our supplemental brief, the fact that

21   the patent talks about how if the cardiologist is able to see

22   the stent as it's threaded through the vasculature, it

23   enables the safe and appropriate placement of that stent in

24   the effected artery.

25             Well, the patent talks about the use of radiopaque

1   markers and even has patent claims that go to such radiopaque

2   markers.  Some of them are plated, some of them are

3   non-plated.  But what if one of those little radiopaque

4   markers, just a little dot of gold supported by a strut

5   somehow, was placed in the preferred embodiment of Dr. Jang's

6   patent?

7           Boston Scientific says it's no longer an expansion

8   column, if it's an expansion column, or it's no longer a

9   connecting strut column because you've added something to it.

10  You've put something in there that deprives it of being a

11  connecting strut column in the same way that adding a fourth

12  wheel to a tricycle deprives it of being classified as a

13  tricycle.  The difference is that everybody knows that a

14  tricycle only has three wheels.

15          With respect to the connecting strut and connecting

16  strut columns and expansion columns, they say everybody knows

17  that it only has expansion struts or expansion strut pairs or

18  connecting struts.  They don't point to anything that says

19  that.  There's no evidence before the Court to suggest that.

20  And so there's no basis on which this Court could read that

21  limitation into the claims, and it would be reading that

22  limitation into the claims.

23          Finally, Your Honor, I want to suggest that

24  Phillips does not in any way change the calculus that this

25  Court applies in looking at the question of whether or not,

1    for example, a disclosure of a single embodiment in a patent
2    can give rise to a suggestion that the claims are limited to
3    that embodiment.   Phillips rejects that proposition.
4            THE COURT:  It does.  I agree with you on that.
5            MR. BARSKY:  There's no way one could read Phillips
6    to suggest that descriptions in the specification limit the
7    claims.  Phillips clearly says they do not.  So maybe there
8    was a "see change" in some respects after Phillips, but it's
9    limited to the use of dictionaries.  It's limited to the fact
10   that Phillips looked at the Texas Digital case and said,
11   huh-uh, we've got too many district courts running to
12   dictionaries first and then going to the claims and
13   interpreting what the claims --
14           THE COURT:  I've burned all my dictionaries.
15           MR. BARSKY:  Okay.  So I won't belabor the point
16   further.  I'll simply say that the approach that we've
17   outlined is the approach that is endorsed by Phillips.  And
18   we thank the Court very much for its patience and attention.
19           THE COURT:  Do you wish to respond briefly?
20           MR. WOLF:  Very briefly, Your Honor.
21           A couple notions.  First, on the issue of the
22   accusation of insincerity, I would note that it was counsel
23   for plaintiff that put up the testimony and the statements
24   from the J&J case and said that they bear on this case, and
25   it's the reciprocal of that that motivates us to make sure

1    that we come up with the fairest valid construction of this

2    patent. And it is, of course, not just one case but all the

3    future cases that we might assert the claims at issue here.

4    We want to ensure that they are valid broad claims, not

5    invalid ones.

6          A couple notions, and I don't want to belabor what

7    is relatively well briefed, but one issue, Mr. Barsky

8    suggested that what was novel was non-adjacency. First of

9    all, that's not what the patent office was told. The patent

10   office was expressly told that what was novel in relation to

11   these claim was the offset. So that would have been news to

12   the examiner.

13         The second thing is -- and, Your Honor, it might be

14   better if we submitted a very brief letter brief to explain

15   this, if the Court was interested, but we have a genus

16   species issue here. It would not overcome prior art by not

17   saying "adjacent." It would only overcome prior art if it

18   expressly said "not adjacent."

19         THE COURT: That's right.

20         MR. WOLF: So I think that this --

21         THE COURT: I agree.

22         MR. WOLF: Your Honor, again, we're not basing this

23   on one embodiment or a few embodiments. We're basing this on

24   what is explained in this patent and the prior art, and if

25   the Court cares to construe it, Dr. Squire's.

