# EXHIBIT 5

Welcome to Cordis Corporation

# Cordis®
a **Johnson-Johnson** company

**About Cordis** | **Clinical Professionals** | **Administrative Professionals** | **Patients** | **Press Room**

⊙ VISIT CORDIS INTERNATIONAL

Cordis History
Our Credo
Environmental, Health and Safety Policy
Careers

-SCAI News Release

3.  Patient Education -By Dr. Kandzari

4.  Top-10 Patient Q&A

5.  CYPHER® Stent Patient Safety Guide

*Last Update:04/10/07*

> **Sign up** to receive future communications on the CYPHER® Sirolimus-eluting Coronary Stent and other Cordis products.



## Experience You Can Trust.

## DES or BMS?

**Cordis Cardiology**



Cordis Cardiology is a worldwide leader in developing and manufacturing interventional vascular technology.

Learn more

**Cordis Endovascular**



Cordis Endovascular is a recognized leader in providing physicians with breakthrough treatment solutions for peripheral vascular disease.

Learn more

**Biologics Delivery Systems**

Developing cardiac navigation and mapping solutions that are designed to optimize the delivery of biologic therapies to the heart.

Learn more

## News

▼ 05/07/07: Conor Medsystems, LLC Reports COSTAR II Pivotal Drug-Eluting Stent Trial Conclusions

▼ 03/27/07: CYPHER® Sirolimus-eluting Coronary Stent Demonstrates Sustained Benefits Compared To Bare-Metal Stents In Five-Year Randomized Clinical Trial

▼ 03/26/07: Two-Year Patient Registry Results Support Safety And Efficacy Of CYPHER® Sirolimus-eluting Coronary Stent In 'Real World' Uses

View more news...

© **Cordis Corporation 2002 - 2007, 155-1805-91**     **Site Map**     **Contact Us**     **Legal Notice**     **Privacy Policy**

This site is published by Cordis Corporation which is solely responsible for its contents.
This site is intended for visitors from the United States.

http://www.cordis.com/

5/9/2007

Cordis



**Cordis®**
a Johnson-Johnson company

About Cordis | Clinical Professionals | Administrative Professionals | Patients | Press Room

● VISIT CORDIS INTERNATIONAL



executive bios

EXECUTIVE BIOS

---

**Rick Anderson**
**Company Group Chairman, Johnson & Johnson**
**Worldwide Franchise Chairman, Cordis Corporation**

Rick Anderson is Company Group Chairman, Johnson & Johnson, and Worldwide Franchise Chairman, Cordis Corporation. In his position, Rick is responsible for global leadership of the Cordis Cardiology, Cordis Endovascular, Cordis Neurovascular and the Nitinol Devices and Components (NDC) businesses.

In October 2003, Rick was promoted to Worldwide President, Cordis Cardiology. As president, Rick led the company to global market leadership in the drug-eluting stent category. Since 2005, Rick has also served as Leader, CardioVascular Franchise and helped grow the overall Cordis Franchise into a $4 billion global enterprise.

He joined Cordis Cardiology in August 2002, as Vice President, Sales and Marketing. Rick was a key architect behind the launch of the world's first drug-eluting stent – the CYPHER® Sirolimus-eluting Coronary Stent. This breakthrough innovation for the treatment of restenosis (reblockage) has been used to treat more than two million patients worldwide.

Rick also served as Vice President, Immunology Franchise, at Centocor, Inc., which merged with Johnson & Johnson in 1999. He was responsible for worldwide sales and marketing of the company's fastest growing, billion dollar biotechnology product, REMICADE® (infliximab), which is indicated for a variety of immune-mediated inflammatory conditions, including Crohn's disease and rheumatoid arthritis.

Before joining Johnson & Johnson, Rick served in senior leadership positions with other international health care and medical device companies. At Racal HealthCare Inc., he was Vice President, Global Marketing and responsible for respiratory devices and before that, he spent a decade with Boehringer Mannheim Pharmaceuticals and Allergan Pharmaceuticals in various U.S. and global sales, sales management and marketing management roles.

Rick holds a Bachelor of Business Administration in Marketing from Mississippi State University and has completed graduate level course work at Indiana University and Duke University. He served five years in the United States Army where he obtained the rank of captain.

---

○ **Photo Library**

○ **Drug-Eluting Stent Media Center**

TM
angiograms | Exceptional Outcomes | Cell Design



One of the most significant advancements in the history of cardiology, drug-eluting stents provide a new hope for patients suffering from heart disease.

Click here to learn more.

● **Executive Bios**

Click here to view executive bios.

○ **Glossary**

Click here to view the glossary.

○ **Press Room**

The Cordis Corporation Press Room provides journalists and analysts with company information that will help facilitate their research and assignments. This page is regularly updated with company announcements and also provides a news archive for quick

Cordis

searches.

Click here to view the press room.

© Cordis Corporation 2002 - 2007, 155-1805-91Site Map    Contact Us    Legal Notice    Privacy Policy

# EXHIBIT 6

Downloaded By: John S Fitzgerald

Company: CONOR MEDSYSTEMS INC
Form Type: DFAN14A    SEC File #:
Description:
File Date: 12/08/06
State of Incorporation:
Fiscal Year End:
CIK:  0001108271
SIC:  3841
IRS Identifying Number:  943350973


Business Address
1003 HAMILTON COURT
MENLO PARK, CA 94025
(650) 614-41

Mailing Address
1003 HAMILTON COURT
MENLO PARK, CA 94025

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY              Chicago, IL
Los Angeles, CA              Miami, FL                Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant

Filed by a Party other than the Registrant X

Check the appropriate box:
__   Preliminary Proxy Statement

__   Confidential, for Use of the Commission Only (as permitted
by Rule 14a-6(e)(2))

__   Definitive Proxy Statement

__   Definitive Additional Materials

 X   Soliciting Material Pursuant to Section 240.14a-12

CONOR MEDSYSTEMS, INC.

(Name of Registrant as Specified in Its Charter)

JOHNSON & JOHNSON

(Name of Person(s) Filing Proxy Statement, if other than the
Registrant)

Payment of Filing Fee (Check the appropriate box):
X   No fee required.

__   Fee computed on table below per Exchange Act Rules 14a-
6(i)(1) and 0-11.

   (1)  Title of each class of securities to which transaction
        applies:

   (2)  Aggregate number of securities to which transaction
        applies:

   (3)  Per unit price or other underlying value of transaction
        computed pursuant to Exchange Act Rule 0-11 (set forth
        the amount on which the filing fee is calculated and state
        how it was determined):

   (4)  Proposed maximum aggregate value of transaction:

   (5)  Total fee paid:

__   Fee paid previously with preliminary materials.

__   Check box if any part of the fee is offset as provided by
     Exchange Act Rule 0-11(a)(2) and identify the filing for
     which the offsetting fee was paid previously. Identify the
     previous filing by registration statement number, or the Form or
     Schedule and the date of its filing.

   (1)    Amount Previously Paid:

(2)    Form, Schedule or Registration Statement No.:

(3)    Filing Party:

(4)    Date Filed:

The following text was sent to Conor Medsystems, Inc.
and Cordis Corporation employees on December 8, 2006.

December 8, 2006

To Cordis Corporation and Conor Medsystems, Inc.
Associates:

The cardiovascular market continues to be one of the
fastest growing segments of the health care industry as
populations in the United States and other countries
continue to age.  Upon the completion of the acquisition,
which is subject to certain closing conditions, the
relationship between Conor Medsystems, Inc. and Cordis
Corporation would create a unique opportunity for two
exceptional companies with strong technology capabilities
and outstanding employees to build a stronger, more
diverse cardiovascular franchise. The combination of
talent from Conor Medsystems and Cordis businesses gives
us the ability to advance the vision of defeating
cardiovascular disease by delivering better medical
options sooner to many millions of patients suffering from
cardiovascular disease.

To ensure our capacity to deliver these important new
therapies, we have formed an Acceleration Steering
Committee comprised of Frank Litvack, Chairman and Chief
Executive Officer; Michael Boennighausen, Vice President
and Chief Financial Officer; Jeff Shanley, Founder and
Chief Technology Officer; and Azin Parhizgar, Vice
President and Chief Operating Officer from Conor
Medsystems, and Rick Anderson, Company Group Chairman,
Johnson & Johnson; Todd Pope, President, Cordis
Cardiology; Joe Prati, Vice President, Finance; Campbell
Rogers, Chief Technology Officer; and Lisa Uthgenannt,
Vice President, Human Resources from Cordis Corporation, a
Johnson & Johnson company.

The proposed acquisition of Conor Medsystems affirms
Cordis' focus on accelerated growth through expanded
capabilities and investment in Conor Medsystems'
technologies.  Through a multiyear strategy, we will build
on the complementary expertise of both organizations.  To
achieve this goal, the Steering Committee has
responsibility for establishing the acceleration
objectives and guiding principles, organizing work teams
from each company, monitoring the planning process,
approving transition plans, and overseeing the transition
implementation.

This past week, the Steering Committee met and agreed on
the mission and goals of our planned future together and
the three phases of our integration strategy.

-     The first phase will accelerate and enhance the capabilities and programs of Conor Medsystems with support from Cordis and Johnson & Johnson
-     The second phase will create a drug delivery center of excellence in vascular technologies, including an Advanced R&D center that focuses on delivering therapeutics through medical devices.  This is a critical component of Cordis' West Coast Strategy to enhance research and development capabilities around innovative product concepts.
-     The third phase will explore possibilities in a broad range of clinical indications beyond cardiovascular categories.

