# EXHIBIT 8

```
1                    - VOLUME E -
2            IN THE UNITED STATES DISTRICT COURT
3            IN AND FOR THE DISTRICT OF DELAWARE
4                        - - -
5    BOSTON SCIENTIFIC CORPORATION,   :    CIVIL ACTION
                                     :
6            Plaintiff        :
                              :
7            vs.             :
                              :
8    CORDIS CORPORATION and           :
     JOHNSON & JOHNSON, INC.,         :
9                              :
             Defendants      :    NO. 03-27 (SLR)
10   ----------------------------------
     BOSTON SCIENTIFIC SCIMED, INC.,  :    CIVIL ACTION
11   and BOSTON SCIENTIFIC            :
     CORPORATION,                     :
12                           :
             Plaintiffs      :
13                           :
             vs.             :
14                           :
     CORDIS CORPORATION and           :
15   JOHNSON & JOHNSON, INC.,         :
                              :
16           Defendants      :    NO. 03-283 (SLR)
17                        - - -
18                    Wilmington, Delaware
                      Tuesday, June 28, 2005
19                    9:28 o'clock, a.m.
20                        - - -
21   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
22                        - - -
23                    Valerie J. Gunning and
                      Leonard A. Dibbs,
24                    Official Court Reporters
25
```

1004

1 Velocity stent. Down here, we see an excerpt from an
2 engineering drawing that engineers like me would
3 generate to tell the machine shop how to cut the stent
4 exactly, which would be the geometry that would be
5 desired.
6        You see the number of dimensions on here
7 and then, if we zoom in on both of these, we can see
8 that we have these curvy offset connectors. We see one
9 connection point down at this level, another connection
10 point up here at this level (indicating), so the
11 connection points are offset. And then we see that
12 it's curvy in between and that's the same whether you
13 look at the actual product or the engineering drawing.
14 Q.  Now, Doctor, you mentioned these curvy offset
15 connectors.  Are those features important for
16 flexibility?
17 A.  Absolutely.  It's very crucial in the flexibility
18 of this design.
19 Q.  Why is that?
20 A.  Well, because you have these connectors -- the
21 fact that they're offset, it gives them something that --
22 gives them a property that avoids what we call the
23 backbone effect.  All right.  The backbone effect is
24 something that would occur if you had the connection
25 point for, say, this end of the connecting strut here

1005

1 (indicating) at the tip and this one here at the tip.
2        Now, those would be along the same circumferential
3 line or along the same horizontal position in this
4 picture.
5        Now, if you had an entire length of a stent
6 with the connection points all at peaks, then you could
7 draw a line along the longitudinal axis that would
8 connect all these peaks, and, in fact, when you try to
9 bend that stent around the corner, you would find that
10 it's much more stiff right at this point right here
11 (indicating).
12        So if, when we bend something, we stretch
13 the outside and compress the inside.  Okay?
14        Now, if we tried to stretch this structure at
15 the point of where these would be connected at the peaks,
16 then it would be much stiffer there.  That's called the
17 backbone effect.  All right?
18        Now, by offsetting the positions of these
19 connectors, it avoids the backbone effect.
20        Now, the other advantage to this being curvy
21 is that you increase the total length from this point to
22 this point (indicating), thereby increasing the
23 flexibility.  And then you have the angles between the
24 different parts of this connecting strut can change
25 quite easily as well.  So the curvy offset design is

1006

1 crucial, really crucial in determining the flexibility of
2 the stent.
3 Q.  Did this curvy offset design make the BX Velocity
4 stent more flexible than the Crown stent?
5 A.  Yes, it did.
6 Q.  Let's take a look now at BSC-4207 (placing chart on
7 the easel).
8        What other stents that Cordis makes use the
9 same curvy offset design to increase flexibility?
10 A.  Well, we see the BX Velocity here again, the BX
11 Sonic, the Cypher and the Genesis stents all use the
12 curvy offset connection design to achieve their
13 flexibility.  And then on the top here, we see from the
14 list of interrogatories between the lawyers, Cordis and
15 the lawyers of Boston Scientific, we see that Cordis
16 was asked whether or not differences exist in the bare
17 metal stent architectures of BX Velocity, BX Sonic and
18 Cypher stents, and they said no.  Basically, they are
19 all using the same curvy offset connector design.
20 Q.  Given these similarities, would it be fair to call
21 the BX Velocity, BX Sonic, Cypher and Genesis, group
22 them all together and call them the BX Velocity for your
23 testimony here today?
24 A.  That would be very useful.
25 Q.  And did Cordis' use of these curvy offset connectors

1061

1   Q.   Do you believe this is the priority date for Claim
2   36 of the '021 patent?
3   A.   Yes, it is.
4   Q.   Why?
5   A.   Because the material described in Claim 36 is
6   clearly outlined in this application and the material
7   is clearly outlined in this application and the Patent
8   Office agreed that the priority date for Claim 36 should
9   be April of 1998.
10   Q.   Now let's turn to Cordis' specific assertions
11   regarding Claim 36 of the '021 patent.
12        Could you turn in your binder to BSE-4234 and
13   tell me, is this a slide that reflects the primary
14   references that Cordis has asserted here?
15   A.   Yes.
16   Q.   Let's take a look.  What do we see on BSE-4234?
17   A.   Here we see the cover pages of four patents that
18   Cordis claims would constitute prior art for the Jang
19   '021 patent.  They're saying these ideas is what Dr.
20   Jang talk and put together to make his invention.  But
21   this argument was considered and rejected by the Patent
22   Office.  They had all this information in front of them
23   at the time and they rejected these as prior art.
24        So what we see, first of all, is the '373
25   patent to Pinchasik.  It's common to refer to patents

1062

1   by the last three numbers.  And then '417 to Palmaz,
2   '303 to Israel.  But I will just point out that the
3   Patent Office, when they granted Dr. Jang the '021
4   patent, considered not the U.S. version of the Israel
5   patent, but the equivalent international version.
6        And then the Brown patent, the '065 patent,
7   which we see here, was also considered in the form of an
8   equivalent international version.
9   Q.   In your expert opinion, do any of these references
10   invalidate Claim 36?
11   A.   No.
12   Q.   Did the Patent Office consider all of these
13   references in either their U.S. patent form or their
14   international patent form?
15   A.   Yes, they did.
16   Q.   And what did the Patent Office conclude?
17   A.   It rejected these as prior art.  It said, We
18   read these, we understand them.  We've read Dr. Jang's
19   claims and we understand them.  And Dr. Jang's claims
20   are clearly new, novel and this patent should be granted.
21   Q.   Now, how do you know that the Patent Office
22   reviewed each of these documents?
23   A.   Because they are included in the list of
24   references cited on the front page of the Jang '021
25   patent.

1063

1   Q.   And did you prepare a slide of that as BSE-4235?
2   A.   Yes.
3   Q.   Let's take a look.
4        MR. ARMENIO:  BSE-4235, please.
5   BY MR. ARMENIO:
6   Q.   What do we see here?
7   A.   Here we see the cover page of the Jang '021 patent
8   and under, right on the cover page, first page of the
9   patent, it gives a list of references cited.  And we
10   see is the '417 Palmaz, '373 Pinchasik and these are
11   the equivalent international versions of the other two
12   patents.
13   Q.   And after the Patent Office considered these
14   references, what did it do?
15   A.   Again, it rejected these as being prior art.  It
16   determined that this prior art did not teach what Dr.
17   Jang was teaching in his claims.
18   Q.   Now let's take a look at a specific page of the
19   prosecution history, the back and forth with the Patent
20   Office.
21        MR. ARMENIO:  JFH-194, please.  And if we
22   could enlarge the highlighted text, please...
23   BY MR. ARMENIO:
24   Q.   What do we see here, Doctor?
25   A.   Okay.  This is part of the back and forth between

1064

1   Dr. Jang's patent lawyers and the Patent Office.  And
2   this is the Patent Office telling Dr. Jang and his
3   lawyers what the allowable subject matter is.
4        So we see a bunch of claim numbers here are
5   objected to as being dependent on a rejected base claim,
6   but they would be allowable if rewritten in independent
7   form.
8        In other words, if we just rewrite all of
9   these claims without depending on this other claim that
10   was rejected, then they would be allowable.  In other
11   words, all of these claims are good as they stand by
12   themselves.
13        Now, if we look here, we see 3138.  Now, the
14   original number upon submission was 37, but that
15   eventually became Claim 36.  So clearly what the Patent
16   Office is saying to Dr. Jang and his lawyers right off
17   the bat is Claim 36 is allowable.  It's new and novel
18   and should not be rejected by these prior-art references.
19   Q.   Let's take a look at some of Cordis' references in
20   a little more detail.
21        Have you prepared some slides of your analysis
22   as BSE-4236 through 4246?
23   A.   Yes.
24   Q.   So let's turn to the first one and take a look at
25   BSE-4236, please, the Pinchasik '373 patent.

1065

1   What do we see here?
2   A.   We see hear the cover page of the Pinchasik '373.
3   Again, it was considered by the Patent Office and
4   rejected as being prior art.
5        If we look at the Pinchasik '373 patent, we
6   can see that it does not have expansion columns as
7   described by Dr. Jang and it does not have the offset
8   corner to corner connections that are crucial in
9   determining the flexibility of the structure.
10  Q.   So is Pinchasik missing important features of the
11  '021 patent?
12  A.   Very important features, yes.
13  Q.   Let's take a look at the first one of those
14  features.
15       And if we could turn to BSE-4237, please...
16       What do we have here, Doctor?
17  A.   Here we have some text from the summary of the
18  invention of the Pinchasik '373. We said that -- we
19  see that it refers to at least two substantially rigid
20  segments. And what it's referring to is what I've
21  highlighted in red here (indicating). This particular
22  embodiment has three of these substantially rigid
23  segments.
24       Now, this is different from an expansion
25  column because we see this slot running this way is an

1066

1   entirely enclosed space, unlike the expansion columns.
2        And when that expands, that slot becomes kind
3   of like a diamond shape. All right?
4        Well, the behavior, mechanical behavior of
5   this substantially rigid segment is really very, very
6   different from an expansion column as described by Dr.
7   Jang.
8   Q.   So Pinchasik has substantially rigid segments and
9   that's different from the '021 patent, which has expansion
10  columns; is that right?
11  A.   That's correct. Yes.
12  Q.   Is that difference important?
13  A.   Absolutely. The flexibility of this structure is
14  going to be largely determined by the connectors, not by
15  the substantially rigid segments. These things do not
16  have very much flexibility to them at all. So with Dr.
17  Jang's design, we have the expansion columns that have
18  their own flexibility and the connectors that have
19  their own flexibility. So the result is a more
20  uniformly flexible structure and much more flexible
21  overall as well.
22  Q.   Now let's talk about the second difference you
23  mentioned.
24       And if we could turn to BSE-4238, please...
25       What do we see here, Doctor?

1067

1   A.   Here we see another excerpt from the Pinchasik
2   '373. We see links 112 between apexes of diamond-
3   shaped cells.
4        So it's referring to these connectors here
5   that run between the apexes (indicating). And we can see
6   another version over here, which they actually prefer,
7   that has these zig-zag connectors. And what it says
8   about this is that it prefers these kinds of connectors
9   to these spiral connectors because the spiral connectors,
10  when the stent is expanded, can rotate out of plane and
11  hang up on the artery wall and maybe damage the artery
12  wall.
13       So they're saying they don't want the offset
14  connection scheme. They want the straight across
15  connection scheme here, and they want them attached at
16  the apexes of these points, not on the corners.
17  Q.   And so here (indicating), under Pinchasik, if we
18  drew a line from the one end of the connector to the
19  other, even though the connector itself goes back and
20  forth, that would be a straight line; is that correct?
21  Along the longitudinal axis?
22  A.   That's right. It would be a straight line along
23  the longitudinal axis. It would not be offset.
24  Q.   Is that different than the '021 patent?
25  A.   Absolutely. And that difference is very important.

