# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 05-768-SLR |
| CONOR MEDSYSTEMS, INC., | ) ) | |
| Defendant. | ) ) ) | REDACTED |

## ANSWERING BRIEF IN OPPOSITION TO CONOR'S MOTION
## FOR SUMMARY JUDGMENT OF OBVIOUSNESS

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Josy W. Ingersoll (I.D. #1088)
John W. Shaw (I.D. #3362)
Adam W. Poff (I.D. #3990)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
(307) 571-6600

*Attorneys for*
*Boston Scientific Corporation*
*and Boston Scientific Scimed, Inc.*

*Of Counsel:*

John M. Desmarais
Peter J. Armenio
Young J. Park
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800

Dated: May 25, 2007

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ..................................................1

SUMMARY Of THE ARGUMENT ......................................................................1

COUNTER-STATEMENT OF FACTS ..................................................................2

I.      The Validity Issue Has Already Been Adjudicated ..................................2

II.     Decades Of Attempts Failed To Yield A Stent Both Flexible And Strong ........................3
        A.      CAD And The Potential For Stents ..................................................3
        B.      The Prior Art's Difficulty In Realizing This Potential .............................3

III.    Dr. Jang Succeeded In Providing A Stent Both Flexible And Strong ................................7
        A.      Dr. Jang's Invention ................................................................7
        B.      The Stent Industry Has Recognized The Value Of Dr. Jang's Invention ...............9
        C.      Conor's Design Efforts Recognized The Success Of Dr. Jang's Invention............11
        D.      The Bulk Of Conor's Brief Concerns "Limitations" That Do Not Actually
                Exist ..............................................................................12

IV.     None Of The Prior Art Cited By Conor Discloses Top-Corner-To-Bottom-Corner
        Connections...........................................................................12

V.      Conor's "In-Phase Version Of Israel" Was Created For Litigation Purposes...................13
        A.      The Actual Disclosure Of Israel Teaches Away From The Changes Conor
                Proposes ..........................................................................14
        B.      Conor's Litigation Inspired Stent Does Not Disclose The Invention Of
                Claim 35...........................................................................15
        C.      Conor's Proposed Manipulations Would Yield A Non-Functioning Stent............16

ARGUMENT...................................................................................17

I.      This Court Need Not Even Entertain Conor's Motion ..................................17

II.     Summary Judgment Is Improper Where Facts Are In Dispute Or Do Not Support
        The Movant's Position ...............................................................17

III.    Conor's Motion Fails Even Under The Facts Conor Recites ...........................18
        A.      Conor Merely Offers Art That The PTO Already Considered ......................19
        B.      Conor Does Not Perform The Proper Comparison ................................20
        C.      Conor's Motion Fails Under The Proper Comparison .............................22
        D.      Conor's Failure To Carry Its Initial Burden Is Fatal To Its Motion ......................23

IV.     Conor's Motion Also Fails Under The Facts BSC Recites .............................23
        A.      There Is No *Prima Facie* Case Of Obviousness..................................24

## TABLE OF CONTENTS (cont'd)

Page

1. Israel '303 Teaches Away From The Changes Conor Proposes ................24
2. Conor's Litigation-Inspired Stent Does Not Disclose All Of The
   Elements Of Claim 35..................................................................................26
3. Conor's Litigation-Inspired Stent Would Not Function............................27
4. There Is No Support For The Additional Changes Conor Is Making
   To The Prior Art.........................................................................................28

B. The Real-World Evidence Rebuts Any *Prima Facie* Case Of Obviousness.........28
   1. There Was A Long-Felt Need For Strong Yet Flexible Stents.................29
   2. Dr. Jang's Invention Has Been Commercially Successful........................30
   3. Conor Copied Infringing Stents In Designing The CoStar Stent...............31
   4. Additional Objective Indicia Support Nonobviousness............................32

V. At A Minimum, Conor's Motion Fails Because There Are Genuine Issues Of
   Material Fact ..............................................................................................32

CONCLUSION............................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Akami Techs., Inc. v. Cable & Wireless Internet Servs.,*
344 F.3d 1186 (Fed. Cir. 2003) .................................................................................... 32

*Alco Standard Corp. v. TVA,*
808 F.2d 1490 (Fed. Cir. 1986) .................................................................................... 18

*Arkie Lure, Inc. v. Gene Larew Tackle, Inc.,*
119 F.3d 953 (Fed. Cir. 1997) ...................................................................................... 23

*Finish Eng'g Co. v. Zerpa Indus., Inc.,*
806 F.2d 1041 (Fed. Cir. 1986) .............................................................................. 18, 23

*Gambro Lundia AB v. Baxter Healthcare Corp.,*
110 F.3d 1573 (Fed. Cir. 1997) .............................................................................. 29, 33

*Gillette Co. v. S.C. Johnson & Son, Inc.,*
919 F.2d 720 (Fed. Cir. 1990) ...................................................................................... 22

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
840 F.2d 902 (Fed. Cir. 1988) ................................................................................ 18, 24

*Hodosh v. Block Drug Co.,*
786 F.2d 1136, (Fed. Cir. 1986) ................................................................................... 17

*In re Gordon,*
733 F.2d 900 (Fed. Cir. 1984) ...................................................................................... 27

*In re Rouffet,*
149 F.3d 1350 (Fed. Cir. 1998) .................................................................................... 32

*In re Zurko,*
258 F.3d 1379 (Fed. Cir. 2001) .................................................................................... 19

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.,*
367 F.3d 1381 (Fed. Cir. 2004) .................................................................................... 29

*KSR Int'l Co. v. Teleflex Inc.,*
550 U.S. ___, 82 U.S.P.Q.2d 1385 (2007) ......................................................... 21, 24, 26

*McGinley v. Franklin Sports, Inc.,*
262 F.3d 1339 (Fed. Cir. 2001) .............................................................................. 18, 19

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Minnesota Mining & Mfg. Co. v. J&J Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992)..................................................................................... passim

*Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*,
    139 F.3d 877 (Fed. Cir. 1998)......................................................................... 18, 21, 26, 30

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
    75 F.3d 1568 (Fed. Cir. 1996).......................................................................................... 18

*Tec Air., Inc. v. Denso Mfg. Michigan Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999)........................................................................................ 24

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
    813 F.2d 1207 (Fed. Cir. 1987)........................................................................................ 30

*Westwood Chem., Inc. v. United States*,
    525 F.2d 1367 (Ct. Cl. 1975) ........................................................................................... 31

## STATUTES

35 U.S.C. § 282................................................................................................................... 18

Fed. R. Civ. Pro. 56............................................................................................................. 32

Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively, "BSC") respectfully submit this brief in opposition to Conor Medsystem, Inc.'s ("Conor's") motion for summary judgment that Claim 35 of United States Patent No. 5,922,021 ("the Jang '021 patent") is somehow invalid as obvious over the prior art.

## NATURE AND STAGE OF THE PROCEEDINGS

BSC filed its Complaint against Conor on November 8, 2005 for Conor's willful infringement of the Jang '021 patent. (D.I. 1) Under the Court's Amended Rule 16 Scheduling Order, fact discovery was completed on March 9, 2007 and expert discovery was completed on April 30, 2007. (D.I. 113) Motions for summary judgment were filed on May 11, 2007 and answering briefs are to be filed on May 25, 2007. (*Id.*) Trial is scheduled to begin on October 15, 2007. (D.I. 36)

## SUMMARY OF THE ARGUMENT

1.     Conor's sister entity, Cordis Corporation ("Cordis"), litigated the same validity issue at trial in 2005 and lost. Conor is therefore collaterally estopped from contesting validity and this Court need not even consider Conor's motion.

