# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC.,   )<br>)<br>)<br>)<br>Plaintiffs,   )<br>)<br>v.   )<br>)<br>CONOR MEDSYSTEMS, INC.,   )<br>)<br>Defendant.   )<br>) | C.A. No. 05-768-SLR |

## REBUTTAL EXPERT REPORT
## <u>OF PROFESSOR JAMES E. MOORE JR., PH.D.</u>

       Pursuant to the Federal Rules Of Civil Procedure and this Court's Amended Rule16 Scheduling Order, the following is my written rebuttal expert report detailing additional subject matter areas and opinions about which I expect to testify at trial.

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

they do not actually disclose connectors attached to corners within the meaning of Claim 35 of the Jang '021 patent, such analysis is irrelevant.

40.     Furthermore, throughout their expert reports, Drs. Buller and Solar assert that it would have been obvious to a person of ordinary skill in the art to modify a reference without explaining how such a person would be motivated to do so.  For example, the only grounds Dr. Buller gives for disconnecting and moving certain stent components disclosed in the '161 patent is that such changes would be "an obvious design choice."  The facts contradict that conclusion, however, as no one made this choice in connection with a stent in the prior art of the type claimed by Claim 35.  Also, for references that do not disclose the upper-to-lower corner, curvilinear connection scheme required by Claim 35 of the Jang '021 patent, Drs. Buller and Solar merely state that it would have been obvious to incorporate such a scheme, citing the benefits it would provide.  My understanding from counsel is that obviousness requires evidence that a person of ordinary skill would have been motivated to modify the prior art and would have had a reasonable expectation of success with respect to the design changes at issue.  It is my opinion that the conclusory statements made by Drs. Buller and Solar do not provide such evidence.

41.     Stent design is not an easily predictable process today and was even less predictable as of the relevant time period.  A given stent design represents a balance of various design goals.  Seemingly minor changes can impact a stent's performance in drastic ways by upsetting this balance.  For example, even slight alterations in the connection points of a stent can impact, *inter alia*, cell size, metal content, foreshortening, tuliping[3] and strut twisting.  This

---

3 *See* Brian Brown March 9, 2007 Deposition Tr. at 93-94.

14

principle is aptly demonstrated by the Jang '021 patent itself.  The '021 patent explains how seemingly minor shifts in the location of the attachment point between the connectors and the joining struts are associated with significant functional differences.  *See* Exhibit E at col. 9:31-41, 14:10-21.  *See also* David Fischell March 15, 2007 Deposition Tr. at 47-50.  To the extent that Drs. Buller and Solar use Claim 35 of the Jang '021 patent as a roadmap for modifying prior art  references — rather than considering if there was any motivation to make the modification or any expectation of success in doing so — their analysis is not relevant to the question of validity.

42.    None of the references relied upon by Drs. Buller, Solar and Richter, whether considered separately or in combination, would have disclosed or rendered obvious the limitations of Claim 35 of the Jang '021 patent to one of ordinary skill in the art as of the relevant time frame.

**The '417 Patent**

43.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the '417 patent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons.

44.    The '417 patent discloses "a plurality of expandable and deformable intraluminal vascular grafts," or "tubular members," that are connected together by straight "connecting members."  *See, e.g.*, '417 patent at Abstract.  Consistent with the Court's earlier construction of the claims of the related U.S Patent No. 4,739,762 to Palmaz in *Cordis Corporation v. Medtronic Ave, Inc.*, Civil Action No. 97-550-SLR (D. Del.), each of these "grafts" or tubular members" are independently functional stents that are "capable of serving to prevent a body passageway from collapsing."  Exhibit 7 at 331.  *See also* '417 patent at col. 6:20-54, col. 8:60-64.

of the references relied upon by Drs. Buller, Solar and Richter, did not anticipate or render obvious Claim 35 of the Jang '021 patent as of the relevant time frame.

84.    Moreover, the disclosures of the '210 patent are similar to the disclosures of other references discussed herein, including those references considered during the prosecution of the Jang '021 patent. The expert reports of Drs. Buller and Solar are in agreement that the '210 patent does not disclose any limitations of Claim 35 of the '021 patent that would not have been disclosed by the cited references under their interpretation of the prior art.

85.    The PTO's consideration of the disclosure of these references and decision to grant the Jang '021 patent over these references is consistent with my opinion that the '210 patent does not disclose the invention of Claim 35 or render it obvious and is not material to its patentability.

**The '303 Patent**

86.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the '303 patent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons.

87.    The '303 patent fails to disclose, at a minimum, the upper-to-lower corner, curvilinear connection scheme claimed in Claim 35 of the Jang '021 patent. Indeed, that reference teaches away from such a connection, as it discloses a stent comprised of a number of continuous horizontal and vertical meander patterns. *See, e.g.*, '303 patent at col. 1:55-60. The '303 patent further discloses that when the stents claimed by the '417 expand, the "helical connectors twist," which is "probably harmful to the blood vessel" whereas a "straight member" that is "parallel to the longitudinal axis" of the stent "removes the twisting motion" *See* '303 patent at col 1:40-48. In order to meet the limitations of Claim 35 of the Jang '021 patent, one of ordinary skill in the art would have to disconnect and move various portions of the horizontal

meander patterns of the '303 patent, thereby contradicting the teachings of the '303 patent.
Figure 6 of the '303 patent does not disclose a corner-to-corner connection scheme. As the
patent states, Figure 6 is merely a schematic of Figure 7, which decidedly does not have a
corner-to-corner connection scheme. *See* '303 patent 4:41-42.

88. One of ordinary skill in the art would have to contradict the teachings of the
'303 patent in order to arrive at the subject matter claimed in Claim 35 of the Jang '021 patent
without disturbing the horizontal meander patterns of the '303 patent. The '303 patent discloses
only expansion columns that are 180 degrees out-of-phase and specifically states that the "even
and odd first meander patterns are 180° out of phase with each other." *See, e.g.*, '303 patent at
col. 1:63-64; Figures 1-4, 6-8. Indeed, the '303 patent teaches away from in-phase designs. The
'303 patent prefers that the "loop[s]" of the stent that are aligned along the longitudinal axis be
"generally opposite to one another." *See, e.g.*, '303 patent at col. 5:9-13, 5: 38-62. This
orientation aids in the mechanism disclosed in the '303 patent for minimizing foreshortening and
can only be achieved if the vertical meander patterns are 180 degrees out-of-phase with each
other.