1          Thank you very much for your time.

2          THE COURT:  Thank you.

3          Just a couple of other matters I need to bring up,

4    and I may have already done this, so forgive me if I'm

5    repeating it, but better to do it twice than neglect to do

6    it.  And that is to make the disclosure that one of my law

7    clerks, I have one-year-term law clerks, and one of my law

8    clerks this year, Daniel Weiss, will be joining Gibson, Dunn

9    & Crutcher at the end of the clerkship.  So he is not working

10   on this case.  He is in the courtroom solely just to

11   observe.  He's not working on the case and I don't discuss

12   the --

13         MR. WOLF:  We have no objection, Your Honor.

14         THE COURT:  Thank you.  I just want to make the

15   disclosure that the case is not assigned to him.  It's my

16   other law clerk who is working on this case.  I don't discuss

17   the substance of the case with him at all even though it is

18   on calendar.

19         One other thing it occurs to me when this case --

20   in the unhappy event that the parties don't reach a

21   resolution of this case and it's set to go to trial, it's the

22   sort of case that I will be asking -- directing the

23   parties -- counsel for the parties to come up with a short

24   glossary of terms for the jury.

25         In every case that gets tried to a jury in my

1  courtroom we give the jury a jury notebook that looks -- I
2  guess I don't have one up here, but we give them a small
3  black notebook that has blank pages in that they take their
4  notes in.  It has a copy of the introductory jury
5  instructions.  And I hope, you know, in a case like this it
6  would have some of the instructions on the substance of the
7  law that you've agreed upon.  But in a case like this it
8  would also have a glossary of terms, an agreed upon glossary
9  of terms.  And just so you're not hit with that as a surprise
10 at the pretrial conference where you wouldn't have much time
11 to put it together, you might start thinking along those
12 lines now.  It shouldn't be overwhelming.  It shouldn't be
13 100 terms, but it should be, you know, in a case like this
14 probably 10 or 25 terms.  So you might start thinking about
15 it now and putting together some of the agreed upon terms.
16         MR. BARSKY:  I'm anticipating, Your Honor, we have
17 no differences in terms of the basic technology involved or
18 of the definitions of any of the key terms.  I imagine we
19 will be able to accomplish that very readily.
20         MR. WOLF:  That's right.
21         THE COURT:  And, again, you may want to do a short
22 agreed upon one, that I don't always do but I often do and I
23 probably would do in a case like this is give counsel the
24 opportunity during voir dire, actually at the very beginning
25 of voir dire to make mini-opening statements of about five

1    minutes so that the members of the jury panel have a better

2    idea of what the case is about so that they understand why

3    we're asking questions.  It makes a little more sense.

4    Doesn't seem quite so intrusive.  So you might keep that in

5    mind.

6              And then, you know, that video that one side or the

7    other side showing how the technology worked, I would

8    probably in a case like this if you have an agreed upon short

9    thing to show as early as voir dire, but certainly during

10   opening statements, I would permit that.  So just to keep

11   those things in mind.

12             Lastly, where do you stand with settlement or

13   mediation attempts?

14             MR. WOLF:  Your Honor, I believe we have agreed on

15   a method of mediation.  Have we agreed on timing?

16             MR. BARSKY:  I'm sorry, Your Honor, I'm not able to

17   distinguish this case at this moment from others, but we may

18   have agreed on --

19             MR. HAN:  I think in the normal scheduling order we

20   agreed on an outside mediator.

21             THE COURT:  I'm sure you agreed on a private

22   mediator.  Do you remember who it is?

23             MR. BARSKY:  I don't think we've agreed on that.

24             MR. WOLF:  I think the initial discussions were

25   that mediation might make sense after the claim construction

```
1   ruling.
2           THE COURT:  That coincides with my memory.
3           MR. HAN:  I think we had that conversation.
4           THE COURT:  You haven't agreed on a mediator yet?
5           MR. WOLF:  No.
6           THE COURT:  I won't make any promises, but I think
7   a couple of weeks.  I will have a ruling within a couple of
8   weeks.
9           MR. BARSKY:  Thank you very much, Your Honor.
10          THE COURT:  Thank you both very much.
11          MR. BARSKY:  Appreciate it.
12                    (Proceedings concluded)
13                        ---o0o---
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

DOCKET NO. EDCV 05-426 VAP

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and accurate transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

PHYLLIS A. PRESTON, CSR
Official U.S. Court Reporter
License No. 8701

DATED:  August 31, 2006