Our work will be guided by the following principles:
-     Protecting, maintaining, and investing in the Conor Medsystems technology platform
-     Retaining and enriching technical capabilities and talent of both organizations
-     Utilizing Cordis and Johnson & Johnson resources, lessons learned, and infrastructure
-     Respecting each others' ideas, capabilities, and expertise

Upon closure, our near-term efforts will focus on the following activities:
-     Supporting efforts to secure approvals for Conor products worldwide
-     Fully integrating Conor Medsystems products into the Cordis global sales and marketing strategy
-     Expanding the Cordis West Coast Innovation Strategy to include Conor Medsystems


Within the coming weeks, Acceleration Leaders from each company will be named and these individuals will form their teams. The teams will develop detailed goals and a work plan for the successful implementation of the three-phase strategy. It is important for us all to remember that the implementation of the strategy would become effective only upon conclusion of the acquisition, projected for the first quarter of 2007.

Collaborative teams will be providing more clarity to both organizations as we work together to further define our strategy to accelerate our growth. Together, we are certain that our combined organization will accomplish more together than either could have alone.

We know we can count on your focus, collaboration, and commitment to our combined success.  The first steps we take together will be critical toward our long term ability to achieve our goals and realize our potential to positively impact health care professionals, patients, and employees. We will communicate our progress frequently, but in the meantime, feel free to contact your respective Acceleration Steering Committee members with additional questions.

Thank you for your enthusiasm and dedication to our shared goals.

Sincerely,


Rick Anderson                    Frank Litvack, MD
Company Group Chairman           Chairman & CEO
Cordis Corporation               Conor Medsystems


Forward Looking Statements

The above memorandum contains "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could vary materially from Johnson & Johnson's and Conor Medsystem's expectations and projections. Risks and uncertainties include satisfaction of closing conditions including receipt of regulatory approvals for the transaction, and the possibility that the transaction will not be completed; general industry conditions and competition; economic conditions, such as interest rate and currency exchange rate fluctuations; technological advances and patents attained by competitors; challenges inherent in new product development, including obtaining regulatory approvals; domestic and foreign health care reforms and governmental laws and regulations; and trends toward health care cost containment. A further list and description of these risks, uncertainties and other factors can be found in Exhibit 99 of Johnson & Johnson's Annual Report on Form 10-K for the fiscal year ended January 1, 2006 and Conor Medsystem's Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. These filings, as well as subsequent filings, are available online at www.sec.gov or on request from the applicable company. Neither company undertakes to update any forward-looking statements as a result of new information or future events or developments.

Additional Information About the Proposed Transaction and Where To Find It

In connection with the proposed transaction, Conor Medsystems intends to file a proxy statement and other relevant materials with the Securities and Exchange Commission (the "SEC"). Before making any voting decision with respect to the proposed transaction, stockholders of Conor Medsystems are urged to read the proxy statement and other relevant materials because they will contain important information about the proposed transaction. The proxy statement and other relevant materials, and any other documents filed by Conor Medsystems with the SEC, may be obtained free of charge at the SEC's website at www.sec.gov. In

addition, stockholders of Conor Medsystems may obtain
free copies of the documents filed with the SEC by
contacting Conor Medsystems at (650) 614-4100, or Conor
Medsystems, Inc., 1003 Hamilton Court, Menlo Park, CA
94025. You may also read and copy any reports,
statements, and other information filed by Conor
Medsystems with the SEC at the SEC public reference
room at 100 F Street, NE, Room 1580, Washington, DC
20549. Please call the SEC at 1-800-SEC-0330 or visit
the SEC's website for further information on its public
reference room.

Conor Medsystems and Johnson & Johnson and each of
their executive officers and directors may be deemed to
be participants in the solicitation of proxies from
Conor Medsystems' stockholders in favor of the proposed
transaction. A list of the names of Conor Medsystems'
executive officers and directors and a description of
their respective interests in Conor Medsystems are set
forth in the proxy statement for Conor Medsystems' 2006
Annual Meeting of Stockholders, which was filed with
the SEC on April 28, 2006, and in any documents
subsequently filed by its directors and executive
officers under the Securities and Exchange Act of 1934,
as amended. Certain executive officers and directors of
Conor Medsystems have interests in the proposed
transaction that may differ from the interests of
stockholders generally, including benefits conferred
under retention, severance and change in control
arrangements and continuation of director and officer
insurance and indemnification. These interests and any
additional benefits in connection with the proposed
transaction will be described in the proxy statement
when it becomes available.

# EXHIBIT 7



1 | GIBSON, DUNN & CRUTCHER LLP
Wayne M. Barsky, SBN 116731
2 | Julian W. Poon, SBN 219843
Joshua A. Jessen, SBN 222831
3 | Brenda L. Kleidosty, SBN 234987
Shannon E. Mader, SBN 235271
4 | 333 South Grand Avenue
Los Angeles, California 90071-3197
5 | Telephone: (213) 229-7000
Facsimile: (213) 229-7520
6 | wbarsky@gibsondunn.com
jpoon@gibsondunn.com
7 |
MUNDELL, ODLUM & HAWS, LLP
8 | Thomas C. Mundell, SBN 99081
650 E. Hospitality Lane, Suite 470
9 | San Bernardino, CA 92408
Telephone: (909) 890-9500
10 | Facsimile: (909) 890-9580
tmundell@mohlaw.net
11 |
Attorneys for Plaintiff,
12 | G. David Jang, M.D.

13 | [Additional counsel listed on next page]

FILED
CLERK, U.S. DISTRICT COURT

SEP 18 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

ENTERED

SEP 20 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY                    DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

LODGED

2006 SEP 12 PM 2:57
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE
BY

14 |
15 | UNITED STATES DISTRICT COURT
16 | CENTRAL DISTRICT OF CALIFORNIA
17 | EASTERN DIVISION - RIVERSIDE
18 |

19 | G. DAVID JANG, M.D.,

20 |          Plaintiff,

21 |     v.

22 | BOSTON SCIENTIFIC CORPORATION,
a Delaware Corporation; SCIMED LIFE
23 | SYSTEMS, INC., a Minnesota
Corporation,
24 |
25 |          Defendants.

26 |
27 |
28 |

Case No. EDCV 05-00426 VAP (CTx)

**STIPULATION AND [PROPOSED]
ORDER: (1) GRANTING PARTIAL
SUMMARY JUDGMENT AGAINST
PLAINTIFF ON PLAINTIFF'S
THIRD CLAIM FOR RELIEF FOR
BREACH OF CONTRACT AGAINST
DEFENDANT SCIMED LIFE
SYSTEMS, INC., AND (2)
DISMISSING WITHOUT
PREJUDICE DEFENDANTS' FIRST
AND SECOND COUNTERCLAIMS**

The Honorable Virginia A. Phillips

Trial Date:  February 20, 2007

DOCKETED ON CM

SEP 20 2006

BY

Gibson, Dunn &
Crutcher LLP

BSC-C 0098656

1   Wallace Wu, SBN 220110
    HOWREY LLP
2   550 South Hope Street, Suite 1100
    Los Angeles, California 90071
3   Telephone: (213) 892-1800
    Facsimile: (213) 892-2300

4
    Matthew M. Wolf (*pro hac vice*)
5   Edward Han (*pro hac vice*)
    John E. Nilsson (*pro hac vice*)
6   HOWREY LLP
    1299 Pennsylvania Avenue, N.W.
7   Washington, DC 20004
    Telephone: (202) 783-0800
8   Facsimile: (202) 383-6610
    Wolfm@howrey.com
9   Hane@howrey.com
    Nilssonj@howrey.com

10
    Attorneys for Defendants,
11  Boston Scientific Corporation and
    Scimed Life Systems, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

BSC-C 0098657

Plaintiff G. David Jang, M.D. ("Dr. Jang") and Defendants Boston Scientific
Corporation ("BSC") and Scimed Life Systems, Inc. ("Scimed") hereby stipulate and
agree, by and through their undersigned counsel of record, subject to the terms set
forth below, including but not limited to the preservation of Dr. Jang's right of appeal,
and further subject to the approval of this Court, that an order should be entered (1)
granting partial summary judgment against Dr. Jang and in favor of Scimed on Dr.
Jang's Third Claim for Relief for Breach of Contract against Scimed, and (2)
dismissing without prejudice Defendants' First and Second Counterclaims as moot.  In
support of their Stipulated Motion, the parties state as follows:

1.    On or about March 3, 2006, Dr. Jang filed a First Amended Complaint
and Demand For Jury Trial (the "Complaint") against BSC and Scimed.  Dr. Jang's
Complaint states five claims for relief, including a Third Claim for Relief for breach of
contract against Scimed.

2.    Dr. Jang's Third Claim for Relief alleges, among other things, that
"Scimed has breached the Assignment Agreement by failing to pay Dr. Jang
approximately $100 million of the $160 million in payments to which Dr. Jang is
entitled under the Assignment Agreement from the Boston Scientific Parties' sale of
Contingent Payment Products, even though the Express . . . coronary stent products
(including the drug-coated versions thereof) constitute Contingent Payment Products
and have generated sufficient revenue to trigger Scimed's Earn Out and other payment
obligations under the Assignment Agreement."  Complaint, ¶ 31.

3.    Under the Assignment Agreement, the question of whether Express stents
are Contingent Payment Products, and thus whether Scimed has breached the
Assignment Agreement by failing to make payments to Dr. Jang based upon sales of
Express stents, depends on whether the "development, manufacture, use, or sale" of
the Express stent is "covered by one or more Valid Claims of the Patents in the
jurisdiction in which such stent is manufactured or sold or which, but for the
assignment made pursuant to this Agreement, would infringe one of more Valid

Gibson, Dunn &
Crutcher LLP

1

BSC-C 0098658

1  Claims of the Patents." Complaint, Exh. 3-033. Stated differently, in order for Dr.

2  Jang to prove that Scimed has breached the Assignment Agreement, Dr. Jang must

3  prove that, absent the Assignment Agreement (under which he assigned several of his

4  patents to Scimed), the Express stent would infringe one or more valid claims of the

5  patents assigned by Dr. Jang to Scimed.

6      4.    On or about March 20, 2006, Defendants filed an Answer to Dr. Jang's

7  Complaint and also asserted several counterclaims against Dr. Jang. Defendants' first

8  and second counterclaims are styled "Declaratory Judgment Of Non-Infringement" and

9  "Declaratory Judgment Regarding 'Contingent Payment Products,'" respectively, and

10  turn on the same patent-coverage or infringement issues as does Dr. Jang's breach of

11  contract claim against Scimed.