1068

1   Q.   Why is it important?
2   A.   Because of the flexibility. This stent here is
3   going to exhibit what I call the backbone effect.
4        By saying that it prefers this kind of
5   connector that runs straight across rather than offset,
6   it's achieving, in fact, what I referred to previously
7   as the backbone effect.
8        So the difference between this kind of curvy
9   connector and the kind of curvy connector specified by Dr.
10  Jang is really very significant.
11  Q.   And the backbone effect we've heard you tell us
12  earlier, we want to avoid that because that hurts
13  flexibility; is that right?
14  A.   Exactly, yes.
15  Q.   Now let's look at BSE-4239. What do we see here?
16  A.   Here we see an excerpt from the communication
17  between Dr. Jang's lawyers and the Patent Office in
18  which the patent examiner has colored in half of the
19  tubular member of the Pinchasik '373.
20       - - -
21  A.   (Continuing) It says, well, half of this structure
22  looks like an expansion column and you've got curvy
23  connectors here, and thought maybe that would invalidate
24  part of the Jang patent.
25       When Dr. Jang's lawyers replied and said,

1059

1 no, this is not the same structure. This is a tubular
2 member over here, not an expansion column.
3 Q. Let me ask you, Doctor, with respect to Claim 36,
4 what turned out to be Claim 36 of the '021 patent, did
5 the Patent Office ever reject Claim 36 that we're
6 talking about in this courtroom over this figure?
7 - - -
8 A. No. In fact, this figure was -- was talking about
9 some other claim.
10 Claim 36 was allowed from the beginning,
11 remember, and this figure was not used to invalidate
12 Claim 36.
13 Q. So now taking into account everything you've
14 studied and everything you've discussed here today,
15 does the Pinchasik '373 patent invalidate Claim 36 in
16 any way?
17 A. No. Absolutely not.
18 Q. Let's turn to Cordis' next reference and let's
19 take a look at BSE-4240, please.
20 What do we see here?
21 A. Here we see the cover page of the Palmaz '417
22 patent. Again, it was considered by the Patent Office
23 when it was looking at Dr. Jang's, what eventually
24 became the '021 patent, Claim 36. It considered this
25 and rejected it as prior art. It determined it was not

1070

1 relevant as prior art. It did not have the same ideas
2 as Dr. Jang had disclosed in his invention.
3 Now, if we look at the design in the Palmaz
4 '417 patent, we see that it does not have curvy
5 connectors, and it does not have corner to corner
6 connections.
7 Q. Let's talk about that a little more, and to do so,
8 may we see BSE-4242, please?
9 What do we see here, Doctor?
10 A. Here we see an excerpt from the Palmaz '417 patent.
11 It comes from Column 4. And we see that a feature of
12 the present invention is that at least one connector
13 member may be disposed in a non-parallel relationship
14 with respect to the longitudinal axis of the tubular
15 members.
16 And in this figure, it shows one of these
17 connectors running up this way. We see that that is
18 not parallel to the longitudinal axis, which would be
19 running in this direction (indicating).
20 Q. Is this the connector here in red?
21 A. Yes. I've highlighted in red there, so we can
22 see it. It runs up this way, not parallel to the
23 longitudinal axis.
24 Q. Is that connector curvy?
25 A. No. It's straight. And if we -- we couldn't call

1071

1 it curvy and stick with -- it couldn't be curvy and
2 comply with this -- this, what this sentence is saying
3 here. The non-parallel relationship.
4 Well, if it's running up in a straight line
5 this way, clearly, it's not parallel.
6 Now, if it were zig-zagging or if it were
7 curvy, then at least portions of it could be considered
8 parallel and we wouldn't talk about it using this kind
9 of language.
10 So it's clear that what was intended here
11 was a straight connector that did not run parallel to
12 the longitudinal axis.
13 Q. Is that the same or different than the connector in
14 the '021 patent?
15 A. It's very, very different. Remember the '021
16 patent, Claim 36 specifies a curvy offset connector.
17 Q. Are those connectors important to flexibility?
18 A. Absolutely. The curvy offset connector is going
19 to provide a much more flexible structure than any
20 straight connector.
21 Q. Now, earlier, we talked in our infringement
22 analysis about the corner to corner offset connections.
23 Does Palmaz '417 show this corner to corner type of
24 connection scheme that we see in the '021 patent?
25 A. No. In fact, we can see this connector here is

1072

1 connected to the apex here and the apex up there
2 (indicating).
3 Q. Does the Palmaz '417 patent -- you've read that
4 patent; right?
5 A. Yes.
6 Q. Does it even mention corners?
7 A. No. It does not even mention corners there.
8 Q. Taking into account, Doctor, everything you've
9 studied and everything you've discussed here today in
10 court, does the Palmaz '417 patent invalidate Claim 36
11 in any way?
12 A. No. Absolutely not.
13 Q. Let's turn to another of Cordis' references, the
14 Israel '303 patent.
15 MR. ARMENIO: And if we can see BSE-4243,
16 please...
17 BY MR. ARMENIO:
18 Q. What do we see here, Doctor?
19 A. Here we have the cover page of the Israel '303
20 patent, and here we have the cover page of the
21 international equivalent, which has this number here
22 (indicating).
23 Remember, it was the international equivalent
24 that was in front of the patent examiner in this case and
25 he rejected it as being prior art. He read the -- the

1073

1 patent examiner read these documents very carefully.
2 Read the '021 patent and rejected this as being prior
3 art. It does not constitute prior art.
4      Now, what we see if we read about the
5 structure is that it does not have offset corner to
6 corner connections. And actually it teaches away from
7 offset corner to corner connections.
8      It says that it does not want offset corner
9 to corner connections.
10 Q.  Let's talk about that a little bit more.
11      MR. ARMENIO:  Could we turn to BSE-4244,
12 please?
13 BY MR. ARMENIO:
14 Q.  So, first of all, let's just get our bearings.
15      Is this an offset connector scheme that's
16 shown (indicating)?
17 A.  No. This is not an offset connector scheme. We
18 see here that the connection point here is perfectly
19 even with the connection point on the other side, and so
20 that would run straight across there. And then if we
21 read in the background of the invention, it talks about
22 actually the '417 patent that we just got through talking
23 about.
24      It says when those expand, the helical
25 connectors, in other words, if it has offset connection

1074

1 points, that it twists and it may be harmful to the
2 blood vessels.
3      So it's saying, all right, in this invention,
4 we're not going to do that. All right? We're not going
5 to offset the connection points. All right?
6      And then it refers to this patent by Schatz,
7 who was a collaborator of Dr. Palmaz. They had designed
8 a stent with a one straight connector that removes the
9 twisting motion that it's talking about up here.
10      So it clearly is saying that it wants to
11 connect straight across and not at offset points.
12 Q.  Now, is this requirement to avoid offset connection
13 points one of the reasons that this stent design is less
14 flexible than the BX Velocity?
15 A.  Absolutely. Remember, the offset part of the curvy
16 offset connection scheme is very important in determine
17 the flexibility because it helps avoid the backbone
18 effect.
19 Q.  Doctor, taking into account everything you've
20 studied and everything you've discussed here today about
21 this Israel '303 patent, does it invalidate Claim 36 of
22 the '021 patent in any way?
23 A.  No. Absolutely not.
24 Q.  Now, sorry, but there's one more reference Cordis
25 has asserted.

1075

1 Q.  Can we take a look now at the Brown '065
2 patent and BSE-4245.
3      What do we see here, Doctor?
4 A.  Again, we have the cover page of the Brown '065.
5 We have the international equivalent down here. And,
6 again, this material was in front of the patent examiner
7 when the patent examiner was looking at Dr. Jang's '021
8 Claim 36.
9      The patent examiner rejected this as being
10 prior art. He said this is not prior art. Claim 36 is
11 new and novel and should be granted right off the bat.
12      Now, if we look at the structure described
13 in this patent, we see that it does not have curvy
14 connectors, it does not have corner to corner connections
15 for adjacent strut pairs, and it actually teaches that
16 the connectors should be rigid.
17      Dr. Jang's connectors are offset and curvy,
18 so they can be flexible. This is saying that the
19 connectors have to be rigid.
20      Well, that's teaching 180 degrees opposite,
21 totally opposite to what Dr. Jang is trying to achieve.
22 Q.  Well, let's take a look at that. Let's turn to
23 BSE-4246, please.
24      What do we see here?
25 A.  Here we see in the summary of the invention of the

1076

1 Brown '065, it says that the connectors between the
2 segments, which I've highlighted in red here (indicating),
3 are not intended to flexion or bend under normal use,
4 unlike Dr. Jang's connectors.
5 Q.  Is that the difference between the rigid connectors
6 of Brown and the flexible connectors of the '021 patent
7 important?
8 A.  Very, very important. The overall structure is not
9 going to be as flexible if the connectors are not
10 intended to flex or bend. So with the offset, curvy
11 connection scheme of Dr. Jang, we have flexibility.
12 With this we don't. The opposite is in that sense.
13 Q.  Taking into account, Doctor, everything you've
14 studied and discussed about the Brown '065 patent, does
15 this patent invalidate Claim 36 in any way?
16 A.  No. Absolutely not.
17 Q.  So now we've talked about four patents. Could any
18 of these four patents either by itself or combined in
19 some way be considered to invalidate Claim 36 in any way?
20 A.  No. In fact, they teach away from each other.
21 This one teaches connectors that are not intended to flex
22 or bend, for example, and the others, well, they have
23 other kind of connectors.
24      So really they're teaching completely
25 opposite things.

1077

1    Q.   Would a stent designer of ordinary skill in 1996
2    have had any motivation at all to try to mix and match
3    and combine any of these elements from any of these
4    patents to arrive at the claimed invention with these
5    elements of Claim 36?
6    A.   No.  As I said, this patent, for example, teaches
7    away.  These -- there's no way these four patents could
8    be combined to arrive at Dr. Jang's invention because
9    they teach away from each other.  One thing teaches one
10   thing.  Another patent teaches another.  And, really,
11   there would be no motivation to combine things that are
12   telling you to do two completely different things.
13   Q.   Now, Doctor, Cordis had some other references.
14   Did you kind of group these together on one slide,
15   BSE-4248?
16   A.   Yes.
17   Q.   So let's go ahead and take a look, please.
18   BSE-4248.
19        What do we see here, Doctor?
20   A.   Here we see some of the other things that Cordis
21   is calling prior art.  And we see a sort of hoop
22   arrangement here (indicating) that's connected with this
23   undulating longitudinal member here and clearly, this
24   kind of undulating longitudinal member could never be
25   used to have offset connectors.  It's not described in

1078

1    there.
2         And then this figure down here from this
3    patent here shows a completely different structure as
4    well.  And, in fact, this one was in front of the patent
5    examiner when Claim 36 was granted without hesitation.
6    Q.   Now, after studying all of Cordis' other asserted
7    references, do any of them invalidate Claim 36 in any way?
8    A.   No.  Absolutely not.
9    Q.   Sitting here today, Dr. Moore, are you aware of any
10   reference, whether cited by Cordis or otherwise, that
11   invalidates Claim 36, which are all of these requirements
12   and its increased flexibility, in any way?
13   A.   No, I'm not.
14   Q.   Now, Dr. Moore, in addition to these references,
15   did you consider the fact that Cordis applied for a patent
16   on the BX Velocity design?
17   A.   Yes.
18   Q.   Why did you consider that?
19   A.   Because when Cordis went to the Patent Office with
20   what it thought was a new design, it said that all of
21   these design features that we see here on the board, it
22   said that all of those were new.
23   Q.   So Cordis wanted to get a patent like this one,
24   Claim 36 of the Jang '021; is that right?
25   A.   Yes.  You bet they wanted it.

# EXHIBITS 9 – 13

# REDACTED

# IN

# FULL

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION and )
JOHNSON AND JOHNSON, INC. )
)
)
Plaintiffs, )
) C.A. No. 03-27-SLR
v. )
)
BOSTON SCIENTIFIC SCIMED, INC. and )
BOSTON SCIENTIFIC CORPORATION, )
)
)
Defendants. )

## PLAINTIFFS' AND COUNTERCLAIM-DEFENDANTS'
## NOTICE PURSUANT TO 35 U.S.C. § 282

Pursuant to 35 U.S.C. § 282, Plaintiffs and counterclaim-defendants Cordis

Corporation and Johnson and Johnson, Inc. (collectively "Cordis") hereby give notice to

Defendants and counterclaim-plaintiffs Boston Scientific Corp. and Boston Scientific Scimed,

Inc. (collectively "BSC") of those patents and publications that Cordis may rely upon as

anticipation of the patent-in-suit or as showing the state of the art, and the persons whom Cordis

may rely upon as prior inventor(s) or as having prior knowledge of or as having previously used

or offered for sale the alleged invention of the patent-in-suit.