2.     If this Court were to consider Conor's motion, evaluating obviousness requires a comparison of the actual disclosures of the prior art to the actual limitations of the claimed invention. Conor does not perform this comparison and its motion should accordingly be denied.

3.     Proving obviousness further requires that a combination of prior art references discloses each and every limitation of the claimed invention. None of the prior art cited by Conor discloses the claimed top-corner-to-bottom-corner connection scheme of Claim 35 of the Jang '021 patent. Conor's motion should be denied for this reason as well.

4.    Obviousness arguments are improper if they manipulate prior art references in
contravention of their teachings.  Here, the prior art teaches away from the manipulations
underlying Conor's arguments and Conor's motion should be denied for this reason as
well.

5.    Even if Conor could establish a *prima facie* case of obviousness, the real-world evidence
of nonobviousness, so-called secondary considerations, defeat Conor's affirmative
defense.

6.    At a minimum, there are genuine disputes as to material facts — including the scope and
content of the prior art, the differences between the prior art and the claimed invention
and the existence of objective indicia of nonobviousness — that preclude summary
judgment.

## COUNTER-STATEMENT OF FACTS

### I.    THE VALIDITY ISSUE HAS ALREADY BEEN ADJUDICATED

As set forth in greater detail in BSC's co-pending motion for summary judgment
of collateral estoppel (D.I. 137, 138), Cordis and Conor are sister corporations working in
concert.  Cordis was found to infringe the Jang '021 patent in a 2005 trial.  (*Cordis Corporation
v. Boston Scientific Corp.*, 03-027-SLR (D. Del.), D.I. 381)  This trial also adjudicated and
rejected Cordis' affirmative defense of obviousness.  (*Id.*)  The references Cordis relied upon at
trial in 2005 — *e.g.*, the Israel '303 patent and  Pinchasik '373 patent — are the same references
that underlie Conor's current obviousness defense.  Conor's affirmative defense in general, and
its present motion in particular, seek to relitigate the previously adjudicated validity issue
without any basis for doing so.

2

## II.    DECADES OF ATTEMPTS FAILED TO YIELD
## A STENT BOTH FLEXIBLE AND STRONG

### A.    CAD And The Potential For Stents

Coronary artery disease ("CAD") is a leading cause of death in the United States.
(Ex. 1 at 341-42)  Staring in the 1970's, percutaneous coronary balloon angioplasty ("PCBA")
showed promise as a relatively non-invasive treatment for CAD, but many drawbacks — such as
dissections and restenosis — were soon discovered.  (*Id.* at 344-48)  The use of stents to help
hold open arteries was championed as a potential solution to these drawbacks and held out the
hope of an effective treatment for CAD.  (Ex. 2 at 7; Ex. 3 at 7)  As expressed by Conor's expert,
Dr. Nigel J. Buller, "[b]y the late 1970's and early 1980's . . . teams of researchers were
experimenting with different stent designs for use in body passageways, including the coronary
arteries."  (Ex. 2 at 7)

### B.    The Prior Art's Difficulty In Realizing This Potential

Early stents had serious flaws.  As a result, by the early- to mid-1990's there were
many companies and inventors working in the stent field trying to address these flaws.  As
described by Conor, this was a "crowded field" undergoing a "frenzy of activity."  (COB at 2,
28)  But as shown from the prior art references of this period, expert testimony from the present
and prior cases and the admissions of Conor's sister corporation, Cordis, all of these efforts still
left the industry without a stent that combined all of the desired characteristics.

For example, the Lau '154 patent, which claims priority back to 1991, describes
the difficulty encountered by the stent industry in simultaneously providing strength and
flexibility: "One of the difficulties encountered using prior stents involved maintaining the radial
rigidity needed to hold open a body lumen while at the same time maintaining the longitudinal
flexibility of the stent to facilitate its delivery."  (Ex. 4)  This struggle to combine radial strength

3

with flexibility continued to be expressed throughout the 1990's in references such as the Globerman '161 patent of October 1995, which criticized existing stents as providing "inadequate radial force to maintain expansion; inappropriate scaffolding; pre-dilated longitudinal rigidity . . . and shortening." (Ex. 5)  The Wijay '569 patent, filed on June 27, 1997, similarly divided existing stents into those which "fail[] to provide radial support" and those which "although typically providing sufficient radial support when expanded, are not flexible enough to be placed in curved vessels." (Ex. 6)

Having looked at record evidence such as this, and having applied his expert experience and knowledge, Dr. James E. Moore has expressed similar views of the state of the art in this time-frame: "the industry struggled to develop a stent that would overcome the disadvantages, such as the lack of sufficient flexibility of longer stents, associated with the prior art." (Ex. 7 at ¶ 162)  Despite the "frenzy of activity" in this "crowded field," there was a "long-felt need in the art for a closed-cell stent with improved flexibility, including a stent with a connector *that improved flexibility while maintaining the radial strength of the stent*." (*Id.* at ¶ 161 (emphasis added))  Conor's own expert, Dr. Ronald J. Solar, similarly stated that this was the "ultimate goal" of stent design — "a goal of having a stent design which is flexible on delivery and strong." (Ex. 9 at 57-58)

The shortcomings of the prior art were experienced first hand by Conor's sister corporation, Cordis, during this time period.[1]  For example, Dr. Brian Firth, Cordis' Vice President of R&D in 1997, testified that there was a long-felt need for a stent that achieved flexibility without sacrificing strength or scaffolding:

---

[1]    Conor itself was not founded until 1999.

Question: And were there specific areas [of stent design] that you were trying to improve in your [research and development group in 1995]?

Answer: *Yes, we were definitely trying to improve flexibility of the stent. But we also had certain criteria. We were very interested in maintaining the same radial force of the stent.* And, based on all the Palmaz experience, we were very interested in obtaining a design where every crown was attached to every adjacent crown. In other words, not have unconnected internal edges.

*        *        *

Question: Is it fair to say that the goal [of the next generation] was to obtain radial strength, a closed-cell design but yet increase flexibility as compared to the Crown stent?

Answer: That would be fair.

(Ex. 8 at 494:18-495:2, 497:6-9 (emphasis added))  The many failed attempts of Cordis and others — including the Crown, Mini-Crown and BX stents — were explored in detail during the 2005 *Cordis* Trial.  (*E.g.*, *Cordis* D.I. 386, 387)

Part of the difficulty in meeting this long-felt need can be traced to the inherent difficulties and complexities involved in stent design.  Attempts to increase one performance factor, such as flexibility, often have negative and unexpected effects on other factors, such as radial strength.  As explained in the rebuttal report of Dr. Moore, stent design in 1996-97 (and even today) was unpredictable and involved attempting to balance competing goals:

Stent design is not an easily predictable process today and was even less predictable [in 1996-97].  A given stent design represents a balance of various design goals.  *Seemingly minor changes can impact a stent's performance in drastic ways by upsetting this balance.*  For example, even slight alterations in the connection points of a stent can impact, *inter alia*, cell size, metal content, foreshortening, tuliping and strut twisting.

(Ex. 7 at ¶ 41 (emphasis added))  This view of stent design has been echoed by Conor's expert Dr. Ronald J. Solar:

5

Q:  Is there ever a trade-off in stent designs between flexibility and strength?