89. Disconnecting and flipping certain of the vertical meander patterns of the '303
patent, as Dr. Buller has done in his expert report, results in loops aligned along the longitudinal
axis that are not "generally opposite to one another," thereby contradicting the teachings of the
'303 patent. There is therefore no way for one of skill in the art to arrive at the subject matter
claimed in Claim 35 of the Jang '021 patent without violating the explicit teachings of the '303
patent.

90. The connection scheme of the Jang '021 patent provides benefits nowhere
disclosed in the '303 patent, including but not limited to an overall increase in connector length,

lever arm length and ability to deform more easily in response to applied axial torque, which promotes longitudinal flexibility. Much like the analysis comparing Claim 35 of the Jang '021 patent to the '417 patent, because the connecting struts run in a substantially linear fashion from one expansion column to the next, the structure of the '303 patent deforms in response to axial torque primarily by the elongation (strain) of the connectors.

91. This is an important difference between the structure of the '303 patent and the structure of Claim 35 of the Jang '021 patent. Furthermore, much like the analysis comparing Claim 35 of the Jang '021 patent to the '373 patent, a stent with points of connection between successive connectors and expansion columns aligned along the same longitudinal axis, as shown in the '303 patent, will suffer from a "backbone" effect where the connection points locally increase the resistance to extension or compression. This is another important difference between the structure of the '303 patent and the structure of Claim 35 of the Jang '021 patent.

92. These shortcomings in the '303 patent are nowhere corrected or avoided by reference to any of Conor's other cited materials.

93. In light of the above, and because the '303 patent teaches away from the subject matter claimed in Claim 35 of the Jang '021 patent, one of ordinary skill in the art would have concluded that the '303 patent, whether considered alone or in combination with any or all of the references relied upon by Drs. Buller, Solar and Richter, did not anticipate or render obvious Claim 35 of the Jang '021 patent as of the relevant time frame.

94. The '303 patent (in the form of WO96/03092, which contains essentially the same disclosure) was before the patent examiner during prosecution of the Jang '021 patent, which confirms my opinion that the '303 patent neither anticipates nor renders obvious that claim. It is worth noting that Dr. Buller has previously agreed that the disclosure of the '303

32

patent is the same as that in the cited '092 application in terms of the inventions embodied in the Jang '021 patent. *See* Exhibit 13 at 1287, 1363-64.

## The NIR Stent

95.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the NIR stent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons. The NIR stent is an embodiment of the '303 patent. *See* Ex. 18. Accordingly, Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the NIR stent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for the same reasons that the '303 patent neither anticipates nor renders obvious that claim.

## The '161 Patent

96.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the '161 patent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons.

97.    For example, the '161 patent fails to teach or suggest a connector having a proximal section, a distal section and an intermediate section that is non-parallel to the proximal and distal sections, as required by Claim 35 of the Jang '021 patent. Rather, as can be seen from Figures 13, 14, 15, 17, 18, 19, 20A, 20B, 21, 22 and 28 of the '161 patent, the "longitudinal connections" between "adjacent radial rings" are substantially straight. In fact, the patent teaches away from a flexible curvilinear connector having an intermediate section that is non-parallel to the proximal and distal sections, as required by Claim 35 of the Jang '021 patent. For example, the '161 patent discloses a stent that, upon expansion, "transform[s] into a cylinder comprised of substantially rigid rectangular grid geometry" in order to achieve "maximum rigidity, after the stent is expanded to its final large diameter, for supporting the body vessel wall." *See, e.g.*, '161

patent because such a connection scheme results in longer connectors that *increase* metal content.

104.    The connection scheme of the Jang '021 patent provides benefits nowhere disclosed in the '161 patent, including but not limited to an overall increase in connector length, lever arm length and ability to deform more easily in response to applied axial torque, which promotes longitudinal flexibility.  Much like the analysis comparing Claim 35 of the Jang '021 patent to the '417 patent, because the connecting struts run in a substantially linear fashion from one expansion column to the next, the structure of the '161 patent deforms in response to axial torque primarily by the elongation (strain) of the connectors.  This is an important difference between the structure of the '161 patent and the structure of Claim 35 of the Jang '021 patent.

105.    Furthermore, much like the analysis comparing Claim 35 of the Jang '021 patent to the '373 patent, a stent with points of connection between successive connectors and expansion columns aligned along the same longitudinal axis, as shown in the '161 patent, will suffer from a "backbone" effect where the connection points locally increase the resistance to extension or compression.  This is another important difference between the structure of the '161 patent and the structure of Claim 35 of the Jang '01 patent.

106.    These shortcomings in the '161 patent are nowhere corrected or avoided by reference to any of Conor's other cited materials.

107.    In light of the above, and because the '161 patent teaches away from the subject matter claimed in Claim 35 of the Jang '021 patent, one of ordinary skill in the art would have concluded that the '161 patent, whether considered alone or in combination with any or all of the references relied upon by Drs. Buller, Solar and Richter, did not anticipate or render obvious Claim 35 of the Jang '021 patent as of the relevant time frame.

36

108.    The fact that the patent examiner for the Jang '021 patent allowed Claim 35 over the '161 patent further confirms my opinion that the '161 patent neither anticipates nor renders obvious that claim.

**The '569 Patent**

109.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the '569 patent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons.

110.    The '569 patent fails to disclose, at a minimum, the upper-to-lower corner, curvilinear connection scheme required by Claim 35 of the Jang '021 patent.  Indeed, that reference teaches away from such a connection.