12      5.    During discovery, Dr. Jang identified several claims in two U.S. patents

13  (U.S. Patent Nos. 5,922,021 and 5,954,743) that he believes cover the Express stent.

14  Accordingly, and after significant briefing on the issue by both parties, the Court held

15  a claim construction (Markman) hearing on May 30, 2006 to construe several terms

16  contained in the patent claims at issue.

17      6.    On or about August 24, 2006, the Court issued a Claim Construction

18  Order ("the Order"), which the parties received on August 28, 2006. Plaintiff Dr. Jang

19  believes that the Court's Order is incorrect in several fundamental respects, and he

20  intends to seek appellate review of the Court's Order in the appropriate appellate court.

21  Nonetheless, the parties agree that, under the Court's existing Claim Construction

22  Order, Dr. Jang cannot prove that the Express stent is covered by any claims of U.S.

23  Patent Nos. 5,922,021 and 5,954,743, and therefore cannot prove that Scimed breached

24  the Assignment Agreement with respect to those patents.

25      7.    Accordingly, in order to conserve the resources of both the parties and the

26  Court, *see, e.g., York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d

27  1568, 1571 (Fed. Cir. 1996), the parties hereby stipulate and agree, subject to the

28  approval of this Court, and further subject to the full and complete preservation of Dr.

Gibson, Dunn &
Crutcher LLP

2

1  Jang's right to appeal the Order, that an order of partial summary judgment should now

2  be entered against Dr. Jang and in favor of Scimed on Dr. Jang's Third Claim for

3  Relief for Breach of Contract against Scimed.  Similarly, because the Defendants' first

4  and second counterclaims are now moot, the parties also stipulate and agree, subject to

5  the approval of this Court, that an order should be entered dismissing those

6  counterclaims without prejudice.

7  8.     This Stipulation is wholly predicated on Dr. Jang's right to obtain appellate

8  review of the Court's Claim Construction Order.  By entering into this Stipulation, the

9  parties agree that Dr. Jang is *not waiving*, but rather is *expressly reserving*, his right to

10  obtain appellate review of the Court's Claim Construction Order and to proceed further

11  with his Third Claim for Relief on remand from the Court of Appeals should the Court

12  of Appeals reverse or vacate this Court's Claim Construction Order in whole or in part.

13  Indeed, Dr. Jang's right to appeal the Court's Claim Construction Order is an *essential*

14  *condition* of this Stipulation, and if the Court does not agree that Dr. Jang is *fully*

15  *preserving all of his rights to obtain appellate review of the Claim Construction Order*,

16  ///

17  ///

18  ///

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

3

BSC-C 0098660

1  then Dr. Jang does not consent to the entry of an order granting partial summary

2  judgment against him on his Third Claim for Relief and requests that the Court reject

3  this Stipulation.

4
                                    Respectfully submitted,
5

6  Dated:  September 12, 2006        GIBSON, DUNN & CRUTCHER LLP

7

8                                    By: _____
9                                            Wayne M. Barsky

10                                   Attorneys for Plaintiff,
                                     G. David Jang, M.D.
11

12 Dated:  September 12, 2006        HOWREY LLP

13

14

15                                   By: _____
                                             Matthew M. Wolf
16
                                     Attorneys for Defendants,
17                                   Boston Scientific Corporation and
                                     Scimed Life Systems, Inc.
18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

BSC-C 0098661

1   then Dr. Jang does not consent to the entry of an order granting partial summary

2   judgment against him on his Third Claim for Relief and requests that the Court reject

3   this Stipulation.

4                                          Respectfully submitted,

5

6   Dated:  September __, 2006            GIBSON, DUNN & CRUTCHER LLP

7

8                                          By: _____

9                                               Wayne M. Barsky

10                                          Attorneys for Plaintiff,
                                           G. David Jang, M.D.

11

12  Dated:  September 12th, 2006           HOWREY LLP

13

14                                         By: _Matthew Wolf_ (by permission by JEM)

15                                              Matthew M. Wolf

16                                          Attorneys for Defendants,
                                           Boston Scientific Corporation and
17                                          Scimed Life Systems, Inc.

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

                                    4

BSC-C 0098662

**[PROPOSED] ORDER**

Having considered the parties' foregoing Stipulation (1) Granting Partial Summary Judgment Against Plaintiff on Plaintiff's Third Claim for Relief for Breach of Contract Against Defendant Scimed Life Systems, Inc., and (2) Dismissing Without Prejudice Defendants' First and Second Counterclaims as moot, and good cause appearing to exist, IT IS SO ORDERED.

Specifically, in accordance with the terms of the foregoing stipulation, the Court grants partial summary judgment against Dr. Jang and in favor of Scimed on Dr. Jang's Third Claim for Relief for Breach of Contract. The Defendants' First and Second Counterclaims are accordingly moot, and are dismissed without prejudice. Entry of this Order does not waive or compromise Dr. Jang's right to obtain appellate review of the Court's Claim Construction Order and, if the Court's Claim Construction Order is reversed or vacated in part on appeal, to proceed further with his Third Claim for Relief on remand from the Court of Appeals.

Dated: September 18, 2006

Virginia C. Phillips

Hon. Virginia A. Phillips
United States District Judge

100073692_1.DOC

Gibson, Dunn &
Crutcher LLP

5

BSC-C 0098663

## CERTIFICATE OF SERVICE

I, Cynthia C. Altounian, declare as follows:

I am employed in Los Angeles, California; I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Ave., Los Angeles, CA 90071. On September 12, 2006, I served the within:

**STIPULATION AND [PROPOSED] ORDER: (1) GRANTING PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF ON PLAINTIFF'S THIRD CLAIM FOR RELIEF FOR BREACH OF CONTRACT AGAINST DEFENDANT SCIMED LIFE SYSTEMS, INC., AND (2) DISMISSING WITHOUT PREJUDICE DEFENDANTS' FIRST AND SECOND COUNTERCLAIMS**

by placing a copy thereof in an envelope addressed to each of the persons named below at the address shown:

| | |
|---|---|
| Matthew M. Wolf, Admitted *pro hac vice*<br>Edward Han, Admitted *pro hac vice*<br>John Nilsson, Admitted *pro hac vice*<br>Wallace Wu<br>HOWREY LLP<br>550 S. Hope Street, Suite 1100<br>Los Angeles, CA 90071 | Attorneys for Defendants, Boston Scientific Corporation and SciMed Life Systems, Inc. |

**BY MAIL**: I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ **BY PERSONAL SERVICE**: I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

**BY FACSIMILE**: From facsimile machine telephone number (310) 551-8741, on the above-mentioned date, I served a full and complete copy of the above-referenced document[s] by facsimile transmission to the person[s] at the number[s] indicated.

**BY OVERNIGHT MAIL**: I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection ad processing correspondence for delivery by overnight mail. Pursuant to that practice, envelopes placed for collect ion at designated locations during designated hours are delivered to the overnight mail service with a fully completed airbill, under which all delivery charges are paid by Gibson, Dunn & Crutcher LLP, that same day in the ordinary course of business.

Gibson, Dunn &
Crutcher LLP

BSC-C 0098664

1    **(STATE)**    I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

2    ☑    **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and
3    correct.

4    I certify under penalty of perjury that the foregoing is true and correct, that the
foregoing document(s) were printed on recycled paper, and that this Certificate of
5    Service was executed by me on September 12, 2006 at Los Angeles, California.

6

7    _C. C. Altounian_
Cynthia C. Altounian

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

BSC-C 0098665

# Exhibit 8



Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT

AUG 24 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

ENTERED

AUG 25 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY _____ DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

G. DAVID JANG, M.D.,          )   Case No. EDCV 05-426-
                             )   VAP(CTx)
            Plaintiff,        )
                             )   **CLAIM CONSTRUCTION ORDER**
      v.                      )
                             )
BOSTON SCIENTIFIC            )
CORPORATION, a Delaware      )
corporation; SCIMED LIFE     )
SYSTEMS, INC., a             )
Minnesota corporation,       )
                             )
            Defendants.       )
_____)

DOCKETED ON CM

AUG 25 2006

BY _____ 044

The Court conducted a hearing on May 30, 2006, on the

parties' proposed constructions of certain terms in Claim

1 in the two patents at issue here,[1] pursuant to _Markman_

_v. Westview Instruments, Inc._, 52 F.3d 967 (Fed. Cir.

1995) (en banc) _aff'd_, 517 U.S. 370 (1996).  Having

considered the written submissions from both parties, as

---

[1] These are U.S. Patent Nos. 5,922,021, entitled
"Intravascular Stent" ("the '021 patent'") and
5,954,743, entitled "Intravascular Stent" ("the '743
patent"), attached to the Declaration of June T. Tai as
Exhibits 1 and 2, respectively, and to the Declaration of
John Nilsson as Exhibits A and B, respectively, referred
to collectively in this Order as "the Jang patents."

1  well as the arguments presented at the hearing, the Court

2  now issues its claim construction order.[2]

## I.   INTRODUCTION

5      Plaintiff G. David Jang, M.D., is the inventor of

6  certain coronary stents;[3] in 1999, the United States

7  Patent and Trademark Office issued patents for these

8  intravascular stents, used to treat coronary artery

9  disease.   In 2002, Plaintiff assigned his rights in these

10 coronary stent patents to Defendants Boston Scientific

11 Corporation and Scimed Life Systems, Inc. (collectively

12 referred to in this Order as "BSC").   Plaintiff alleges

13 that under various assignment and other agreements

14 between the parties, BSC paid Plaintiff $50 million

15 immediately, and an additional $10 million on June 2,

16 2004, but failed to pay other amounts owed under the

17 agreements. [Pl.'s First Amended Complaint ("FAC") ¶¶ 18,

18 19.]