1.    **Patents**

| Patent | Issue/Publication Date | Inventor (Assignee) |
|---|---|---|
| U.S. Patent No. 4,733,665 and Reexamination Certificate B1 4,733,665 | 3/29/88 (Reexamination Certificate issued 1/11/94) | Julio Palmaz (Cordis Corporation) |

BSC-C 026940

| Patent | Issue/Publication Date | Inventor (Assignee) |
|---|---|---|
| U.S. Patent No. 4,739,762 and Reexamination Certificate B1 4,739,762 | 4/26/88 (Reexamination Certificate issued 10/27/98) | Julio Palmaz (Cordis Corporation) |
| U.S. Patent No. 5,102,417 | 4/7/92 | Julio Palmaz et al. (Cordis Corporation) |
| E.P.O. 0 335 341 A1 | 10/4/89 | Julio Palmaz (Cordis Corporation) |
| E.P.O. 0 221 570 | 5/13/87 | Julio Palmaz |
| U.S. Patent No. 5,449,373 | 9/12/95 | Gregory Pinchasik et al. |
| U.S. Patent No. 5,195,984 | 3/23/93 | Richard Schatz (Cordis Corporation) |
| U.S. Patent No. 5,902,332 | 5/11/99 | Richard Schatz (Cordis Corporation) |
| E.P.O. 0 709 067 A2 | 5/1/96 | Gregory Pinchasik et al. (Medinol Limited) |
| U.S. Patent No. 4,776,337 | 10/11/88 | Julio Palmaz (Cordis Corporation) |
| U.S. Patent No. 4,793,348 | 12/27/88 | Julio Palmaz (Cordis Corporation) |
| WO 96/03092 | 2/8/96 | Henry Israel et al. |
| WO 98/40035 | 9/17/98 | Hess et al. |
| U.S. Patent No. 5,733,303 | 3/31/98 | Israel et al. (Medinol Ltd.) |
| U.S. Patent No. 5,922,005 | 7/13/99 | Richter et al. (Medinol Ltd.) |
| U.S. Patent No. 6,348,065 | 2/19/02 | Brown et al. (Scimed Life Systems, Inc.) |
| U.S. Patent No. 5,104,404 | 4/14/92 | Wolff (Medtronic, Inc.) |

2

BSC-C 026941

| Patent | Issue/Publication Date | Inventor (Assignee) |
|---|---|---|
| U.S. Patent No. 5,292,331 | 3/8/94 | Boneau (Arterial Vascular Engineering, Inc.) |
| U.S. Patent No. 5,514,154 | 5/7/96 | Lau et al. (Advanced Cardiovascular Systems, Inc.) |
| U.S. Patent No. 5,643,312 | 7/1/97 | Fischell et al. |
| U.S. Patent No. 5,879,370 | 3/9/99 | Fischell et al. |
| U.S. Patent No. 5,810,872 | 9/22/98 | Nozomu Kanesaka et al. |
| DE 297 021 671 U1 | 5/22/97 | Jomed Implantate GmbH |
| E.P.O. 0606165 | 7/13/94 | Miksza |
| U.S. Patent No. 5,810,872 | 3/14/97 | Kanesaka et al. |

2.    **Publications**

P. Serruys et al., <u>A Comparison of Balloon-Expandable Stent Implantation with Balloon Angioplasty in Patients with Coronary Artery Disease</u>, New Engl. J. Med., 331:489-95 (1994).

Fischman, et al., <u>A randomized comparison of coronary-stent placement and balloon angioplasty in the treatment of coronary artery disease</u>, New Engl. J. Med. 331:496-501 (1994).

Ruygrok and Serruys, <u>From Bench to Beside, Intracoronary Stenting, From Concept to Custom</u>, Circulation, 882-890 (1994).

Charles Dotter et al., <u>Transluminal Treatment of Arteriosclerotic Obstruction Description of a New Technique and a Preliminary Report of its Application</u>, CIRCULATION 30:654-669 (1964).

C. T. Dotter, <u>Transluminally Placed Coil Spring Endarterial Tube Grafts Long Term Patency in Canine Popliteal Arteries</u>, INVESTIGATIVE RADIOLOGY 4:329-332 (1969).

A. Gruntzig et al., <u>Non-operative Dilatation of Coronary Artery Stenosis Percutaneous Transluminal Coronary Angioplasty</u>, New Engl. J. Med., 301:61-68 (1979).

3

BSC-C 026942

Dotter, Intraventional Radiology -- Review of an Emerging Field, SEMINARS IN ROENTGENOLOGY 16(1):7-8 (1982).

Palmaz et al., Removable Biliary Endoprosthesis, Am. J. Roentgenol. 140(4):812-4 (1983).

J.C. Palmaz, Expandable Intraluminal Graft: A Preliminary Study, 153(P) RADIOLOGY 329 Abs. 993 (November 1984).

C. Charnsangavej et al., A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation, HOUSTON MEDICAL JOURNAL 2:41-51 (June 1987).

K. Wright et al., Percutaneous Endovascular Stents: An Experimental Study, 153(P) RADIOLOGY Abs 593 (November 28, 1984).

J.C.Palmaz et al., Expandable Intraluminal Porto Caval Shunt: An Experimental Study, PROGRAM OF THE 85th ANNUAL MEETING OF THE AMERICAN ROENTGEN RAY SOCIETY 125 (April 21-26, 1985).

Julio Palmaz, MD, Expandable Intraluminal Graft: A Preliminary Study: Work in Progress, Radiology 1985; 156:73-77 (July 1985).

K. Wright et al., Percutaneous Endovascular Stents: An Experimental Evaluation, RADIOLOGY 1:69-72 (July 1985).

Julio C. Palmaz et al., Expandable Intrahepatic Portacaval Shunt Stents: Early Experience in the Dog, 145 Am. J. Roentgenol. 145:821-825 (1985).

C. Charnsangavej et al., Endovascular Stent for Vena Caval Stenosis: Laboratory Experiment and Potential Clinical Applications, 157(P) RADIOLOGY 66 Abs. 129 (November 1985).

J.C. Palmaz et al., Expandable Intraluminal Grafting in Atherosclerotic Rabbit Aortas, 157(P) RADIOLOGY 66 Abs 130 (November 1985).

J.C. Palmaz et al., Expandable Intraluminal Vascular Graft: A Feasibility Study, SURGERY 199(2):199-205 (February 1986).

Michael Wallace, et al., Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications, RADIOLOGY 158(2):309-12 (February 1986).

Julio C. Palmaz et al., Expandable Intrahepatic Portocaval Shunt Stents in Dogs with Chronic Portal Hypertension, American Roentgen Ray Soc'y 1986 Annual Meeting, Washington, D.C., April 13-18, 1986 (BT 000079).

4

BSC-C 026943

Julio C. Palmaz et al., Atherosclerotic Rabbit Aortas:  Expandable Intraluminal Grafting, RADIOLOGY 160:723-726 (September 1986).

R. Schatz et al., Balloon Expandable Intracoronary Stents In Dogs, CIRCULATION 74(Supp. II-458):1824 Abstract (October 1986).

Roubin, Intracoronary Stenting of Canine Coronary Arteries After Percutaneous Coronary Angioplasty (PTCA), CIRCULATION 74(Supp. II-458): 1825 Abstract(October 1986).

Chusilip Charnsangavej, et al., Stenosis of the Vena Cava:  Preliminary Assessment of Treatment with Expandable Metallic Stents, RADIOLOGY 161:295 (November 1986).

J.C. Palmaz et al., Balloon Expandable Intraluminal Grafting of Normal and Abnormal Renal Arteries:  Experimental Study, RADIOLOGY 161(P):40-41 Abstract 85 (November 1986).

Palmaz et al., Expandable Intrahepatic Portacaval Shunt Stents in Dogs with Chronic Portal Hypertension, AJR 147:1251-54 (December 1986).

Presentation at The Society of CV & Interventional Radiology's Twelfth Annual Course On "Diagnostic Angiography and Interventional Radiology." Includes: "The Current Status of Vascular Prostheses" by Julio Palmaz at 118-120 (3/23-3/26/87).

R. A. Schatz et al., Balloon-expandable Intra-coronary Stents In The Adult Dog, CIRCULATION 76(2):450-457 (August 1987).

J.C. Palmaz et al., Normal and Stenotic Renal Arteries:  Experimental Balloon-expandable Intraluminal Stenting, RADIOLOGY 164(3):705-708 (September 1987).

J.C. Palmaz et al., New Technology in Angioplasty:  Balloon-Expandable Intravascular Stents, NEW DEVELOPMENTS IN MEDICINE, 2(2):59-75 (September 1987).

R.A. Schatz et al., Balloon Expandable Intravascular Stents in Diseased Human Cadaver Coronary Arteries, CIRCULATION 70(4):Abstract 0102 (October 1987).

Julio C. Palmaz, Balloon-Expandable Intravascular Stent, AJR 150:1263-1269 (June 1988).

Richard A. Schatz, Introduction to Intravascular Stents, CARDIOLOGY CLINICS 6(3):357-72 (August 1988).

5

BSC-C- 026944

Richard A. Schatz, A View of Vascular Stents, CIRCULATION 70(2):445-57 (February 1989).

Richard A. Schatz, et al., Clinical Experience with the Palmaz-Schatz Stent: Initial Results of A Multicenter Study, CIRCULATION 83(1):148-161 (January 1991).

Palmaz, J.C. et al., Intravascular Stents: Basic Physical and Biological Properties, ENDOLUMINAL TREATMENT: THE DIFFERENT TECHNIQUES 149-158 (Mid 1990's).

H. Herrmann and John W. Hirshfeld, Jr., Clinical Use of the Palmaz-Schatz Intracoronary Stent (Futura Publishing Co. 1993).

Gruntzig et al., Nonoperative Dilatation of Coronary-Artery Stenosis, NEW ENGLAND J. MED. 301(2):61-68 (1979).

P. Teirstein (ed.), Coronary Stents: pros and cons, Coronary Artery Disease 1994, 5:561-600.

A. Columbo et al., A Novel Strategy for Stent Deployment in the Treatment of Acute or Threatened Closure Complicating Balloon Coronary Angioplasty, JACC 22(7):1887-91 (Dec. 1993).

Alan Cohen, Ten Patents that Changed the World, IP Worldwide, at 30-32 (Aug. 2002).

J.B. Kutryk and P. Serruys, Coronary Stenting: Current Perspectives (1999).

Michael Parks and Gary S. Roubin, Current Clinical and Technical Status of the Gianturco-Roubin Flex Stent: State of the Art and Future Developments (Dieter D. Liermann ed. 1995), 100-105.

Oesterle, et al., The Stent Decade: 1987 to 1997, American Heart Journal Vol. 136, No. 4, Part 1, 578-599.

B.F. Waller, Crackers, Breakers, Stretchers, Drillers, Scrapers, Shavers, Burners, Welders and Melters — The Future Treatment of Atherosclerotic Coronary Artery Disease? A Clinical-Morphologic Assessment, JACC 13:969-87 (1989).

Roubin et al., Interventional Cardiology Medicine, Principles and Practice.

Sigwart, Endoluminal Stenting.

P.C. Block, Coronary-artery stents and other endoluminal devices, New Engl. J. Med. 324:52-3 (1991).

BSC-C 026945

3.   **Prior Inventors, Persons With Prior Knowledge of the Alleged Inventions, Persons Who Made Prior Uses or Offers for Sale and Persons with Knowledge of the Art**

Julio Palmaz
4031 Hagen Road
Napa, CA 94558

Robert Fischell
14600 Viburnum Drive
Dayton, MD 21036

David Fischell
71 Riverlawn Drive
Fairhaven, NJ 07704

Tim Fischell
Heart Institute Borgess Medical Center
1521 Gull Road
Kalamazoo, MI 49001

Nigel Buller
Queen Elizabeth Hospital
Edgaston
Birmingham B15 2TH, England

David M. Parks
Massachusetts Institute of Technology
77 Massachusetts Avenue
Room 1-310
Cambridge, MA 02139

Brian J. Brown

Gregory Pinchasik

Jacob Richter

Henry Marshall Israel

BSC-C 026946

4.    **Other  Materials Constituting or Describing The Art**

    a.    **Stents**

Palmaz stent

Palmaz-Schatz coronary stent

Wallstent

    b.    **Other Materials**

P. Serruys, <u>Handbook of Coronary Stents</u> (1st ed. 1997).

P. Serruys, <u>Handbook of Coronary Stents</u> (2d ed. 1998).

P. Serruys, <u>Handbook of Coronary Stents</u> (3rd ed. 2000).

P. Serruys, <u>Handbook of Coronary Stents</u> (4th ed. 2002).

A. Columbo & J. Tobis, <u>Techniques in Coronary Artery Stenting</u> (2000).

A. Kastrati et al., Am. J. Cardiol. 2001; 87:34-49.

Sigwart, <u>Endoluminal Stenting</u> (1996).