A:  There can be, yes.

*      *      *

Q:  Is it fair to say that many of the choices a stent designer makes involve balancing of relative advantages and drawbacks?

A:  That's one consideration.

*      *      *

Q:  Do you think it is difficult to predict changes in [stent] performance based on changing the design on paper?

A: I would say experience tells us that it is.

Q:  You would want to actually make a stent and test it to see how it performed?

A:  Yes.

Q:  Merely talking about making changes to a schematic or a design on paper wouldn't give you confidence as to how it would function?

    Ms. Storto:  Objection.

A:  You'd have to do a lot more than make drawings.

(Ex. 9 at 63, 112, 208)

There is no dispute that, especially in 1996-97, stent design was complicated and unpredictable.  The experiences reflected in the prior art, in the opinions of the experts in this case and in Cordis' work to develop the infringing Bx Velocity stent all show the long-felt need for a stent both flexible and strong, as well as the failure of the "frenzy of activity" in this "crowded field" to achieve such a stent prior to Dr. Jang's invention.

### III.    DR. JANG SUCCEEDED IN PROVIDING A STENT BOTH FLEXIBLE AND STRONG

As set forth in the Background and Summary Of The Invention of the Jang '021 patent, Dr. Jang confronted the shortcomings found in the prior art.  Eschewing the rigidity that was inherent to tubular designs such as the original Palmaz stent, Dr. Jang sought to design a stent that provided added flexibility.  *See,* Ex. 10 at 2:15-28 ("The stent described in the Palmaz Patent consists of a series of elongated tubular members having a plurality of slots . . . The unexpanded tubular members of the Palmaz Patent are overly rigid so that practical application is limited to short lengths . . . longer stents can not navigate tortuous blood vessels.").  Yet Jang did not want to obtain flexibility at the expense of strength or scaffolding.  (*Id.* at 2:66-3:47)  And that was a fundamental problem that had stymied stent designers, since flexibility and strength appeared to be mutually exclusive.

To succeed where others had failed, Dr. Jang began investigating stent designs based on expansion columns and connecting struts, and focused on the design and connection of the connecting struts as a mechanism to increase flexibility without sacrificing strength.

#### A.    Dr. Jang's Invention

As shown in the claims of the Jang '021 patent, Dr. Jang describes his invention in terms of specific connection schemes.  For example, Claim 23 (from which Claim 35 depends) recites a stent comprised of expansion columns joined together by a connecting strut column. (Ex. 10, Claim 23)  The expansion columns, in turn, are comprised of pairs of expansion struts which are joined together by joining struts.  (*Id.*)  In a prelude to the various connection schemes that are explored in the dependent claims, Claim 23 also defines "corners" where the expansion struts couple to the joining strut:



(First and Second Expansion Columns, Ex. 11 at ex. D)

To impart the desired flexibility without sacrificing radial strength or scaffolding, Dr. Jang next investigated the design and placement of "connecting struts" to join together these expansion columns. The dependent claims reflect a variety of these connection schemes. For example, some of the dependent claims require that the connecting struts that join two expansion columns run between offset — *i.e.*, opposite — corners. Claim 35 in particular requires such an offset, corner-to-corner connection, with the connecting struts running from the top-corner to the bottom-corner:



(Top-Corner-to-Bottom-Corner Connections, Ex. 11 at ex. L)

By employing such offset connections, as well as requiring that the connecting struts themselves be curvy by having non-parallel sections, Claim 35 recites a stent that is strong and has good scaffolding, yet is flexible enough to get to the necessary locations within a patient. As Conor's expert has testified, such improved flexibility has increased the "locations where stents could be used." (Ex. 9 at 67)  Claim 36, which was previously before this court in the 2005 *Cordis* trial, recites a nearly identical design, replacing Claim 35's connection scheme with its mirror image — *i.e.*, a bottom-corner-to-top-corner curvy connector.[2]

## B.    The Stent Industry Has Recognized The Value Of Dr. Jang's Invention

As set forth in the Summary Of The Invention, Dr. Jang's invention combined strength, scaffolding and flexibility in a single stent design.[3]  (Ex. 10 at 3:23-47)  Dr. Moore has offered his expert opinion that "[t]he upper-to-lower-corner, curvilinear connection scheme required by Claim 35 of the Jang '021 patent is a unique design that increases the flexibility and deliverability of the stent while maintaining adequate radial strength, without increasing the cell size of the stent and without compromising length." (Ex. 7 at ¶ 163)

These descriptions of the benefits of Dr. Jang's invention are confirmed by the real-world experience of Cordis with its commercial embodiment of the Jang '021 patent — the infringing Bx Velocity stent.  David Fischell, a designer of the Bx Velocity stent, has testified that:

> A:  [The Bx Velocity] *had a lot of flexibility* at the time.  *That's why we like it*.

---

[2]    Conor's experts have stated that this difference between Claims 35 and 36 would not affect the performance benefits of Dr. Jang's invention.  (Ex. 2 at 9; Ex. 3 at 14 & n.2; Ex. 9 at 218-19; Ex. 19 at 403)

[3]    Dr. Jang recognized that additional benefits that were sought by the industry, such as a reduction in foreshortening, flowed from his design as well.  (Ex.10 at 3:21-47)

Q: And that was the point of it; right?  To beat the previous Cordis designs in flexibility; right?

A: That was one *key attribute* of it, yes.

\*     \*     \*

Q: And one of the reasons you've been told it has been well received is *because of the flexibility*; right?

A: That is one of the reasons, yes.

(Ex. 8 at 451:25-452:15 (emphases added))  Dr. Firth confirmed that the Bx Velocity's increased

flexibility led to its success in the marketplace:

Q: And as you explained to me, that design [the offset lower-to-upper connection of the Bx Velocity connector] was *specifically chosen and evaluated by Cordis because of its improvement in flexibility* and deliverability; is that right?

A: That's my understanding. . . . *Yes*.

Q: And as a result of the improvement in flexibility, it was better received by interventional cardiologists than the Crown had been?

A: That's correct.

(*Id*. at 500:6-501:6 (emphases added))  As Robert Croce, the Johnson & Johnson Company

Group Chairman in charge of Cordis, testified:

Q: But did there come a time when Cordis introduced your [sic] second-generation slotted tube stents of its own?

A: Yes.  We came out with a series of products.  It was the Crown, Mini Crown, Crossflex LC, *but we really didn't have a competitive product until probably the May time frame of 2000, when we came out with Bx Velocity*.

(*Id*. at 504:8-18 (emphasis added))  The benefits of Dr. Jang's invention were confirmed by the

Bx Velocity's commercial success in the marketplace:

A: [The Bx Velocity stent] was the first, really, I would say, high-quality, second-generation product that was competitive that we introduced. . . . *And the Bx Velocity was quite successful.  It*

10

*garnered 25 to 30 percent market share rather rapidly*, and so it was – put us really back in the game.

Q: And at the time the Bx Velocity stent was introduced, Cordis' share of the coronary stent market was about 5 percent?

A: Yes, it was.

(*Id.* at 504:18-505:4 (emphasis added); *see also* Ex. 12 at 860:24-861:4; 861:12-14; 878:4-8)

Conor's experts have admitted the commercial success of the infringing Bx Velocity stent. (Ex. 9 at 69-70; Ex. 19 at 37-38)  And such commercial success is especially noteworthy given the "frenzy of activity" in the "crowded field" of the stent industry and the number of competing products and designs in the marketplace.