111.    The '569 patent states that "twist[ing] of the component segments such that they extend into the flowpath of the artery or vein . . . causes turbulence which is undesirable." *See* '569 patent at col. 3:22-25.  The '559 patent further discloses a stent design intended to alleviate such twisting, in particular by reducing the tendency of the "reversing bends" to bend away from the circumferential plane upon expansion, as depicted in Figures 9 and 10 of that patent.  *See id.* at col. 3:63-4:5; 5:20-24; 5:38-57.  Given this teaching, one of ordinary skill in the art would not be motivated to use the upper-to-lower corner, curvilinear connection scheme claimed by the '021 patent with the stent claimed by the '569 patent because such a connection scheme would have been associated with strut twisting during the relevant time period.  *See* '373 patent at col. 35-44; '303 patent at col 1:40-48; Opening Expert Report Of Nigel Buller at 38.

112.    The '569 patent teaches that the maximum benefit with respect to securing the "reversing bends" in order to prevent them from bending away from the circumferential plane upon expansion is achieved when connectors are attached to apices of the "reversing bends," as the '569 patent illustrates.  *See, e.g.*, '569 patent at Figures 1, 2, 11.  In order to arrive at the stent

37

claimed by Claim 35 of the Jang '021 patent, one of ordinary skill in the art would first have to disconnect and move the connectors, as Dr. Buller has done in his expert report. One of ordinary skill in the art would not be motivated to make such a change. Next, one of ordinary skill in the art would have to contradict the teachings of the '569 patent and disconnect and move the connectors away from the apices of the "reversing bends," as Dr. Buller suggests doing in his expert report.

113.    Even if one of ordinary skill in the art were motivated "to make the connection struts' points of connection to the expansion columns the maximum distance apart," as Dr. Buller suggests, in light of the teachings of the '569 patent, one of ordinary skill in the art would connect the connectors to the apices of "reversing bends" that are further apart circumferentially or longitudinally rather than move the connectors away from the apices of the "reversing bends."

114.    I understand that Dr. Buller has opined that it would have been obvious for one of ordinary skill in the art to substitute the "top-to-bottom" or "first-corner-to-second-corner connections" disclosed in the '417 and '210 patents. However, one of ordinary skill in the art would not have been motivated to combine the stent of the '569 patent with these references for a number of reasons. For example, the stent of the '569 patent is comprised of expansion columns. One of ordinary skill would thus not be motivated to substitute the elements of the '417 and '210 patents, which both disclose tubular members, for the reasons discussed above at paragraphs 45-46, 49-51. Moreover, as discussed above, the '569 patent teaches away from the top-to-bottom, curvilinear connection scheme required by Claim 35 of the Jang '021 patent. Therefore, to the extent that the '417 and '021 patent teach such a scheme, one of ordinary skill in the art would

not be motivated to combine these patents with the '569 patent.[7]  In any event, the '569 patent discloses connectors (not articulations) and thus one of ordinary skill in the art would not be motivated to substitute the articulations disclosed by the '210 patent for the reasons discussed above at paragraph 38.

115.    Even if one of ordinary skill in the art were motivated to combine the stent of the '569 patent with any the references discussed above, such combinations would still fail to disclose connecting struts that join adjacent expansion columns using a corner-to-corner connection scheme, much less the upper-to-lower corner, curvilinear connection scheme required by Claim 35 of the '021 patent.

116.    These shortcomings in the '569 patent are nowhere corrected or avoided by reference to any of Conor's other cited materials.

117.    In light of the above, and because the '569 patent teaches away from the subject matter claimed in Claim 35 of the Jang '021 patent, one of ordinary skill in the art would have concluded that the '569 patent, whether considered alone or in combination with any or all of the references relied upon by Drs. Buller, Solar and Richter, did not anticipate or render obvious Claim 35 of the Jang '021 patent as of the relevant time frame.

**The '065 Patent**

118.    Claim 35 of the Jang '021 patent is neither anticipated nor rendered obvious by the '065 patent, whether taken alone or in combination with any other reference relied upon by Drs. Buller, Solar and Richter, for a number of reasons.

---

[7] It is my opinion that the '417 and '210 patents fail to disclose the top-to-bottom, curvilinear scheme required by Claim 35 of the Jang '021 patent.  *See supra* paragraphs 73-81, 149-51.

160.    My understanding is that secondary considerations may support or rebut, for one consideration, the nonobviousness of a claim. According to the Proposed Delaware Uniform Jury Instructions, such secondary considerations include, among other things, any "long felt need in the art that was satisfied by the invention", "the failure of others to make the invention," any "commercial success or lack of commercial success of products covered by the patents in suit" and "copying of the invention by others in the field." Exhibit 14 at § 4.8.6.

161.    The nonobviousness of Claim 35 of the Jang '021 patent is supported by the long-felt need in the art for a closed-cell stent with improved flexibility, including a stent with a connector that improved flexibility while maintaining the radial strength of the stent and that allowed stent designers to connect all of the expansion strut pairs. With respect to this last point, I would note that Cordis employee Brian Firth testified in the *Cordis* action that it is very important to have connections between all of the expansion strut pairs. *See* January 12, 2005 Deposition Tr., attached hereto as Exhibit 15, at 230-31; 494-95; 497.

162.    Although the possibility of using connectors to improve flexibility of certain stent designs was known to those in the art of stent technology in 1996, the industry struggled to develop a stent that would overcome the disadvantages, such as the lack of sufficient flexibility of longer stents, associated with the prior art, including stents having connections between all of the expansion strut pairs. *See* Brian Brown March 9, 2007 Deposition Tr. at 16-19. Many stents were proposed, and failed, prior to Dr. Jang's invention. *See, e.g.*, BX stent.

163.    The upper-to-lower-corner, curvilinear connection scheme required by Claim 35 of the Jang '021 patent is a unique design that increases the flexibility and deliverability of the stent while maintaining adequate radial strength, without increasing the cell size of the stent and without compromising its length. By attaching multi-section, curvilinear connectors from the

lower corner to the upper corner of the adjacent expansion strut pairs, that connection scheme elongates the length of the connector, increases its lever arm length, and enhances its ability to deform in response to an applied axial torque, thus increasing the flexibility of the stent. *See, e.g.*, Opening Expert Report Of Nigel Buller at 13-14, 37; Opening Expert Report Of Ronald J. Solar at 13-14. The Jang '021 patent connection scheme achieves all of these benefits while connecting all strut pairs, which avoids flares and other uneven surfaces on the stent during delivery.