19 // // //

20 // // //

---

24      [2]The parties agree that the disputed terms have the
same meaning in both the '021 and '743 patents.  See Dr.
25 Jang's Opening Claim Construction Brief ("Pl.'s Br.") at
2; Defendants Boston Scientific Corp.'s and Scimed,
26 Inc.'s Opening Claim Construction Brief ("Def'ts' Br." at
1 fn.3.

27      [3]"A coronary stent is a flexible, mesh, metal tube
that is inserted in the artery in a compressed state."
28 Pl.'s FAC, ¶ 8.

2

BSC-C 0098603

1  Plaintiff now sues for both equitable and legal
2  relief,[4] alleging that BSC breached the 2002 agreement by
3  failing to pay for products it sold which were "covered
4  by" one or more of the assigned patents.  In this
5  context, the parties seek construction of certain terms
6  in Claim 1 in the two Jang patents.
7
8                    **II.  LEGAL STANDARD**
9  Claim construction is a legal question for the Court.
10 Markman, 517 U.S. at 390; Cyborg Corp. v. FAS Techs.,
11 Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).
12
13 The Court begins its construction of a patent claim
14 with the words of the claim itself, which "are generally
15 given their ordinary and customary meaning . . . , the
16 meaning that the term would have to a person of ordinary
17 skill in the art in question . . . as of the [patent's]
18 effective filing date."  Phillips v. AWH Corp., 415 F.3d
19 1303, 1312-13 (Fed. Cir. 2005) (en banc).
20
21 The parties in the case dispute the proper extent to
22 which the Court should rely on the embodiments and
23 specifications in construing the claims here.   For
24 example, Plaintiff argues that the Defendant is tempting
25 the Court into error by inviting it, when construing the
26 _____
27    [4]The FAC contains claims for (1)Rescission, (2)
   Reformation of Contract, (3) Breach of Contract, (4)
28 Breach of Fiduciary Duty, and (5) Declaratory Relief.

                          3

BSC-C 0098604

1  disputed terms, to limit its consideration only to the
2  embodiments and specifications contained in the patent.
3  See Pl.'s Br. at 20.  The defense, on the other hand,
4  criticizes Plaintiff for offering dictionary definitions,
5  citing Phillips and Nystrom v. Trex Co., 424 F.3d 1136
6  (Fed. Cir. 2005) for the proposition that "the claims
7  must be read in view of the specification, of which they
8  are a part."  [Def'ts' Br. at 16.]
9
10      The Court looks to the patent specifications when
11 construing "the meaning of a claim term as it is used by
12 the inventor in the context of the entirety of his
13 invention. . . ."  Comark Comm. v. Harris Corp., 156 F.3d
14 1182, 1187 (Fed. Cir. 1998).  Furthermore, in the
15 Phillips case, the Federal Circuit emphasized the
16 specification's critical importance:  it "is always
17 highly relevant to the claim construction analysis.
18 Usually it is dispositive; it is the single best guide to
19 the meaning of a disputed term."  Phillips, 415 F.3d at
20 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90
21 F.3d 1576, 1582 (Fed. Cir. 1996).
22
23      In Phillips, the Federal Circuit also addressed the
24 use of dictionaries in claim construction, reiterating
25 that "[i]n some cases, the ordinary meaning of claim
26 language as understood by a person of skill in the art
27 may be readily apparent even to lay judges, and claim
28

4

1  construction in such cases involves little more than the
2  application of the widely accepted meaning of commonly
3  understood words. . .  In such circumstances, general
4  purpose dictionaries may be helpful.  Phillips, 415 F.3d
5  at 1314 (citing Brown v. 3M, 265 F.3d 1349, 1352 (Fed.
6  Cir. 2001)).  With these principles in mind, the Court
7  turns to the terms at issue.
8
9              II.   CLAIM CONSTRUCTION
10  1.   "Expansion Column"
11       The parties agree that the expansion columns consist
12  of expansion pairs; they dispute, however, whether or not
13  the expansion columns can contain structural members, or
14  struts, other than expansion strut pairs, and whether the
15  columns should be defined as "tubular."  Thus, Plaintiffs
16  ask the Court to adopt the following construction of this
17  term:  "a vertical extension of space around the
18  circumference of the stent formed by two or more
19  expansion strut pairs."  [Pl.'s Br. at 18.]  The defense
20  seeks an order construing the term as follows:  "a
21  tubular structure formed solely by a plurality of
22  expansion strut pairs arranged in a column along the
23  circumference of the stent."  [Def'ts' Br. at 24.][5]
24  _____
25       [5]The Court's resolution of the parties' dispute over
    the construction of this term also determines its
26  construction of the following terms: (1) "expansion
    strut," for which Plaintiff seeks the following
27  construction:  "A strut that extends at least in part in
    the direction of the longitudinal axis of the unexpanded
28                                          (continued...)

BSC-C 0098606

1    The language of the patent, including the Summary of
2  the Invention as well as the specifications, supports
3  Defendants' proposed construction.

4

5    The Summary of the Invention, for example, mentions
6  only expansion strut pairs - and no other structural
7  member - in the description of the expansion columns.
8  [See '021 Patent, Col. 3, lines 47-67, Col. 4, lines 1-
9  8.]  As the Federal Circuit explained in C.R. Bard, Inc.
10 v. U.S. Surgical Corp., 388 F.3d 858, 864 (Fed. Cir.
11 2004), "[a]lthough a statement's location is not
12 'determinative,' the location can signal the likelihood
13 that the statement will support a limiting definition of
14 a claim term.  Statements that describe the invention as
15 a whole, rather than statements that describe only
16 preferred embodiments, are more likely to support a
17 limiting definition of a claim term."  (Citations
18 omitted.)  And, as Defendants point out, all of the
19 references to "expansion columns" in the patents mention
20 only expansion strut pairs.  See '743 patent, col. 5,
21 lines 14-15, 29-38; col. 8, lines 8-21.
22 // // //

23

24

25    ⁵(...continued)
26 stent."  [Pl.'s Br. at 16] and Defendants argue should be
   construed as follows:  "A strut in an expansion column"
27 [Def'ts' Br. at 35]; and (2) "expansion strut pair."  For
   both of these terms, the Court adopts the defense's
28 proposed construction.

6

1    Plaintiff also argues that Claim 1 of both patents
2  recites that a plurality of expansion strut pairs form an
3  expansion column, as opposed to reciting that the column
4  is formed *solely* by a plurality of expansion strut pairs.
5  [Pl.'s Br. at 18.]  Plaintiff rests this argument, in
6  part, on what he characterizes as the "comprising" nature
7  of the claim; he contends that a comprising claim is
8  "open" and additional elements may be added beyond those
9  that are specifically recited in the claim.  [Pl.'s
10 Rebuttal Br. at 6.]  Furthermore, he argues, one cannot
11 avoid infringement by adding a feature to a patented
12 invention, citing <u>Lighting World, Inc. v. Birchwood</u>
13 <u>Lighting, Inc.</u>, 382 F.3d 1354, 1365 (Fed. Cir. 2004).
14 According to Dr. Jang, his patents do not disclaim
15 inclusion of additional elements in expansion columns,
16 and in fact teach that other elements may be added, such
17 as radiopaque markers.  [Plaintiff's Supplemental Claim
18 Construction Brief ("Pl.'s Supp'l Br.")  7.]
19
20    "When a patent claim uses the word 'comprising' as
21 its transitional phrase, the use of 'comprising' creates
22 a presumption that the body of the claim is open.  In the
23 parlance of patent law, the transition 'comprising'
24 creates a presumption that the recited elements are only
25 a part of the device, that the claim does not exclude
26 additional, unrecited elements." <u>Crystal Semiconductor</u>
27 <u>Corp. v. TriTech Microelect. Int'l, Inc.</u>, 246 F.3d 1336

28
                                7

1   (Fed. Cir. 2001).  Plaintiff relies too heavily on this

2   concept, however;  the Federal Circuit case law

3   reiterates that mere presence of the transitional word

4   "comprising" in the patent "does not free the claim from

5   its own limitations."  Kustom Signals, Inc. v. Applied

6   Concepts, Inc., 264 F.3d 1326, 1332 (Fed. Cir. 2001).

7

8       Only "expansion strut pairs"[6] are described in the

9   claim language; as discussed above, nowhere does the

10  patent describe any other structural member contained in

11  the expansion columns.  ['743 patent, col. 5, lines 14-

12  15, 29-38; col. 8, lines 18-21.]  The Court thus adopts

13  Defendants' proposed construction of this claim term; for

14  the foregoing reasons, it also adopts the defense's

15  proposed definition of "expansion strut," i.e., "a strut

16  in an expansion column."

17

18      Plaintiff also objects that the patents neither

19  describe nor define the expansion columns as "tubular

20  structures."  [Pl.'s Br. at 18.]  In order to perform its

21  intended function, i.e., to prop open the artery wall

22  into which it has been inserted, the patented stent

23  necessarily forms a tubular shape when fully expanded.

24  The patent describes the role played by the expansion

25  columns when the stent is expanded thus:  "each expansion

26  _____

27      [6]The parties agree that "expansion strut pair"
    includes "joining struts" as well as "expansion struts."
28  Def'ts' Br. at 24 fn. 13.