COR891322

COR891330

BSC219870

To the extent not separately listed above, prior art referenced in the prosecution histories of the Jang '021 patent and any related applications.

           ASHBY & GEDDES

           Steven J. Balick (#2114)
           John G. Day (#2403)
           222 Delaware Avenue, 17th Floor
           P.O. Box 1150
           Wilmington, Delaware 19801
           (302) 654-1888

           *Attorneys for Plaintiffs Cordis Corporation and*
           *Johnson and Johnson, Inc.*

8

BSC-C 026947

*Of Counsel:*

Gregory L. Diskant
Kim J. Landsman
Catherine A. Williams
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric I. Harris
Paul A. Coletti
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Dated:  May 12, 2005
157180.1

BSC-C 026948

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2005, the attached **PLAINTIFFS' AND**

**COUNTERCLAIM-DEFENDANTS' NOTICE PURSUANT TO 35 U.S.C. § 282** was served

upon the below-named counsel of record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391

<u>HAND DELIVERY</u>

Peter J. Armenio, Esquire
Citigroup Center
153 East 53rd Street
New York, NY  10022-4675

<u>VIA FEDERAL EXPRESS</u>

John G. Day

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and )
BOSTON SCIENTIFIC SCIMED, INC., ) **CONFIDENTIAL**
)
Plaintiffs, )
)
v. ) C.A. No. 05-768-SLR
)
CONOR MEDSYSTEMS, INC., )
)
)
Defendant. )
_____ )

## CONOR MEDSYSTEMS, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 8 AND SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NOS. 13-14

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Conor Medsystems, Inc. ("Conor") hereby objects and responds to Plaintiffs Boston Scientific Corporation and Boston Scientific SciMed, Inc.'s ("BSC") Interrogatory Nos. 8 & 13-14, as follows:

### GENERAL OBJECTIONS

Conor incorporates by reference the General Objections set forth in Conor's Objections and Responses To Plaintiffs' Interrogatory Nos. 7-11 and 13-16.

### DEFINITIONS

A.    "'021 Patent" means U.S. Patent No. 5,922,021.

### SPECIFIC OBJECTIONS & RESPONSES

Subject to and without waiving its General Objections, Conor objects and responds to BSC's Interrogatory Nos. 8 & 13-14 as follows:

**INTERROGATORY NO. 8:**

Describe in detail each and every factual and legal basis for Conor's contention that "[e]ach of the claims of the '021 patent is invalid for failure to comply with the Patent Laws of the United States, including without limitation the conditions and requirements for patentability set forth in 35 U.S.C. §§ 102, 103, and 112."

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome, in particular, because BSC seeks Conor's contentions for "each of the claims of the '021 patent" even though BSC accuses Conor of infringing only Claim 35. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to a contention interrogatory before claim construction and the start of expert discovery. Conor also objects to this interrogatory as premature because it seeks expert opinion testimony prior to the disclosure dates set forth in the Federal Rule of Civil Procedure 26(a)(2)(C) and the Court's scheduling order for expert discovery. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General and Specific Objections, Conor responds as follows: As properly construed and/or as apparently construed by BSC in furtherance of its apparent infringement theories, Claim 35 of the '021 Patent is anticipated pursuant to 35 U.S.C. § 102 and/or rendered obvious, including by simultaneous invention, pursuant to 35 U.S.C. § 103 by the following prior art references, separately and in combination:

1.    U.S. Patent No. 5,545,210 (Hess)

2.    U.S. Patent No. 5,807,404 (Richter)

3.    U.S. Patent No. 5,733,303 (Israel)

4.    U.S. Patent No. 4,739,762 (Palmaz)

2

5.    U.S. Patent No. 4,733,665 (Palmaz)

6.    U.S. Patent No. 5,102,417 (Palmaz)

7.    U.S. Patent No. 5,514,154 (Lau)

8.    U.S. Patent No. 5,195,984 (Schatz)

9.    U.S. Patent No. 6,348,065 (Brown)

10.    U.S. Patent Application No. 08/816348 (Hess)

11.    EP 0709 067 A2 (Pinchasik)

12.    WO 98/40035 (Hess)

13.    PCT/US98/05014 (Hess)

14.    DE 297 08 689 (Hoefer)

15.    EP 0421 729 (Wolff)

16.    EP 0606 165 (Miksza-Ethicon)

17.    The V-Flex and V-Flex Plus Coronary Stents as manufactured, sold, offered for sale, and/or used by Global Therapeutics in the United States prior to the filing date of the '021 Patent

18.    The NIR stent as manufactured, sold, offered for sale, and/or used by Jakob Richter and Medinol Ltd. in the United States prior to the priority and/or application dates of the '021 Patent

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. Beginning in 1996, Robert, Tim, and David Fischell individually, and as a group, developed stent architectures that predate the priority date of the '021 Patent as described and depicted in the declaration of Robert Fischell dated June 12, 2000 filed in the *Scimed Life*

3

*Systems, Inc., et al. v. Johnson & Johnson, et al.* litigation (D. Del.) (Civil Action No. 00-404-SLR), the Jan. 1996 Robert Fischell stent drawings, U.S. Patent No. 5,643,312, U.S. Patent No. 5,697,971, and U.S. Patent No. 6,190,403 and was eventually demonstrated to the public as the Isostent, including at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands, and Cordis' Bx Velocity stent. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Progressive Angioplasty System ("PAS") before the priority date of the '021 Patent when it developed the stent design in the United States that eventually was disclosed to the public as the Paragon stent. The design for the Paragon stent was described in Bruce Modesitt's lab notebooks, 1996-97 CAD drawings from PAS, the 1997 *Handbook of Coronary Stents*, and at the December 1997 Cardiovascular Summit and 4th Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

The stent described in Claim 35 of the '021 Patent also was invented by personnel at UniCath before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Iris stent. The design for the Iris stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Devon Medical before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Pura-Vario stent. The design for the Pura-Vario stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

The stent described in Claim 35 of the '021 Patent is obvious to one of ordinary skill at the times Jang filed provisional application 60/017,484 and his '021 patent application in light of several factors. First, as apparently construed by BSC in furtherance of its infringement theories, Claim 35 purportedly covers the design where the expansion strut pairs in the first and second expansion strut columns are longitudinally aligned ("non-offset design"). This non-offset design was commonly known in the prior art and described in several references that predate the priority date of the '021 Patent, including the Israel '303 patent, the Pinchasik '067 reference, the '065 Brown patent, the '154 Lau patent, and the '417 Palmaz patent. In addition, the use of a curvy connector to attach two expansion struts in two separate expansion strut columns was well-known and obvious to a person of ordinary skill in the art as of the priority or the application date of the '021 Patent. The stent architectures developed by the Fischells beginning in 1996 and described in the Fischell '312 patent, the Pinchasik '067 reference, and the Israel '303 patent all demonstrate that the use of a curvy connector was widely known in the prior art. A person of ordinary skill in the art would have had the motivation to combine the non-offset design and the curvy connector in a single stent design prior to the time Jang filed his provisional application in April 1996 or the '021 patent application in April 1997. An example of such a motivation to combine can be found in the stent designs of Paul H. Burmeister, et al., described in U.S. Patent Application No. 08/246,320.

The stent described in Claim 35 of the '021 Patent is further obvious because this design was simultaneously invented by other companies during 1996 and 1997. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Jomed when it developed the Jostent Coronary stent prior to the filing date of the '021 Patent, described it in the German patent application no. DE 297 08 689, and was demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam,

Netherlands. Additional evidence of simultaneous invention by other people and companies can be found in the Richter '404 patent and the developments, as described above, of the Isostent by the Fischells, the Bx Velocity stent by the Fischells and Cordis, the Paragon stent by Progressive Angioplasty System, the NIR stent by Medinol Ltd., the Iris stent by Uni-Cath, V-Flex and V-Flex Plus stents by Global Therapeutics, and the Pura-Vario stent by Devon Medical.

Claims 23 and 35 of the '021 Patent are also invalid pursuant to 35 U.S.C. § 112 because, as apparently construed by BSC in furtherance of its infringement theories, the specification does not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea of a stent with a non-offset design as of April 26, 1996 or April 25, 1997.

To the extent BSC claims priority to Jang's provisional application No. 60/017,484 dated April 26, 1996, the specification of this provisional application did not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a stent that has an expansion strut pair consisting of first expansion strut that is adjacent but not parallel to a second expansion strut. In addition, the specification of provisional application No. 60/017,484 did not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a connecting strut from the top corner of one expansion strut pair in the first expansion strut column to the bottom corner of a second expansion strut pair in a second expansion strut column as it is purportedly claimed in Claim 35 of the '021 Patent.

Finally, the asserted claim of the '021 Patent is invalid because the prior art references in Cordis' 35 U.S.C. § 282 statement anticipate the stent described in Claim 35 under 35 U.S.C. § 102 and/or render the claimed stent obvious under 35 U.S.C. § 103. In addition, Claim 35 of the '021 Patent is invalid for all the reasons stated in Cordis' opening and reply

briefs in support of its motions for judgment as a matter of law filed in the *Cordis Corp. v. Boston Scientific Corp., et al.*, Civil Action No. 03-027-SLR (D. Del.) litigation.

Discovery is still ongoing and expert discovery has yet to begin.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome, in particular, because BSC seeks Conor's contentions for "each of the claims of the '021 patent" even though BSC accuses Conor of infringing only Claim 35. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to a contention interrogatory before claim construction and the start of expert discovery. Conor also objects to this interrogatory as premature because it seeks expert opinion testimony prior to the disclosure dates set forth in the Federal Rule of Civil Procedure 26(a)(2)(C) and the Court's scheduling order for expert discovery. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General and Specific Objections, Conor responds as follows: As properly construed and/or as apparently construed by BSC in furtherance of its apparent infringement theories, Claim 35 of the '021 Patent is anticipated pursuant to 35 U.S.C. § 102 and/or rendered obvious, including by simultaneous invention, pursuant to 35 U.S.C. § 103 by the following prior art references, separately and in combination:

1. U.S. Patent No. 5,545,210 (Hess)

2. U.S. Patent No. 5,807,404 (Richter)

3. U.S. Patent No. 5,733,303 (Israel)

4. U.S. Patent No. 4,739,762 (Palmaz)

5. U.S. Patent No. 4,733,665 (Palmaz)

7

6.  U.S. Patent No. 5,102,417 (Palmaz)

7.  U.S. Patent No. 5,514,154 (Lau)

8.  U.S. Patent No. 5,195,984 (Schatz)

9.  U.S. Patent No. 6,348,065 (Brown)

10.  U.S. Patent No. 5,827,321 (Roubin)

11.  U.S. Patent No. 6,183,506 (Penn)

12.  U.S. Patent Application No. 08/816348 (Hess)

13.  EP 0709 067 A2 (Pinchasik)

14.  WO 98/40035 (Hess)

15.  WO 95/26695 (Lau)

16.  WO 95/31945 (Burmeister)

17.  WO 96/28116 (Fogarty)

18.  WO 97/14375 (Wijay)

19.  PCT/US98/05014 (Hess)

20.  DE 297 08 689 (Hoefer)

21.  EP 0421 729 (Wolff)

22.  EP 0606 165 (Miksza-Ethicon)

23.  The V-Flex and V-Flex Plus Coronary Stents as manufactured, sold, offered for sale, and/or used by Global Therapeutics in the United States prior to the filing date of the '021 Patent

24.  The NIR stent as manufactured, sold, offered for sale, and/or used by Jakob Richter and Medinol Ltd. in the United States prior to the priority and/or application dates of the '021 Patent