C.

REDACTED

REDACTED

**D.    The Bulk Of Conor's Brief Concerns "Limitations"
That Do Not Actually Exist**

Despite Conor's extensive discussion of "in-phase" stent designs and "horizontal

connectors" — *see, e.g.*, COB at 4-7, 21-23, 29-30 —Claim 23, as well as Claims 35 and 36,

nowhere recite such limitations.  As admitted by Conor's expert Dr. Solar, these claims cover

stents that have a large range of designs, both in-phase and out-of-phase.  (Ex. 9 at 183-84)  This

conclusion is confirmed by the fact that the Bx Velocity stent — a 180-degree out of phase stent

sold by Conor's sister corporation, Cordis — was found to infringe the Jang '021 patent after the

2005 *Cordis* jury trial.  (Ex. 16)  Similarly, there is no requirement in these claims that the

connecting struts run horizontally.  Indeed, none of the stents disclosed in the Jang '021 patent

specification, nor the infringing Bx Velocity stent, even contains such a connector.  (Exs. 10, 17)

Conor's non-existent "limitations" stand in contrast to the top-corner-to-bottom-corner limitation,

which is actually recited in the claims and clearly present in the accused CoStar stents.

**IV.    NONE OF THE PRIOR ART CITED BY CONOR
DISCLOSES TOP-CORNER-TO-BOTTOM-CORNER
CONNECTIONS**

Considering the actual limitations of Claim 35 of the Jang '021 patent — *e.g.*,

curvy, offset corner-to-corner connectors — instead of Conor's non-existent "limitations" — *e.g.*,

"in-phase" and "horizontal connectors" — none of the prior art cited by Conor discloses the

invention of Claim 35.  Indeed, Conor does not even make this argument.  For example, the

actual disclosure of the Israel '303 patent, as shown in Figure 7 reproduced below, does not show

offset connections between opposite corners:

12





(Israel '303 — connection at same point)          (Jang '021 — connection at opposite corners)

Experts for both parties agree that the Israel '303 patent does not disclose offset — *i.e.*, top-corner-to-bottom-corner — connectors. (Ex. 2 at 30; Ex. 7 at ¶¶ 86-94) As shown in Conor's opening brief, and as reflected in the opinions of both sides' experts, the Wijay '569 patent similarly fails to disclose the claimed top-corner-to-bottom-corner connection. (Ex. 2 at 43-44; Ex. 6; Ex. 7 at ¶¶ 109-117) The Lau '154 patent likewise fails to disclose the offset connection scheme, as well as failing to disclose curvy connectors. (Ex. 4) The commercial embodiments of these references (*e.g.*, the NIR and Multilink stents) share the same deficiencies. (*E.g.*, Ex. 7 at ¶ 95) None of the art cited by Conor discloses the Claim 35 limitations.

## V.  CONOR'S "IN-PHASE VERSION OF ISRAEL" WAS CREATED FOR LITIGATION PURPOSES

The crux of Conor's argument concerns what Conor has called the "in-phase version of Israel '303." (*E.g.*, COB at 17-23) But there is no such version. Despite the name Conor has bestowed, this design is found nowhere within the Israel '303 patent nor in any other prior art reference. Rather, it was created by Conor's attorneys for the purpose of this litigation. As discussed above, it is undisputed that the actual disclosure of the Israel '303 patent does <u>not</u> disclose an offset — *i.e.*, top-to-bottom — corner connection scheme. Nor does Conor's brief assert that any other reference discloses a top-corner-to-bottom-corner connection.

As discussed in Conor's opening brief, Conor generated the "in-phase version of Israel" by taking one of the stents disclosed in the reference, breaking apart the stent, rearranging

13

the stent's components and then rejoining those components in a new configuration. (*Id.*) This stent dissection is inappropriate. *See, e.g.*, Ex. 23 at 80 ("[I]t is not a design that is described in the Israel '303 patent. This is a design that would go against the teachings of the Israel '303.")

Conor's brief states that its manipulation of the prior art results in a substitution of an "in-phase" design for the design actually disclosed in the Israel '303 reference. But Conor made other changes as well. For example, Conor substituted a different connection scheme for the one actually disclosed in Israel. Conor added a top-corner-to-bottom-corner connection scheme as one of its modification in generating the "in-phase version of Israel," even though that connection scheme is not disclosed in the reference itself. (*E.g.*, COB at 20) And Conor has offered no explanation of why it made the changes it did to the actual disclosure of the Israel '303 reference, other than that they were necessary in hindsight to bridge the gap between the prior art's disclosure and the limitations of the patent claim at issue in this litigation.

### A.    The Actual Disclosure Of Israel Teaches Away From The Changes Conor Proposes

As discussed in the rebuttal report of Dr. Moore, the actual Israel reference focuses on the use of continuous "meander patterns" for designing stents. (Ex. 7 at ¶¶ 86-94; Ex. 18) Conor's modification of the reference by dissecting and moving various components of the meander patterns is thus contrary to the reference's teaching. (Ex. 7 at ¶ 87; Ex. 23 at 80)

Conor's substitution of an in-phase design is also contrary to the teachings of the Israel reference. "Indeed, the [Israel] '303 patent teaches away from in-phase designs." (Ex. 7 at ¶ 88) Every disclosure in the Israel reference is 180-degrees out-of-phase, and one of the principal goals taught by the reference — reduction of foreshortening — would be lost by Conor's manipulations. (*Id.*) The Israel reference's teaching of cells with "loop[s] . . . generally

opposite to one another" would also be lost by the changes Conor labels "obvious." (*Id.* at 88-89, 93)

In short, the only way to arrive at Conor's "Frankenstent" is to dissect an Israel '303 stent and manipulate the pieces in ways that are completely contrary to that patent's teachings. This is not the basis for an obviousness conclusion. If anything, it shows that the prior art teaches away from Claim 35.

### B.    Conor's Litigation Inspired Stent Does Not Disclose The Invention Of Claim 35

While Conor's opening brief notes that Figure 6 of the Israel '303 reference is merely a stick figure of the stent shown in Figure 7 (COB at 16), Conor's invalidity analysis concerns only that stick figure. And for good reason. As stated in Dr. Moore's rebuttal report, the actual stent disclosed in the Israel reference, *i.e.*, Figure 7, does <u>not</u> show a corner-corner connection scheme at all, let alone the top-corner-to-bottom-corner design claimed by Dr. Jang. (Ex. 7 at ¶ 87) Therefore, even flipping around the stent's components as Conor proposes could not result in a top-corner-to-bottom-corner connection scheme because Israel does not teach any corner connections.[4] Figure 6 does not add to the disclosure of Figure 7, if anything it discloses less information to one of skill in the art as a mere cartoon stick figure compared to Figure 7's depiction of a stent. The inventor of the Israel '303 patent has confirmed that stick figures such as Figure 6 are not intended to disclose actual stent designs: "the square version is only for ease of drafting, it's not for manufacturing." (Ex. 22 at 147-148) Because Figure 6 purports to disclose the exact same stent as Figure 7, albeit in a stick figure form with less detail, it similarly

---

[4]    Contrary to Conor's assertion, Dr. Moore's expert report indicates that there <u>is</u> a dispute as to whether the "in-phase version of Israel" reads on Claim 35 of the Jang '021 patent. (Ex. 7 at ¶ 87)

fails to reveal to one of skill in the art a corner-to-corner connection scheme of the type taught

and claimed in the Jang '021 patent.