164.    I understand from certain testimony from the *Cordis* action, of David Majercak, the designer of Cordis' Bx VELOCITY stent, and Dr. Brian Firth, who was Vice President of Research and Development during the development of the Bx VELOCITY stent, that the original connection scheme of the BX Velocity stent had connectors attached to the apices of its joining struts. I further understand from their testimony that Cordis abandoned this connection scheme in mid- to late-1998, when it adopted the lower-to-upper-corner, curvilinear connection scheme required by Claim 36 of the Jang '021 patent. *See*, *e.g.*, Majercak January 13, 2005 Deposition Tr., attached hereto as Exhibit 16, at 27-28. I also understand that Cordis subsequently filed a patent application directed to, among other things, its modification of the connection scheme of the original design (*id.* at 150-151) to match the connection scheme of Claim 36 of the Jang '021 patent, which application ultimately resulted in the '403 patent, discussed above.

## VI.    COMPENSATION

178.    As stated in my initial expert report, I am being compensated for the time I have spent on this litigation at my customary rate of $450 per hour.  My compensation does not depend in any way upon the outcome of this litigation.


Dated:  April 12, 2007

James E. Moore Jr., Ph. D.

# EXHIBIT 8

Page 408

```
 1              - VOLUME C -
 2          IN THE UNITED STATES DISTRICT COURT
 3         IN AND FOR THE DISTRICT OF DELAWARE
 4              - - -
 5  BOSTON SCIENTIFIC CORPORATION,   :   CIVIL ACTION
 6          Plaintiff                :
 7          vs.                      :
 8  CORDIS CORPORATION and           :
    JOHNSON & JOHNSON, INC.,         :
 9                                   :
          Defendants                 :   NO. 03-27 (SLR)
10  ---------------------------------
    BOSTON SCIENTIFIC SCIMED, INC.,  :   CIVIL ACTION
11  and BOSTON SCIENTIFIC            :
    CORPORATION,                     :
12          Plaintiffs               :
13          vs.                      :
14  CORDIS CORPORATION and           :
15  JOHNSON & JOHNSON, INC.,         :
16          Defendants               :   NO. 03-283 (SLR)
17              - - -
18                    Wilmington, Delaware
19                    Thursday, June 23, 2005
                      9:33 o'clock, a.m.
20              - - -
21  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
22              - - -
23                    Valerie J. Gunning and
                      Leonard A. Dibbs,
24                    Official Court Reporters
25
```

Page 409

```
 1  APPEARANCES:
 2
 3  ASHBY & GEDDES
    BY: STEVEN J. BALICK, ESQ. and
 4      JOHN G. DAY, ESQ.
 5          -and-
 6
 7  PATTERSON, BELKNAP, WEBB & TYLER LLP
    BY: GREGORY L. DISKANT, ESQ.,
 8      MICHAEL TENNMONS, ESQ.,
        EUGENE GELERNTER, ESQ.,
 9      KIM J. LANDSMAN, ESQ.,
        SCOTT HOWARD, ESQ. and
10      THOMAS POPPERT, ESQ.
        (New York, New York)
11
12          -and-
13
    JOHNSON & JOHNSON
14  BY: ERIC HARRIS, ESQ.
15      Counsel for Cordis Corporation
16
    YOUNG, CONAWAY, STARGAT & TAYLOR
17  BY: JOSY W. INGERSOLL, ESQ
18          -and-
19
20  BOUCHARD, MARGULES & FRIEDLANDER, P.A.
    BY: KAREN L. PASCALE, ESQ.
21
22          -and-
23
24
25
```