8

1  column 24 becomes circumferentially stretched...." ['021
2  patent, col. 8, lines 34-38.] Each illustration of the
3  expanded stent in the patent, showing the expansion
4  columns, displays them in the form of a tubular
5  structure.
6
7      Accordingly, the Court adopts the proposed
8  construction of this term advanced by the defense.
9
10     2.   "Connecting Strut Column"
11     The parties dispute two issues regarding construction
12 of this term:  whether the connecting struts must be
13 attached to each other, and whether the columns must be
14 defined as formed solely of connecting struts.  Hence,
15 Plaintiff proposes that this term be construed as
16 follows:  "A plurality of the first connecting strut
17 forming a first connecting strut column," (Pl.'s Br. at
18 23), whereas the defense offers the following
19 construction:  "A column formed **solely** of a plurality of
20 connecting struts **unattached** to each other and arranged
21 along the circumference of the strut."  (Def'ts' Br. at
22 26; emphasis added.)
23
24     As to the first dispute, Plaintiff argues that
25 Defendants base their proposed construction on an
26 impermissible theory that the only embodiments disclosed
27 in the Jang patents show connecting struts that are
28

9

1  unattached to each other.  [Pl.'s Br. at 23; Pl.'s Supp'l
2  Br. at 14.]  For support, Plaintiff cites to <u>Liebel-</u>
3  <u>Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 906 (Fed.
4  Cir. 2004); there, the court expressly disavowed any
5  "contention that if a patent describes only a single
6  embodiment, the claims of the patent must be construed as
7  being limited to that embodiment. . . . Even when the
8  specification describes only a single embodiment, the
9  claims of the patent will not be read restrictively
10 unless the patentee has demonstrated a clear intention to
11 limit the claim scope using 'words or expressions of
12 manifest exclusion or restriction.'"  (Citations
13 omitted.)  Relying on this passage, Plaintiff argues that
14 Defendants have failed to point to any language in the
15 patents where Dr. Jang summarizes his invention with
16 limiting language, requiring that the connecting struts
17 be unattached to one another.  [Pl.'s Supp'l Br. at 14-
18 15.)]
19
20     Defendants' proposed definition does not run afoul of
21 the proscription against unduly restrictive claim
22 construction.  First, as they point out, "every single
23 figure in the Jang patents that shows 'connecting
24 columns' . . . shows that the connecting struts forming
25 those columns are not connected to each other, but rather
26 (like prior art designs) connect the 'expansion columns'
27 . . . on either side of them."  [Def'ts' Br. at 26.]  In
28

                              10

1  other words, all of the figures in the specifications
2  depicting the connecting columns portray those columns
3  with connecting struts unattached to each other.  All of
4  the embodiments disclosed in these patents contain
5  connecting columns with connecting struts which are
6  unattached to each other; Plaintiff has not cited to a
7  single instance in the specifications to support his
8  contrary position.  The specifications' descriptions of
9  the connecting columns clearly state that the connecting
10  struts are unattached to one another.  Second, the
11  Federal Circuit in the Phillips case had this to say
12  regarding a lack of explicit language in the patent
13  defining a claim term or disavowing a particular
14  construction:  "[R]equiring that any definition of claim
15  language in the specification be express, is inconsistent
16  with our rulings that the specification is 'the single
17  best guide to the meaning of a disputed term.'"
18  Phillips, 415 F.3d at 1321.
19
20      The parties' second dispute revolves around whether
21  or not connecting strut columns are composed *solely* of
22  connecting strut pairs.  Plaintiff correctly notes the
23  similarity between this issue and that resolved above,
24  i.e., whether the term "expansion column" should be
25  construed as composed only of expansion strut pairs.
26  Again, however, the specifications, illustrations, and
27  Summary of the Invention all uniformly and consistently
28

11

1  show and define the connecting strut columns as composed
2  only of connecting strut pairs.   Thus, the authorities
3  cited above support Defendants' proposed construction.
4
5       Finally, Defendants argue strenuously that to accept
6  Plaintiff's proposed construction would "collapse the
7  structural distinction between connecting struts and
8  expansion struts, and between expansion columns and
9  connecting columns," and thus "broaden[] the claims to
10 cover prior art stents, even ones with very different
11 architectures."  [Def'ts' Br. at 32.]   This, Defendants
12 point out, would run the risk that the patent claims in
13 the Jang patents now assigned to them would be rendered
14 invalid as disclosed by or obvious under the prior art,
15 an inequitable result according to the Supreme Court in
16 Westinghouse v. Formica, 266 U.S. 342 (1924).
17
18
19 **3.  "Connecting Strut"**
20      Plaintiff offers this construction of the term
21 "connecting strut":  "a strut that couples an expansion
22 strut pair in one expansion column with an expansion
23 strut pair in another expansion column."  Defendants ask
24 the Court to construe this term as follows:  "A strut
25 that connects adjacent expansion columns."
26 // // //
27
28

12

1   All of the embodiments disclosed in the Jang patents
2   depict "connecting struts" connecting adjacent columns;
3   the language in the specifications and the Summary of the
4   Invention likewise consistently state that the
5   "connecting struts" connect adjacent expansion columns.
6   Plaintiff argues that all these reflect only "preferred
7   embodiments," upon which Defendants are relying in an
8   approach specifically disapproved by Phillips.
9
10   The Federal Circuit last year reiterated that the
11   "words of the claim are generally given their ordinary
12   and customary meaning," i.e., the meaning the term would
13   have to a person of ordinary skill in the art in question
14   at the time of the invention, "who views the claim term
15   in the light of the entire intrinsic record. . . Thus,
16   the claims 'must be read in view of the specification, of
17   which they are a part.'" Nystrom, 424 F.3d at 1142
18   (citing Phillips, 415 F.3d at 1316, and Markman, 52 F.3d
19   at 979). The entire intrinsic record here supports
20   Defendants' proposed construction: that "connecting
21   strut" means a strut that connects adjacent expansion
22   columns. Accordingly, the Court adopts that definition
23   of this term.
24
25   4.   Other Terms
26   The parties dispute a few other terms, some of which
27   the Court finds need not be construed.
28

13

**a.    "proximal" and "distal"**

The construction proposed by Plaintiff is that consistent with the language in the patents, and accordingly the Court adopts Plaintiff's construction of these two terms, i.e.,

**b.    "radius of curvature"**

In support of its proposed construction of this term, Plaintiff cites the Court to a dictionary definition, i.e., Webster's Third New International Dictionary:  "the reciprocal of the curvature of a curve," and proposes that the term be construed as "a mathematical measurement of the curvature of a curve; specifically, the reciprocal of the curvature of a curve."  Defendants propose that the term be construed to mean "a smooth curve."

Plaintiff's proposed definition is more precise and is consistent with the language and specifications in the patent, and the Court hereby adopts it.

**c.    Terms for which no construction is needed**

The remaining terms need no construction by the Court:  "comprising,"[7] "column," "longitudinal axis," and "...the first expansion strut of the first expansion strut pair...has a longitudinal axis offset from a

---

[7]As noted above, however, the relevant case law defines this term in "patent law parlance."

14

1  longitudinal axis of the first expansion strut of the

2  second expansion strut pair...."

7  Dated: _August 23, 2004_

_Virginia C. Phillips_
VIRGINIA A. PHILLIPS
United States District Judge

15

BSC-C 0098616

# Exhibit 9

1  Sharla Manley (SBN 240026)
   HOWREY LLP
2  550 South Hope Street, Suite 1100
   Los Angeles, CA 90071
3  Telephone: (213) 892-1800
   Facsimile: (213) 892-2300
4  Email: Manleys@howrey.com

5  Matthew M. Wolf (admitted *pro hac vice*)
   Edward Han (admitted *pro hac vice*)
6  John Nilsson (admitted *pro hac vice*)
   HOWREY LLP
7  1299 Pennsylvania Avenue, NW
   Washington, DC 20004
8  Telephone: (202) 783-0800
   Facsimile: (202) 383-6610
9  Email: Wolfm@howrey.com
   Email: Hane@howrey.com
10 Email: Nilssonj@howrey.com

11 Attorneys for Defendants
   *Boston Scientific Corporation and*
12 *SciMed Life Systems, Inc.*

13          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
14            EASTERN DIVISION - RIVERSIDE

15 G. DAVID JANG, M.D.,                    )    Case No. ED CV 05-00426 VAP
                                           )    (CTx)
16            Plaintiff,                    )
       v.                                   )
17                                          )
   BOSTON SCIENTIFIC                        )
18 CORPORATION, a Delaware                  )    DEFENDANTS BOSTON
   Corporation, and SCIMED LIFE            )    SCIENTIFIC CORP.'S AND
19 SYSTEMS, INC., a Minnesota              )    SCIMED, INC.'S REBUTTAL
   Corporation,                            )    CLAIM CONSTRUCTION
20                                          )    BRIEF
              Defendants.                   )
21 BOSTON SCIENTIFIC                        )
   CORPORATION, a Delaware                  )
22 Corporation, and SCIMED LIFE            )    May 30, 2006 *Markman* Hearing
   SYSTEMS, INC., a Minnesota              )
23 Corporation,                            )
                                           )
24            Counterclaimants,             )
       v.                                   )
25                                          )
   G. DAVID JANG, M.D.,                     )
26                                          )
              Counterdefendant.             )
27

28

HOWREY LLP

DM_US\8343172.v1

BSC-C 0098468

1

# TABLE OF CONTENTS

2    I.    PRELIMINARY STATEMENT ....................................................... 1

3    II.   THE CONTROLLING PRINCIPLES OF CLAIM
4          CONSTRUCTION ..................................................................... 2

5          A.    The Court Should Construe Claims In Light Of The
                 Specification .................................................................. 2

6          B.    The Court Should Avoid Claim Constructions That
7                Render Differences Between Claim Terms
                 Meaningless .................................................................... 3

8          C.    The Court Should Avoid Constructions That Would
9                Threaten The Validity Of The Claims.................................. 4

10   III.  ARGUMENT ........................................................................... 4

11         A.    Dr. Jang's Version Of The Patented Stent Is Not
                 Supported By The Specification.......................................... 5

12         B.    Dr. Jang's Proposed Constructions Would Render
13               The Difference Between "Connecting" And
                 "Expansion" Elements Meaningless..................................... 8

14         C.    Under Dr. Jang's Proposed Constructions, The
15               Claims Would Read On The Prior Art................................. 13

16

17

18

19

20

21

22

23

24

25

26

27

28

BSC-C 0098469

1
# TABLE OF AUTHORITIES

2
## CASES

3
*Gillette Co. v. Energizer Holdings, Inc.*
    405 F.3d 1367 (Fed. Cir. 2005)..................................................................2

4

*Global Maintech Corp. v. I/O Concepts*
5
    No. 05-1340, 2006 WL 1153574 (Fed. Cir. May 2, 2006)......................7