8

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. Beginning in 1996, Robert, Tim, and David Fischell individually, and as a group, developed stent architectures that predate the priority date of the '021 Patent as described and depicted in the declaration of Robert Fischell dated June 12, 2000 filed in the *Scimed Life Systems, Inc., et al. v. Johnson & Johnson, et al.* litigation (D. Del.) (Civil Action No. 00-404-SLR), the Jan. 1996 Robert Fischell stent drawings, U.S. Patent No. 5,643,312, U.S. Patent No. 5,697,971, and U.S. Patent No. 6,190,403 and was eventually demonstrated to the public as the Isostent, including at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands, and Cordis' Bx Velocity stent. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Progressive Angioplasty System ("PAS") before the priority date of the '021 Patent when it developed the stent design in the United States that eventually was disclosed to the public as the Paragon stent. The design for the Paragon stent was described in Bruce Modesitt's lab notebooks, 1996-97 CAD drawings from PAS, the 1997 *Handbook of Coronary Stents*, and at the December 1997 Cardiovascular Summit and 4th Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

The stent described in Claim 35 of the '021 Patent also was invented by personnel at UniCath before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Iris stent. The design for the Iris stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. The stent described in Claim 35 of the '021 Patent also was invented

9

by personnel at Devon Medical before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Pura-Vario stent. The design for the Pura-Vario stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

The stent described in Claim 35 of the '021 Patent is obvious to one of ordinary skill at the times Jang filed provisional application 60/017,484 and his '021 patent application in light of several factors. First, as apparently construed by BSC in furtherance of its infringement theories, Claim 35 purportedly covers the design where the expansion strut pairs in the first and second expansion strut columns are longitudinally aligned ("non-offset design"). This non-offset design was commonly known in the prior art and described in several references that predate the priority date of the '021 Patent, including the Israel '303 patent, the Pinchasik '067 reference, the '065 Brown patent, the '154 Lau patent, Burmeister WO 95/31945 patent, Fogarty WO 96/28116 and the '417 Palmaz patent. In addition, the use of a curvy connector to attach two expansion struts in two separate expansion strut columns was well-known and obvious to a person of ordinary skill in the art as of the priority or the application date of the '021 Patent. The stent architectures developed by the Fischells beginning in 1996 and described in the Fischell '312 patent, the Pinchasik '067 reference, the Wijay WO 97/14375 reference, and the Israel '303 patent all demonstrate that the use of a curvy connector was widely known in the prior art. A person of ordinary skill in the art would have had the motivation to combine the non-offset design and the curvy connector in a single stent design prior to the time Jang filed his provisional application in April 1996 or the '021 patent application in April 1997. Examples of such a motivation to combine can be found in the stent designs of Paul H. Burmeister, et al., described

in U.S. Patent Application No. 08/246,320, the WO 95/31945 patent, the stent designs described in the Wijay WO 97/14375 reference, the Fischell '971 reference, the Pinchasik '373 reference, the Burmeister WO 95/31945 reference, the Israel '303 reference, and the Richter '404 reference.

The stent described in Claim 35 of the '021 Patent is further obvious because this design was simultaneously invented by other companies during 1996 and 1997. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Jomed when it developed the Jostent Coronary stent prior to the filing date of the '021 Patent, described it in the German patent application no. DE 297 08 689, and was demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. Additional evidence of simultaneous invention by other people and companies can be found in the Richter '404 patent and the developments, as described above, of the Isostent by the Fischells, the Bx Velocity stent by the Fischells and Cordis, the Paragon stent by Progressive Angioplasty System, the NIR stent by Medinol Ltd., the Iris stent by Uni-Cath, V-Flex and V-Flex Plus stents by Global Therapeutics, and the Pura-Vario stent by Devon Medical.

Claims 23 and 35 of the '021 Patent are also invalid pursuant to 35 U.S.C. § 112 because, as apparently construed by BSC in furtherance of its infringement theories, the specification does not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea of a stent with a non-offset design as of April 26, 1996 or April 25, 1997.

To the extent BSC claims priority to Jang's provisional application No. 60/017,484 dated April 26, 1996, the specification of this provisional application did not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a stent that has an expansion strut pair consisting of first expansion strut that is adjacent but not parallel to a second expansion strut. In addition, the specification of provisional application No. 60/017,484 did not establish to one of ordinary skill

11

in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a connecting strut from the top corner of one expansion strut pair in the first expansion strut column to the bottom corner of a second expansion strut pair in a second expansion strut column as it is purportedly claimed in Claim 35 of the '021 Patent.

Finally, the asserted claim of the '021 Patent is invalid because the prior art references in Cordis' 35 U.S.C. § 282 statement anticipate the stent described in Claim 35 under 35 U.S.C. § 102 and/or render the claimed stent obvious under 35 U.S.C. § 103. In addition, Claim 35 of the '021 Patent is invalid for all the reasons stated in Cordis' opening and reply briefs in support of its motions for judgment as a matter of law filed in the *Cordis Corp. v. Boston Scientific Corp., et al.*, Civil Action No. 03-027-SLR (D. Del.) litigation.

Discovery is still ongoing and expert discovery has yet to begin.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. Beginning in 1996, Robert, Tim, and David Fischell individually, and as a group, developed stent architectures that predate the priority date of the '021 Patent as described and depicted in the declaration of Robert Fischell dated June 12, 2000 filed in the *Scimed Life Systems, Inc., et al. v. Johnson & Johnson, et al.* litigation (D. Del.) (Civil Action No. 00-404-SLR), the Jan. 1996 Robert Fischell stent drawings, the Jan. 1996 Todd Turnlund CAD drawings, U.S. Patent No. 5,643,312, U.S. Patent No. 5,697,971, and U.S. Patent No. 6,190,403, and was eventually demonstrated to the public as the Isostent, including at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands, and Cordis' Bx Velocity stent. The stent described in Claim 35 of the '021 Patent also was invented

by personnel at Progressive Angioplasty System ("PAS") before the priority date of the '021 Patent when it developed the stent design in the United States that eventually was disclosed to the public as the Paragon stent. The design for the Paragon stent was described in Bruce Modesitt's lab notebooks, 1996-97 CAD drawings from PAS, the 1997 *Handbook of Coronary Stents*, and at the December 1997 Cardiovascular Summit and 4th Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Claims 23 and 35 of the '021 Patent are also invalid pursuant to 35 U.S.C. § 112, paragraph 2, because it is apparent to one of ordinary skill in the art that, under BSC's interpretation of the claims, the claims assertedly cover stents that Dr. Jang did not regard as his invention.

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. The stent described in Claim 35 of the '021 Patent was invented by personnel at Medinol, Ltd. before the application date of the '021 Patent. That stent design was disclosed to the public as the NIR stent. The design for the NIR stent was presented in December 1995 during the Rotterdam medical conference. It was also described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. (CM 180801-872) and in the 1998 *Handbook of Coronary Stents* (CM 189256-263).

The stent described in Claim 35 of the '021 Patent is further obvious because this design was simultaneously invented by other companies during 1996 and 1997. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Jomed when it developed the Jostent Coronary stent prior to the filing date of the '021 Patent, described it in the

13

German patent application no. DE 297 08 689, and was demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. Additional evidence of simultaneous invention by other people and companies can be found in the Richter '404 patent and the developments, as described above, of the Isostent by the Fischells, the Bx Velocity stent by the Fischells and Cordis, the Paragon stent by Progressive Angioplasty System, the NIR stent by Medinol Ltd., the Iris stent by Uni-Cath, V-Flex and V-Flex Plus stents by Global Therapeutics, and the Pura-Vario stent by Devon Medical. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Medinol, Ltd. when it developed the NIR stent prior to the filing date of the '021 Patent, as presented in December 1995 at the Rotterdam medical conference and as described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. (CM 180801-872) and in the 1998 *Handbook of Coronary Stents* (CM 189256-263).

**FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**:

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome, in particular, because BSC seeks Conor's contentions for "each of the claims of the '021 patent" even though BSC accuses Conor of infringing only Claim 35. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to a contention interrogatory before claim construction and the start of expert discovery. Conor also objects to this interrogatory as premature because it seeks expert opinion testimony prior to the disclosure dates set forth in the Federal Rule of Civil Procedure 26(a)(2)(C) and the Court's scheduling order for expert discovery. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

14

Subject to and without waiving its General and Specific Objections, Conor responds as follows: As properly construed and/or as apparently construed by BSC in furtherance of its apparent infringement theories, Claim 35 of the '021 Patent is anticipated pursuant to 35 U.S.C. § 102 and/or rendered obvious, including by simultaneous invention, pursuant to 35 U.S.C. § 103 by the following prior art references, separately and in combination:

1. U.S. Patent No. 5,545,210 (Hess)

2. U.S. Patent No. 5,807,404 (Richter)

3. U.S. Patent No. 5,733,303 (Israel)

4. U.S. Patent No. 4,739,762 (Palmaz)

5. U.S. Patent No. 4,733,665 (Palmaz)

6. U.S. Patent No. 5,102,417 (Palmaz)

7. U.S. Patent No. 5,514,154 (Lau)

8. U.S. Patent No. 5,195,984 (Schatz)

9. U.S. Patent No. 6,348,065 (Brown)

10. U.S. Patent No. 5,827,321 (Roubin)

11. U.S. Patent No. 6,183,506 (Penn)

12. U.S. Patent Application No. 08/816348 (Hess)

13. EP 0709 067 A2 (Pinchasik)

14. WO 98/40035 (Hess)

15. WO 95/26695 (Lau)

16. WO 95/31945 (Burmeister)

17. WO 96/28116 (Fogarty)

18. WO 97/14375 (Wijay)

19. PCT/US98/05014 (Hess)

20. DE 297 08 689 (Hoefer)

21. EP 0421 729 (Wolff)

22. EP 0606 165 (Miksza-Ethicon)

23. The V-Flex and V-Flex Plus Coronary Stents as manufactured, sold, offered for sale, and/or used by Global Therapeutics in the United States prior to the filing date of the '021 Patent

24. The NIR stent as manufactured, sold, offered for sale, and/or used by Jakob Richter and Medinol Ltd. in the United States prior to the priority and/or application dates of the '021 Patent

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. Beginning in 1996, Robert, Tim, and David Fischell individually, and as a group, developed stent architectures that predate the priority date of the '021 Patent as described and depicted in the declaration of Robert Fischell dated June 12, 2000 filed in the *Scimed Life Systems, Inc., et al. v. Johnson & Johnson, et al.* litigation (D. Del.) (Civil Action No. 00-404-SLR), the Jan. 1996 Robert Fischell stent drawings, U.S. Patent No. 5,643,312, U.S. Patent No. 5,697,971, and U.S. Patent No. 6,190,403 and was eventually demonstrated to the public as the Isostent, including at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands, and Cordis' Bx Velocity stent. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Progressive Angioplasty System ("PAS") before the priority date of the '021 Patent when it developed the stent design in the United States that eventually was disclosed to the public as the Paragon stent. The design for the Paragon stent was described in Bruce Modesitt's lab notebooks, 1996-97 CAD drawings from PAS, the 1997

16

*Handbook of Coronary Stents*, and at the December 1997 Cardiovascular Summit and 4th Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

  The stent described in Claim 35 of the '021 Patent also was invented by personnel at UniCath before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Iris stent. The design for the Iris stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Devon Medical before the application date of the '021 Patent when it developed the stent design in the United States that was eventually disclosed to the public as the Pura-Vario stent. The design for the Pura-Vario stent was described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. and demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

  The stent described in Claim 35 of the '021 Patent is obvious to one of ordinary skill at the times Jang filed provisional application 60/017,484 and his '021 patent application in light of several factors. First, as apparently construed by BSC in furtherance of its infringement theories, Claim 35 purportedly covers the design where the expansion strut pairs in the first and second expansion strut columns are longitudinally aligned ("non-offset design"). This non-offset design was commonly known in the prior art and described in several references that predate the priority date of the '021 Patent, including the Israel '303 patent, the Pinchasik '067 reference, the '065 Brown patent, the '154 Lau patent, Burmeister WO 95/31945 patent, Fogarty WO 96/28116 and the '417 Palmaz patent. In addition, the use of a curvy connector to attach two expansion

17

struts in two separate expansion strut columns was well-known and obvious to a person of ordinary skill in the art as of the priority or the application date of the '021 Patent. The stent architectures developed by the Fischells beginning in 1996 and described in the Fischell '312 patent, the Pinchasik '067 reference, the Wijay WO 97/14375 reference, and the Israel '303 patent all demonstrate that the use of a curvy connector was widely known in the prior art. A person of ordinary skill in the art would have had the motivation to combine the non-offset design and the curvy connector in a single stent design prior to the time Jang filed his provisional application in April 1996 or the '021 patent application in April 1997. Examples of such a motivation to combine can be found in the stent designs of Paul H. Burmeister, et al., described in U.S. Patent Application No. 08/246,320, the WO 95/31945 patent, the stent designs described in the Wijay WO 97/14375 reference, the Fischell '971 reference, the Pinchasik '373 reference, the Burmeister WO 95/31945 reference, the Israel '303 reference, and the Richter '404 reference.