### C.    Conor's Proposed Manipulations
###        Would Yield A Non-Functioning Stent

Conor's recourse to the stick figure of Figure 6 rather than the actual stent of

Figure 7 helps Conor to conceal a fundamental flaw of its manipulations — the stent Conor has

created would not work.  The connection scheme of the actual Israel reference is based on the

interlacing of specific meander patterns.  If one were to dissect those functional units into the

expansion columns and connecting struts columns taught by the Jang '021 patent, and then break

apart and reposition those components according to Conor's manipulations, the resulting stent

would have awkward connections (or no connections at all) and sharp projections:

   

(Actual Disclosure of Israel '303)          (Conor's Allegedly "Obvious" Modification)

A close-up of this design highlights these concerns:



(Conor's "Obvious" Modification)

In creating its litigation stent, Conor silently chooses how to proceed from this

non-functional design to its allegedly invalidating designs, without citing any basis for these

choices in the prior art.  There are a range of modifications that could be made from this point to

16

reconnect the structure. Conor alone chooses where to couple the connecting strut to the

expansion columns. And Conor chooses the only possible location that would implicate Claim

35 — a top-corner-to-bottom-corner connection. Conor does not explicitly acknowledge this

choice, and it is not based upon any teaching from the prior art.

      At a minimum, these are genuine issues of material fact regarding whether

Conor's Frankenstent is disclosed in the Israel '303 patent and would work as a stent. These

issues of fact alone are sufficient basis to deny Conor's motion for summary judgment.

**ARGUMENT**

## I.    THIS COURT NEED NOT EVEN ENTERTAIN CONOR'S MOTION

      As set forth in BSC's opening brief in support of its co-pending motion for

summary judgment of collateral estoppel (D.I. 137, 138), the 2005 *Cordis* trial is dispositive of

Conor's obviousness defense in the present case. Conor should therefore be collaterally estopped

from contesting the validity of the Jang '021 patent. Accordingly, this Court may deny Conor's

motion without even considering its merits.

## II.    SUMMARY JUDGMENT IS IMPROPER WHERE FACTS ARE IN DISPUTE OR DO NOT SUPPORT THE MOVANT'S POSITION

      Summary judgment is only appropriate where "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). "The movant bears the burden of demonstrating the absence of all genuine issues of

material fact, and the district court must view the evidence in a light most favorable to the

nonmoving party and draw all reasonable inferences in its favor." *Hodosh v. Block Drug Co.*,

786 F.2d 1136, 1141 (Fed. Cir. 1986). "All reasonable inferences must be drawn in favor of the

party opposing the motion and where 'there is doubt as to the existence of a genuine issue of

17

material fact, that doubt must be resolved in favor of the nonmovant.'" *Finish Eng'g Co. v. Zerpa Indus., Inc.*, 806 F.2d 1041, 1043 (Fed. Cir. 1986) (internal citations omitted)

"Obviousness is ultimately a determination of law based on underlying determinations of fact." *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998). "Among these factual inquiries are secondary considerations, which include evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1572 (Fed. Cir. 1996).

Each claim of a patent is presumed valid. 35 U.S.C. § 282. "The presumption may be rebutted only by clear and convincing evidence." *Alco Standard Corp. v. TVA*, 808 F.2d 1490, 1498 (Fed. Cir. 1986). "When no prior art other than that which was considered by the PTO examiner is relied on by the attacker . . . he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job . . ." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001). In evaluating allegations of obviousness, "[c]are must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide though the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988).

## III.    CONOR'S MOTION FAILS EVEN UNDER THE FACTS CONOR RECITES

Among the required factual determinations in evaluating an allegation of obviousness are "the scope and content of the prior art . . . [and] the differences between the claimed invention and the prior art. . ." *Monarch Knitting*, 139 F.3d at 881. These factual determinations are necessary because obviousness requires, among other things, that every

18

limitation of the claim at issue be found in some combination of prior art references. *See In re Zurko*, 258 F.3d 1379, 1385 (Fed. Cir. 2001) (reversing a finding of obviousness where "the Commissioner apparently concedes that neither [of the references] teaches [a claim limitation]."); *Minnesota Mining & Mfg. Co. v. J&J Orthopaedics, Inc.*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) (affirming judgment of non-obviousness where combination of prior art references failed to disclose a claimed limitation.).

A.    **Conor Merely Offers Art That
      The PTO Already Considered**

Conor's obviousness affirmative defense relies heavily on the disclosure of the Israel '303 patent. But as admitted by Conor's expert Dr. Buller during the 2005 *Cordis* trial, this disclosure was considered by the United States Patent and Trademark Office ("PTO") in the form of the foreign counter-part to the Israel '303 patent, sometimes referred to as the "Brun" patent. (Ex. 20 at 1287, 1363-64)  Conor's expert Dr. Solar has similarly stated that he is not "aware of any differences between the Brun patent and the Israel '303 patent regarding their respective disclosures that is relevant to the validity of the Jang '021 patent." (Ex. 9 at 152)

Many of the additional references Conor cites, such as the Palmaz '417 patent and the Pinchasik '373 patent, were also considered by the PTO.  The PTO found Claim 35 patentable in light of all of these disclosures.  Indeed, the PTO never rejected the claim that resulted in Claim 35 over any prior art.  Therefore, Conor bears "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job. . ."  *McGinley*, 262 F.3d at 1353; *see also Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (noting this additional burden where "the PTO considered nearly all the prior art that [defendant] asserts renders [plaintiff's] patents obvious.").

### B.    Conor Does Not Perform The Proper Comparison

The bulk of Conor's brief is dedicated to setting up a straw-man argument. There is no claim chart or other comparison of the <u>actual</u> limitations of Claim 35 of the Jang '021 patent against the <u>actual</u> disclosures of a specific combination of prior art references. In fact, Conor did not even ask its expert Dr. Solar to prepare a claim chart or other one-to-one comparison, contrary to his prior practice. (Ex. 9 at 83-84, 239-240)  Rather, Conor engages in a legally improper discussion of the alleged "novel feature" or "point of novelty" of the invention and the generic "building blocks" allegedly taught in the art.  (*E.g.*, COB at 1, 3, 9-10)

Taking snippets of deposition testimony, trial testimony and expert reports out of context, Conor characterizes Claim 35 as requiring "in-phase" arrangements of expansion columns and "horizontally aligned connectors."  (COB at 11-15)  Conor goes so far as to state that this was the very problem Dr. Jang was addressing — how to design "an in-phase stent with horizontally aligned connectors."  (COB at 29-30)  Conor then argues for obviousness based upon the prior art's alleged disclosure of "an in-phase stent with horizontally aligned connectors." But these are not the <u>actual</u> limitations of Claim 35 and Conor's arguments regarding these limitations are misdirected and fundamentally flawed.