Page 410

```
 1  APPEARANCES (Continued):
 2
 3  KENYON & KENYON
    BY: RICHARD DeLUCIA, ESQ.
 4      THOMAS MELORO, ESQ. and
        ELIZABETH GARDNER, ESQ.
 5      (New York, New York)
 6          -and-
 7
 8  KIRKLAND & ELLIS
    BY: JOHN DESMARAIS, ESQ. and
 9      PETER J. ARMENIO, ESQ.
        (New York, New York)
10
11      Counsel for Boston Scientific
        Corporation
12          - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 411

## PROCEEDINGS

(Proceedings commenced at 9:33 a.m., and the following occurred without the presence of the jury.)

THE COURT: Good morning.

MR. DISKANT: Good morning, your Honor.

MR. DeLUCIA: Your Honor, just a matter of business to state for the record.

Mr. Fischell, who's the first witness being taken out of order, in order to accommodate that, we've reached, I believe, an understanding with opposing counsel that Mr. Fischell, who was only identified as a witness in the Jang case, will be testifying in the Jang case, and we trust and have discussed that there will be no evidence offered relevant to the Helmus and Ding patent.

With that, we're just making that statement for the record, preserving our right to object. We expect -- we're trying to cooperate and minimize the hoop-de-do. Thank you.

MR. DISKANT: That's absolutely correct.

Let me hand up a package of materials and then I will explain the issue that Mr. Desmarais raised

BSC-C 008023

Page 448

1  called Isostent, in California.
2  Q.  Okay.  And ultimately -- let's go back to the
3  engineering drawing, the BX Velocity.  What shape --
4  I'm going to ask you about the -- the shape that you
5  ended up choosing for the red connectors in the BX
6  Velocity design.
7  A.  Yes.
8  Q.  And what shape did you choose?
9  A.  That's that N or letter N shape.
10  Q.  And what are the benefits of that shape?
11  A.  The primary benefit is a very long length of
12  metallic structure, lots of curves, and sort of long
13  legs.  You see the three long legs here.  And that makes
14  this a very flexible connector because it makes it easy
15  for it to open and close.  In other words, as the rings
16  pull on it, as it's going around the bend, it's easy for
17  the rings to pull it apart on the outside of the bend
18  and it's very soft, so it's easy for the rings to push
19  it together on the inside of the bend.
20  Q.  And focusing on the end points of the connectors,
21  what orientation did you select for the end points of
22  the connectors?
23  A.  The end points of this connector are connected on
24  the circular arc between the center and where the
25  circular arc connects to the straight segment.  And so

Page 449

1  in this case, it's going from the lower left to upper
2  right, a diagonal connection pattern.
3  Q.  And is that similar in any way to the design that
4  you worked with in 1996?
5  A.  Yes.  Very similar.
6  Q.  The connector running from the lower left to the
7  upper right, what are the benefits that you achieve by
8  that orientation?
9  A.  The primary benefit is it allows you to fit this
10  very long connector into a -- what you can see, here is
11  a pretty tight space between these crowns.  And if I
12  had to connect it in the center, I would have to push
13  the crowns apart.
14      Remember I said that having a good mesh,
15  sort of a fine mesh to hold that -- that gunk in the
16  artery back is very important.  And if you make a big --
17  bigger holes, there's more potential that the gunk or
18  the plaque will push through the stent wires and not
19  give you as good a result or as safe a result for the
20  patient.
21      So by connecting off-center here, what we
22  were able to do is put a very flexible connector without
23  having to spread the rings apart very far.
24  Q.  Whose idea was having the offset connector?
25  A.  David Majercak at Cordis.

Page 450

1  Q.  Okay.  Okay.  Dr. Fischell, when is the first time
2  you ever heard of David Jang?
3  A.  About a month ago.
4  Q.  Before then, you had never heard of Dr. Jang?
5  A.  No, never heard of him.
6  Q.  Did Dr. Jang have anything to do with the design of
7  the BX Velocity?
8  A.  Nothing to do whatsoever.
9      MR. GELERNTER:  Thank you very much.
10      Nothing further.
11      THE COURT:  All right.  Cross-examination, Mr.
12  Desmarais.
13      MR. DESMARAIS:  Yes.
14          CROSS-EXAMINATION
15  BY MR. DESMARAIS:
16  Q.  Good morning, Dr. Fischell.
17  A.  Good morning.
18  Q.  Now, I think you told us about the flexibility of
19  stents.  Am I right that, as a stent designer, you agree
20  that interventional cardiologists want a stent that's
21  flexible; right?
22          - - -
23  A.  It's one key attribute that they want.
24  Q.  Because a stent has to go through the body, through
25  these curvy arteries and arteries are small and make

Page 451

1  sharp turns; right?
2  A.  Yes.
3  Q.  So you know, don't you, as a stent designer, that
4  interventional cardiologists want stents that are the
5  most flexible so they can, such as they are, have other
6  attributes like strength?
7          - - -
8  A.  Of course.
9  Q.  And the connectors, I think you'll agree, are
10  important to the stent design, and I think you may have
11  just testified to this, because it's the connectors and
12  their design that imparts the flexibility to the stent;
13  right?
14  A.  In most cases.
15  Q.  Now, the BX Velocity, Cordis began selling that in
16  the year 2000; right?
17  A.  In the U.S. in 2000.
18  Q.  And am I right that even Cordis describes the BX
19  Velocity as a quantum leap forward in stent technology
20  because it combined the flexibility of the coil stent
21  with the scaffolding of a slotted tube?
22  A.  I'm not aware of that description, but they may
23  have.
24  Q.  But that sounds right to you; right?
25  A.  It had a lot of flexibility at the time.  That's why

BSC-C 008033

Page 452

1  we like it.
2  Q.  And that was the point of it, right?  To beat the
3  previous Cordis designs in flexibility; right?
4  A.  That was one key attribute of it, yes.
5  Q.  And the BX Velocity, I think you testified on your
6  direct, but let me make sure, the BX Velocity you know
7  is the base metal stent for the Cypher product, the
8  drug-eluting stent that Cordis sells; is that right?
9  A.  To the best of my knowledge, yes.
10  Q.  And your BX Velocity has been well received by
11  interventional cardiologists; right?
12  A.  That's what I've been told.
13  Q.  And one of the reasons you've been told it has
14  been well received is because of the flexibility; right?
15  A.  That is one of the reasons, yes.
16  Q.  Now, when you were working on the design for the
17  BX velocity, am I right that Cordis was selling something
18  called the Crown stent?
19  A.  I don't remember exactly what they were selling at
20  the time.  I know the Crown was in that time frame.
21  Q.  And you're somewhat familiar with the Crown stent,
22  aren't you?
23  A.  Vaguely.
24       MR. DESMARAIS:  May I have the Elmo, please?