6
*Innova/Pure Water, Inc. v. Safari Water Filtrations Sys., Inc.*
    381 F.3d 1111 (Fed. Cir. 2004).........................................................2, 4, 12

7

*Karsten Mfg. Corp. v. Cleveland Golf Co.*
8
    242 F.3d 1376 (Fed. Cir. 2001)..................................................................4

9
*Kustom Signals, Inc. v. Applied Concepts, Inc.*
    264 F.3d 1326 (Fed. Cir. 2001)..................................................................7

10

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*
11
    75 F.3d 1545 (Fed. Cir. 1996)...................................................................4

12
*Moleculon Research Corp. v. CBS, Inc.*
    793 F.2d 1261 (Fed. Cir. 1986)..................................................................7

13

*Nystrom v. Trex Co., Inc.*
14
    424 F.3d 1136 (Fed. Cir. 2005).........................................................3, 6, 7

15
*Old Town Canoe Co. v. Confluence Holdings Corp.*
    No. 05-1123, 05-1148, 2006 WL 1228887 (Fed. Cir. May 9,
16
    2006) ..........................................................................................................7

17
*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005).....................................................2, 3, 4, 15

18

*Spectrum Int'l, Inc. v. Sterilite Corp.*
19
    164 F.3d 1372 (Fed. Cir. 1998)..............................................................7, 8

20
*Texas Digital Systems, Inc. v. Telegenix, Inc.*
    308 F.3d 1193 (Fed. Cir. 2002)..................................................................2

21

*Varco LP v. Pason Sys. USA Corp.*
22
    436 F.3d 1368 (Fed. Cir. 2006)..................................................................7

23
*Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*
    266 U.S. 342 (1924)..........................................................................1, 4, 15

24

25

26

27

28

HOWREY LLP

DM_US\8343172.v1

BSC-C 0098470

1    Pursuant to the Court's Scheduling Order, Defendants Boston Scientific
2  Corporation and SciMed Life Systems, Inc. (collectively, "Boston Scientific")
3  respectfully submit this rebuttal brief in support of its proposed constructions of the
4  disputed claim terms of U.S. Patent No. 5,922,021 ("the '021 patent") and U.S. Patent
5  No. 5,954,743 ("the '743 patent").

6    ## I.    PRELIMINARY STATEMENT

7    As Boston Scientific noted in its opening brief, it has no interest in unduly
8  narrowing the scope of the Jang patents.  It is currently asserting those patents in
9  multiple litigations, the importance of which greatly outweighs what is at stake for
10 Boston Scientific in its dispute with Dr. Jang.

11    At the same time, Boston Scientific has a compelling interest in avoiding an
12 overbroad interpretation of the Jang patents that would threaten their validity in the
13 currently pending and possible future cases.  Dr. Jang, however, appears unconstrained
14 by any interest in preserving the patents' validity.  Having assigned the patents to
15 Boston Scientific – and having agreed to a cap on his total royalty payments – Dr. Jang
16 takes reckless claim construction positions in a gambit to obtain more than the $60
17 million Boston Scientific has already paid him.  The Court should not allow Dr. Jang to
18 take extreme positions that would clearly deprive Boston Scientific of the benefit of its
19 bargain. *See Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342,
20 345-46 (1924) (assignor of patent is precluded from maintaining legal position that
21 would undermine validity of patent assigned).

22    In any event, Dr. Jang's positions violate several fundamental principles of claim
23 construction. *First*, he has proposed constructions that expand the claims beyond what
24 he disclosed as his invention in his patent specifications. *Second*, he has proposed
25 constructions that render key differences between key claim terms meaningless. *Third*,
26 he has proposed constructions that would threaten the claims' validity in light of the
27 prior art.  The Court should therefore reject Dr. Jang's proposed constructions in favor
28 of Boston Scientific's proposed constructions of the disputed claim terms.

HOWREY LLP

-1-

DM_US\8343172.v1

BSC-C 0098471

## II.    THE CONTROLLING PRINCIPLES OF CLAIM CONSTRUCTION

### A.    The Court Should Construe Claims In Light Of The Specification

Boston Scientific's proposed claim constructions are based on the approach set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the landmark decision in which the Federal Circuit clarified the manner in which claims should be construed. In *Phillips*, the Federal Circuit declared that "[t]he words of the claims must be based on the description." *Id.* at 1315 (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). Thus, "[t]he words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history." *Id.* (quoting *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004)).

Although Dr. Jang pays lip service to *Phillips*, his claim construction contentions actually depend on the sort of analysis rejected by the Federal Circuit in *Phillips*. In particular, Dr. Jang suggests that the specification and prosecution history are dispositive only to the extent that they explicitly define or narrow the meaning of the term in question. Otherwise, according to Dr. Jang, the claim term should be interpreted as broadly as possible, regardless of whether there is support for such a broad construction in the specification.[1] Dr. Jang's approach, which is substantially the same as the one advocated in *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), was expressly rejected by the Federal Circuit in *Phillips*. In *Texas Digital*, the court sought to minimize the role of the specification in construing the claims, admonishing the lower courts not to achieve an understanding of the invention as disclosed in the specification before construing the terms and instructing them to refer to the specification only to confirm that it does not define a claim term in particular or explicitly disavow a particular construction. *See id.* at 1203-04. *Phillips*

---

[1]    A number of the cases upon which Dr. Jang relies were decided before *Phillips*. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtrations Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

HOWREY LLP

-2-

BSC-C 0098472

1   overruled *Texas Digital* and rejected its claim construction methodology, stating that

2   this "approach, in our view, improperly restricts the role of the specification in claim

3   construction." 415 F.3d at 1320. As the *Phillips* court explained, "[a]ssigning such a

4   limited role to the specification, and in particular requiring that any definition of claim

5   language in the specification be express, is inconsistent with our rulings that the

6   specification is 'the single best guide to the meaning of a disputed term.'" *Id.* at 1320-

7   21.

8           Interpreting a claim term in light of the specification is very different from

9   "reading limitations into the claim," or restricting the claims to "preferred

10   embodiments." Boston Scientific has not proposed a single construction that does

11   anything more than provide a clear definition for the claim term at issue – a definition

12   that is fully supported by the specification and the prior art. More importantly, Dr. Jang

13   has not and cannot identify *any* embodiment of his invention – preferred, alternative, or

14   even merely suggested – that does not possess the attributes identified by Boston

15   Scientific in its proposed claim constructions. This failure on Dr. Jang's part is crucial

16   because the objective of the claim construction analysis is to understand what the

17   inventor actually invented as set forth in his or her description:

18           Ultimately, the interpretation to be given a term can only be determined and

19           confirmed with a full understanding of what the inventors actually invented and

20           intended to envelop with the claim.  The construction that stays true to the claim

21           language and most naturally aligns with *the patent's description of the invention*

22           will be, in the end, the correct construction.

23   *Phillips*, 415 F.3d at 1316 (emphasis added).

24
                    **B.    The Court Should Avoid Claim Constructions That**
25                  **Render Differences Between Claim Terms Meaningless**

26           Another fundamental principle of claim construction requires courts to avoid

27   constructions that render distinctions in claim terms meaningless. *See Nystrom v. Trex*

28   *Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (to the extent there are differences

HOWREY LLP

DM_US\8343172.v1

-3-

BSC-C 0098473

1   between the terms, those differences are presumed to be meaningful) (citing *Tandon*

2   *Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)); *see*

3   *also Innova/Pure Water*, 381 F.3d at 1119 ("all claim terms are presumed to have

4   meaning in a claim"). As demonstrated below, Dr. Jang's proposed claim constructions

5   render meaningless any difference between clearly distinct claim terms.

### C. The Court Should Avoid Constructions That Would Threaten The Validity Of The Claims

8   In focusing upon "what the inventor actually invented," it is equally important to

9   bear in mind what the inventor did not invent, including previous inventions disclosed

10  in the prior art. The prior art of record is intrinsic evidence that the Court must

11  consider. In addition, to the extent that an examination of the intrinsic evidence leaves

12  some question as to the meaning of a claim term, the Court should strive to interpret the

13  claim in such a way that it does not cover the prior art. *See Phillips*, 415 F.3d at 1328

14  (in construing the claims, the trial court is encouraged to review prior art and to preserve

15  claims' validity by rejecting constructions that would encompass prior art); *see also*

16  *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001);

17  *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir.

18  1996). This is especially the case where an inventor assigns a patent and subsequently

19  takes a position that would threaten its validity. *See Westinghouse*, 266 U.S. at 345-46.

## III. ARGUMENT

21  Dr. Jang's proposed claim constructions violate each of the fundamental

22  principles set forth above. In particular, he has proposed claim constructions that (1)

23  expand the claims beyond what he disclosed as his invention in his patent specifications;

24  (2) render the differences between the claim terms meaningless; and (3) would threaten

25  the claims' validity in light of the prior art. These errors are most apparent in Dr. Jang's

26  proposed constructions of the claimed "expansion columns," "connecting strut

27  columns," "expansion struts" and "connecting struts." By ignoring the principles of

28  claim construction, Dr. Jang attempts to broaden his claims to assert that:

HOWREY LLP

-4-

DM_US\8343172.v1

1    • The claimed "connecting struts" may be attached to each other, in the same
2    way that "expansion struts" and "expansion strut pairs" are attached to each
3    other circumferentially to form "expansion columns";

4    • The "connecting struts" need not connect "expansion columns" that are
5    next to each other, but need only connect "expansion columns" in some
6    way, no matter how remotely or circuitously;

7    • The claimed "connecting strut columns" can contain "expansion struts" and
8    "expansion strut pairs," even though this is nowhere disclosed in the
9    specification and would allow one to categorize virtually any "expansion
10   column" as a "connecting strut column"; and

11   • The claimed "expansion column" can contain "connecting struts" and need
12   not form a tubular structure, a construction that is also unsupported by the
13   specification.[2]

14
15   **A.    Dr. Jang's Version Of The Patented Stent Is Not Supported By The Specification**

16   In view of the court's decision in *Phillips*, Dr. Jang must concede that "'the
17   specification is the single best guide to the meaning of a disputed claim term' and, thus,
18   … the claims 'must be read in view of the specification, of which they are a part.'" Pl.'s
19   Br. at 12 (quoting *Phillips*, 415 F.3d 1202 (Fed. Cir. 2005)).  Nonetheless, the vast
20   majority of Dr. Jang's brief is spent attempting to trivialize the importance of the
21   specification's descriptions and depictions of the inventive stent.  Dr. Jang claims that
22   the depictions and descriptions of the connecting struts in a connecting strut column as
23   unattached to each other are merely *preferred embodiments*. *Id.* at 23.  Similarly, the
24   various depictions and descriptions that clearly show that a connecting strut column

25

26   ―――――――――――――――
27   [2]  There are a handful of other claim terms whose proper construction is in dispute
     (*e.g.*, "proximal," "distal," and "radius of curvature").  With respect to those disputed
     claim terms (and any others not specifically addressed in this Rebuttal Brief), Boston
28   Scientific relies on the arguments, points and authorities set forth in its Opening Brief.