The stent described in Claim 35 of the '021 Patent is further obvious because this design was simultaneously invented by other companies during 1996 and 1997. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Jomed when it developed the Jostent Coronary stent prior to the filing date of the '021 Patent, described it in the German patent application no. DE 297 08 689, and was demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. Additional evidence of simultaneous invention by other people and companies can be found in the Richter '404 patent and the developments, as described above, of the Isostent by the Fischells, the Bx Velocity stent by the Fischells and Cordis, the Paragon stent by Progressive Angioplasty System, the NIR stent by Medinol Ltd., the Iris stent by Uni-Cath, V-Flex and V-Flex Plus stents by Global Therapeutics, and the Pura-Vario stent by Devon Medical.

Claims 23 and 35 of the '021 Patent are also invalid pursuant to 35 U.S.C. § 112 because, as apparently construed by BSC in furtherance of its infringement theories, the specification does not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea of a stent with a non-offset design as of April 26, 1996 or April 25, 1997.

To the extent BSC claims priority to Jang's provisional application No. 60/017,484 dated April 26, 1996, the specification of this provisional application did not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a stent that has an expansion strut pair consisting of first expansion strut that is adjacent but not parallel to a second expansion strut. In addition, the specification of provisional application No. 60/017,484 did not establish to one of ordinary skill in the art that Dr. Jang had possession of the idea at the time the provisional application was filed of a connecting strut from the top corner of one expansion strut pair in the first expansion strut column to the bottom corner of a second expansion strut pair in a second expansion strut column as it is purportedly claimed in Claim 35 of the '021 Patent.

Finally, the asserted claim of the '021 Patent is invalid because the prior art references in Cordis' 35 U.S.C. § 282 statement anticipate the stent described in Claim 35 under 35 U.S.C. § 102 and/or render the claimed stent obvious under 35 U.S.C. § 103. In addition, Claim 35 of the '021 Patent is invalid for all the reasons stated in Cordis' opening and reply briefs in support of its motions for judgment as a matter of law filed in the *Cordis Corp. v. Boston Scientific Corp., et al.*, Civil Action No. 03-027-SLR (D. Del.) litigation.

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. Beginning in 1996, Robert, Tim, and David Fischell individually, and as a group,

19

developed stent architectures that predate the priority date of the '021 Patent as described and depicted in the declaration of Robert Fischell dated June 12, 2000 filed in the *Scimed Life Systems, Inc., et al. v. Johnson & Johnson, et al.* litigation (D. Del.) (Civil Action No. 00-404-SLR), the Jan. 1996 Robert Fischell stent drawings, the Jan. 1996 Todd Turnlund CAD drawings, U.S. Patent No. 5,643,312, U.S. Patent No. 5,697,971, and U.S. Patent No. 6,190,403, and was eventually demonstrated to the public as the Isostent, including at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands, and Cordis' Bx Velocity stent. The stent described in Claim 35 of the '021 Patent also was invented by personnel at Progressive Angioplasty System ("PAS") before the priority date of the '021 Patent when it developed the stent design in the United States that eventually was disclosed to the public as the Paragon stent. The design for the Paragon stent was described in Bruce Modesitt's lab notebooks, 1996-97 CAD drawings from PAS, the 1997 *Handbook of Coronary Stents*, and at the December 1997 Cardiovascular Summit and 4th Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands.

Claims 23 and 35 of the '021 Patent are also invalid pursuant to 35 U.S.C. § 112, paragraph 2, because it is apparent to one of ordinary skill in the art that, under BSC's interpretation of the claims, the claims assertedly cover stents that Dr. Jang did not regard as his invention.

The asserted claim of the '021 Patent also is invalid pursuant to 35 U.S.C. § 102(g) because the subject matter claimed in the '021 Patent was invented in the United States by other inventors who have not abandoned, suppressed, or concealed their work in developing stents. The stent described in Claim 35 of the '021 Patent was invented by personnel at Medinol, Ltd. before the application date of the '021 Patent. That stent design was disclosed to the public as the NIR stent. The design for the NIR stent was presented in December 1995 during the

20

Rotterdam medical conference. It was also described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. (CM 180801-872) and in the 1998 *Handbook of Coronary Stents* (CM 189256-263).

The stent described in Claim 35 of the '021 Patent is further obvious because this design was simultaneously invented by other companies during 1996 and 1997. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Jomed when it developed the Jostent Coronary stent prior to the filing date of the '021 Patent, described it in the German patent application no. DE 297 08 689, and was demonstrated to the public at the December 1996 3rd Thoraxcenter Course on Cardiovascular Stenting held in Rotterdam, Netherlands. Additional evidence of simultaneous invention by other people and companies can be found in the Richter '404 patent and the developments, as described above, of the Isostent by the Fischells, the Bx Velocity stent by the Fischells and Cordis, the Paragon stent by Progressive Angioplasty System, the NIR stent by Medinol Ltd., the Iris stent by Uni-Cath, V-Flex and V-Flex Plus stents by Global Therapeutics, and the Pura-Vario stent by Devon Medical. In particular, the stent described in Claim 35 of the '021 Patent was simultaneously invented by Medinol, Ltd. when it developed the NIR stent prior to the filing date of the '021 Patent, as presented in December 1995 at the Rotterdam medical conference and as described in December 1996 in a printed publication known as *Emerging Opportunity for Coronary Stent* by David Firn, PBJ Publications, Ltd. (CM 180801-872) and in the 1998 *Handbook of Coronary Stents* (CM 189256-263).

Conor incorporates by reference the expert reports of Nigel Buller, Ron Solar, and Kobi Richter submitted on March 19, 2007, and all of the materials cited therein.

21

**INTERROGATORY NO. 13:**

Describe in detail each and every factual and legal basis for Conor's contention that BSC's claim for infringement of the '021 patent "is barred under the doctrine of unclean hands."

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to an interrogatory when discovery is ongoing, and BSC has yet to produce documents concerning the negotiations for and the assignment of the '021 Patent, and Dr. Jang's attempts to rescind or set aside the assignment. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General or Specific Objections, Conor responds that BSC has asserted the '021 Patent with unclean hands in at least 2 ways: (1) obtaining the '021 Patent by fraudulently inducing Dr. Jang into assigning the '021 Patent to BSSI, (2) asserting the '021 Patent when it has been obtained through fraud upon the Patent Office.

BSC obtained the '021 Patent by fraudulently inducing Dr. Jang into assigning a number of patents, including the '021 Patent, in 2002. On or about June 3, 2002, Jang entered into an assignment agreement with plaintiff BSSI and a part-time employment agreement with BSC. At the same time, Jang signed a Patent Assignment, a Bill of Sale and Assignment, and a Non-Qualified Stock Option Agreement that led to the assignment of the '021 Patent to BSC. Nearly three years later, on May 19, 2005, Jang filed suit in the Central District of California against BSC (Case No. 05-cv-00426-VAP-CT) ("Jang ownership dispute"), alleging that BSC had defrauded Jang into assigning his rights to the '021 Patent to BSC and seeking a rescission or reformation of the assignment. In Jang's complaint, he alleges that BSC "acted reprehensibly

22

and in bad faith, with oppression, fraud and/or malice" in inducing Dr. Jang to assign his patents to BSSI back in 2002. Even though BSC fraudulently obtained the '021 Patent, BSC now seeks to assert this patent against Conor with unclean hands.

In addition, during the prosecution of the '021 Patent application, named inventor G. David Jang and his patent prosecutor, Paul Davis (collectively "Jang"), committed inequitable conduct in at least three ways: (1) knowingly withholding the material reference U.S. Patent 5,545,210 from the U.S. Patent Office during the '021 Patent prosecution, (2) knowingly withholding the material reference U.S. Patent 5,807,404 from the U.S. Patent Office during the '021 Patent prosecution, and (3) misrepresenting the scope of his claim amendments to the Patent Office in distinguishing the '021 Patent from European Patent 0709 067 A2 and misleading the Patent Office into issuing the '021 Patent. In all three instances, on information and belief, Jang acted with intent to deceive the Patent Office in order to fraudulently obtain the '021 Patent.

On March 25, 1997, Jang filed a patent application that later issued as U.S. Patent No. 6,241,760, entitled "Intravascular Stent." On March 26, 1997, Jang filed another patent application on intravascular stents that later issued as U.S. Patent No. 5,954,743. One month later, on April 25, 1997, Jang filed the '021 Patent application. The '760, '743, and '021 Patent applications all claimed priority to the same provisional application, specifically, application no. 60/017,484, dated April 26, 1996.

During the prosecution of the '743 patent application, Jang received an office action from the Patent Office dated January 5, 1998, that cited U.S. Patent No. 5,545,210 to Robert Hess as pertinent prior art. The Hess '210 patent was subsequently listed on the face of the Jang '743 patent as a cited reference. In September 1998, Jang submitted the Hess '210 patent to the Patent Office during the examination of the '760 patent application. But Jang did not submit the Hess

23

'210 patent during the examination of the related, pending '021 Patent application. In addition, during the pendency of the '760 patent application, Jang also learned of U.S. Patent No. 5,807,404 to Jacob Richter when the Patent Office cited the Richter '404 patent as pertinent prior art in two office actions dated December 29, 1998, and June 3, 1999. The Richter '404 patent was subsequently listed on the face of the '760 patent as a cited reference. But Jang did not reveal the Richter '404 patent to the Patent Office during the examination of the related '021 Patent application, which did not issue until July 13, 1999.

The Hess '210 patent describes a stent "comprising first and second sections 1*a*, 1*b* joined by bridging member 7. The bridging member can have any suitable configuration such as a straight, helical (shown in phantom in FIG. 3) *curved or wavy strip*." '210 Patent at 4:59-64 (emphasis provided); *see also id.* at Fig. 3. The Richter '404 patent describes a stent with a "flexible connector" "disposed between the first member 4 and the second member 5" wherein the flexible connectors "may be made in a variety of shapes, e.g., an 'S' or a 'Z' shape as shown in FIG. 11." '404 Patent at 6:2-7; *see also id.* at Fig. 11. Thus, Jang was aware of the Hess '210 and Richter '404 patents as material references that anticipate and/or render obvious one or more claims of the '021 patent but withheld these references from the Patent Office during the '021 Patent application with intent to deceive the Patent Office.

Additionally, during the prosecution of the '021 Patent application, Jang amended application claims 1 and 24 (which later issued as independent claims 1 and 23 of the '021 Patent) on June 17, 1998, to overcome the Patent Office's rejection of the claims in view of European Patent 0709 067 A2, issued to Gregory Pinchasik. After amending the claims of the '021 Patent application, Jang represented to the Patent Office that his "invention is a strut with a first connecting strut with proximal, distal and intermediate sections. The intermediate section is non-parallel to the proximal and distal ends. Additionally, the stent has a first expansion strut of

24

a first expansion strut pair in a first expansion column that has a longitudinal axis which is offset from a longitudinal axis of a first expansion strut of the second expansion strut pair in a second expansion column." Jang proffered this explanation to lead the Patent Office into believing that application claim 24 (independent claim 23 of the '021 Patent) was distinguishable from the Pinchasik '067 patent. In fact, BSC's current interpretation of the claim reveals that claim 23 cannot be distinguished from the Pinchasik '067 patent, and that Jang's representations to the Patent Office were an attempt to mislead the Office for the purpose of obtaining the '021 patent.

The September 15, 1998 letter of the Patent Examiner demonstrates that the Patent Office was, in fact, misled by Jang's statements to believe that claim 24 (which issued as independent claim 23) was distinguishable from the Pinchasik '067 patent: "This application claims a first expansion column comprising a plurality of expansion strut pairs, a second expansion column comprising a plurality of second column expansion strut pairs, a first connecting strut column comprising struts which connect the first column expansion strut pairs to the second column expansion strut pairs, and a second connecting strut column comprising connecting struts which connect the second column expansion strut pairs to a third expansion column, wherein the expansion strut pairs of the first expansion column are longitudinally offset from the expansion strut pairs of the second expansion column." As described above, Jang's misleading statements convinced the Examiner to allow independent claim 23 when, under BSC's construction, the Pinchasik '067 patent anticipates or renders claim 23 obvious. On information and belief, Jang intentionally misled the Patent Office into believing that its amended claim was distinguishable from Pinchasik '067 patent to induce the Patent Office to issue the '021 Patent.