Conor compounds its error by committing a similar error with respect to the scope and content of the prior art.  Conor cites a number of prior art references, such as the Israel '303 reference, but does not base its obviousness argument on their actual disclosures.  Rather, Conor dissects rings, manipulates the disclosure of the Israel '303 patent — including by breaking connections, moving components and altering the connection points — to create its Frankenstent. As discussed above, Conor silently makes changes not supported by the prior art in addition to those that it explicitly discusses. *See* Counter-Statement of Facts § V, *supra*. Conor then bases its obviousness allegations on a comparison of its Frankenstent to the non-existent "in-phase

stent with horizontally aligned connectors" that it purports to find in the '021 patent. (COB at
17-21, 25-29)

   This is legally improper.  Obviousness requires a comparison of the <u>actual</u>
claimed invention with the <u>actual</u> disclosures of the prior art.  *Monarch Knitting*, 139 F.3d at
881.  Claim 35 does not <u>actually</u> claim or disclose an "in-phase stent with horizontally aligned
connectors."  Nor does the prior art <u>actually</u> disclose Conor's Frankenstent, the non-existent and
contradicted "in-phase version of Israel."  Conor's obviousness analysis is fatally flawed and its
motion should be denied.

   Conor repeatedly seeks to denigrate the Jang '021 patent as merely combining
known technology or "building blocks."  But as recently recognized by the Supreme Court,
"inventions in most, if not all, instances rely upon building blocks long since uncovered, and
claimed discoveries almost of necessity will be combinations of what, in some sense, is already
known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. ___, 82 U.S.P.Q.2d 1385, 1397 (2007).  Where,
as here, the art is unpredictable, small changes in a design can lead to big difference and the prior
art teaches away from the proposed changes — *see* Counter-Statement of Facts §§ II, V, *supra*
— Conor's "building block" argument is both factually irrelevant and legally insufficient.  *KSR*,
82 U.S.P.Q.2d at 1395-96 ("when the prior art teaches away from combining certain known
elements, discovery of a successful means of combining them is more likely to be nonobvious. . .
. a court must ask whether the improvement is more than the predictable use of prior art
elements.").

   Additionally, Conor's general approach to obviousness — finding the closest
reference it can (*i.e.*, the Israel '303 patent) and then arguing that the specific differences between
reference and Claim 35 are obvious, is legally improper.  "Focusing on the obviousness of

substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990) (affirming non-obviousness)

### C.    Conor's Motion Fails Under The Proper Comparison

The reason for Conor's approach becomes apparent when one compares the actual limitations of Claim 35 to the actual disclosures in the prior art. Claim 35 of the Jang '021 patent explicitly requires a top-corner-to-bottom-corner connection scheme:

> the first connecting strut proximal section is coupled to the first
> [*i.e.*, top] corner of the second expansion strut pair in the first
> expansion strut column, and the first connecting strut distal section
> is coupled to the second [*i.e.*, bottom] corner of the first expansion
> strut pair of the second expansion strut column.

(Ex. 10 at Claim 35) *None of the prior art cited by Conor discloses this limitation.* Since this limitation is not found in any of the cited prior art, Conor's combination of references necessarily fails to disclose this limitation as well. Merely stating that one of skill in the art would add in the missing limitation, without evidentiary support that the missing limitation was known in the prior art, is insufficient. *Zurko*, 258 F.3d at 1385 ("Finally, the deficiencies of the cited references cannot be remedied by . . . general conclusions about what is 'basic knowledge' or 'common sense' to one of ordinary skill in the art. . . . This assessment of basic knowledge and common sense was not based on any evidence in the record. . .").

As discussed above, Conor adds this missing limitation as part of its manipulation of the actual disclosures of the Israel '303 reference to its Frankenstent, the non-existent and contradicted "in-phase version of Israel." But Conor does not, and cannot, point to any prior art source for this element.

22

**D.    Conor's Failure To Carry Its Initial Burden
Is Fatal To Its Motion**

"The party moving for summary judgment bears the initial burden of coming

forward with evidence that demonstrates the absence of a genuine material question of disputed

facts and establishes that the moving party is entitled to judgments as a mater of law." *Arkie*

*Lure, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 955 (Fed. Cir. 1997). Conor has failed to

come forward with evidence that any prior art reference disclosed the top-corner-to-bottom-

corner connection scheme required by Claim 35. As a result, Conor has failed to satisfy its

initial burden and its motion should be denied accordingly. *See Zurko*, 258 F.3d at 1385

(reversing a finding of obviousness because none of the prior art disclosed one of the claim

limitations); *Minnesota Mining*, 976 F.2d at 1573 (affirming judgment of nonobviousness where

none of the prior art disclosed one of the claim limitations).

## IV.    CONOR'S MOTION ALSO FAILS UNDER THE FACTS BSC RECITES

Even if a movant can meet its initial burden, which Conor cannot, its motion fails

if the "non-movant . . . come[s] forward with sufficient evidence to show that, on the non-

movant's evidence, the movant is not entitled to judgment as a matter of law." *Arkie Lures*, 119

F.3d at 955. On summary judgment, "[a]ll reasonable inferences must be drawn in favor of the

party opposing the motion. . ." *Finish Eng'g*, 806 F.2d at 1043.

As set forth above, BSC has adduced ample evidence showing that Claim 35 of

the Jang '021 patent is non-obvious. Regarding the specific obviousness argument advanced in

Conor's motion, BSC has adduced evidence that: (1) the Israel '303 patent teaches away from

making the modifications Conor proposes; (2) the Frankenstent that Conor has created still does

not disclose all of the limitations of Claim 35 of the Jang '021 patent; and (3) Conor's

Frankenstent would not work. Even if Conor could make a *prima facie* case of obviousness,

which it cannot, BSC has adduced evidence of: (4) secondary indicia that rebut Conor's

arguments.

### A.    There Is No *Prima Facie* Case Of Obviousness

"Care must be taken to avoid hindsight reconstruction by using 'the patent in suit

as a guide through the maze of prior art references, combining the right references in the right

way so as to achieve the result of the claims in suit." *Grain Processing*, 840 F.2d at 907.  The

Supreme Court's recent decision in *KSR* reiterates this caution against hindsight.  *KSR*, 82

U.S.P.Q.2d at 1397.  The changes that Conor makes to the prior art must be considered in light

of these admonitions.

### 1.    Israel '303 Teaches Away From The Changes Conor Proposes

Conor's obviousness arguments depend upon making a number of modifications

to the actual disclosure of the Israel '303 patent.  *See* COB at 17-20; Counter-Statement of Facts

§ V, *supra*.  Before even considering Conor's litigation-inspired combination, one must

determine whether modifications needed to arrive at this combination are proper or if the actual

Israel reference teaches away from making them.  *See Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,

192 F.3d 1353, 1360 (Fed. Cir. 1999) ("A reference may be said to teach away when a person of

ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path

that was taken by the applicant. . .")  The Supreme Court's recent decision in *KSR* reaffirms that

"teach[ing] away" remains an important consideration in evaluating obviousness allegations.

*KSR*, 82 U.S.P.Q.2d at 1395-96.

The Israel '303 patent teaches out-of-phase designs that are comprised of

interlacing "meander patterns." (Ex. 18 at Figs. 1-4, 6-8; 1:63-64)  These out-of-phase meander

patterns ensure the existence of "loops" aligned along the longitudinal axis, which are "generally

opposite to one another." (*Id.* at 5:9-13, 5:38-62)  The Israel '303 patent teaches that these

specific designs minimize longitudinal foreshortening by having the shortening in one meander

pattern offset by a corresponding lengthening of an orthogonal meander pattern. (*Id.* at 5:38-62;

Ex. 7 at ¶¶ 88-89, 93)

        All of these teachings contradict the modifications Conor proposes. Conor's

dissecting of portions of the meander patterns and reorienting of the stent's components violates

the basic tenet of the Israel '303 design. For example, Conor's substitution of an in-phase design

into the Israel disclosure eliminates the "loops . . . generally opposite to one another" and upsets

the careful balance of the shrinking and lengthening orthogonal patterns to prevent

foreshortening. The fact that Israel teaches away from the modifications Conor proposes is

further supported by the expert opinion of Dr. Moore, who has specifically considered Conor's

arguments and rejected them. (Ex. 7 at ¶¶ 87-89) Reviewing the record evidence in its entirety,

Dr. Moore opined that Israel teaches away from both the specific changes Conor now proposes

as well as other changes which might implicate the scope of Claim 35 of the Jang '021 patent.