25

Page 453

1  BY MR. DESMARAIS:
2  Q.  I've put up on the screen Boston Scientific Exhibit
3  4126.
4       Up at the top we see the Palmaz-Schatz; is
5  that right?
6  A.  That looks like the Palmaz-Schatz stent, yes.
7  Q.  And down below is the Crown stent; right?  You
8  are familiar enough to recognize it, aren't you?
9  A.  Looks like the Crown stent to me.
10  Q.  And --
11       MR. DESMARAIS:  Your Honor, I will offer
12  Boston Scientific Exhibit 4126.
13       MR. GELERNTER:  I'm going to object to the
14  title, your Honor.  Otherwise, we have no objection.
15       THE COURT:  All right.  And generally we
16  don't show graphics until they've been admitted, and that
17  would be admitted without the title.
18  ***     (Boston Scientific Exhibit No. 4126 was
19  received into evidence.)
20  BY MR. DESMARAIS:
21  Q.  Now, you know, don't you, from your work at Cordis
22  that the Crown stent was Cordis' attempt to come up
23  with a stent that was more flexible than the
24  Palmaz-Schatz; right?
25  A.  I only know that it was Cordis' next stent offered

Page 454

1  in the United States.  I don't -- wasn't privy to their
2  motivations.
3  Q.  But you do know that the Crown was Cordis' next
4  stent after the Palmaz-Schatz; right?
5  A.  In the United States, they also had a stent called
6  the Spiral.  Which was another Palmaz design offered
7  outside the U.S. in between.
8  Q.  In the U.S. it was the Crown stent?
9  A.  To the best of my knowledge.
10  Q.  You know that the Crown stent didn't even sell as
11  well as the previous Palmaz-Schatz that it was trying
12  to improve upon; right?
13  A.  Once again, you're asking me about impressions.
14  Yes, I think it was not as successful as the
15  Palmaz-Schatz stent.
16  Q.  And you know, don't you, that one of the reasons
17  the Crown stent wasn't as successful even as the one it
18  was trying to be better than was because the Crown had
19  problems with flexibility and deliverability?
20  A.  I'm not an interventional cardiologist.
21  Q.  But you know that, don't you?
22  A.  It was not as flexible as doctors would have liked.
23  Q.  Now, turning to the BX Velocity stent, the
24  original stent that you made was actually called the
25  BX stent, not the BX Velocity; right?

Page 455

1  A.  I'm sorry.  We made hundreds of different stent
2  designs in the period.  Which one specifically are you
3  referring to?
4  Q.  I would like to talk about the BX, something
5  that you called the BX stent that had been designed in
6  the spring of 1996.
7  A.  Okay.  We refer to it as the Isostent BX version
8  M stent, yes.
9  Q.  Right.  You called it the BX stent; right?
10  A.  Yes.
11  Q.  And am I right that the design of the BX stent
12  was finished in September of 1996?  Excuse me.  In the
13  spring of 1996?
14  A.  The design was what we call frozen.  They wanted
15  to have something to put radioactivity on and it was
16  the design that was chosen.
17  Q.  And it was frozen in the spring of --
18  A.  Yes.  They stopped changing that design at
19  Isostent.
20  Q.  And that design had S-shaped connectors; right?
21  A.  Yes.  Like that Superman S I mentioned.
22  Q.  And they weren't offset, they were touching the
23  crowns of the rings; right?
24  A.  They were exactly along the longitudinal axis.
25  Q.  Right.  They weren't offset?

BSC-C 008034

Page 492

1  Medical Affairs and Health Economics.
2    "Question: What is your current title?
3    "Answer: The same.
4    "Question: Dr. Firth, are you, just for the
5  record, I know you testified to this before, you're an
6  M.D. and a Ph.D.; is that correct?
7    "Answer: That's correct.
8    "Question: But was the BX Velocity stent
9  commercialized by Cordis?
10   "Answer: Yes.
11   "Question: Now, that stent was used for
12  what, by the medical field?
13   "Answer: It was used for the same purpose as
14  our bare metal stents.
15   "Question: Which is what?
16   "Answer: Fundamentally to reduce restenosis
17  and also to prevent acute closure of the vessel.
18   "Question: When is the first time you ever
19  met Dr. Jang personally?
20   "Answer: I don't remember the precise date.
21  Somewhere in the '95 to '97 time frame.
22   "Question: Okay. And did you, yourself,
23  have any direct negotiations with Dr. Jang about any
24  stent technology?
25   "Answer: I believe I -- I can recall

Page 493

1  meeting him. Reviewing the documents yesterday, it
2  appears I may have met only on two occasions. I don't
3  believe that constitutes negotiation.
4    "Question: Are you aware of that someone
5  on behalf of Johnson & Johnson Cordis was negotiating
6  with Dr. Jang in 1995 to '98 time frame?
7    "Answer: Yeah. Again, I'm not sure that
8  I would even characterize it's as negotiations. There
9  were conversations that went back and forth with
10  multiple letters to Dr. Jang with different iterations
11  of his ideas of stents.
12   "Question: Did Cordis ever consider
13  licensing any of those designs that Dr. Jang was
14  discussing?
15   "Answer: Well, again, based on what I
16  looked at yesterday, there was this ongoing dialogue.
17   "Whether this actually got to the point of
18  considering licensing or not is not clear to me.
19   "Question: At this time, the 1995 time
20  frame, what was your job title?
21   "Answer: 1995?
22   "Question: Yes, please.
23   "Answer: VP of R&D at J&J Invention
24  Systems.
25   "Question: And did bare metal stents fall

Page 494

1  under your research and development responsibility?
2    "Answer: Yes.
3    "Question: At that time, was there a bare
4  metal stent on the market that the company was selling?
5    "Answer: Yes, indeed.
6    "Question: And what stent was that?
7    "Answer: Well, there were actually several.
8  There were coronary stents, and there were peripheral
9  stents that were being sold.
10   In the coronary area we had the Palmaz-
11  Schatz stents and outside the U.S. In addition to that,
12  we had the so-called spiral stent.
13   "Question: In your position as the head of
14  R&D at that time, were you overseeing research and
15  development efforts to design a stent that had
16  improved functioning versus the Palmaz-Schatz stent?
17   "Answer: Yes.
18   "Question: And were there specific areas
19  that you were trying to improve in your group?
20   "Answer: Yes. We were definitely trying to
21  improve flexibility of the stent. But we also had
22  certain criteria. We were very interested in maintaining
23  the same radial force of the stent.
24   "And, based on all the Palmaz experience, we
25  were very interested in obtaining a design where every

Page 495

1  Crown was attached to every adjacent Crown. In other
2  words, not have unconnected internal edges.
3    "Question: And is that often referred to
4  as a closed cell design when all the crowns are attached?
5    "Answer: By some people, yes.
6    "Question: Do you refer to it as a closed
7  cell design?
8    "Answer: I may have.
9    "Question: Is the BX Velocity a closed cell