HOWREY LLP

-5-

BSC-C 0098475

1  contains only connecting struts are also merely *preferred embodiments*. *Id*. Likewise,

2  the specification's clear statement that the "connecting strut" connects adjacent

3  expansion columns merely reflects a *preferred embodiment*. *Id*. at 19-22.

4       Dr. Jang's suggestion that there are alternative embodiments of the Jang stent in

5  which these features are not present is utterly unsupported. There is not a single

6  embodiment disclosed or suggested in the Jang patents in which connecting struts in a

7  connecting strut column are attached to each other. There is not a single embodiment

8  disclosed or suggested in the Jang patents in which the connecting strut column contains

9  expansion struts. There is not a single embodiment disclosed or suggested in the Jang

10  patents in which the connecting struts connect non-adjacent columns. There is not a

11  single embodiment of the "expansion column" that does not possess a tubular structure.[3]

12  The statements, figures and descriptions now dismissed by Dr. Jang as "embodiments,"

13  were not mere recommendations as to a preferred structure for the stent; they were the

14  sum of the disclosure with respect to his invention. As the Federal Circuit held last year

15  in *Nystrom v. Trex Co.*:

16       It is not admissible to adopt the argument ... that this language is to be taken as a

17       mere recommendation by the patentee of the manner in which he prefers to

18

19  [3]  *See* '021 patent, col. 5, lines 46-48; '021 patent, col. 8, lines 39-41; '021 patent, col.

20  8, lines 34-38. Not only is this supported by every depiction of the Jang stent as well as the manner the expansion columns are described in the Jang patents, it is true of any

21  stent. As Dr. Squire explains in his declaration, the expansion columns in the Jang patents necessarily form tubular structures; otherwise, they simply would not perform

22  their function. (Squire Decl. ¶ 17.) Moreover, Dr. Jang himself acknowledges, "[a] stent is an expandable, mesh-like tube made of metal." (Pl.'s Br. at 4) (emphasis

23  added.) The only elements in the Jang stent that can form the expandable tube are the expansion columns. The fact that the claims do not recite this inherent necessity does

24  not make it any less of one. As the *Phillips* court instructed, the claim must be interpreted in such a way as to enable the invention. *See Phillips*, 415 F.3d at 1323 ("It

25  is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode

26  for doing so."). The meaning of "expansion strut" can only be understood with reference to the meaning of "expansion column." That is, an "expansion strut" is an

27  "expansion strut" by virtue of being part of an "expansion column." If an expansion strut were cut out of the stent's "expansion column" and placed on a table it would

28  become simply a strut – that is, "a structural member designed to withstand force."

HOWREY LLP

-6-

BSC-C 0098476

1      arrange these parts of his machine.  There is nothing in the context to indicate that

2      the patentee contemplated any alternative....

3  424 F.3d 1126, 1144 (Fed. Cir. 2005) (quoting *Snow v. Lake Shore & Mich. S. Ry. Co.*,

4  121 U.S. 617, 629-30 (1887)).[4]

5      Nor can the claims' use of the transitional phrase "comprising" magically alter

6  and expand the definitions of "connecting strut" and "connecting strut column."

7  Although a claim using the transition term "comprising" generally is construed as an

8  open claim, the Federal Circuit has nonetheless emphasized that the term "comprising"

9  cannot be used to improperly broaden a claim or to "free the claim from its own

10  limitations." *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed.

11  Cir. 2001).  As the Federal Circuit instructed in *Moleculon Research Corp. v. CBS, Inc.*,

12  793 F.2d 1261, 1271 (Fed. Cir. 1986), "'comprising' makes the claim open-ended so

13  that other elements may be added without avoiding infringement, but it does not allow

14  one ... to change the meaning of the words that are there." *Id.*

15      The Federal Circuit's decision in *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d

16  1372, 1380 (Fed. Cir. 1998), is particularly instructive in this regard.  In that case, the

17  patentee attempted to use "comprising" language to construe the claim in such a way as

18

19    [4]  Federal Circuit cases that have come down just within the past month have

20  reaffirmed that the scope of the claims cannot be broader than the invention disclosed in the specification.  *See Old Town Canoe Co. v. Confluence Holdings Corp.*, No. 05-

21  1123, 05-1148, 2006 WL 1228887, at *6 (Fed. Cir. May 9, 2006) (holding that "coalescence" step of claimed molding process was accomplished at the end of the

22  process insofar as "nothing in the written description suggests [otherwise]"); *Global Maintech Corp. v. I/O Concepts*, No. 05-1340, 2006 WL 1153574, at *4 (Fed. Cir. May

23  2, 2006) (holding that "heterogeneous computer system" was restricted to systems in which at least two host computers use different operating systems because "Nowhere

24  does the written description disclose or describe the context of the claimed invention in broader terms").  The cases cited by Dr. Jang are distinguishable insofar as they stand

25  for the unremarkable proposition that where the specification indicates that there are alternative embodiments the claims should not be construed to require elements of the

26  preferred embodiment that are not recited in them.  *See Varco LP v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006) (claim reciting element of relaying signals

27  from a drill component to its electronic controller did not require use of pneumatic valves where the specification made plain that this was just "one example" and that

28  others were contemplated).

HOWREY LLP

-7-

DM_US\8343172.v1

BSC-C 0098477

1  to dismiss as "irrelevant, unrecited element[s]" key structural features of the claimed

2  invention. *Id.* at 1377. The Federal Circuit firmly rejected this tactic, cautioning that

3  "*'[c]omprising' is not a weasel word with which to abrogate claim limitations*." *Id.* at

4  1380 (emphasis added). This was especially the case insofar as the patentee's use of

5  "comprising" language would broaden the claim to cover the prior art. As the Federal

6  Circuit noted, "Were the result otherwise, the [patentee] could [disregard key

7  differences between the claim and the prior art].... This [the patentee] clearly cannot

8  do." *Id.* at 1379.

9
10    **B.  Dr. Jang's Proposed Constructions Would Render The Difference Between "Connecting" And "Expansion" Elements Meaningless**

11    In addition, Dr. Jang's proposed constructions improperly permit the arbitrary

12  characterization of a stent element *either* as an "expansion" strut (or segment thereof) *or*

13  a "connecting strut." Indeed, under Dr. Jang's construction, that which is indisputably

14  an expansion strut in an expansion column could be characterized as a connecting strut

15  in a connecting strut column. This is illustrated by Dr. Jang's analysis of Boston

16
17
18    
19
20
21
22    **Figure A – From Page 11 of Dr. Jang's Opening Markman Brief**

23    As a matter of clarification, the Figure on the left above is not the "building

24  block" of the Express stent. Indeed, it does not even exist in the real Express stent.

25
26
27
28

HOWREY LLP

-8-

DM_US\8343172.v1

Below left is an extrapolated version of the Dr. Jang's "Express stent." Below right is the actual Express stent.[5]



**Figure B – Dr. Jang's Express Stent Versus the Actual Express Stent**

As is apparent, Dr. Jang's revisionist version of the Express stent differs from the real stent in that the "connecting strut column" in Dr. Jang's version has "connecting struts" that are unattached to each other. In the actual Express stent on the right, Dr. Jang's "connecting strut column" is revealed for what it truly is – an expansion column composed of joined expansion struts connected to the expansion columns adjacent to it by straight connectors.

In any case, by suggesting that there is no real difference between the highlighted columns, Dr. Jang makes it possible for virtually any "expansion column" or "expansion" element to be simultaneously characterized as a "connecting strut column" or connecting element. In the figure below, that which Dr. Jang calls the "intermediate sinusoidal section" of a "connecting strut" is highlighted in blue; highlighted in red are what Dr. Jang says are two joined "expansion strut pairs." Thus, according to Dr. Jang, these different claim terms can encompass precisely the same structure.

---

[5]  Although Dr, Jang includes this Figure in his brief, it is the altered figure that he juxtaposes with the diagram from his patent.

HOWREY LLP

-9-

DM_US\8343172.v1

BSC-C 0098479



**Figure C**

In fact, under Dr. Jang's construction, any "expansion strut" in the Express stent could just as fairly be characterized as being part of a "connecting strut." As shown below, this leads to outlandish (but, under Dr. Jang's proposed construction, valid) "connecting strut columns" that can include or travel over what clearly are "expansion columns."

BSC-C 0098480

**Figure D**

Theoretically, the "connecting struts" above could be divided into three sections, and given their tortuous shapes, a non-parallel intermediate section could be carved out. Moreover, Dr. Jang's insistence that the connecting strut can connect non-adjacent expansion columns permits him to wind the "connecting strut" until it reaches an expansion strut pair that is circumferentially offset (a limiting element of both claim 1 of the '021 patent and claim 1 of the '743 patent).[6] In other words, if the claims mean what Dr. Jang says they mean there is virtually no limit to the manner in which an accused stent's elements could be arranged so as to infringe.