On information and belief, BSC was and is aware that Jang fraudulently obtained the '021 Patent by intentionally withholding the Richter '404 and Hess '210 patents from the Patent Office and intentionally misrepresenting the amendments made to overcome the Pinchasik '067

25

patent during the '021 patent prosecution. But for Jang's improper acts of concealment and misrepresentation, the '021 Patent would not have issued.

Discovery and investigation are ongoing.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to an interrogatory when discovery is ongoing, and BSC has yet to produce documents concerning the negotiations for and the assignment of the '021 Patent, and Dr. Jang's attempts to rescind or set aside the assignment. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General or Specific Objections, Conor responds that BSC has asserted the '021 Patent with unclean hands in at least 2 ways: (1) obtaining the '021 Patent by fraudulently inducing Dr. Jang into assigning the '021 Patent to BSSI, (2) asserting the '021 Patent when it has been obtained through fraud upon the Patent Office.

BSC obtained the '021 Patent by fraudulently inducing Dr. Jang into assigning a number of patents, including the '021 Patent, in 2002. On or about June 3, 2002, Jang entered into an assignment agreement with plaintiff BSSI and a part-time employment agreement with BSC. At the same time, Jang signed a Patent Assignment, a Bill of Sale and Assignment, and a Non-Qualified Stock Option Agreement that led to the assignment of the '021 Patent to BSC. Nearly three years later, on May 19, 2005, Jang filed suit in the Central District of California against BSC (Case No. 05-cv-00426-VAP-CT) ("Jang ownership dispute"), alleging that BSC had defrauded Jang into assigning his rights to the '021 Patent to BSC and seeking a rescission or reformation of the assignment. In Jang's complaint, he alleges that BSC "acted reprehensibly

26

and in bad faith, with oppression, fraud and/or malice" in inducing Dr. Jang to assign his patents to BSSI back in 2002. Even though BSC fraudulently obtained the '021 Patent, BSC now seeks to assert this patent against Conor with unclean hands.

In addition, during the prosecution of the '021 Patent application, named inventor G. David Jang and his patent prosecutor, Paul Davis (collectively "Jang"), committed inequitable conduct in at least three ways: (1) knowingly withholding the material reference U.S. Patent 5,545,210 from the U.S. Patent Office during the '021 Patent prosecution, (2) knowingly withholding the material reference U.S. Patent 5,807,404 from the U.S. Patent Office during the '021 Patent prosecution, and (3) misrepresenting the scope of his claim amendments to the Patent Office in distinguishing the '021 Patent from European Patent 0709 067 A2 and misleading the Patent Office into issuing the '021 Patent. In all three instances, on information and belief, Jang acted with intent to deceive the Patent Office in order to fraudulently obtain the '021 Patent.

On March 25, 1997, Jang filed a patent application that later issued as U.S. Patent No. 6,241,760, entitled "Intravascular Stent." On March 26, 1997, Jang filed another patent application on intravascular stents that later issued as U.S. Patent No. 5,954,743. One month later, on April 25, 1997, Jang filed the '021 Patent application. The '760, '743, and '021 Patent applications all claimed priority to the same provisional application, specifically, application no. 60/017,484, dated April 26, 1996.

During the prosecution of the '743 patent application, Jang received an office action from the Patent Office dated January 5, 1998, that cited U.S. Patent No. 5,545,210 to Robert Hess as pertinent prior art. The Hess '210 patent was subsequently listed on the face of the Jang '743 patent as a cited reference. In September 1998, Jang submitted the Hess '210 patent to the Patent Office during the examination of the '760 patent application. But Jang did not submit the Hess

27

'210 patent during the examination of the related, pending '021 Patent application. In addition, during the pendency of the '760 patent application, Jang also learned of U.S. Patent No. 5,807,404 to Jacob Richter when the Patent Office cited the Richter '404 patent as pertinent prior art in two office actions dated December 29, 1998, and June 3, 1999. The Richter '404 patent was subsequently listed on the face of the '760 patent as a cited reference. But Jang did not reveal the Richter '404 patent to the Patent Office during the examination of the related '021 Patent application, which did not issue until July 13, 1999.

The Hess '210 patent describes a stent "comprising first and second sections 1*a*, 1*b* joined by bridging member 7. The bridging member can have any suitable configuration such as a straight, helical (shown in phantom in FIG. 3) *curved or wavy strip.*" '210 Patent at 4:59-64 (emphasis provided); *see also id.* at Fig. 3. The Richter '404 patent describes a stent with a "flexible connector" "disposed between the first member 4 and the second member 5" wherein the flexible connectors "may be made in a variety of shapes, e.g., an 'S' or a 'Z' shape as shown in FIG. 11." '404 Patent at 6:2-7; *see also id.* at Fig. 11. Thus, Jang was aware of the Hess '210 and Richter '404 patents as material references that anticipate and/or render obvious one or more claims of the '021 patent but withheld these references from the Patent Office during the '021 Patent application with intent to deceive the Patent Office.

Additionally, on or about May 8, 1998, Jang signed an Assignment and License Agreement with Schneider (Europe) GmbH on May 8, 1998 in which he assigned to Schneider certain rights to his PSJ-3 stent product and licensed to Schneider certain rights under U.S. Provisional Application No. 60/017,484, U.S. Application No. 08/824,142, U.S. Application No. 08/824,866, U.S. Application No. 08/824,865, and U.S. Application No. 08/845,657. *See* BSC-C 136001. The '021 Patent purports to claim priority to or through these applications. On June 15, 1998, BSC acquired Schneider, including the rights under the May 8 1998 Assignment

Agreement and License. *See* BSC-C69775-70628. In 1998, Schneider and BSC were already large business entities with well over 500 employees. Subsequently, on October 6, 1998, Jang, through his attorney Paul Davis, represented to the Patent Office in an officially filed response that the "[a]pplicant is a small entity" in violation of 37 C.F.R. § 1.9(d) despite the fact that Jang had licensed the '021 Patent application to BSC. Jang thus obtained the '021 Patent through deceptive means, thus rendering this patent unenforceable.

Furthermore, during the prosecution of the '021 Patent application, Jang amended application claims 1 and 24 (which later issued as independent claims 1 and 23 of the '021 Patent) on June 17, 1998, to overcome the Patent Office's rejection of the claims in view of European Patent 0709 067 A2, issued to Gregory Pinchasik. After amending the claims of the '021 Patent application, Jang represented to the Patent Office that his "invention is a strut with a first connecting strut with proximal, distal and intermediate sections. The intermediate section is non-parallel to the proximal and distal ends. Additionally, the stent has a first expansion strut of a first expansion strut pair in a first expansion column that has a longitudinal axis which is offset from a longitudinal axis of a first expansion strut of the second expansion strut pair in a second expansion column." Jang proffered this explanation to lead the Patent Office into believing that application claim 24 (independent claim 23 of the '021 Patent) was distinguishable from the Pinchasik '067 patent. In fact, BSC's current interpretation of the claim reveals that claim 23 cannot be distinguished from the Pinchasik '067 patent, and that Jang's representations to the Patent Office were an attempt to mislead the Office for the purpose of obtaining the '021 patent.

The September 15, 1998 letter of the Patent Examiner demonstrates that the Patent Office was, in fact, misled by Jang's statements to believe that claim 24 (which issued as independent claim 23) was distinguishable from the Pinchasik '067 patent: "This application claims a first expansion column comprising a plurality of expansion strut pairs, a second expansion column

comprising a plurality of second column expansion strut pairs, a first connecting strut column comprising struts which connect the first column expansion strut pairs to the second column expansion strut pairs, and a second connecting strut column comprising connecting struts which connect the second column expansion strut pairs to a third expansion column, wherein the expansion strut pairs of the first expansion column are longitudinally offset from the expansion strut pairs of the second expansion column." As described above, Jang's misleading statements convinced the Examiner to allow independent claim 23 when, under BSC's construction, the Pinchasik '067 patent anticipates or renders claim 23 obvious. On information and belief, Jang intentionally misled the Patent Office into believing that its amended claim was distinguishable from Pinchasik '067 patent to induce the Patent Office to issue the '021 Patent.

On information and belief, BSC was and is aware that Jang fraudulently obtained the '021 Patent by intentionally withholding the Richter '404 and Hess '210 patents from the Patent Office and intentionally misrepresenting the amendments made to overcome the Pinchasik '067 patent during the '021 patent prosecution. But for Jang's improper acts of concealment and misrepresentation, the '021 Patent would not have issued.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to an interrogatory when discovery is ongoing, and BSC has yet to produce documents concerning the negotiations for and the assignment of the '021 Patent, and Dr. Jang's attempts to rescind or set aside the assignment. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General or Specific Objections, Conor responds that BSC has asserted the '021 Patent with unclean hands in at least 2 ways: (1) obtaining the '021 Patent by fraudulently inducing Dr. Jang into assigning the '021 Patent to BSSI, and (2) asserting the '021 Patent when it has been obtained through fraud upon the Patent Office.

BSC obtained the '021 Patent by fraudulently inducing Dr. Jang into assigning a number of patents, including the '021 Patent, in 2002. On or about June 3, 2002, Jang entered into an assignment agreement with plaintiff BSSI and a part-time employment agreement with BSC. At the same time, Jang signed a Patent Assignment, a Bill of Sale and Assignment, and a Non-Qualified Stock Option Agreement that led to the assignment of the '021 Patent to BSC. Nearly three years later, on May 19, 2005, Jang filed suit in the Central District of California against BSC (Case No. 05-cv-00426-VAP-CT) ("Jang ownership dispute"), alleging that BSC had defrauded Jang into assigning his rights to the '021 Patent to BSC and seeking a rescission or reformation of the assignment. In Jang's complaint, he alleges that BSC "acted reprehensibly and in bad faith, with oppression, fraud and/or malice" in inducing Dr. Jang to assign his patents to BSSI back in 2002. Even though BSC fraudulently obtained the '021 Patent, BSC now seeks to assert this patent against Conor with unclean hands.

In addition, during the prosecution of the '021 Patent application, named inventor G. David Jang and his patent prosecutor, Paul Davis (collectively "Jang"), committed inequitable conduct in at least four ways: (1) knowingly withholding the material reference U.S. Patent 5,545,210 from the U.S. Patent Office during the '021 Patent prosecution; (2) knowingly withholding the material reference U.S. Patent 5,807,404 from the U.S. Patent Office during the '021 Patent prosecution; (3) knowingly claiming small entity status during the '021 Patent prosecution with the intent to deceive the patent office, and (4) misrepresenting the scope of his claim amendments to the Patent Office in distinguishing the '021 Patent from European Patent

31

0709 067 A2 and misleading the Patent Office into issuing the '021 Patent. In all four instances, on information and belief, Jang acted with intent to deceive the Patent Office in order to fraudulently obtain the '021 Patent.

On March 25, 1997, Jang filed a patent application that later issued as U.S. Patent No. 6,241,760, entitled "Intravascular Stent." On March 26, 1997, Jang filed another patent application on intravascular stents that later issued as U.S. Patent No. 5,954,743. One month later, on April 25, 1997, Jang filed the '021 Patent application. The '760, '743, and '021 Patent applications all claimed priority to the same provisional application, specifically, application no. 60/017,484, dated April 26, 1996.

During the prosecution of the '743 patent application, Jang received an office action from the Patent Office dated January 5, 1998, that cited U.S. Patent No. 5,545,210 to Robert Hess as pertinent prior art. The attorney who prosecuted the '743 patent application and the '021 patent application on Jang's behalf, Paul Davis, testified that it was his customary practice to review cited references to determine whether they were relevant to any of the applicant's related patent prosecutions. *See* deposition of Paul Davis at 103. He further testified that he had no reason to doubt that he would not have followed his normal practice after receiving the office action citing the Hess '210 patent and considered whether it was relevant to other applications. *Id.* at 104. The Hess '210 patent was subsequently listed on the face of the Jang '743 patent as a cited reference. On September 5, 1998, Jang submitted an Information Disclosure Statement with respect to the '760 patent application that cites the Hess '210 patent. That same day, Jang also submitted an Information Disclosure Statement with respect to the '021 patent application that does not cite the Hess '210 patent. Jang never submitted the Hess '210 patent during the examination of the '021 patent.