(*Id.* at ¶¶ 86-94)

        In response, Conor offers no explanation of why one of skill in the art would

manipulate the Israel stent in the manner Conor has proposed. In fact, the admissions of Conor's

expert Dr. Solar caution against such manipulations:

> Q: Do you think it is difficult to predict changes in [stent]
> performance based on changing the design on paper?
>
> A: I would say experience tells us that it is.
>
> Q: You would want to actually make a stent and test it to see how
> it performed?
>
> A: Yes.
>
> Q: *Merely talking about making changes to a schematic or a
> design on paper wouldn't give you confidence as to how it would
> function?*

25

Ms. Storto:  Objection.

A:  *You'd have to do a lot more than make drawings.*

(Ex. 9 at 112, 208) (emphasis added)  While the Supreme Court's recent decision in *KSR*

criticized the use of an overly rigid "motivation to combine" requirement, an "apparent reason"

to make changes to the prior art is still necessary.  *KSR*, 82 U.S.P.Q.2d at 1396.  And Conor has

not come forward with any such basis, much less one that is not contradicted by the references

themselves.

As the Federal Circuit has explained, obviousness cannot rest on manipulating a

reference in a manner contrary to its teaching.  *Tec Air*, 192 F.3d at 1360.  At a minimum, the

teachings of the Israel '303 patent, as well as the testimony of Dr. Moore, raise genuine issues of

material fact as to whether the Israel reference teaches away from the modifications necessary

for Conor's obviousness arguments.  *See Monarch Knitting*, 139 F.3d at 886 (overturning

summary judgment of obviousness where "factual issues remain about . . . teaching away at the

time of invention.")

2.    Conor's Litigation-Inspired Stent Does Not
Disclose All Of The Elements Of Claim 35

Even if Conor were allowed to manipulate the Israel reference in the manner set

forth in its opening brief, which it should not be, the resulting structure would still not disclose

all of the limitations of Claim 35 of the Jang '021 patent.  As discussed above, Figure 7 of the

Israel '303 patent does not disclose a corner-to-corner connection.  This conclusion is supported

by the expert opinion of Dr. Moore.  (Ex. 7 at ¶ 87)  Because Israel does not disclose corner-to-

corner connections at all, the manipulations Conor proposes would not lead to an upper-corner-

to-lower-corner connection scheme as required by Claim 35.  (*Id.*)  Conor cannot rely on Figure

6 for a different disclosure than Figure 7 because, as Conor admits, Figure 6 is a mere stick

figure of the stent actually shown in Figure 7.  The failure of Conor's combinations and

manipulations to disclose all of the limitations or Claim 35 is fatal to its obviousness argument.

*See Zurko*, 258 F.3d at 1385; *Minnesota Mining*, 976 F.2d at 1573.

Even if the Israel '303 patent did disclose any corner connections, the

manipulations Conor proposes would not result in a top-corner-to-bottom-corner connection.

Indeed, it is not clear that there would be any connection points at all:



(Conor's Litigation Stent)

Conor's Frankenstent does not have top-corner-to-bottom-corner connectors.  And Conor has not

identified any prior art teaching how to modify this structure to arrive at Dr. Jang's invention.

### 3.    Conor's Litigation-Inspired Stent Would Not Function

In evaluating obviousness, it is improper to manipulate a reference in such a way

as to render it inoperable.  *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (overturning a

finding of obvious based on inverting a portion of a prior art device, because such modification

would render the reference "inoperable for its intended purpose.").

As discussed above, the modifications Conor proposes for the Israel '303 patent

— namely dissecting the rings, breaking the connection scheme, inverting some of the

components and then reassembling the stent — would yield a structure with precarious joints and

sharp, protruding edges:




(Conor's litigation stent)                    (close-up)

*See* Counter-Statement of Facts § V, *supra*.  This is similar to the facts at issue in *Gordon* —

where the allegation of obviousness required inverting a portion of the prior art in a manner that

rendered the prior art inoperable.  The Federal Circuit in that case overturned the obviousness

determination, concluding that such manipulations were improper.  *Gordon*, 733 F.2d at 902.

Conor's approach is similarly improper.

    4.    <u>There Is No Support For The Additional Changes</u>
            <u>Conor Is Making To The Prior Art</u>

As discussed above, a number of unspoken modifications of the prior art underlie

Conor's litigation stent.  *See* Counter-Statement of Facts § V, *supra*.  These modifications are

necessary to add the claimed top-corner-to-bottom corner connection scheme, because such

connections are not found in the prior art.  Conor fails to point to any prior art support for these

modifications, and its motion should be denied accordingly.  *Zurko*, 258 F.3d at 1385 ("Finally,

the deficiencies of the cited references cannot be remedied by . . . general conclusions about

what is 'basic knowledge' or 'common sense' to one of ordinary skill in the art.").

**B.**    **The Real-World Evidence Rebuts**
       **Any *Prima Facie* Case Of Obviousness**

Objective indicia of nonobviousness (sometimes referred to as secondary indicia

or considerations) reflect the real-world facts and response to a patentee's invention.

"[O]bjective evidence such as commercial success, failure of others, long-felt need, and

unexpected results must be considered before a conclusion on obviousness is reached."

*Minnesota Mining*, 976 F.2d at 1573. "Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. . . . This rule is no less worthy when the new product narrowly fits into a field already well explored . . . than when a transcendent scientific breakthrough is launched." *Arkie Lures*, 119 F.3d at 957.

The failure to adequately consider secondary indicia is reversible error. *See Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (reversing summary judgment of obviousness for failure to properly consider the objective criteria); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (reversing a determination of obviousness where "the district court did not evaluate fully the fourth prong of the obviousness determination — the objective indicia of nonobviousness.").

1.    There Was A Long-Felt Need For Strong Yet Flexible Stents

Conor's expert Dr. Buller has opined that "[b]y the late 1970's and early 1980's . . . teams of researchers were experimenting with different stent designs for use in body passageways, including the coronary arteries." (Ex. 2 at 7) By the 1990's, this had allegedly led to a "frenzy of activity" in a "crowded field." (COB at 2, 28) Many individuals and organizations were working hard to develop effective stents. But against this backdrop, those of skill in the art continued to decry the lack of a stent that combined flexibility with strength and scaffolding. *See* Counter-Statement of Facts § II, *supra*. This was the problem that the Jang '021 patent confronted. And the praise and success of the patent's commercial embodiments, such as the Bx Velocity, speak to Jang's satisfaction of this long-felt need.