10  design in your view?
11   "Answer: Insofar as it has everything
12  connected, yes.
13   "Question: After the Palmaz-Schatz stent,
14  did Cordis J&J commercialize another coronary stent
15  before the BX Velocity?
16   "Answer: Yes.
17   "Question: What stent was that?
18   "Answer: The Crown stent and the Cross XLC
19  stent and the Mini Crown stent.
20   "Question: Let's talk about the Crown stent.
21   "Answer: Yes.
22   "Question: Did that have improved function
23  versus the Palmaz-Schatz stent?
24   "Answer: Yes, it did.
25   "Question: In what respect?

BSC-C 008044

Page 496

1      "Answer: It was more flexible.
2      "Question: And was that perceived as a
3  benefit by physicians who were selecting stents to use?
4      "Answer: Well, it was definitely more
5  flexible, intrinsically more flexible per unit length
6  than the Palmaz-Schatz stent. It was not as flexible as
7  some competitors.
8      "Question: Did that fact, the fact that
9  the Crown stent was not as flexible as some of the
10 competitors lead to a dropoff in Cordis J&J's market
11 share for bare metal stents?
12     "Answer: Yeah. It's not just the stent,
13 but it was also the stent delivery system. So the
14 stent and the stent delivery system together were
15 somewhat less deliverable.
16     "And it was not as successful as we hoped
17 having had 90-plus percent market share. There's only
18 one way to go from that and it's down.
19     "Question: After the Crown stent was on
20 the market, and you were experiencing a lower market
21 share --
22     "Answer: Right.
23     "Question: -- than you were used to --
24     "Answer: Right.
25     "Question: -- was one of your R&D projects

Page 497

1  to come up with the next generation after the Crown
2  stent?
3      "Answer: Well, it's an ongoing process.
4  Constantly iterating trying to get better and better,
5  yeah.
6      "Question: Is it fair to say that the goal
7  was to obtain radial strength, a closed cell design but
8  yet increase flexibility as compared to the Crown stent?
9      "Answer: That would be fair.
10     "Question: So by the time your team was
11 working on the design that eventually became the BX
12 Velocity, they knew very well that connectors were an
13 important aspect of flexibility and, therefore, overall
14 deliverability of the stent?
15     "Answer: Correct. And, indeed, we played
16 around with 12 connectors and 10 connectors and knew
17 there was a difference between that. And we understood
18 connectors.
19     "Question: Did you have an understanding
20 of how your team settled on the precise connector that
21 we see depicted here in Firth Exhibit 1 for the BX
22 Velocity?
23     "Answer: Well, my recollection of it is as
24 follows. We already said that the notion of connectors
25 and multiple connectors was already -- was well

Page 498

1  established and had already been reduced to practice
2  with our spiral stent.
3      "And then the notion was that if one could
4  potentially lengthen that lever arm, you might get more
5  flexibility. The Fischells met with us, and I don't
6  recall when the first meeting was on their stent design,
7  with their very first generation of stent, which
8  actually had these kind of S connectors and also had
9  straight connectors. So they had S cells and H cells.
10 And that was their original construct. And working
11 with our engineers, this ultimately evolved into the
12 stent that you see here, which got rid of the H
13 connectors, modified these S connectors, modified their
14 point of attachment.
15     "They are in diagonal connectors that go
16 from the bottom of the one arc to the top of the
17 adjacent arc. And these arcs are out of phase.
18     "Question: Do you have a general
19 understanding of why your team, working with the
20 Fischells, modified the points of attachment for these
21 connectors?
22     "Answer: I don't know all the reasons, but
23 certainly one of them was to get the longest lever arm.
24 And further evolution of this has led to create an even
25 longer level arm.

Page 499

1      "Question: And the level arm in this context
2  is desirable because it increases flexibility and
3  deliverability?
4      "Answer: Right, because this element is
5  thinner than the rest of the stent.
6      "Question: And you mentioned that the Cordis
7  engineers made the connector overall in its connection
8  points a diagonal; is that right?
9      "Answer: Yes.
10     "Question: And was there a benefit to that
11 design?
12     "Answer: Well, I just indicated. You end up
13 with a longer lever arm by doing that. And that was not
14 a new concept.
15     "Again, that is what we have on the spiral.
16 We have diagonal connectors so they can be longer than
17 just straight connectors.
18     "Question: Now, if we look at, on, for
19 example, on Page 175116, as a result of the diagonal
20 nature of the connector and the points of attachments,
21 these points of attachments aren't at the same location
22 circumferentially on the stent; correct?
23     "Answer: I think I've already said, these,
24 in the -- what you have here is a sinusoidal member
25 which has arcs.

BSC-C 008045

Page 500

1           - - -
2           "Answer (Continuing): And the connector goes
3   to the bottom. The lower side of the one arc to the
4   upper side of the adjacent arc, which is a 180-degree
5   out-of-phase.
6           "Question: And as you explained to me,
7   that design was specifically chosen and evaluated by
8   Cordis because of its improvement in flexibility and
9   deliverability; is that right?
10          "Answer: That's my understanding.
11          - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 501

1
2           "Answer (Continuing): Yes.
3           "Question: And as result of the improvement
4   in flexibility, it was better received by interventional
5   cardiologists than the Crown had been?
6           "Answer: That's correct.
7           "Question: And Cordis ended up making a
8   substantial amount of sales of the BX velocity in part
9   because interventional cardiologists found it to be
10  more deliverable than the Crown had been?
11          "Answer: Yes. The BX velocity and also
12  the balloon platform, which was much more flexible than
13  the earlier platforms we had used for Crown and Mini
14  Crown.
15          "Question: Is it your understanding that at
16  some point in the discussions that were going on between
17  Dr. Jang and Cordis and J&J, that Dr. Jang made an offer
18  of his stent technology to Cordis J&J?
19          "Answer: Well, based on the reading the
20  communication yesterday, it seems, yes, he made multiple
21  offers of what he characterized as the best stent in the
22  world.
23          "Question: Did Cordis ever make a counter-
24  offer?
25          "Answer: I have no knowledge of that, and I

Page 502

1   did not review any correspondence indicating that. I
2   mean, when you say offer, and use the term negotiation,