The same holds true for Dr. Jang's own stent. If Dr. Jang were correct in what he is now asserting, the expansion struts in the second and third expansion columns depicted below could just as well be categorized as connecting struts, in a connecting strut column (or sections thereof). The figure below shows (highlighted in blue) three different "connecting strut columns" that would be permissible under Dr. Jang's proposed constructions; each of the "connecting struts" in the two connecting strut columns to the right includes one or more elements that have clearly been defined as "expansion struts":

---

[6] There are other claims in the Jang patents that the expansion struts in the connected expansion columns be circumferentially offset, but those claims are not at issue here.

BSC-C 0098481



**Figure E**

Under Dr. Jang's proposed construction, any application of the claim language would be correct. An expansion strut could be a connecting strut, and an expansion column could be a connecting strut column, limited solely by the whim and imagination of the percipient. Even the authority Dr. Jang has cited warns against such erasing of distinctions between claim terms. *See Innova/Pure Water*, 381 F.3d at 1119 ("when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms").

As Boston Scientific explained in its opening brief, Defs.' Br. at 6-10, there are fundamental differences between expansion columns and connecting strut columns in stent geometry – differences that are borne out in the Jang patents as well as in the prior art. Expansion columns contain attached expansion struts or expansion strut pairs, which form the tubular structure necessary to resist recoil from the vessel wall. The purpose of a "connecting strut column" is to connect the expansion elements of the stent. Thus, the "connecting struts" are not attached to each other; otherwise, they would necessarily function as expansion elements upon expansion of the stent. (Squire Decl. ¶ 24.) Dr. Jang's recklessness inheres in his willingness to misrepresent and to erase these settled differences.

BSC-C 0098482

### C.    Under Dr. Jang's Proposed Constructions, The Claims Would Read On The Prior Art

Finally, the Court must keep firmly in mind the prospect that, should Dr. Jang's proposed claim constructions be adopted, there would be a real danger that the claims at issue here (or at least the independent claims) would read on any number of prior art stents. Just as Jang superimposed tortuous "connecting struts" over the expansion elements of the Express stent, so too could they be superimposed over expansion elements in the prior art. One such stent is the Lau stent.[7]  As the diagram below shows, the real Express stent (as opposed to Dr. Jang's redacted version of the Express stent) is based upon the preferred embodiment of the Lau prior art stent (to which Boston Scientific also possesses rights) – not the Jang stent:



**Figure F – The Lau Stent, the Express Stent, and the Jang Stent**

Figure F shows how Lau's preferred embodiment and the Express each have "expansion strut pairs" which are joined (at their distal ends) by straight connectors such that the axes of the "expansion struts" in the "expansion strut pairs" are not circumferentially offset from one another.  In contrast, the distinctive geometry of claim 1 of the '021 patent features a connecting strut with "non-parallel" sections such that the axes of the expansion struts in the joined expansion strut pairs (which are joined at

---

[7]  The Lau stent (as disclosed in U.S. Patent No. 5,514,154) is attached as Exhibit H to the Declaration of John Nilsson in Support of Defendants' Opening Claim construction Brief ("Nilsson Decl.").

BSC-C 0098483

1  opposite ends in an "out of phase" configuration) are circumferentially offset (an

2  element of both claim 1 of the '021 patent and claim 1 of the '743 patent).[8]  *See* Pl.'s Br.

3  at 8 (acknowledging that, in the Jang stent, "connected expansion strut pairs do not

4  share a common longitudinal axis; rather, they are circumferentially offset").  If the

5  Express stent can be said to have a connecting strut with a curved intermediate section,

6  so too does the Lau prior art stent, as shown below.

7

8

9

10

11  

12

13

14

15  **Figure G – Comparison of "Infringing" Express Stent to Lau Prior Art Stent**

16      Indeed, as shown below (and as explained in more detail in Boston Scientific's

17  opening brief), one can trace a "connecting strut" across the expansion struts of

18  numerous prior art stents to show how Dr. Jang's version of his claims would read on

19  the prior art.

20

21

22

23

24

25  ────────────────

26  [8]  Although claim 1 of the '743 patent does not require that the connecting strut possess
     a connecting strut with "non-parallel" sections, it does require that expansion strut pairs
27  connected by the connecting strut be circumferentially offset.  As noted above, there are
     claims of the Jang patents that require neither limitation, but those claims are not at
28  issue here.

HOWREY LLP

DM_US\8343172.v1

BSC-C 0098484

1
2
3
4
5
6
7



8

**Figure H – Pinchasik[9], Fischell[10] and Orth[11] Under Dr. Jang's Construction**

9
10

Dr. Jang must not be permitted to destroy the value of the patents he assigned to

11 Boston Scientific by now insisting upon an overbroad construction of the claims in an

12 effort to obtain more money from Boston Scientific. *See Westinghouse*, 266 U.S. at

13 345-46.  Even if it were a close question whether, in light of the specification, the

14 claimed "connecting strut column" could contain "expansion struts" and/or "connecting

15 struts" that are attached to each other (which it is not), Federal Circuit precedent

16 requires that the claims be interpreted so as to ensure that they do not read on the prior

17 art.  *See Phillips*, 415 F.3d at 1328 (in construing the claims, the trial court is

18 encouraged to review prior art and to preserve claims' validity by rejecting

19 constructions that would encompass prior art).

20                                         *  *  *

21    Accordingly, Boston Scientific requests that Court enter the following claim

22 constructions with respect to the disputed terms of the '021 and '743 patents:

23    • An "expansion strut" is a strut in an expansion column.

24
25
26 9   U.S. Patent No. 5,449,373 (Nilsson Decl. Ex. E).

27 10  U.S. Patent No. 5,697,971 (Nilsson Decl. Ex. F).

28 11  U.S. Patent No. 5,591,197 (Nilsson Decl. Ex. G).

HOWREY LLP

-15-

DM_US\8343172.v1

BSC-C 0098485

1      • An "expansion strut pair" is a combination of two circumferentially
2      adjacent expansion struts coupled at one end by a joining strut and open at
3      the other.
4      • An "expansion column is a tubular structure formed solely by a plurality of
5      expansion strut pairs arranged in a column along the circumference of the
6      stent.
7      • A "connecting strut is a strut that connects adjacent expansion columns.
8      • A "connecting strut column" is formed solely of a plurality of connecting
9      struts unattached to each other and arranged in a column along the
10      circumference of the stent.
11      • "Proximal" means closer to the operator once the stent has been mounted
12      on the catheter, and "distal" means further from operator once the stent has
13      been mounted on the catheter.[12]
14      • "The first expansion strut of the first expansion strut pair . . . has a
15      longitudinal axis offset from a longitudinal axis of the first expansion strut
16      of the second expansion strut pair" means that the first expansion strut of
17      the first expansion pair in the first expansion column is circumferentially
18      offset from the first expansion strut of the second expansions strut pair in
19      the second expansion column.
20      • "Radius of curvature" means a smooth curve.
21
22
23
24
25
26

---

27   [12] With respect to these claim terms as well as the two claim terms that follow, Boston
     Scientific relies on the arguments, points and authorities set forth in its Opening Brief.
28   *See supra* note 2.

HOWREY LLP

-16-

DM_US\8343172.v1

BSC-C 0098486

1

2                              CONCLUSION

3          For the reasons set forth above, Boston Scientific respectfully requests that the

4    Court reject Dr. Jang's proposed claim constructions and adopt those proposed by

5    Boston Scientific.

6

7    Dated:  May 25, 2006                    HOWREY LLP

8

9                                     By:  _Sharla  Manley_____

10                                         Sharla Manley
                                           Matthew M. Wolf (pro hac vice)
11                                         Edward Han (pro hac vice)
                                           John Nilsson (pro hac vice)
12                                         Attorneys for Defendants
                                           *Boston Scientific Corporation and*
13                                         *Scimed Life Systems, Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

                                          -17-

DM_US\8343172.v1

BSC-C 0098487

## PROOF OF SERVICE

I, Deborah Fritts-Rodriguez, declare as follows:

I am employed in the County of Los Angeles, California. I am over the age of eighteen years and not a party to the within action. My business address is 550 South Hope Street, Suite 1100, Los Angeles, California 90071. Upon this day, I served a copy of the following document:

### DEFENDANTS BOSTON SCIENTIFIC CORP.'S AND SCIMED, INC.'S REBUTTAL CLAIM CONSTRUCTION BRIEF

on all interested parties through their attorneys of record listed below in the manner shown below:

☒     **VIA FIRST CLASS MAIL** (CCP §§ 1012, et seq.). I am readily familiar with the firm's practice of collection and processing for mailing. Under that practice it would be deposited with the U.S. postal service on that same day as shown on this declaration with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

| | |
|---|---|
| Wayne M. Barsky, Esq.<br>Julian Poon, Esq.<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Phone: (213) 229-7000<br>Fax: (213) 229-6758<br>Wbarsky@gibsondunn.com<br>Jpoon@gibsondunn.com | Thomas Mundell, Esq.<br>Mundell, Odlum & Haws, LLP<br>Suite 470<br>650 East Hospitality Lane<br>San Bernardino, CA 92408<br>Phone: (909) 890-9500<br>Fax: (909) 890-9580<br>tmundell@mohlaw.net |

☐     **BY FACSIMILE** By sending a copy of said document by facsimile machine for instantaneous transmittal via telephone line to the offices of each addressee.

☐     **VIA HAND DELIVERY/PERSONAL SERVICE** (CCP §§ 1011, et seq.). I directed a courier to personally deliver said document(s) to each addressee.

☐     **VIA FEDERAL EXPRESS OVERNIGHT/NEXT BUSINESS DAY DELIVERY SERVICE** (CCP §§ 1013). I placed in an envelope, properly labeled, and caused to be deposited into a Federal Express pick-up receptacle as per the regular practice of this office.

**FEDERAL**: I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on May 25, 2006 at Los Angeles, California.

_____
Deborah Fritts-Rodriguez

BSC-C 0098488