In addition, during the pendency of the '760 patent application, Jang also learned of U.S. Patent No. 5,807,404 to Jacob Richter when the Patent Office cited the Richter '404 patent as pertinent prior art in two office actions dated December 29, 1998, and June 3, 1999. The Richter '404 patent was subsequently listed on the face of the '760 patent as a cited reference. But Jang did not reveal the Richter '404 patent to the Patent Office during the examination of the related '021 patent application, which did not issue until July 13, 1999.

The Hess '210 patent describes a stent "comprising first and second sections $1a$, $1b$ joined by bridging member 7. The bridging member can have any suitable configuration such as a straight, helical (shown in phantom in FIG. 3) *curved or wavy strip*." '210 Patent at 4:59-64 (emphasis provided); *see also id.* at Fig. 3. The Hess '210 patent anticipates and/or renders obvious clam 35 of the '021 patent. *See* expert report of Nigel Buller submitted on March 19, 2007 at 40-43. Therefore, Hess '210 is a material reference to the '021 patent.

The Richter '404 patent describes a stent with a "flexible connector" "disposed between the first member 4 and the second member 5" wherein the flexible connectors "may be made in a variety of shapes, e.g., an 'S' or a 'Z' shape as shown in FIG. 11." '404 Patent at 6:2-7; *see also id.* at Fig. 11. The Richter '404 patent anticipates and/or renders obvious the '021 patent. *See* expert report of Nigel C. Buller submitted on March 19, 2007 at 48-49. Therefore, Richter is a material reference to the '021 patent. Thus, Jang and/or Davis was aware of the Hess '210 and Richter '404 patents as material references that anticipate and/or render obvious one or more claims of the '021 patent but withheld these references from the Patent Office during the '021 patent application with intent to deceive the Patent Office.

Additionally, on or about May 8, 1998, Jang signed an Assignment and License Agreement with Schneider (Europe) in which he assigned to Schneider certain rights to his PSJ-3 stent product and licensed to Schneider certain rights under U.S. Provisional Application No.

33

60/017,484, U.S. Application No. 08/824,142, U.S. Application No. 08/824,866, U.S. Application No. 08/824,865, and U.S. Application No. 08/845,657. *See* BSC-C 136001. Davis knew of the Assignment and License Agreement between Jang and Schneider at least as of November 30, 1998, when he mailed a copy of the agreement to Eli J. McKhool. *See* BSC-C69775-70268; *see also* deposition of Paul Davis at 71-72. The patent application that became the '021 patent is specifically identified as a licensed patent in the Jang-Schneider Agreement. Jang signed and submitted a Verified Statement claiming small entity status in connection with the '657 application. This document advised Jang of his duty to notify the Patent Office of any change in status that would result in the loss of entitlement to small entity status prior to or at the time of payment of an issue or maintenance fee. Jang acknowledged this duty by signing the statement. *See* JFH000186. On June 15, 1998, BSC acquired Schneider, including the rights under the May 8 1998 Assignment Agreement and License. *See* BSC-C69775-70628. In 1998, Schneider and BSC were already large business entities with well over 500 employees. *See* patent application 08/845,734, Notification of Change in Small Entity Status (Davis Exhibit 2 at Tab 16).

Subsequently, on October 6, 1998, Jang, through his attorney Paul Davis, represented to the Patent Office in an officially filed response that the "[a]pplicant is a small entity" in violation of 37 C.F.R. § 1.9(d) despite the fact that Jang had licensed the '021 Patent application to BSC. Thereafter, in April 1999, Davis received a Notice of Allowance and Issue Fee Due from the Patent Office concerning the '657 patent application stating that the applicant was not entitled to small entity status. *See* JFH-000229. On the Issue Fee Transmittal that Davis subsequently signed and returned to the Patent Office in April 1999, the small entity status designation "NO" that had been printed by the Patent Office is crossed out and the word "YES" is hand-written above it. In addition, the printed notation "$1210" under fee due is crossed out and "605.00" is

34

hand-written above it. *See* JFH000258. Davis testified that the edits to the document would have been made by someone else in his office before he signed the document. *See* Davis deposition at 63-65. Davis also testified that by signing the document, he indicated his approval of the hand-written changes made to it. *See* Davis deposition at 125. Jang was aware that Davis had claimed small entity status on the April 1999 Issue Fee Transmittal because Davis sent a copy of this document to Jang on April 15, 1999. *See* BSC-JS2626-36. When he sent the issue fee to the Patent Office, Davis either knew that Jang was not entitled to small entity status or had a duty to investigate this issue in light of his awareness of the license agreement between Jang and Schneider. Jang thus obtained the '021 Patent with the intent to deceive the patent office, thus rendering this patent unenforceable.

Furthermore, during the prosecution of the '021 Patent application, Jang amended application claims 1 and 24 (which later issued as independent claims 1 and 23 of the '021 Patent) on June 17, 1998, to overcome the Patent Office's rejection of the claims in view of European Patent 0709 067 A2, issued to Gregory Pinchasik. After amending the claims of the '021 Patent application, Jang represented to the Patent Office that his "invention is a strut with a first connecting strut with proximal, distal and intermediate sections. The intermediate section is non-parallel to the proximal and distal ends. Additionally, the stent has a first expansion strut of a first expansion strut pair in a first expansion column that has a longitudinal axis which is offset from a longitudinal axis of a first expansion strut of the second expansion strut pair in a second expansion column." Jang proffered this explanation to lead the Patent Office into believing that application claim 24 (independent claim 23 of the '021 Patent) was distinguishable from the Pinchasik '067 patent. In fact, BSC's current interpretation of the claim reveals that claim 23 cannot be distinguished from the Pinchasik '067 patent, and that Jang's representations to the Patent Office were an attempt to mislead the Office for the purpose of obtaining the '021 patent.

The September 15, 1998 letter of the Patent Examiner demonstrates that the Patent Office was, in fact, misled by Jang's statements to believe that claim 24 (which issued as independent claim 23) was distinguishable from the Pinchasik '067 patent: "This application claims a first expansion column comprising a plurality of expansion strut pairs, a second expansion column comprising a plurality of second column expansion strut pairs, a first connecting strut column comprising struts which connect the first column expansion strut pairs to the second column expansion strut pairs, and a second connecting strut column comprising connecting struts which connect the second column expansion strut pairs to a third expansion column, wherein the expansion strut pairs of the first expansion column are longitudinally offset from the expansion strut pairs of the second expansion column." As described above, Jang's misleading statements convinced the Examiner to allow independent claim 23 when, under BSC's construction, the Pinchasik '067 patent anticipates or renders claim 23 obvious. On information and belief, Jang intentionally misled the Patent Office into believing that its amended claim was distinguishable from the Pinchasik '067 patent to induce the Patent Office to issue the '021 Patent.

On information and belief, BSC was and is aware that Jang fraudulently obtained the '021 Patent by intentionally withholding the Richter '404 and Hess '210 patents from the Patent Office and intentionally misrepresenting the amendments made to overcome the Pinchasik '067 patent during the '021 patent prosecution. But for Jang's improper acts of concealment and misrepresentation, the '021 Patent would not have issued.

**INTERROGATORY NO. 14:**

Describe in detail each and every factual and legal basis for Conor's contention that BSC's claim for infringement of the '021 patent "is barred due to inequitable conduct ...."

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to a contention interrogatory before claim construction and deposition discovery. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General and Specific Objections, Conor incorporates its response to Interrogatory No. 12 regarding the fraud committed upon the Patent Office during the prosecution of the '021 Patent.

Discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to a contention interrogatory before claim construction and deposition discovery. Conor finally objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General and Specific Objections, Conor incorporates its supplemental response to Interrogatory No. 12 regarding the fraud committed upon the Patent Office during the prosecution of the '021 Patent.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

In addition to its General Objections, Conor objects that this interrogatory is overbroad and unduly burdensome. Conor further objects that this interrogatory, including the detail it seeks, is inappropriate and premature at this stage of discovery because BSC seeks a response to

a contention interrogatory before claim construction and deposition discovery.  Conor finally

objects to this interrogatory to the extent it seeks legal conclusions.

Subject to and without waiving its General and Specific Objections, Conor incorporates

its second supplemental response to Interrogatory No. 12 regarding the fraud committed upon the

Patent Office during the prosecution of the '021 Patent.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888

*Attorneys for Defendant*

*Of Counsel:*
Gregory L. Diskant
Eugene M. Gelernter
Kathleen M. Crotty
Scott W. Parker
Ravi V. Sitwala
Diana Breaux
Laura M. Storto
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 336-2000

Courtland L. Reichman, Esq.
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone:  (404) 572-4600

Dated:  April 9, 2007
179530.1

38

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 2007, the attached **CONOR**

**MEDSYSTEMS, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO PLAINTIFFS'**

**INTERROGATORY NO. 8 AND SECOND SUPPLEMENTAL RESPONSE TO**

**PLAINTIFFS' INTERROGATORY NOS. 13-14** was served upon the below-named counsel

of record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                                        HAND DELIVERY
The Brandywine Building
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE 19801

Peter J. Armenio, Esquire                                        VIA FEDERAL EXPRESS
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022


Lauren E. Maguire

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|                                                              |     |                     |
|--------------------------------------------------------------|-----|---------------------|
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC., | )<br>)<br>) |                     |
| Plaintiffs,                                                  | )<br>) |                     |
| v.                                                           | )<br>) | C.A. No. 05-768-SLR |
| CONOR MEDSYSTEMS, INC.,                                      | )<br>) |                     |
| Defendant.                                                   | )   |                     |

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 9th day of April, 2007, **CONOR MEDSYSTEMS, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 8 AND SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NOS. 13-14** was served upon the following counsel of record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                                  HAND DELIVERY
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE 19801


Peter J. Armenio                                            VIA FEDERAL EXPRESS
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant*

*Of Counsel:*

Gregory L. Diskant
Eugene M. Gelernter
Kathleen M. Crotty
Scott W. Parker
Ravi V. Sitwala
Diana  Breaux
Laura M. Storto
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 336-2000

Courtland L. Reichman
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone:  (404) 572-4600

Dated:  April 9, 2007
177969.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 2007, the attached **NOTICE OF SERVICE**

was served upon the below-named counsel of record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                                    HAND DELIVERY
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE  19801


Peter J. Armenio                                              VIA FEDERAL EXPRESS
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY  10022


                                             /s/ *Lauren E. Maguire*
                                             _____
                                             Lauren E. Maguire

## Discovery Documents

1:05-cv-00768-SLR Boston Scientific Corporation et al v. Conor Medsystems Inc.
MEDIATION, PATENT, PaperDocuments

### U.S. District Court

### District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Maguire, Lauren on 4/9/2007 at 10:38 AM EDT and filed on 4/9/2007

**Case Name:**     Boston Scientific Corporation et al v. Conor Medsystems Inc.
**Case Number:**   1:05-cv-768
**Filer:**         Conor Medsystems Inc.
**Document Number:** 127

**Docket Text:**
NOTICE OF SERVICE of Fourth Supplemental Response to Plaintiffs' Interrogatory No. 8 and Second Supplemental Response to Plaintiffs' Interrogatory Nos. 13-14 by Conor Medsystems Inc..(Maguire, Lauren)

**1:05-cv-768 Notice has been electronically mailed to:**

Steven J. Balick    sbalick@ashby-geddes.com, dfioravanti@ashby-geddes.com, jday@ashby-geddes.com, lmaguire@ashby-geddes.com, mkipp@ashby-geddes.com, nlopez@ashby-geddes.com, rgamory@ashby-geddes.com, tlydon@ashby-geddes.com

Josy W. Ingersoll    jingersoll@ycst.com, cglover@ycst.com, corpcal@ycst.com, corporate@ycst.com

Lauren E. Maguire    lmaguire@ashby-geddes.com

Adam Wyatt Poff    apoff@ycst.com, corpcal@ycst.com, corporate@ycst.com

**1:05-cv-768 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/9/2007] [FileNumber=369496-0]
[6a87fb14f6df01866ef19205d35d7ac25c92fe0a01bd0545508497ebc55149c4492a5
0b24e9faa5ffce57b5b14542ec5acc2f354bc67f7e249f893c83ff4ad92]]

# EXHIBITS 16 – 17

# REDACTED

# IN

# FULL