Conor tries to define the problem facing Dr. Jang as the "need for an in-phase design with horizontally aligned connectors." (*E.g.,* COB at 30) This characterization is puzzling given that the Jang '021 patent does not teach such stents and its claims do not recite either of those properties as limitations. Moreover, Conor's attempt to use the nature of Jang's

29

solution to the problem (*e.g.*, the design and placement of connecting struts) as a substitute for the problem itself (*e.g.*, lack of strength and flexibility) is legally inappropriate. *Monarch Knitting*, 139 F.3d at 881 (overturning the district court's grant of summary judgment where "[t]he district court defined the problem as 'designing the *stem segment* of a knitting needle . . . [to] minimize[] needle head breakage' . . . . ***The district court's formulation of the problem confronting the '053 inventors presumes the solution to the problem*** — modification of the stem segment.") (emphasis added).  Conor's ability to hypothesize an embodiment of the Jang '021 patent that may have never been made or sold is inapposite to the question of whether actual embodiments of the Jang '021 patent demonstrate objective indicia of non-obviousness.

There is ample evidence — including prior art references, expert testimony and admissions of Conor's sister corporation Cordis — that there was a long-felt need in the stent industry for a stent that combined flexibility with strength and scaffolding. *See* Counter-Statement of Facts § II, *supra*.  Even assuming, *arguendo*, that Conor had set forth a *prima facie* case of obviousness, this long-felt need would rebut Conor's case or, at a minimum, raise a genuine issue of material fact.

### 2. Dr. Jang's Invention Has Been Commercially Successful

The commercial success of a patented invention is another indication of nonobviousness. *Minnesota Mining*, 976 F.2d at 1573.  Sales by an infringer are relevant to the question of commercial success. *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1212 (Fed. Cir. 1987) (allowing discovery into an infringer's sales for this reason).  As BSC proved at trial in 2005, and as this Court has subsequently affirmed, Cordis' Bx Velocity stent is a commercial embodiment of the Jang '021 patent. (Ex. 16)  As discussed above, the Bx Velocity, has been a huge commercial success. *See* Counter-Statement of Facts § III, *supra*. And this success is attributable to the offset corner-to-corner connection scheme set forth in

Claim 36 of the Jang '021 patent. (*Id.*) Such commercial success is powerful evidence of nonobviousness.

Claim 35 claims the mirror image of Claim 36 — *i.e.*, top-to-bottom offset corner connections rather than bottom-to-top connections. (Ex. 10) Conor's own experts have testified that there is no difference in terms of stent performance between the two claims and that they represent a mere "design choice." (Ex. 2 at 9; Ex. 3 at 14 & n.2; Ex. 9 at 218-19; Ex. 19 at 403) The fact that a Claim 36 embodiment was a commercially successful solution to the long-felt need for flexibility, strength and scaffolding indicates that Claim 35 provides similar benefits and represents a similar solution to the industry's long-felt need. *Cf. Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1372-76 (Ct. Cl. 1975) (validity determinations for one claim are relevant to other claims that distinguish over the prior art for the same reasons). This evidence of commercial success rebuts Conor's obviousness case or, at a minimum, raises a genuine issue of material fact.

3.

REDACTED

*E.g.,*

*Akami Techs., Inc. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1196 (Fed. Cir. 2003)

(finding evidence of copying where "the record shows that [defendant] expended significant

effort to determine how [the patented] products worked.")  This evidence rebuts any *prima facie*

case of obviousness or, at a minimum, raises a genuine issue of material fact.

       4.      Additional Objective Indicia Support Nonobviousness

      The list of objective indicia that courts have considered is long and varied.  *See In*

*re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (listing some of the considerations that have

previously been used).  Additional indicia are also present in this case, such as industry praise for

the Bx Velocity commercial embodiment of the Jang '021 patent as well as the failure of others

in the "crowded field" of stent design.  *See, e.g.*, Counter-Statement of Facts § II, III, *supra*.  As

Cordis discovered in connection with Crown stent, and Dr. Fischell discovered with the BX

stent, their years of effort were wasted and led to failed stents until they began using the claimed

features of the Jang '021 patent.  *See* Counter-Statement of Facts §§ II, III, *supra, see also Cordis*

D.I. 386, 387.  The existence of such additional indicia of nonobviousness confirms that Conor's

motion should be denied.

## V.     AT A MINIMUM, CONOR'S MOTION FAILS BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT

      Summary judgment is inappropriate if there is a genuine issue as to any material

fact.  Fed. R. Civ. Pro. 56(c).  Such issues abound in this case.  For example, the parties dispute

the scope and content of the disclosure afforded by the prior art, the differences between the

prior art and the claimed invention, the nature of the problem Dr. Jang addressed, whether the

prior art teaches away from Conor's Frankenstent and whether Conor's litigation-inspired stent

reads on Claim 35.  *Compare* Counter-Statement of Facts §§ II, III, IV, V, *supra with* COB at

17-22, 29-30.  These factual disputes impact whether Conor can even establish a *prima facie*

case of obviousness. *E.g.*, *Zurko*, 258 F.3d at 1385 (obviousness turns on whether the prior art discloses all claim limitations); *Tec Air*, 192 F.3d at 1360 (teaching-away prevents finding of obviousness).

Regarding the objective indicia of non-obviousness, the parties dispute the existence of a long-felt need for strong and flexible stents, the commercial success of embodiments of the Jang '021 patent, praise in the industry for stents embodying the Jang '021 patent                      REDACTED                      , and the failure of others. *Compare* Counter-Statement of Facts §§ II, III, *supra with* COB at 29-30. Even assuming that Conor could establish a *prima facie* case of obviousness, these factual disputes impact whether the objective indicia would rebut Conor's showing. *Knoll*, 367 F.3d at 1385 (requiring due consideration of objective indicia); *Gambro Lundia*, 110 F.3d at 1579 (same). Under such circumstances, the grant of summary judgment is not warranted.

Additionally, the fact that the *Cordis* jury considered the same validity issue Conor presently raises, as well as the same prior art Conor presently asserts, and rendered a verdict of nonobviousness cautions against the grant of summary judgment in Conor's favor.

## CONCLUSION

For all of the reasons set forth above, BSC respectfully requests that this Court deny Conor's motion for summary judgment that Claim 35 of the Jang '021 patent is invalid as obvious.

Dated:     May 25, 2007                         Respectfully submitted,


                                                       /s/ **Adam W. Poff**
                                                _____
                                                Josy W. Ingersoll (I.D. #1088)
                                                John W. Shaw (I.D. #3362)
                                                Adam W. Poff (I.D. #3990)
                                                apoff@ycst,com
                                                YOUNG CONAWAY
                                                STARGATT & TAYLOR, LLP
                                                1000 West Street, 17th Floor
                                                P.O. Box 391
                                                Wilmington, Delaware 19899
                                                (302) 571-6600

                                                *Attorneys for*
                                                *Boston Scientific Corporation*
                                                *and Boston Scientific Scimed, Inc.*

*Of Counsel*:

John M. Desmarais
Peter J. Armenio
Young J. Park
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800


34

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that on May 25, 2007, I caused to be served a true and correct copy of the foregoing document upon the following counsel of record as indicated.

### BY HAND DELIVERY

Steven J. Balick, Esquire
John G. Day, Esquire
Lauren E. Maguire, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899

### BY E-MAIL

Gregory L. Diskant, Esquire
Eugene M. Gelernter, Esquire
Kathleen M. Crotty, Esquire
Scott W. Parker, Esquire
Ravi V. Sitwala, Esquire
Diana Breaux, Esquire
Patterson, Belknap, Webb
   & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Courtland L. Reichman, Esquire
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA 30309

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s Adam W. Poff

Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com

*Attorneys for Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*