3   I think that, to my mind, is a more advanced stage than
4   what I saw in the documents, which was multiple letters
5   from Dr. Jang with three sort of different families of
6   stents over several years, and I did not see anything
7   that began to look like a -- kind of a business proposal
8   or an offer to which we responded. That's all I know.
9           "Question: Dr. Firth, I'd ask you to take
10  a moment and review what we've marked as Firth Exhibit
11  5, and tell me if you have ever seen this document
12  before.
13          "Answer: I have seen it before in
14  preparation for the discussion today.
15          "Question: Do you have any reason to doubt
16  that this was a memorandum from D. Dalessandro to you
17  and to J. Kula that you received on or about July 8,
18  1996?
19          "Answer: I have no reason to doubt it."
20          (End of videotape deposition.)
21          MR. DESMARAIS: Your Honor, we would offer
22  now what was referred to as Firth Deposition Exhibit 1
23  as Boston Scientific Trial Exhibit 3086 and what was
24  referred to as Firth Deposition Exhibit 5 as Boston
25  Scientific Exhibit 3095.

Page 503

1           MR. DISKANT: No objection.
2           THE COURT: Thank you.
3           THE DEPUTY CLERK: So marked.
4   ***     (Boston Scientific Exhibits No. 3086 and 3095
5   were received into evidence.)
6           MR. DESMARAIS: Ladies and gentlemen, we're
7   now going to role-play a deposition from Mr. Croce, who
8   was the head of the cardiology business at Cordis
9   during the time of his deposition, I think. And my
10  partner, Maxine Graham, will ask the questions.
11          This is not Mr. Croce. It's someone from
12  our office who's going to play Mr. Croce and Maxine
13  Graham will ask the questions.
14          And his testimony goes to this issue of the
15  Crown not selling well and the switch to the BX velocity
16  at Cordis.
17          MS. GRAHAM: "Question: Good morning, Mr.
18  Croce.
19          "Answer: Good morning.
20          "Question: By whom have you been employed?
21          "Answer: I've been employed by Johnson &
22  Johnson, and I retired January 1st, 2005, just a couple
23  months ago.
24          "Question: And right prior to your
25  retirement, what was your job title and your job

BSC-C 008046

Page 504

1  responsibilities?
2        "Answer: I was Company Group Chairman for
3  Johnson & Johnson, and I had worldwide responsibilities
4  for Cordis.
5        "Of course, in 2004, I was transitioning
6  slowly some of those responsibilities over to my
7  replacement.
8        "Question: And when did you first get
9  responsibility for Johnson & Johnson's stent business?
10       "Answer: That was in October of 1995.
11       "Question: But did there come a time when
12 Cordis introduced your second-generation slotted tube
13 stents of its own?
14       "Answer: Yes. We came out with a series of
15 products. It was the Crown, Mini Crown, Crossflex LC,
16 but we really didn't have a competitive product until
17 probably the May time frame of 2000, when we came out
18 with BX Velocity. That really was the first, really, I
19 would say, high-quality, second-generation product that
20 was competitive that we introduced. I mean, hindsight,
21 it would have been wonderful if we could have had that
22 in 1998, but we didn't. We had it in the year 2000.
23 And the BX Velocity was quite successful. It garnered
24 25 to 30 percent market share rather rapidly, and so it
25 was -- put us really back in the game.

Page 505

1        "Question: And at the time the BX Velocity
2  stent was introduced, Cordis' share of the coronary stent
3  market was about 5 percent?
4        "Answer: Yes, it was.
5        "Question: Okay. Now, you referred to that
6  as a second-generation stent. Had you also referred to
7  that as a third-generation stent?
8        "Answer: I referred to it as our first time,
9  our first competitive second-generation stent. Dr.
10 Fischell mentioned third generation. Probably marketing
11 people may have even called it a third generation but,
12 in reality, it was our first successful second-generation
13 flexible stent in the market.
14       "Question: Okay. And it was a totally
15 different product from the coronary stents that Cordis
16 had offered at that time; correct?
17       "Answer: Yes. All of them were different
18 all the way through.
19       "Question: But this one, the BX Velocity, was
20 a totally different product?
21       "Answer: Yes.
22       "Question: Of what you introduced up to that
23 time; is that correct?
24       "Answer: Yes.
25       "Question: And the BX Velocity stent, I think

Page 506

1  you indicated, was a commercial success?
2        "Answer: We had 25 to 30-poercent market
3  share rather quickly. I think the high water mark was
4  around 32 percent.
5        "Question: You know that the BX Velocity has
6  improvements in features that the Crown stent does not;
7  correct?
8        "Answer: Yes.
9        "Question: Those improvements and features
10 were responsible for having greater impact on the market
11 than the Crown; correct?
12       "Answer: Yes, that's true."
13       MR. DESMARAIS: Your Honor, I'd like to at
14 this time just read a stipulation of fact and a discovery
15 response.
16       THE COURT: All right.
17       MR. DESMARAIS: Ladies and gentlemen, the
18 parties have agreed to the following for the purposes of
19 this case. I can put it on the Elmo, if it would be
20 easier.
21       Cordis has made, marketed and sold in the
22 United States BX Velocity, BX Sonic and Cypher coronary
23 stents, the accused coronary stents, and Palmaz Genesis
24 eight-cell N link X stent, seven-cell N link P stent,
25 and eleven-cell Y stent peripheral stents, the accused

Page 507

1  Cordis peripheral stents.
2        And also Cordis has answered the following
3  question, which is called an Interrogatory, which is
4  binding for the purposes of this case. And I will read
5  that to you now, too.
6        Does Cordis contend that differences exist
7  in the bare metal stent architectures used in the BX
8  Velocity, BX Sonic, and Cypher stents?
9        And the answer was no, there are no
10 differences.
11       With that, your Honor, I will turn it back
12 over to the Cypher side of the case.
13       THE COURT: All right. Thank you.
14       MR. CANADA: Good morning, ladies and
15 gentlemen of the jury.
16       Right now we're going to turn our attention
17 to the Helmus patent, and first up we're going to also
18 be reading in some deposition testimony. We're going to
19 be reading a 30(b)(6) deposition that was taken of a
20 gentleman named Dr. Rob Falotico, who works at Johnson &
21 Johnson. He was one of their principal scientists in
22 working on development of the Cypher product.
23       Dr. Falotico's deposition was taken in
24 October of last year. He's going to be talking about
25 some of the avenues that Johnson & Johnson went down

BSC-C 008047

# EXHIBIT 9
# REDACTED IN FULL

# EXHIBIT 10